AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☑ INDICTMENT
☐ SUPERSEDING

**OFFENSE CHARGED**

SEE PENALTY SHEET ATTACHMENT

☐ Petty
☐ Minor
☐ Misdemeanor
☑ Felony

PENALTY:
SEE PENALTY SHEET ATTACHMENT

E-filing

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA

**DEFENDANT - U.S.**

▶ KENT H. ROBERTS

DISTRICT COURT NUMBER

CR 07 0100 MHP

FILED FEB 27 PM 1:4[?]
RICHARD W. WIEKING
CLERK US DISTRICT COURT
N. DIST. OF CALIFORNIA

**DEFENDANT**

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☑ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges   } ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of institution _____

**PROCEEDING**
Name of Complaintant Agency, or Person (&Title, if any)

FBI

☐ person is awaiting trial in another Federal or State Court, give name of court _____

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District _____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y  ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under ▶

SHOW DOCKET NO. _____

MAGISTRATE CASE NO. _____

Has detainer been filed?   ☐ Yes   ☐ No   } If "Yes" give date filed _____

DATE OF ARREST ▶   Month/Day/Year _____
Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ▶   Month/Day/Year _____

Name and Office of Person Furnishing Information on THIS FORM   SCOTT N. SCHOOLS
☑ U.S. Att'y   ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)   CHRISTOPHER J. STESKAL, AUSA

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☑ WARRANT   Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____
Before Judge: _____

Comments:

## ATTACHMENT TO PENALTY SHEET

COUNTS ONE THROUGH THREE: 18 U.S.C. §§ 1341, 1343, 1346 and 2 (Mail and Wire Fraud; Deprivation Of Right To Honest Services; Aiding, Abetting and Willfully Causing)

20 years in prison; $250,000 fine; 3 years supervised release; $100 special assessment.

COUNT FOUR THROUGH SIX: 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, 18 U.S.C. § 2 (False SEC Filing; Aiding, Abetting and Willfully Causing)

20 years in prison; $5,000,000 fine; 3 years supervised release; $100 special assessment.

COUNT SEVEN: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, 17 C.F.R. § 240.13b2-1, and 18 U.S.C. § 2 (Falsifying Books, Records, and Accounts; Aiding, Abetting and Willfully Causing)

20 years in prison; $5,000,000 fine; 3 years supervised release; $100 special assessment.

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**
**CRIMINAL DIVISION**
VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

KENT H. ROBERTS

E-filing

# CR 07 0100 MHP

DEFENDANT.

---

# INDICTMENT

18 U.S.C. §§ 1341, 1343, 1346 - Mail and Wire Fraud;
15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5 - False SEC Filings;
15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff and 17 C.F.R. § 240.13b2-1-
Falsifying Books, Records, and Accounts;
18 U.S.C. § - Aiding and Abetting

---

A true bill.

_____ Foreman

Filed in open court this __27__ day of
__February, 2007__.

Brenda Tolbert
Clerk

Bail, $_____

MARIA-ELENA JAMES

| | |
|---|---|
| 1 | SCOTT N. SCHOOLS (SCBN 9990) |
| 2 | United States Attorney |



E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MHP

| UNITED STATES OF AMERICA, | ) CR 07 0100 |
|---|---|
| Plaintiff, | ) VIOLATIONS: 18 U.S.C. §§ 1341, 1343, |
| | ) 1346 – Mail and Wire Fraud; |
| v. | ) 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § |
| | ) 240.10b-5 – False SEC Filings; |
| KENT H. ROBERTS, | ) 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and |
| | ) 78ff and 17 C.F.R. § 240.13b2-1 – Falsifying |
| Defendant. | ) Books, Records, and Accounts; |
| | ) 18 U.S.C. § 2 – Aiding and Abetting |
| | ) |
| | ) SAN FRANCISCO VENUE |

INDICTMENT

The Grand Jury charges:

I. BACKGROUND

At all times relevant to this Indictment:

A. The Company

1.  McAfee, Inc. was a Delaware corporation with its headquarters in Santa Clara, California. Prior to June 2004, McAfee, Inc. was called Networks Associates, Inc., which was also a Delaware corporation with its headquarters in Santa Clara, California. For purposes of this indictment, the term "Network Associates" or "the company" will be used to refer to both McAfee, Inc. and Networks Associates, Inc.

2.  Network Associates was a provider of computer security solutions designed to prevent intrusions on networks and protect computer systems from a variety of threats and

1 attacks.

2     3.    Network Associates was a publicly held corporation whose stock was registered with the United States Securities and Exchange Commission (the "SEC") pursuant to Section 12(b) of the Securities and Exchange Act of 1934. Network Associates' shares originally traded on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") under the symbol "NETA." On February 12, 2002, Network Associates' shares began trading on the New York Stock Exchange ("NYSE") under the symbol "NET." After June 2004, its shares began trading on the NYSE under the symbol "MFE." The NASDAQ and NYSE are national securities exchanges that use the means and instrumentalities of interstate commerce and the mails.

    4.    As a public company, Network Associates was required to comply with regulations of the SEC. Those regulations are designed to protect members of the investing public by, among other things, ensuring that a company's financial information is accurately recorded and disclosed to the public.

    5.    Under SEC regulations, Network Associates and its officers also had a duty to: (a) make and keep books, records and accounts that fairly and accurately reflected the company's business transactions; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of reliable financial statements; (c) file quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) with the SEC; and (d) file statements of ownership (Forms 3, 4, and 5) which, among other things, reflect an officer's ownership of Network Associates' securities.

    6.    Network Associates' fiscal year ended on December 31. Network Associates independent auditor was PricewaterhouseCoopers ("PwC").

B. The Defendant.

    7.    Defendant KENT H. ROBERTS was employed as a lawyer within the legal department of Network Associates. On or about May 1, 1998, ROBERTS was hired by Network Associates as the Director of Legal Affairs. On or about February 14, 2000, ROBERTS was

INDICTMENT    -2-

1  promoted to Vice President, Legal Affairs. In or about 2001, ROBERTS became the General
2  Counsel and Secretary of Network Associates. ROBERTS' employment was terminated
3  effective May 30, 2006.

4      8.      ROBERTS was Network Associates' corporate compliance officer regarding SEC
5  reporting rules. Among other things, ROBERTS was responsible for assuring Network
6  Associates' compliance with various SEC reporting requirements, including the filing of SEC
7  forms (Forms 3, 4, and 5) which reflect an officer's ownership of Network Associates' securities.
8  In addition, as Secretary for the company, ROBERTS was responsible for creating and
9  maintaining the minutes of meetings of the Board of Directors of Network Associates (the
10 "Board"), including the minutes of meetings of the Compensation Committee of the Board.

11     9.      In or about 2002, ROBERTS became one of the three founding members of the
12 Ethics First Committee. The Ethics First Committee was designed in part to remedy past
13 internal control deficiencies which had led to financial restatements by Network Associates. The
14 Ethics First Committee was charged with investigating, among other things, any fraudulent
15 conduct reported by employees.

16     10.      ROBERTS was a lawyer licensed to practice law in Texas and Missouri. As an
17 employee and officer of Network Associates, and as a lawyer representing Network Associates,
18 ROBERTS owed both a fiduciary duty and a duty of loyalty to act in the best interests of
19 Network Associates and its shareholders, both financially and otherwise.

20     C. Stock Options And Relevant Accounting Rules.

21     11.      As ROBERTS knew, Network Associates used stock options to recruit and retain
22 qualified personnel. Those stock options gave employees the right to purchase Network
23 Associates' stock in the future at a set exercise or "strike" price.

24     12.      Network Associates' public filings represented that it accounted for its stock
25 option grants in accordance with generally accepted accounting principles ("GAAP"). GAAP
26 provided that a company was not required to record any compensation expenses for an employee
27 stock option grant where, among other things, the exercise price of the grant was equal to the
28 market price of the company's stock on the date of the grant. Such stock option grants are "at-

INDICTMENT                                -3-

1  the-money" because they have no intrinsic value on the date of the grant. In contrast, a company
2  was required to record a compensation expense for a stock option grant where the exercise price
3  of the grant was less than the market price of the company's stock on the date of the grant. Such
4  stock option grants are "in-the-money" because they have intrinsic value on the date of the grant.
5  Likewise, a company was required to recognize a compensation expense if it repriced an existing
6  stock option grant.

7  13.   ROBERTS knew that Network Associates would incur a compensation expense if
8  it granted in-the-money stock options or repriced an existing stock option grant with a more
9  favorable exercise price.

## II. THE SCHEME TO DEFRAUD

14.   Beginning in or about 2000 and continuing to in or about 2006, within the Northern District of California, and elsewhere, defendant KENT H. ROBERTS and others, knowingly and with the intent to defraud, devised and intended to devise a scheme and artifice to defraud Network Associates, its Board, its shareholders, its auditors, the public, and the SEC as to a material matter, to obtain money and property for themselves and others by means of materially false and fraudulent pretenses, representations, and promises, and to deprive Network Associates and its shareholders of their intangible right to his honest services.

15.   It was part of the scheme and artifice to defraud that ROBERTS and others, directly and indirectly:

   a.   made, and caused to be made, fraudulent changes to an existing stock option grant so as to reduce the exercise price of that grant without proper approval and without the knowledge of Network Associates' management or Board;

   b.   concealed and failed to disclose the fraudulent changes to the existing stock option grant;

   c.   made, and caused to be made, a false entry in Board meeting minutes that purported to reflect a grant date for a stock option grant when the closing price of Network Associates' stock was relatively low, when in fact the Board did not intend to make the grant effective on that date;

INDICTMENT                              -4-

1          d.    made, and caused to be made, fraudulent entries into Network Associates'
2  books and records;

3          e.    filed, and caused to be filed, materially false and misleading filings with
4  the SEC.

5      16.    The object and purpose of the scheme to defraud were to grant ROBERTS and
6  others valuable in-the-money stock options while hiding the true nature and value of the stock
7  option grants from Network Associates, its Board, its shareholders, its auditors, the public, and
8  the SEC and while avoiding the recognition of a compensation expense in Network Associates'
9  financial statements.

10     A.   Roberts' Fraudulent Change To His February 2000 Promotion Grant.

11      17.    It was part of the scheme and artifice to defraud that, beginning in or about 2000,
12  ROBERTS fraudulently granted himself extra compensation by causing the grant date for his
13  stock option grant to be changed in Network Associates' books and records so that the exercise
14  price of the grant would be lower and so that it appeared that the grant was made on the new
15  fabricated grant date.

16      18.    In connection with ROBERTS' promotion to Vice President of Legal Affairs, the
17  Board granted Roberts the option to purchase 20,000 shares of Network Associates' stock. The
18  Board approved the grant on July 13, 2000. The Board minutes from the July 13, 2000 meeting
19  stated that the grant date for ROBERTS' promotion grant was February 14, 2000, which was the
20  date his promotion became effective. The strike price for the grant was $29.62, the closing price
21  for Network Associates' stock on February 14, 2000. The options would vest over a four year
22  period. They would expire after ten years.

23      19.    Network Associates used a computer system called "Transcentive" to record
24  stock option grants to employees, including the number of options issued to each employee, the
25  grant date for each grant, and the exercise price for each grant. The Transcentive system was
26  also used to generate reports relating to stock options for financial reporting purposes.

27      20.    In late 2000, after the Board approved the February 2000 promotion grant,
28  ROBERTS was concerned that the grant was "underwater," that is, the $29.62 exercise price of

INDICTMENT                            -5-

1  the stock option grant was more than the market price for Network Associates' stock. According
2  to ROBERTS, he caused Network Associates' then-Controller to change the grant date and
3  exercise price for the grant in the Transcentive system so that the exercise price would be lower.
4  In particular, he caused the grant date to be changed to April 14, 2000, and he caused the
5  exercise price to be changed to $19.75, which was the closing price of Network Associates'
6  stock on the new, fabricated grant date.

7  B.  Roberts' Fraudulent Concealment Of His Altered Stock Option Grant.

8  21.  It was further part of the scheme and artifice to defraud that, beginning in or about
9  2000 and continuing to in or about May 2006, ROBERTS fraudulently concealed and failed to
10 disclose the fraudulent change he caused to be made to his February 2000 promotion grant.

11 22.  Beginning in or about February 2002, after ROBERTS caused the then-Controller
12 to alter his February 2000 promotion grant, ROBERTS began an investigation into allegations
13 that the same then-Controller had, among other things, caused the exercise price for stock
14 options granted to certain consultants to be lowered within the Transcentive system. As a result
15 of the investigation, ROBERTS recommended, and Network Associates' management agreed, to
16 remove the then-Controller from his position in the finance department.

17 23.  Beginning in or about March 2002, Network Associates retained Deloitte &
18 Touche ("D&T") to conduct an internal audit of Network Associates' stock option granting
19 practices. As ROBERTS knew, D&T determined that Network Associates was required to
20 record a compensation expense because of the then-Controller's conduct relating to stock
21 options. D&T did not discover the fraudulent changes to ROBERTS' February 2000 promotion
22 grant. As ROBERTS knew, the results of the D&T internal audit were provided to PwC, the
23 company's independent auditor.

24 24.  On or about April 30, 2002, ROBERTS participated in a conference call with the
25 SEC. ROBERTS described his investigation into the then-Controller's conduct with respect to
26 stock options, the decision to remove the then-Controller from his position in the finance
27 department, and the compensation expense that Network Associates would take for the stock
28 options that the then-Controller repriced within the Transcentive system.

INDICTMENT                              -6-

1      25.    ROBERTS concealed and failed to disclose to Network Associates' management,
2  its Board, D&T, PwC, and others that the then-Controller – who had been removed from his
3  position in the finance department for his conduct relating to stock options and who had caused
4  Network Associates to report a compensation expense as a result of that conduct – had changed
5  the exercise price and grant date of ROBERTS' February 2000 promotion grant.
6      26.    In May 2006, Network Associates' finance department discovered the fraudulent
7  change to ROBERTS' February 2000 promotion grant. Network Associates terminated
8  ROBERTS' employment shortly thereafter.
9      C.   <u>Roberts' Fraudulent Change To The Then-CEO's January 2002 Stock Option Grant.</u>
10      27.    It was further part of the scheme and artifice to defraud that in or about 2002,
11  ROBERTS made a false entry in Board meeting minutes that purported to reflect a grant date for
12  a stock option grant to the then-Chief Executive Officer ("CEO") and Chairman of Network
13  Associates when the closing price of Network Associates' stock was relatively low, when in fact
14  the Board did not intend to make the grant effective on that date.
15      28.    On January 15, 2002, the Compensation Committee for Network Associates'
16  Board met and granted to the then-CEO the option to purchase 420,000 shares of Network
17  Associates' stock, among other things. As ROBERTS knew, the Board intended for the grant to
18  be made on January 15, 2002 and for the exercise price for the grant to be the closing price of
19  Network Associates' stock on January 15, which was $27.19.
20      29.    On January 16, 2002, ROBERTS decided to price the then-CEO's stock option
21  grant at the closing price of Network Associates' stock on January 16, 2002, which was $25.43.
22  The stock option grant was then entered into the Transcentive system with a grant date of
23  January 16, 2002 and an exercise price of $25.43.
24      30.    ROBERTS then prepared minutes of the January 15, 2002 meeting of the
25  Compensation Committee of Network Associates' Board that included the following false
26  description of the stock option grant to the then-CEO: "The Committee directed that [the then-
27  CEO] be granted an additional stock option for 420,000 shares on January 16, 2002 at the
28  closing price on that date."

INDICTMENT                               -7-

1  D. The False And Misleading Filings With The SEC.

2  31. It was further part of the scheme and artifice to defraud that ROBERTS made and
3  caused to be made false and misleading filings with the SEC, including the following:

4  a. On or about January 10, 2002, Network Associates filed a Form 3 with the
5  SEC that, among other things, reported that ROBERTS was granted the option to purchase
6  20,000 shares of Network Associates' stock with an exercise price of $19.75 per share.

7  b. On or about May 10, 2002, Network Associates filed a Form 4 with the
8  SEC that, among other things, reported that the then-CEO was granted the option to purchase
9  420,000 shares of Network Associates' stock with an exercise price of $25.43 per share.

10  c. On or about May 15, 2002, Network Associates filed a Form 10-Q with
11  the SEC for the fiscal quarter ended March 31, 2002 that, among other things, reported
12  compensation expenses associated with stock option grants and the then-Controller's conduct,
13  but failed to disclose Roberts' conduct and compensation expenses in connection with other
14  stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002
15  grant.

16  COUNTS ONE AND TWO:  18 U.S.C. §§ 1341, 1346 and 2 (Mail Fraud; Deprivation Of Right
17  To Honest Services; Aiding And Abetting)

18  32. Paragraphs 1 through 31 are realleged as if fully set forth here.

19  33. Beginning in or about 2000, and continuing up to in or about May 2006, within
20  the Northern District of California and elsewhere, for the purpose of executing a scheme and
21  artifice to defraud as to a material matter, to obtain money and property for himself and others by
22  means of materially false and fraudulent pretenses, representations, and promises, and the
23  concealment of material facts, and to deprive his employer Network Associates and its
24  shareholders of their intangible right to his honest services, defendant

25  KENT H. ROBERTS

26  did knowingly cause the following items to be delivered by a private and commercial interstate
27  carrier and U.S. mail according to the direction thereon:

28

INDICTMENT                                              -8-

| Count | Approximate Date | Description |
|---|---|---|
| ONE | January 9, 2002 | SEC Form 3 sent from Santa Clara, California to Washington D.C. reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share. |
| TWO | May 9, 2002 | SEC Form 4 sent from Santa Clara, California to Washington, D.C. reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43. |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

COUNTS THREE: 18 U.S.C. §§ 1343, 1346 and 2 (Wire Fraud; Deprivation Of Right To Honest Services; Aiding And Abetting)

34.   Paragraphs 1 through 31 are realleged as if fully set forth here.

35.   Beginning in or about 2000, and continuing up to in or about May 2006, within the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, to obtain money and property for himself and others by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, and to deprive his employer Network Associates and its shareholders of their intangible right to his honest services, defendant

KENT H. ROBERTS

did knowingly transmit and cause to be transmitted, by means of a wire communication, certain signs, signals, and sounds, that is:

| Count | Approximate Date | Description |
|---|---|---|
| THREE | April 30, 2002 | Interstate telephone conference call with the SEC including participants in Palo Alto, California and Washington, D.C. |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

///

///

///

///

INDICTMENT                              -9-

1  COUNTS FOUR THROUGH SIX:  15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, 18
2  U.S.C. § 2 (False SEC Filings; Aiding And Abetting)

3      36.    Paragraphs 1 through 31 are realleged as if fully set forth here.

4      37.    On or about the dates set forth below, in the Northern District of California and
5  elsewhere, defendant

6  <center>KENT H. ROBERTS</center>

7  did knowingly and willfully make and cause to be made materially false and misleading
8  statements and omissions in the following reports and documents required to be filed with the
9  SEC under the Securities and Exchange Act of 1934 and the rules and regulations promulgated
10 thereunder:

| Counts | Approximate Date of Filing | SEC Filing |
|---|---|---|
| FOUR | January 10, 2002 | SEC Form 3 reporting grant to Roberts of option to purchase 20,000 shares of Network Associates' stock with an exercise price of $19.75 per share, when in fact the exercise price should have been $29.62. |
| FIVE | May 10, 2002 | SEC Form 4 reporting grant to then-CEO of option to purchase 420,000 shares of Network Associates' stock with an exercise price of $25.43, when in fact the exercise price should have been $27.19. |
| SIX | May 15, 2002 | Form 10-Q for the fiscal quarter ended March 31, 2002 that, among other things, reported compensation expenses associated with stock option grants and the then-Controller's conduct, but failed to disclose Roberts' conduct and compensation expenses in connection with other stock option grants, including Roberts' February 2000 grant and the then-CEO's January 2002 grant. |

    All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

///
///
///
///

INDICTMENT                              -10-

1 | COUNT SEVEN: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, 17 C.F.R. § 240.13b2-1, and
2 | 18 U.S.C. § 2 (Falsifying Books, Records, and Accounts; Aiding And Abetting)

    38.    Paragraphs 1 through 31 are realleged as if fully set forth here.

    39.    On or about and between January 2002 and June 2002, in the Northern District of California and elsewhere, defendant

### KENT H. ROBERTS

did knowingly and willfully, directly and indirectly, falsify and cause to be falsified books, records, and accounts of Network Associates as to a material matter.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States Code, Section 2.

DATED: February 27, 2007                            A TRUE BILL

                                                                                FOREPERSON

SCOTT N. SCHOOLS
United States Attorney

MARK L. KROTOSKI
Chief, Criminal Division

(Approved as to form: _____)
                      AUSA Christopher J. Steskal
                      AUSA Timothy Lucey

INDICTMENT                          -11-