Volume 4

Pages 207 – 483

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

```
UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
   vs.                             )  NO. CR 07-0100 MHP
                                   )
KENT H. ROBERTS,                   )
                                   )  San Francisco, California
              Defendant.           )  Thursday
                                   )  September 18, 2008
_____    )
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

```
For Plaintiff:          DAVID L. ANDERSON
                        Acting United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                BY:  LAUREL BEELER, AUSA
                     TIMOTHY J. LUCEY, AUSA


For Defendant:          COOLEY GODWARD KRONISH LLP
                        Five Palo Alto Square
                        3000 El Camino Real
                        Palo Alto California 94306-2155
                BY:  STEPHEN C. NEAL, ESQUIRE
                     NEAL J. STEPHENS, ESQUIRE
                     SHANNON M. EAGAN, ESQUIRE
```

(Appearances continued on next page)

```
Reported By:   Katherine A. Powell, CSR #5812, RPR, CRR
               Belle Ball, CSR #8785, RMR, CRR
               Official Reporters – U.S. District Court
```

**APPEARANCES (CONTINUED):**

**For McAfee, Inc.:**      ORRICK, HERRINGTON & SUTCLIFFE
                           1000 Marsh Road
                           Menlo Park, California  94025
                    BY:    **LYNNE C. HERMLE, ESQUIRE**
                           **MARK COCHRAN, ESQUIRE**
                           WILSON, SONSINI, GOODRICH & ROSATI
                           650 Page Mill Road
                           Palo Alto, California  94304-1050
                    BY:    **ROD STRICKLAND, ESQUIRE**
                           **LEO P. CUNNINGHAM, ESQUIRE**


**For the Special**        Howrey, Inc.
**Committee:**             4 Park Plaza, Suite 1700
                           Irvine, California  92614-8557
                    BY:    **ROBERT E. GOODING, INC.**

1                    **P R O C E E D I N G S**

2  **SEPTEMBER 18, 2008**                        **8:35 A.M.**

3

4            (The following proceedings were held in open court,

5            outside the presence of the jury.)

6            **THE COURT:**  You've got your issue worked out?

7            **MR. LUCEY:**  No, Your Honor, we have not.

8            **THE COURT:**  When did this issue first arise?

9            **MR. LUCEY:**  This morning.

10        We had not received any further word from the defense

11  about what exhibits or any demonstratives they planned to use

12  this morning.  So I checked in with him this morning and he

13  indicated to me that they may refer to one exhibit --

14            **THE COURT:**  You were supposed to exchange all of this

15  so that was resolved, and not wait until now.

16            **MR. NEAL:**  I'm not using any demonstratives.

17        On Monday afternoon Mr. Stephens, Mr. Lucey and

18  Ms. Beeler, and I had a call.  In that call they asked whether

19  we were going to have demonstratives.  They had given theirs to

20  me.  I said, I'm not going to have any demonstratives but I may

21  use one of yours, and I may use one exhibit.

22        And I do intend to use one demonstrative that they're

23  going to use.  I want to be able to pull it back up and talk

24  about the same demonstrative in front of the jury.  And I told

25  him that on Monday, and he's objecting.

PROCEEDINGS

```
1            MR. LUCEY:  I don't recall any call to that effect.

2            THE COURT:  Hold on just a minute.

3            MR. LUCEY:  I apologize.  I don't recall any call we

4   discussed demonstratives.

5            THE COURT:  It's one you're already using in your

6   opening, right?

7            MR. LUCEY:  My view is -- this goes back to when I

8   was in law school.  We were taught about using demonstratives

9   during court.

10            Maybe I'm wrong about this, and if I am I apologize.

11   But I was always taught -- this is back in the days before

12   PowerPoint -- you put a billboard up to publish to the jury

13   during your opening or closing or as a demonstrative during

14   trial.  You use it and take it down.

15            If you leave it up, the other side is free to comment

16   on it and mark it up, do what they wish.  And I totally agree

17   with that.

18            THE COURT:  You are getting to be silly now.  If

19   you're going to use it, then they can use it.

20            MR. LUCEY:  Okay.

21            THE COURT:  If this was a whole bunch of things we

22   hadn't seen before and it wasn't exchanged, no.  But that's

23   really --

24            MR. LUCEY:  Fair enough.  I respect your ruling, Your

25   Honor.
```

1          **THE COURT:**  Whether you respect it or not, that's the

2   ruling, okay.

3          (Jury enters at 8:38 a.m.)

4          **THE COURT:**  We're standing for you.  You may be

5   seated.

6          Good morning, ladies and gentlemen.

7          (The jurors respond affirmatively.)

8          **THE COURT:**  Everybody have pads and pencils who wants

9   to have them?

10          Okay.  And I'm very sorry about yesterday and the

11   false start, but we did get some matters resolved and so now we

12   are on our road forward.

13          And the first thing we're going to do is ask all of

14   you to stand, please, and raise your right hands and be sworn.

15          (Whereupon, the jury was given the oath.)

16          **THE COURT:**  You may be seated.

17          The first thing that we're going to do is, I'm going

18   to give you some of the instructions as to the law that applies

19   in this case.

20          Is this on?

21          **THE CLERK:**  Yes.

22          **THE COURT:**  Okay.  I can't tell.

23          Not all of them.  At the end of the trial I will give

24   you all of the instructions that apply.  And at that time,

25   also, when you go back to deliberate we will give them to you

1   in writing.  So when you go to deliberations, you will have

2   them in writing.

3          And I would suggest to you that you don't try to take

4   these down now.  Just listen to them.  And you'll see there may

5   be some legal fufu involved but, on the other hand, most of it

6   is just good common sense.  But there are things that I need to

7   tell you about.

8          And during the course of the trial there may be other

9   instructions that will be applicable, and I'll give those to

10  you at that time.  And then at the end we'll have the whole set

11  of instructions.

12         But I think it's better, for the instructions, not to

13  try to copy them down because you're going to hear them again

14  at the end of the trial and then you're going to have the

15  written ones with you in the jury room.

16         The instructions are the law that applies to this

17  case.  Some of the instructions relate to your responsibility

18  as jurors.  They relate to what is evidence and not evidence.

19  They relate to the actual substantive counts that are involved

20  in this case.

21         But I'm giving these to you because at the outset it

22  gives you some guidance as to what to look for, but keeping in

23  mind that a full set of instructions with definitions and other

24  kinds of elaborations will be given to you at the end of the

25  trial.

1           Now let's talk about what happens when -- when we

2    start the trial, because right after the instructions counsel

3    will be making their opening statements to you, and then we

4    will have the evidentiary portion of the trial, and then we

5    will have at the close of the trial a complete set of the

6    instructions, and then the attorneys will make their arguments

7    to you and then you will go back and deliberate.  And I want to

8    talk about that in the context of what is and what is not

9    evidence also.

10          But, first of all, you've just taken an oath.  That

11   makes you jurors in this case.  In fact, it makes you the trier

12   of fact.  You are judges also.  You are judges of the fact.

13   And your job as -- duty as jurors is to find from all of the

14   evidence that is admitted into the case and the evidence that

15   you believe you find persuasive, applying the law to those

16   facts to come to your verdict in this matter.

17          You shouldn't take anything that I say or do in the

18   course of the trial to indicate what I think you should find.

19   But you do have to follow the law as I state it to you.

20          If you think that particular, you know, aspect of the

21   law is -- you'd like to see that changed, well, this is not the

22   place to do that.  You have to follow that.

23          You can write to Congress and tell them the problems

24   you had with it after the trial is over.  But -- or even while

25   the trial is going on, I guess.  But, on the other hand, you

1    must follow the instructions as to the law that I give you.

2          Counsel will be only too happy to tell you that if

3    I'm wrong in any measure there's an appellate court that has

4    three judges on it, and they'll tell me if I'm wrong.

5          This is a criminal case, as you know.  We've talked

6    about that.  It's brought by the United States government so

7    the case is entitled United States versus, and in this case the

8    defendant is Kent H. Roberts.

9          The government charges Mr. Roberts with mail fraud

10   and falsifying company books, records and accounts.  The

11   charges against Mr. Roberts are contained in the indictment.

12         This is a copy of the indictment (indicating.)  I'm

13   not going to read the entire indictment to you.  You'll hear

14   about the facts of the case from the witnesses on the stand.

15   But I will tell you a couple of things about the charges

16   contained in the indictment in just a moment.

17         To the indictment the defendant has entered a plea of

18   not guilty.

19         A defendant in a criminal case is always presumed to

20   be innocent, and presumed to be innocent unless and until he is

21   proven guilty by proof beyond a reasonable doubt.

22         The indictment is not evidence against the defendant.

23   It's just a description of the charges, merely telling him and

24   us what he is charged with.  It's not evidence of anything.

25         The defendant, as I said, is presumed innocent, and

1   he has the right to remain silent, and never has to prove

2   innocence or present any evidence at all.

3          Now, I said to you that guilt must be proved by the

4   government by proof beyond a reasonable doubt.  Proof beyond a

5   reasonable doubt is proof that leaves you firmly convinced that

6   the defendant is guilty.

7          It is not required that the government prove guilt

8   beyond all possible doubt.  A reasonable doubt is a doubt based

9   on reason and common sense, and not based purely on

10  speculation.  It may arise from a careful and impartial

11  consideration of all the evidence or from a lack of evidence.

12         If after a careful and impartial consideration of all

13  the evidence you are convinced beyond a reasonable doubt that

14  the defendant is guilty, it is your duty to so find.

15         If after a careful and impartial consideration of all

16  the evidence, however, you are not convinced beyond a

17  reasonable doubt that the defendant is guilty, it is your duty

18  to find the defendant not guilty.

19         You should also keep in mind in this case that there

20  are three counts in the indictment.  And some of the

21  instructions will apply to the first two counts because they're

22  similar.  And some other instructions will apply to the third

23  count.

24         But each count is entitled to and you are required to

25  give it your separate consideration.  So that a defendant may

 1  be found guilty on one count and not guilty on another.

 2          The fact that the defendant is found guilty or not

 3  guilty on one count does not indicate how you should find as to

 4  the other counts.  You have to weigh the evidence as to each

 5  count and as it applies to each count.

 6          Now, the trial that we are about to start upon, the

 7  first thing that we're going to hear after these instructions

 8  is the opening statement of the government.  And then we will

 9  hear an opening statement -- are you making an opening

10  statement at the outset, or reserving?

11          **MR. NEAL:**  We're going to make one this morning, Your

12  Honor.  Thank you.

13          **THE COURT:**  Okay.  The opening statements -- now I'm

14  going to tell you what they are not.

15          The opening statements are not evidence.  They're not

16  the evidence in the case, and they may not be considered as

17  evidence.  It's up to you to decide the case based upon what we

18  hear in the evidentiary portion of the trial.

19          But the opening statements are important because they

20  give you sort of a roadmap, an idea of what, you know, the

21  evidence is going to look like, how it's going to come in and

22  unfold.

23          Because every witness who testifies may not

24  necessarily be testifying about things in a chronological

25  order.  He or she gets on the stand and testifies about that

1   which they know, and leaves.  So you're going -- this gives you

2   a framework in which to sort of put the pieces together as you

3   listen to the testimony.

4         So the opening statements are very important.  The

5   arguments at the end of the trial also are not evidence.  And

6   anything that the lawyers say in the course of the trial is not

7   evidence.

8         The questions are not evidence.  They supply meaning

9   to the answer.  But it's the answers that are given that really

10  are the evidence in the case.  And you have to decide what

11  answers you will believe, what answers you won't believe, how

12  much weight you will give to it.  I'll go over that in a

13  moment.  But the statements of the attorneys are not evidence.

14        Now, occasionally the attorneys will enter into a

15  stipulation.  In other words, they'll agree that something may

16  have happened on a certain date.  And they agree to that.  And

17  you deem that is a fact that is found.  And you'll be told if

18  there is such a stipulation.

19        What is evidence in the case is what witnesses

20  testify to, what exhibits are admitted into evidence.  And

21  those are the things that you are to consider in determining

22  what facts you find when you apply the law to those facts.

23        Now, I have told you somewhat of what is and is not

24  evidence.  There's also a part of the process that can be a bit

25  distracting.  And so I want to explain something that happens

1   when evidence comes in.

2           You'll hear objections from the attorneys.  I'm not

3   sure how many of them you'll hear and how frequently, if we're

4   going to be peppered with them or if there are going to be few

5   objections at all.

6           Now, it doesn't happen quite as dramatically as

7   you've seen on the shows on television, so you won't be seeing

8   people waiving their arms, I trust, and yelling "objection."

9           But they're important, and it's not a lawyer's clever

10  way of hiding things from us.  It's because when a lawyer

11  objects he or she believes there is a rule of evidence that

12  tells us that that particular evidence is not admissible.

13          Now, I may agree with them or not, but I have to make

14  that call.  So if I sustain an objection, it means the question

15  may not be answered or at least not in that form.  Maybe

16  there's another way of asking the question that's -- that is

17  proper.  If I overrule the objection, then that means that the

18  question may be asked and answered.

19          Now, during the course of this something else happens

20  that is a little more difficult, but you have to -- you have to

21  comply with this rule.

22          Once in a while a question will be asked and a

23  witness will answer.  And either the answer is not responsive

24  or something is wrong that requires one of the attorneys to

25  move to strike the answer.

1    If I do that, then you may not consider that as

2 evidence.  So I will -- you know, I will say, you know, either

3 the motion is granted, the answer is stricken, and most of the

4 time will probably tell you that you are to disregard the

5 answer.  And that's exactly what you have to do.

6    Now, you may have thought, "The answer was good

7 information, I'd like to have that."  But that's not how you

8 treat it.  You just have to disregard it as if it were never

9 said.

10    Nor should you speculate as to the reason for

11 objections that counsel may have.  And you may think, well, she

12 should have let that question be asked.  Again, that's

13 something you're going to have to abide by my rulings and not

14 speculate as to what the answer may have been.

15    So testimony that you've been told to disregard is

16 not evidence in the case and you may not consider it.

17    Also, there is evidence that sometimes comes in for a

18 limited purpose.  In other words, it may come in not for the

19 truth of what is actually stated -- won't get into all the

20 myriad of rules about hearsay -- but it may come in for the

21 purpose of explaining somebody's state of mind, for example.

22 So if it comes in for a limited purpose, I will tell you that

23 as well.

24    Also what is not evidence is anything you see or hear

25 that is done outside the courtroom when we're not in session.

1   And, in fact, as I mentioned to you, I think, yesterday or the

2   day before -- I guess it must have been the day before, that if

3   anyone is talking about the case out in the hallway you are not

4   to listen to it.  Move away, please.

5          If anyone approaches you for any reason and tries to

6   talk with you about the case, you're not to talk about the

7   case.  And if that happens, please report it either to

8   Mr. Bowser or myself because that is not supposed to happen.

9          You are jurors who are supposed to decide this case

10  just based upon the evidence that you hear in this court.  And

11  that's the only fair way to do it, so that you're all deciding

12  the case from the same body of evidence.

13         Now, I think one of the -- well, let me talk to you

14  about one thing.  Direct and circumstantial evidence.  You've

15  heard those terms, I'm sure.  But let me explain to you how we

16  define them.

17         Direct evidence is evidence of something that

18  somebody has seen or heard or done, and something that they are

19  personally a witness to.

20         Circumstantial evidence is indirect evidence.  It's

21  proof of one or more facts from which you can find another

22  fact.

23         The thing you should keep in mind with respect to

24  circumstantial evidence is that the underlying facts must be

25  proved, and the inferences that you draw in order to reach a

1  conclusion about what you can infer from those facts must be a

2  reasonable one.

3          You're entitled to consider both direct and

4  circumstantial evidence.  The law permits you to give equal

5  weight to both.  But it's for you to decide how much weight you

6  will give to any evidence.

7          I think the most important reason for having jurors

8  in cases -- because if you didn't have jurors then judges would

9  have to do it and that's only one person -- you bring together

10 your collective wisdom in deciding the case.  And you all have

11 different experiences.  You come from different backgrounds.

12 And you have different feelings about things, and so forth.

13         But you have to decide the credibility of the

14 witnesses.  And that is really critical and important to have a

15 body such as yourself to do that.

16         It's for you to decide what testimony you will

17 believe, what testimony you will disbelieve.  You may believe

18 everything a witness says, nothing a witness says, some of it.

19         And here are some factors you can consider in

20 deciding what witnesses you will believe or the credibility and

21 weight you will give to their testimony:

22         What was the opportunity and the ability of the

23 witness to see or hear or know the things about which the

24 witness testifies?

25         What is the quality of the witness's memory?

1            What is the witness's demeanor or manner while

2   testifying?

3            What is the witness's interest or outcome -- in the

4   outcome of the case, and any bias or prejudice that that

5   witness may have?

6            Is there other evidence that contradicts the

7   witness's testimony, or other statements that indicate that the

8   witness has said something different than what the witness is

9   testifying to?

10            What is the reasonableness of the witness's testimony

11   in light of all of the evidence?  And we have the catchall, any

12   other factors that you believe bear on believability?

13            The weight of the evidence as to a fact does not

14   necessarily depend on the number of witnesses on either side.

15   It is what you believe with respect to the weight of their

16   testimony.  And the weight -- one witness's testimony may be

17   sufficient for you.

18            I've told you that, I think, but in any event I will

19   tell you again, there's going to be no transcript of the trial

20   as such.  I mean, even though they are taking down every word

21   here, when it comes time for you to deliberate there won't be

22   somebody available, necessarily, to read back testimony.

23            So whether you want to try to remember it just by

24   listening or whether you want to take notes, that's up to you.

25   But it's important that you pay close attention because there

1  will not generally be a transcript -- there will not be a

2  transcript available for you.

3         Also, if you wish to take notes you are free to do

4  that.  You've got the equipment to do it.  And that's up to

5  you.  Don't be overly influenced by somebody who takes notes

6  next to you, is writing copious notes.

7         You can decide you are going to remember things and

8  have ways of refreshing your own recollection about what was

9  testified to.

10        But the notes are for your own personal use.  They

11 are not to be shown to any other jurors or any other persons.

12 They are to be left at the end of the day in an envelope that

13 you've been given in the jury room.  And then at the end of the

14 trial you may take them home.

15        But, also, an important thing to realize in taking

16 notes is don't be distracted in trying to take everything down,

17 also, because sometimes -- you know, body language is

18 important, we're told; the witness's demeanor on the stand.

19 And so it's important to keep an eye on the witnesses as the

20 witness is testifying, and not get so engrossed in taking notes

21 that you may miss something.

22        Now, a little bit about this case, because those are

23 the general kind of instructions that apply in any criminal

24 case.

25        Throughout this trial you may hear Mr. Roberts'

1    employer or former employer referred to as either Network

2    Associates or McAfee.  Prior to June 30 of 2004, McAfee was

3    known by the name Network Associates.  So when you hear the

4    names "Network Associates," "McAfee," or the general term "the

5    company" is used, they are all referring to the same company.

6            Now, with regard to the counts that are charged in

7    the indictment, there are three counts.  The first two counts

8    are characterized with the shorthand of "mail fraud."  The

9    third count is a count which is based upon the securities laws

10   of the United States, and claims a violation -- or charges a

11   violation of those laws regarding falsifying books and records.

12           And, in fact, the indictment, when you see the

13   indictment, ultimately, and you'll have it when you go back to

14   the jury room for your deliberations, you will see that there's

15   a discussion of the backgrounds of how the government says

16   these things occurred.  There is what's alleged as the scheme

17   to defraud, and then there are the counts themselves.

18           Now, also, keep in mind again, if you have the

19   indictment in the jury room, that it's not the facts in the

20   indictment.  So don't spend a lot of time with that.

21           As a matter of fact, I'll talk with counsel about

22   whether we should delete some things so you just have what the

23   counts themselves are.

24           It's the facts that you hear from the witnesses and

25   from the evidence that tell you whether or not the government

1  has proven the charges beyond a reasonable doubt.  So what is

2  said in the indictment is just, as I said, to put the defendant

3  on notice of what the defendant is charged with.

4        So count -- Counts One and Two are the mail fraud

5  counts.  And they charge that Mr. Roberts did knowingly cause

6  the following item to be placed in a post office, an authorized

7  depository for mail, and sent or delivered by a private or

8  commercial carrier according to the directions thereon.

9        Count One involves one particular mailing,

10  approximate date January 9, 2002.  And that's an SEC form sent

11  from Santa Clara, California, to the SEC in Washington, and

12  filed on January 10, 2002.

13        And I assume means filed with the SEC, correct?

14        **MR. LUCEY:**  Correct, Your Honor.

15        **THE COURT:**  Count Two is on April 30, 2004, a rule

16  10b5 trading plan -- that's a 10b5-1 is under the securities

17  laws and regulations.  That's something that is required to be

18  filed -- dated April 30, 2004, and sent from Plano, Texas to

19  UBS in San Francisco.

20        Count Three charges a violation of the securities

21  laws with respect to false books and records, and charges that

22  on or about January 10, 2002, Mr. Roberts did knowingly and

23  willfully make and cause to be made materially false and

24  misleading statements and omissions in the following reporting

25  document required to be filed with the SEC under the Securities

1   and Exchange Act of 1934, and the rules and regulations

2   promulgated thereunder.  And that is the SEC Form 3 sent from

3   Santa Clara, California to the SEC in Washington.

4           Now, in order for the government to prove these

5   charges, what the government must prove beyond a reasonable

6   doubt -- and these are the elements, and they will be given to

7   you.  Again, you'll have these instructions during your

8   deliberations so you can follow them along and see what must be

9   proven.

10          First, that Mr. Roberts made up a scheme or plan for

11  obtaining money or property by making false promises or

12  statements, which all of you will agree upon -- agreeing on at

13  least one particular false promise or statement that was made.

14          Now, the government may have alternative theories on

15  which they attempt to prove this particular count, and you'll

16  hear about those maybe in their opening statements, and we'll

17  talk about them more with the closing instructions.

18          The second thing that must be proven after the plan

19  or scheme devise with all of you agreeing on at least one false

20  promise or statement.

21          Number two is, Mr. Roberts knew that the promises or

22  statements were false.

23          Third, that the promises or statements were material

24  and that they would reasonably influence a person to depart

25  with money or property.

1          Fourth, Mr. Roberts acted with the intent to defraud.

2          And, fifth, Mr. Roberts used or caused to be used the

3 mail to carry out or attempt to carry out an essential part of

4 the scheme.

5          Now, I'm not going to give you all the definitions

6 about mailing and so on and so forth.  You'll get those at the

7 end of the trial.

8          Those instructions apply to both Counts One and Two.

9 But as you'll see from Counts One and Two, as I read, involve

10 different mailings and different dates.

11          Count Three charges a file violation with respect to

12 the false books and records.  And in order to establish this

13 offense the government must prove the following beyond a

14 reasonable doubt:

15          First, that Mr. Roberts was an employee of a company

16 that had a class of securities registered pursuant to a

17 particular section of the U.S. Code, where reports -- that

18 requires reports be filed with the SEC.

19          Second, that McAfee was required to make and keep

20 books, records and accounts which in reasonable detail

21 accurately and fairly reflect the transactions and dispositions

22 of the assets of McAfee.

23          Third, Mr. Roberts directly or indirectly falsified

24 or caused to be falsified any such book, record or account of

25 McAfee.

1       And, fourth, Mr. Roberts acted knowingly and

2  willfully.

3       And, again, there will be more definitions at the end

4  of the closing instructions.

5       Counsel, are there any other instructions you

6  anticipated that I give that I have not given?

7            **MR. NEAL:**  No, Your Honor.

8            **MR. LUCEY:**  No, Your Honor.

9            **THE COURT:**  Are you ready?

10            **MR. LUCEY:**  Yes, Your Honor.

11            **THE COURT:**  Mr. Lucey.

12                          **OPENING STATEMENT**

13            **MR. LUCEY:**  Good morning, Your Honor.  Good morning,

14  everyone.

15       We are here today because this man (indicating), Kent

16  Roberts, tried to cheat his own company.  The evidence will

17  show that the Defendant altered his company's own books and

18  records in order to get an extra $200,000 in compensation.

19  And that when he was about to get caught, he admitted it.

20       Now, what did he do?  Let's go back to the year 2000,

21  to Valentine's Day of the year 2000.  At that point, the

22  Defendant had been working for the company McAfee for about two

23  years.  And as some of you may know, McAfee is based down in

24  Silicon Valley, in Santa Clara.  It makes software designed to

25  keep computers safe from viruses and computer hackers.

1          Now, on February 14th of the year 2000, McAfee

2   promoted the Defendant.  And what kind of work did the

3   Defendant do for his company, McAfee?  Was he an engineer?  A

4   software designer?  Was he in sales?  No, ladies and gentlemen,

5   he was a lawyer.  He was a lawyer for his company, McAfee.  And

6   on that day, February 14th, 2000, he was promoted to be the

7   company's top lawyer.  The vice-president of legal affairs.

8          Now, the promotion that the Defendant got that day

9   carried with it, as you might expect, a few perks.  Some

10  incentives.  First of all, it carried with it a bump-up in

11  salary.  A new title for the Defendant, vice-president of legal

12  affairs.  And, some stock options.

13         Now, some of you may be thinking, "What is a stock

14  option?  I've heard that term tossed around, but what is a

15  stock option?"  You will hear testimony during this trial in

16  detail about what a stock option is.  How they work, and how

17  they are just another form of compensation.

18         Simply put, a stock option gives a person a right to

19  buy stock, oftentimes awarded to employees, so, the right to

20  buy the company's stock at a fixed price for a fixed period of

21  time.  Even if the price changes relative to everyone else's

22  opportunity to buy that stock.  Obviously, the higher the price

23  goes of the stock over time, the more valuable the option

24  becomes.  And the lower the price of the stock, the less

25  valuable that right to buy -- buy the stock becomes.

1          Now, let's think about it a different way for a

2   moment, in more practical terms, in more real-world terms.  A

3   stock option can be compared to a gas card.  A gas card that

4   allows you to buy, for example, 50 gallons of gas, today, at,

5   say, $4 a gallon, but you can't use that gas card for six

6   months.

7          Now, if the price of gas goes up to, say, $5 a

8   gallon, then your gas card is now pretty valuable.  Because you

9   can buy gas at $4 a gallon after six months, where everyone

10  else is paying $5 a gallon for that same gallon of gas.

11  However, if the price of gas were to go down to let's say $3 a

12  gallon, then your gas card has now become essentially

13  worthless, because you can buy gas at $3 a gallon just like

14  everyone else.  The gas card which allows you to buy it at $4 a

15  gallon really doesn't mean very much.

16         Now, so back to the Defendant, and back to the issue

17  of stock options.  On February 14th, 2000, McAfee awarded the

18  Defendant 20,000 stock options.  That was a -- at the price of

19  $29.63.  That price was a closing price for that day of McAfee

20  stock when it closed on the stock exchange on February 14th.

21         So, the Defendant received on February 14th, 2000, a

22  promotion, and some stock options.  All in all, a pretty good

23  day for the Defendant.  Well, by late 2000, by November, 2000,

24  McAfee's stock price had fallen from that $29 price we referred

25  to a moment ago all the way down to about $14 a share.  So at

1   this point, the Defendant's options were now worthless, until

2   the share price went all the way back up to nearly $30 per

3   share.

4            And what did the Defendant do at that point?  You

5   will hear testimony and the evidence will show that in the year

6   2006, after the company had started an investigation, the

7   Defendant admitted to his own company that the date had been

8   changed on his option grant by roughly ten full dollars from

9   $29.63 to $19.75, that he knew it was wrong, and that he was

10  sorry about it.

11           And what does that change mean in very practical,

12  real terms?  Well, 20,000 options with a difference of

13  approximately $10 amounts to a change to the Defendant of

14  roughly $200,000.

15           Now, ladies and gentlemen, before I go any further, I

16  want to make an important point to follow up on what Judge

17  Patel has just talked about, and instructed you about.  Those

18  of us at this table who represent the United States of America

19  have a burden of proof.  We have the burden of proof in this

20  case.  And that means the Defendant is presumed innocent, and

21  that we have to prove at this table that the Defendant is

22  guilty of the crimes charged against him, beyond a reasonable

23  doubt.

24           Now, ladies and gentlemen, that's not just some

25  sound bite for you to consider this morning.  That is the

1  cornerstone of our system of justice.  And it's something that

2  protects each one of us.  But, ladies and gentlemen, we will

3  carry this burden in this trial, by showing you documents from

4  the Defendant's time at his company, McAfee, from his own

5  personnel file, his own e-mail, his own notebooks.  We will

6  show you documents from the company's own records regarding

7  stock option grants.

8           You will hear testimony from the Defendant's

9  co-workers who will tell you about the Defendant's job, his

10  duties, and responsibilities to his company.  They will tell

11  you about their interactions with the Defendant.  And you will

12  hear testimony from people who will tell you about what the

13  Defendant told them and said to them when he admitted in the

14  year 2006 that the price on his own stock option grant had been

15  changed in the year 2000.

16           You will hear evidence that once he became his

17  company's top lawyer, the vice-president for legal affairs, he

18  became responsible for all legal matters within the company.

19  All litigation.  All sales contracts.  You will hear evidence

20  that he was eventually put in charge of what was deemed within

21  the -- deemed and called within the company the company's

22  Ethics First Program.  A training program for employees within

23  McAfee designed to stop fraud.  Designed to promote honesty and

24  integrity within McAfee.  He was the one in charge of making

25  sure his fellow employees knew about the law, and knew how the

1  law related to doing their jobs in a lawful way.  And he was in

2  charge of making sure they obeyed the law.

3          So, ladies and gentlemen, what is the Defendant

4  charged with in this trial?  Well, the Defendant is charged

5  with violating two different laws.  First of all, he's charged

6  with violating the laws relating to mail fraud.  And he's also

7  charged with falsifying books and records of his company.

8          Now, you will be instructed later by Judge Patel

9  about the elements and particulars of each of those charges.

10 But for now, ladies and gentlemen, let's think about them this

11 way.  Mail fraud is simply using the mails, the Postal Service,

12 Federal Express, UPS, to send documents that contain lies in

13 the documents, in order to get something valuable, like for

14 example, money, or in order to cheat your own company and deny

15 your company your honest services.

16         Now, the second charge, the second type of charge,

17 falsifying books and records, applies when a defendant alters

18 or changes information in his company's business records.

19 Records like -- relating to employee salary and employee stock

20 options.

21         You will also hear evidence about how stock options

22 work during this trial, including testimony about the rules --

23 as to about who approves stock options within the company, and

24 how those records are kept.

25         You will also hear evidence, ladies and gentlemen,

1  that in the year 2000, McAfee kept track of all its stock

2  options on a database, on a computer database, and the

3  database, which was called at that time Transcentive, was used

4  to create an electronic record of each grant of stock options

5  made to McAfee employees.  The evidence will show that this is

6  a computer system that the Defendant admitted had been accessed

7  in order to lower his option by approximately ten full dollars.

8          And the evidence will show that the records of the

9  Transcentive system reveal that on November 29, 2000, an entry

10 was made on that system showing that the Defendant was granted

11 20,000 shares, not on February 14th, 2000, the date of his

12 promotion to Vice President of Legal Affairs, his company's top

13 lawyer, at the price of $29.63, but instead, it was then noted

14 on the system that the stock option grant was awarded as of

15 April 14th, 2000, at the price of $19.75.

16         So again, at this point let's stop and think about

17 the stock options and that change, going back to our gas card

18 analogy.  Suppose you have a gas card and it gives you the

19 right again to buy 50 gallons of gas at the price of $4 a

20 gallon, as we talked about earlier.  Suppose after six months

21 the price has fallen to $2 a gallon for the entire population.

22 Everyone can buy gas at $2 a gallon.  Now, at that point, the

23 gas card is worthless to you.  You can't buy gas for any better

24 price than anyone else.

25         And so, what if you decided to alter the gas card so

1  that it gave you the right to buy gas at $3 a gallon, not $4 a

2  gallon?  It wouldn't do you any good right away, you are still

3  a dollar above the market price for gas.  But if the price went

4  back up again, it would become valuable as soon as gas went

5  over $3 a gallon.

6          And what have you done at that point?  You have been

7  dishonest, you have created a false record, and taken something

8  that didn't belong to you.  The right to buy gas at $3 a

9  gallon.

10          And again, ladies and gentlemen, what does that

11  change mean?  The change from $29.63 to $19.75?  Well, at that

12  point, the Defendant had the right, based on the Transcentive

13  records, to buy 20,000 shares of McAfee stock at, again,

14  $19.75, instead of the price of February 14th, 2000, which was

15  $29.63.  And again, doing the math, 20,000 options, by

16  approximately $10 per share -- per option, gives it a value of

17  approximately $200,000.

18          The evidence will show that the data on that

19  Transcentive system is permanent.  That each time the database

20  was used, it showed the Defendant's options at the new, changed

21  price of $19.75.  And that the company relied on the data in

22  the Transcentive system to keep track of how many options each

23  employee was entitled to so it could keep track, logically

24  enough, of what it owed its employees.

25          The evidence will also show that McAfee, as a public

1  company, has to prepare and file certain documents. The

2  evidence will also show that the company used the Transcentive

3  system again and again and again to generate all kinds of

4  important company documents for those filings.

5       You will hear and see evidence about documents such

6  as proxy statements, D&L applications, those documents were

7  signed by the Defendant, who was, as we talked about before,

8  the company's top lawyer. And those documents, ladies and

9  gentlemen, those are the false books and records.

10      Now, in our case, you also heard evidence that the

11 Defendant, himself, lied on a document listing all of his stock

12 option awards, his stock option grants. And that he signed a

13 document called a Form 3, that was sent from Santa Clara, from

14 McAfee's offices in Santa Clara, to Washington, D.C. to the

15 SEC. To the Securities and Exchange Commission in Washington.

16 And that this lie allowed him to keep the change that had been

17 made to the Transcentive system, to his stock options.

18      The Form 3 did not say he was granted an option of

19 20,000 shares on February 14, 2000, at the approved price of

20 $29.63. Instead, that Form 3 said, said that those 20,000

21 options had been given to him on April 14th, 2000, at the price

22 of $19.75.

23      In other words, ladies and gentlemen, the Defendant

24 lied in his Form 3. He lied about what the company had given

25 him. And he signed it. And after he signed it, it got mailed

1   to Washington, D.C.  That is mail fraud.

2          Now, ladies and gentlemen, that was in 2002.  Let's

3   fast-forward now to the year 2004.  You will hear evidence that

4   in the spring of 2004, McAfee set up a process for executives

5   within the company, including the Defendant, to sell their

6   stock options.

7          And we will prove that on April 30th, 2004, the

8   Defendant personally signed his sell plan, the plan he had

9   crafted.  And that the sell plan for his stock options listed

10  all the stock options that he wanted to sell.  And included,

11  just like that 2002 document, that Form 3 we talked about a

12  moment ago, this document also said that his 20,000 shares, his

13  20,000 stock options, had been granted to him on April 14th,

14  2000.  And again, at the price of $19.75.

15         And if we think of the Form 3 as the lie that the

16  Defendant used to keep his changed price, the changed price

17  from February 14th to April 14th, 2000, this sell plan in 2004

18  was the lie he used to actually get the stock options at the

19  changed price.

20         And we will prove that the Defendant -- we will prove

21  that the document, including the Defendant's lie in the 2004

22  plan, was mailed by Federal Express from the Defendant's

23  offices in Texas to San Francisco on that same day he signed

24  it, April 30th, 2004.  And that, ladies and gentlemen, is also

25  mail fraud.

1           Finally, you will hear testimony during this trial

2    about how the company was unaware of the Defendant's plan to

3    put more money into his pocket from the year 2000 all the way

4    up until May of 2006.  And that in May, 2006, the company was

5    conducting an internal review of its stock options.  And at

6    that point the company found out about his scheme.

7           And you will hear testimony from people who will tell

8    you, they will tell you that the Defendant told them that his

9    grant had been changed back in the year 2000, that he knew it

10   was wrong, and that he was sorry for what he had done.

11          Now, let's be quite clear at the outset, ladies and

12   gentlemen.  The Defendant never got the extra $200,000 we have

13   been talking about this morning.  He never actually used the

14   changed option to buy McAfee stock at the changed price of

15   $19.75.

16          But ladies and gentlemen, thinking back to our gas

17   card analogy we have used a couple of times this morning, if

18   you changed that price on that gas card from $4 to $3 per

19   gallon, maybe you don't use it immediately.  Maybe you just

20   keep it in your wallet.  Maybe you think to yourself, "Maybe

21   I'll never need it.  Maybe I'll never use it."  Or "Maybe I'll

22   get caught if I use it," or "Maybe I'll just keep it until I

23   really need to use it."  All the while, you still have it in

24   your wallet.  It's still in your back pocket, ready to be used.

25          And just so we're also clear, ladies and gentlemen,

1    this case is not about accounting.  It's not about corporate

2    fraud that destroyed an entire company or caused people to lose

3    their pensions.  That's not this case.  No, it's about an

4    attempted theft from a public company.

5           This case is about a company's top lawyer taking a

6    cheaper, better price on options he was given in February of

7    the year 2000, a change that altered the company's records.  A

8    change that made his legal right to buy McAfee stock more

9    valuable, more valuable by approximately $10 per share on

10   20,000 options.

11          This is a case about the company's top lawyer putting

12   his own personal gain ahead of his duty to his company.  And

13   this case is also about the laws and rules that we have as a

14   society for a public company, that are designed to protect

15   shareholders who are the owners of these companies.

16          The evidence will show you, ladies and gentlemen,

17   that we rely on certain people within these companies to act as

18   gatekeepers.  And that the company's top lawyer owes a duty of

19   honesty to his company.  To know the rules, and to enforce the

20   rules, to know right from wrong.

21          The Defendant, ladies and gentlemen, is before you

22   today because he tried to steal from his company in order to

23   get a cheaper price on 20,000 stock options.  The evidence will

24   show that the Defendant altered the company's records in order

25   to lie and cheat his way to an extra $200,000 in compensation,

1   and to keep that compensation.  And that when he was about to

2   get caught, he admitted it.

3           Now, ladies and gentlemen, at the end of this case,

4   after you have seen and heard all of the evidence, we at this

5   counsel table representing the United States of America, we are

6   confident that you will render a fair and just verdict in this

7   case.  And we are also confident that you will find the

8   Defendant guilty of all three of the crimes charged against

9   him.

10          Thanks for your attention this morning.

11          **THE COURT:**  Mr. Neal.

12                  **OPENING STATEMENT**

13          **MR. NEAL:**  Thank you, Your Honor.

14          Good morning, ladies and gentlemen.

15          (Jurors respond affirmatively.)

16          **MR. NEAL:**  Again, I had the opportunity to introduce

17   myself to you Monday.  But you heard a lot of people and saw a

18   lot of people on Monday, so, once again, my name is Steve Neal.

19   Together with Neal Stephens and Shannon Eagan it is our

20   privilege to represent Mr. Kent Roberts in this case.

21          As you think about this case, the most important time

22   period to focus on is the year 2000, because the evidence in

23   this case is going to show that notwithstanding what Mr. Lucey

24   just said, no crime was committed by Mr. Roberts in the year

25   2000.

1          He did not do anything that violated any law in the

2    year 2000.  And because of that, there is no case here in the

3    year 2008.

4          The entire foundation of the prosecution's case is

5    the idea that Mr. Roberts violated the law with respect to his

6    option in the year 2000.  They have the burden, a heavy burden

7    of proving that critical foundation, that indispensable

8    foundation, beyond a reasonable doubt.  And they cannot meet

9    that burden.

10          Not only can they not meet that burden, the evidence

11    you will hear in this courtroom, not opening statements from

12    Mr. Lucey or opening statements from me, but the evidence shown

13    here from witnesses on the witness stand and from documents

14    that will be put into evidence will show that, in fact,

15    Mr. Roberts did not do anything wrong and did not violate any

16    law in 2000.  And because of that, the entire remainder of the

17    government's case crumbles.

18          There is no question, no question that the price, the

19    grant price and the strike price on one option that Mr. Roberts

20    received in the year 2000 was changed.

21          Mr. Lucey says nobody knew anything about that.

22    That's simply incorrect.  The people who ran the options

23    administration knew about it.  The people who made the change,

24    the controller of the company changed the date on Mr. Roberts'

25    options.  They knew about it.  It was all over the documents.

1   It was open, it was public, it was no secret from anybody

2   whatsoever.

3            When the date on Mr. Roberts' option was changed,

4   that change did not violate any company rule.  It did not

5   violate any policy.  It did not violate the option plans that

6   were in existence at the time.

7            In fact, what you'll hear is when the price of that

8   option was changed it was changed by a man named Terry Davis,

9   who Mr. Lucey didn't mention here this morning.

10           Mr. Terry Davis was the controller of the company.

11  Mr. Terry Davis had authority, both based on conduct within the

12  company and based on board resolutions, to make changes in the

13  terms and conditions of options and to grant options to people

14  as long as they met certain threshold requirements.

15           He had the authority.  He exercised that authority

16  with respect to numerous people besides Mr. Roberts.  And when

17  he exercised that authority with Mr. Roberts, he did not

18  violate any rule, any policy of the company.

19           Because of that, the case fails.  Because of that,

20  the theory that there was something inaccurate or false in this

21  Form 3 document that Mr. Lucey just showed you is utterly

22  wrong.

23           Because of that, the notion that there was something

24  false or inaccurate in the brokerage statement that was sent to

25  UBS -- a banking firm here in San Francisco -- contained

1   something false is simply wrong, utterly wrong.

2          Because there was nothing done improper in 2000, the

3   claims that there were inaccurate or false statements in those

4   documents is wrong.  Those claims are wrong for other reasons

5   as well that will come out in this investigation -- or in this

6   trial.

7          There is no question that in the year 2006, in May of

8   2006, Mr. Roberts had conversations with people in New York

9   where he said to them he thought there might be an issue with

10  respect to his option because he knew the date of the option

11  had been changed.

12         But the conversations as described by Mr. Lucey and

13  the conversations I expect as you will hear them from the

14  witness stand have been embellished some from the people who

15  are going to come into this court and testify.

16         But, again, in a sense even that doesn't matter

17  because nothing that happened in the year 2004, or the year

18  2005, or the year 2006, can create a crime in 2008, based on

19  conduct that was lawful in 2000.

20         So let me start by showing the demonstrative that

21  Mr. Lucey showed a moment ago during his opening, the one that

22  had the yellow highlighting on it.

23         He put this document up on the screen in front of you

24  just a few minutes ago, and he made a number of comments while

25  he was talking about it.

1           First of all, he said to you that on February 14 of

2   the year 2000, Mr. Roberts received a grant of 20,000 shares of

3   stock.  A grant of an option of 20,000 shares.  That's wrong.

4           On February 14, 2000, when Mr. Roberts was promoted

5   to general counsel of the company he received zero options.

6   Zero options.

7           Can we look briefly at Exhibit 150B.

8           (Document displayed.)

9           This document is a form that reflected Mr. Roberts'

10  promotion to general counsel and vice president of the company.

11  This is the form that reflects his promotion on February 14th

12  of 2000.

13          And we'll show you the date in a minute.  But if you

14  look -- if you look at the stock option section, there's a

15  section at the top, you'll see the effective date for all

16  changes is February 15, 2000.

17          It's a little hard because I can't point to your

18  individual screens, but if you see the top line that's

19  highlighted there, it says 2/15/2000.  That's reflecting the

20  promotion that Mr. Roberts received in February of 2000, to

21  vice president and general counsel.

22          If you look down, there's a section that says,

23  "Compensation."  And under compensation there's a section that

24  says, "Stock options."  And we've highlighted that.  And can

25  you all see the highlighting, where it says, "Stock options"?

1            And when he received that promotion in February of

2   2000, they didn't give him any stock options.  Mr. Lucey said

3   to you a minute ago that in February they gave him options to

4   buy 20,000 shares of stock.  They did not do that.

5            They didn't give him options to buy any stock as a

6   result of this promotion until July of 2000, six months after

7   the promotion occurred.

8            And in July of 2000, there was a decision made to

9   give him shares of stock.  And in July of 2000, when the

10  decision was made to give him that option, they, in fact, set

11  the price for February 14th.

12           So the company started -- when it gave him this

13  option in July of 2000, the company started by saying that the

14  date for that option is going to be February 14, 2000.  That's

15  the date that the prosecutors claim was improperly changed to a

16  different date at some later time.

17           They claim that the date February 14, which was the

18  date that the option was originally set for, was improperly

19  changed.

20           Ladies and gentlemen of the jury, it is beyond

21  dispute that the February 14 date was a wrong date; that the

22  February 14 date was an incorrect date; that the February 14

23  date had to be changed.

24           And we will prove that to you in this courtroom

25  through the mouths of the prosecutor's own witnesses when we

1    cross-examine them, because the company itself has now admitted

2    that the February 14 date was the wrong date.

3            The government's entire theory here is that the

4    February 14 date was the right date, and when it was changed to

5    a different date something wrong happened.  The problem is

6    their starting premise is wrong because that February 14 date

7    was the wrong date.

8            Another thing -- let's go back to Mr. Lucey's

9    highlighted exhibit, the one we were talking about just a

10   minute ago.

11           (Document displayed.)

12           Mr. Lucey put this exhibit in front of you and he

13   highlighted, "Kent Roberts - promotion to VP - 20,000 shares

14   dated 2-14-00."

15           Now, he didn't point out the language above, which I

16   thought he was going to, where there's a reference in this same

17   exhibit in the document -- the exhibit itself I hope you can

18   read, but this is an exhibit from Terry Davis.

19           And in the first paragraph Terry Davis says, "We need

20   to get a completed list of all grants over 15,000 from

21   January 1 to June 30, so that we can get board approval at the

22   meeting on June 13th."

23           Now, you notice one thing odd about that.  He's

24   writing a memo in July, in which he's saying we need this in

25   order to get board approval in June.

1          So, first of all, I think when you look at this

2     document later in the trial, and you'll see more on it, you'll

3     realize that, first of all, he made a mistake.  He meant he

4     needed it for the July, July board meeting, not a June board

5     meeting.

6          But the way they displayed this document to you, it

7     suggests, We need to get a complete list of all grants over

8     15,000, from January 1 to January 30 [sic] so that we can get

9     board approval at the meeting of June 13.

10          And then he says, "Kent Roberts – promotion to VP –

11    20,000 shares dated 2-14-00."  Suggesting, I guess, that that's

12    one of the grants that they need to take to the board to get

13    board approval.

14          Well, the interesting thing about highlighting,

15    ladies and gentlemen, is that highlighting can highlight.

16    Highlighting can also conceal.  And highlighting can sometimes

17    mislead.

18          Because instead of highlighting this document by

19    taking the yellow and putting it off to the left so that the

20    original document remained intact, they did the highlighting in

21    a way that obscures some critical language underneath the

22    yellow.

23          If we can look at the document without the

24    highlighting on it for a minute, I'll show you what I mean.

25               (Document displayed.)

1           So the highlighting obscured some key language on

2     here.  Highlighting obscured the fact that on July 6 of 2000,

3     Terry Davis wrote a memo to Garcia-Lechelt and Marianne Snook,

4     who were both people who were involved in the options process

5     at McAfee.

6           And Marianne Snook, by the way, is another person who

7     knew about the options in the grant, even though Mr. Lucey said

8     nobody knew about it.

9           And he wrote [as read], I need this list of grants

10    from the -- from January 1 to January 30, so we can get board

11    approval.

12          And then he says, independently of that [as read],

13    "The following grants have been approved by Peter" -- that's

14    Peter Watkins -- "and Prabhat Goyal" -- who was the CFO of the

15    company at the time.  "And I will send paperwork to HR and

16    stock today.  Kent Roberts - promotion to VP - 20,000 shares

17    dated 2-14-00.  And Dan Lefelstein and Steve Cavalo - retention

18    and make happy - 25,000 shares dated 6-30-00."

19          But what this shows is that on July 5 of 2000, for

20    the very first time, a decision was made to give a grant to

21    Kent Roberts in connection with his promotion to vice president

22    and general counsel which had occurred six months earlier.

23          But the critical language in that document that I

24    want to bring to your attention is where Terry Davis says, "The

25    following grants have been approved by Peter and Prabhat and I

1   will send paperwork to HR and stock today."

2           So the grant that was being made to Kent Roberts had

3   already been approved as of the date of this memo, and wasn't

4   being submitted to the board for board approval.

5           The board did later get a list that included

6   Mr. Roberts' grant.  And the board, therefore, saw a recap of

7   it.  But the grant itself had been approved by Prabhat and, in

8   fact, it had been approved by Terry Davis himself.

9           And if we can look for a minute at the July 5

10  personnel action form.

11           (Document displayed.)

12           This is a document you'll see in evidence.  And it's

13  similar to the one I showed you a few minutes ago.  But while

14  Mr. Lucey says that the record will show that my client got

15  this grant in February, he didn't get it until July 5th.

16           There had been no mention.  You will not see a piece

17  of paper in this case from the prosecutors, I don't think

18  you'll hear a witness in this case open their mouths and say

19  that anybody had given or authorized a grant to Mr. Roberts

20  prior to this -- for this promotion, prior to July the year

21  2000.

22           And in July of 2000, you will see under,

23  "Authorization and Approval" the grant made to Mr. Roberts in

24  July of 2000 was approved by both Prabhat Goyal and by Terry

25  Davis.  Again, a name you didn't hear mentioned in Mr. Lucey's

1   opening statement.

2          Terry Davis is a finance name.  You see his name

3   printed.  You see his signature, and you see the signature

4   date.  With the execution of this document, the grant that was

5   made to Mr. Roberts was done.  It was completed except for

6   putting it in the system.

7          But the problem was that there was a mistake.

8   Because the problem was they dated the option itself not in

9   July 5th, when it was granted, but they dated it back in

10  February, six months earlier.

11         And by doing that, by the way, they put the grant

12  deeply under water.  Which means they gave him an option at a

13  price that was $10 below the stock price of the company at the

14  time.

15         That's the background to that particular grant.

16         Then it is clear later on Mr. Roberts had a

17  discussion with Mr. Davis, in which he mentioned the fact that

18  he had gotten this grant that was dated six months earlier and

19  that was deeply under water, deeply under water.

20         And Mr. Davis said to him, I can fix that.  And

21  Mr. Roberts said, "You can fix that?"  And Mr. Davis said,

22  "Yeah, I'm authorized to fix that."  And he went ahead and he

23  changed the date of the option from February 14 to April 14.

24         Now, the April 14 date they showed you on a price

25  chart just a few minutes ago, but they didn't show you that

1    price chart sort of extended over time.

2            And the fact is that when Mr. Davis said, "I can

3    change the price from February to April," the April price was

4    deeply under water.

5            So the suggestion that by making this change

6    Mr. Roberts suddenly got an economic windfall is simply wrong.

7    Because when the date was changed from February 14, an

8    erroneous date, to April 14, it was still deeply under water.

9    It was of no value to him when it was changed.  It was still

10   deeply under water.

11           But so Mr. Davis said -- he was the controller.  And

12   you'll see evidence that he ran the options program in the year

13   2000.  He said to Mr. Roberts he could fix it, that he had the

14   authority to fix it.  And he was right.  And he was right for

15   the following reasons:

16           Under the stock option plan that Mr. Roberts received

17   this grant pursuant to, which was a plan called the 1997 Stock

18   Option Plan, the board of directors had specifically -- I will

19   show you this.  You're going to see this in the next -- not

20   today, tomorrow as we cross-examine witnesses.

21           In 1997 -- in the 1997 plan, the board of directors

22   authorized the CEO of the company to make grants of options as

23   long as they were less than 15,000 shares and as long as they

24   were not in-the-money.

25           The 15,000 share number was later changed to 22,500

1  shares.  By the year 2000, the CEO had authority to make grants

2  of stock up to 22,500.  And he could make them at any price he

3  wanted, as long as he didn't make them at a price that was

4  below the price of the stock the day the grant was made.

5          The CEO, in turn, delegated that authority that he

6  had received to division heads and to vice presidents.  And

7  you'll see evidence the company itself concluded this, and the

8  company told the government this, or should have.  But the CEO

9  delegated the authority to make grants as long as they were

10 below -- were not below the stock market price, and as long as

11 they were less than 22,500 shares granted that authority to

12 various managers below him.  One of whom was Terry Davis.

13         And you'll see that Terry Davis exercised his

14 authority with respect to a whole group of people, not just

15 with respect to Kent Roberts.

16         What was done with Kent Roberts was done with lots of

17 other people by Terry Davis exercising his authority that he

18 received from the CEO of this company.  So when he said, "I've

19 got the authority to make this change," he was right.  And the

20 evidence is going to show that he was right.  It was given to

21 him.  He exercised it.  And he did it.

22         And that's what happened with respect to this grant.

23 And it's interesting that when Mr. Lucey stood here this

24 morning he didn't say anything about whether the people who

25 made the change were authorized to make the change.

1          There's no law against changing the price of an

2    option.  There's, in fact, no law that says you can't put

3    somebody deeply in-the-money.  Although, that didn't happen

4    with Mr. Roberts.

5          There was no rule at McAfee that said you couldn't do

6    this.  There wasn't a rule at McAfee that addressed this issue

7    until a number of years later.  There was no board resolution

8    that prohibited it.  There was no rule in any company document

9    that prohibited.

10         Terry Davis had the authority to do it.  And when he

11   said to Mr. Roberts he had the authority to do it, he was

12   right.  He, in fact, did have the authority to make that

13   change.

14         So given all that, given that the change that was

15   made was made by somebody who was authorized to make it, and it

16   was made within the guidelines that he was allowed to operate

17   within, how are we here?  Why do we find ourselves here?

18         Why does Kent Roberts, who is 52 years old, and who,

19   as I pointed out on Monday, has his wife, Susan, and their

20   daughter, Emma, here sitting in court, why is he here?

21         He started his career as a lawyer in Missouri in

22   1981.  He was a real estate lawyer.  He moved from Missouri to

23   Dallas in 1993, where he continued to practice as a real estate

24   lawyer.  He ultimately expanded his practice from real estate

25   to doing licensing work.

1          In 1998, he became the director of legal affairs for

2     McAfee.  And then in 2000, giving rise to this grant, he became

3     the general counsel of McAfee.

4          He stayed in Texas.  McAfee has offices both in

5     Santa Clara County here, and offices in Texas.  And he stayed

6     in Texas.  He performed his job from Texas, commuting from time

7     to time here.

8          But in light of what I said, how does he find himself

9     here?

10          Well, when the options issue started to develop, sort

11     of around the country, particularly here with companies in the

12     Silicon Valley, and particularly when they started to focus and

13     develop at McAfee itself, McAfee formed a special committee

14     that you're going to hear about, a special committee of their

15     board of directors.  And that special committee was given the

16     code name Project Shield.

17          And Project Shield conducted an investigation into

18     options issues at McAfee.  You'll hear they spent $22 million

19     on their investigation.  They hired their own lawyers.  They

20     hired accountants.  They spent $22 million supposedly learning

21     all the facts, supposedly finding the truth and letting the

22     chips fall where they may.

23          That special committee and its lawyers and its

24     accountants in turn fed information to the prosecutors and fed

25     information to the government before the government decided to

1    indict Mr. Roberts.

2           And what you're going to see is that the prosecutors

3    here were in some sense as much victims as Mr. Roberts has

4    been, because the special committee and its advisors gave the

5    prosecutors a slanted, incomplete, at times inaccurate story of

6    what had happened with respect to options at McAfee.

7           Why did they do that?  Well, why they did it may not

8    be critical in the end to your deliberations.  But I think what

9    you'll see as to why they did it is they made a conscious

10   effort that they wanted to try and protect and divert attention

11   away from other people in the company who were more senior than

12   Mr. Roberts, who in fact had bigger issues with respect to

13   their stock options.

14          One of those being the CEO, a man named Mr. Samenuk,

15   whose name Mr. Lucey didn't even mention in his opening but

16   whose name you will hear discussed in this courtroom.

17          They set about diverting the attention of the

18   government investigations away from other people within the

19   company and towards Kent Roberts.

20          And I know you say, "May be standing here giving me a

21   conspiracy theory," but you wait and you see the evidence

22   unroll, and you make your own judgment.

23          Because in the end -- I think you're going to be

24   convinced on this, but in the end it still doesn't bear on the

25   fact that Mr. Roberts didn't commit any crime in the year 2000.

1  But, in fact, they engaged in a slanted, distorted process to

2  try and focus attention on Mr. Roberts.

3          You'll see documents where they actually use that

4  phrase, that, "We're going to focus the Department of Justice

5  attention on Mr. Roberts."

6          And they -- those being other senior people within

7  this company who should have had much more profound issues --

8  aren't here.  They haven't been charged with anything.  They

9  haven't been indicted.  They are footloose and fancy free

10 because Project Shield worked.  And Project Shield it was.

11         When the company finally finished its whole options

12 investigation, and finally decided sort of what the nature of

13 the problem was, this is what happened:

14         They concluded that they had errors, mistakes,

15 improper conduct with respect to over 50 million stock option

16 shares.

17         They concluded that the cost, the impact, the

18 financial impact on their book and records statements to the

19 company of the errors, mistakes and improper activities with

20 respect to options, added up to over $135 million.

21 $135 million.

22         Mr. Roberts' option that you're all here because of

23 represented one-half of one-tenth of 1 percent of the stock

24 options -- of the stock grants that the company itself

25 concluded had problems and improprieties with them.

1          It represented one-half of one-tenth of 1 percent of

2    the dollar value of the $137 million of mistakes that the

3    company admitted had been made.

4          We think it represented zero.  Mr. Lucey said it's

5    not going to be an accounting case.  We may not get into the

6    issue.  But even if you accept the government's view of the

7    world, the grant reference to Mr. Roberts represented one-half

8    of one-tenth of 1 percent of the errors, mistakes and problems

9    with grants at McAfee.

10          And the grants at McAfee that add up to or contribute

11   to that huge number are, in fact, grants that did violate

12   company policies; are, in fact, grants that exceeded the

13   granting authority of the people who made them; are, in fact,

14   grants that violated the resolutions; that did not have the

15   appropriate approvals.

16          They are grants some of which were in-the-money, that

17   put hundreds of thousands of dollars in peoples' pockets

18   immediately.  None of that was true of Mr. Roberts' grants, but

19   that was true of grants by people and to people who aren't here

20   defending anything, some of whom you won't see as witnesses in

21   this case, some of whom you may see as witnesses in this case.

22          So Project Shield worked.  Mr. Lucey already told

23   you, and it's true, that Mr. Roberts didn't make a nickel on

24   this grant.  He never exercised it.  That's not in itself an

25   excuse.  If he did something wrong, the fact he didn't get a

 1  nickel on it doesn't change wrongdoing.

 2           But he didn't do anything wrong.  And the fact that I

 3  talk about these numbers is to show you how Project Shield in

 4  fact worked.  They got Mr. Roberts indicted.  And the rest of

 5  them are off playing golf.  And Mr. Roberts didn't do anything

 6  wrong.

 7           So in the end, Mr. Lucey said, the Court has said, I

 8  say, the government has a heavy burden of proof here.  They

 9  can't meet that burden of proof.

10           They cannot show that there was anything wrong done

11  with respect to Mr. Roberts' option in the year 2000.  And

12  because of that, the whole case goes poof.

13           And because they have the burden of proof, and the

14  heavy burden it is, they get to go first with their witnesses

15  and first with their evidence.

16           But that doesn't mean you need to wait until the end

17  of their case to start hearing our case and what we think the

18  evidence will show.  Because often -- and I think in this case

19  it will be particularly true -- the most important evidence

20  comes through the cross-examination of government witnesses.

21           Now, some of their witnesses will be -- the

22  cross-examinations will be short.  They will have sort of

23  limited things to say.

24           But when we're cross-examining witnesses, these are

25  not people we have worked with or people we have the ability to

1    control.  But we're going to get the right to ask them

2    questions here.  And I believe you'll start hearing, as we

3    cross-examine their witnesses, the fundamental points that I

4    have told you today the evidence will show.

5              So you're not going to have to wait until they are

6    done to start hearing our case develop.  And what our case is

7    going to show is that in the end, as I said at the beginning,

8    and I'll say it over and over because it's the critical

9    question for you people to keep in mind as you deliberate, is:

10   What did they show he did that was criminal in 2000?  What rule

11   of the company did they show he violated when the option price

12   was changed?  What law did they show he violated when the

13   option price was changed?  They can't show you any of that

14   because it did not happen.

15             So Mr. Roberts sits here today because the

16   government, the prosecutors, were given a slanted dump of

17   information.

18             He sits here today defending a case that is based on

19   half a story, an incomplete story that was given to the

20   government.

21             He stands here today defending a case based on that

22   faulty information that was given in the first instance.  And

23   it's going to be aided in this courtroom by witnesses who

24   themselves are self-interested, some of whom were, in fact,

25   protected by Project Shield.

1          That's why he is here today, and for no other reason.

2    Because if you look high and low at what happened in the year

3    2000, you can't find any criminal wrongdoing whatsoever.  And

4    because of that, at the end of this case we will ask you to

5    return a verdict of not guilty on all counts.

6          And, in the meantime, on behalf of Mr. Roberts and

7    our team, we thank you for your attention.  We thank you for

8    the role you play.  It's one of the most critical roles that

9    exists in our society and in our system of justice.

10          It's in some sense an imposition on all of your time,

11    but it's an indispensable role that you play.  And we're

12    grateful for all of you that you're here playing.  And I thank

13    you very much.

14          **MR. NEAL:**  Thank you, Your Honor.

15          **THE COURT:**  Is the government prepared to call the

16    first witness?

17          **MR. LUCEY:**  Yes, Your Honor.  The Government calls

18    Boris Feldman.

19          **THE COURT:**  Yes.  Step right up here, Mr. Feldman,

20    and be sworn.

21          (Witness placed under oath)

22          **THE CLERK:**  Please state your full name, and spell

23    the last name for the Record.

24          **THE WITNESS:**  Boris Feldman.  B-O-R-I-S

25    F-E-L-D-M-A-N.

```
1              THE COURT:  Thank you.  Mr. Lucey?

2                       BORIS FELDMAN,

3   called as a witness for the Plaintiff herein, having been first

4   duly sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6   BY MR. LUCEY

7   Q    Good morning, sir.

8   A    Good morning.

9   Q    Mr. Feldman, where are you currently employed?

10  A    I'm a lawyer at Wilson, Sonsini, Goodrich and Rosati,

11  which is headquartered in Palo Alto.

12  Q    And how long have you been a lawyer at that firm?

13  A    Since 1986, so, 22 years.

14  Q    And what kind of work do you do there?

15  A    I represent -- principally I represent companies in

16  shareholder litigation.

17  Q    And over your time at Wilson, Sonsini, have you had

18  occasion to work for a company known as McAfee?

19  A    Yes, on a number of occasions.

20  Q    And can you think back to when you approximately first

21  began work for that company, as an attorney for them?

22  A    So, I met people -- at the time it was called McAfee, then

23  it became Network Associates, then it became McAfee again.  I

24  met them at the beginning of our relationship with them, some

25  time in the Nineties.
```

1    But, the first matter I recall working on was a

2  shareholder lawsuit, maybe around 1998 or '99, that internally

3  we called NETA 1, "NETA" being the NASDAQ ticker for the

4  company then.

5  **Q**    At that time.

6  **A**    Right.

7  **Q**    And Mr. Feldman, during your time providing services to

8  McAfee, have you had occasion to work with an individual called

9  Kent Roberts?

10 **A**    Yes, I have.

11 **Q**    Do you see that individual in the courtroom today?

12 **A**    I do see him.

13 **Q**    Can you point out to the jury where he is sitting

14 currently?

15       **MR. NEAL:**  We will stipulate, Your Honor, that he

16 knows Mr. Roberts.

17       **THE COURT:**  The record will reflect he has identified

18 the Defendant.

19       **MR. LUCEY:**  Thank you, Your Honor.

20 **BY MR. LUCEY:**

21 **Q**    Now, Mr. Feldman, did you have a conversation with

22 Mr. Roberts, the Defendant, in May of 2006, in advance of the

23 annual shareholders meeting for McAfee?

24 **A**    I did.

25 **Q**    Can you recall the circumstances as to that -- I'm sorry,

1  strike that.  How many conversations did you have around the

2  time of that shareholders meeting in May of 2006,

3  approximately?

4  A    So, it was somewhere in the neighborhood of two or three.

5  There are two that I recall distinctly.  One of which was

6  longer than the others.  But there may have been other brief

7  ones around that time.

8  Q    Can you tell us about the circumstances of the first one

9  in time that you recall?

10  A    Yes.  There's -- sort of a pre-call.  I don't recall the

11  dates, but I'm pretty good on the days.  And I believe it was a

12  Tuesday.  And I had had interaction with Mr. Roberts on another

13  call earlier in the day, on Tuesday.

14  Q    Let me stop you there, Mr. Feldman.  I apologize for

15  interrupting you.

16          Are you talking about the Tuesday -- what is that in

17  reference to?  Tuesday before the annual shareholders meeting?

18  A    Yes.  I believe the shareholder meeting -- I know it was

19  going to be on Thursday or Friday.  I think it was going to be

20  on Thursday, but I can't swear to it.

21          And so, this was the Tuesday before that meeting.

22  Q    Okay.

23  A    So, there was a call with people at the company, working

24  on a review of option grants that I was on, and that

25  Mr. Roberts was on.  And, it just sounded as if something were

1   off.

2          So, I don't remember if I spoke with Mr. Roberts or

3   left him a voicemail, but some time that day I said, "Is -- is

4   something wrong?  Is there an issue?  If so, give me a call

5   tonight."

6   **Q**   And what happened at that point?

7   **A**   So I remember getting home, and I was pulling into the

8   driveway at my house, and I got a call from Mr. Roberts on the

9   cell phone.  And, we then had a discussion -- I don't know,

10  ten, 15 minutes, something like that.

11  **Q**   And Mr. Feldman, could you walk us through how that

12  conversation proceeded, as best you recall it?

13  **A**   Yeah.  So, Mr. Roberts said, "I need to tell you about

14  something, I'm going to go tell George" -- who is George

15  Samenuk, the CEO of the company -- "I'm going to go tell George

16  this."  I think what Mr. Roberts said was "He's going to call

17  you after that, so I wanted you to know about it."

18          And he said, "I made a mistake."  I think that's the

19  word he used.  He said, "I made a mistake a few years ago."  He

20  said, "Back in 2000, when I was working with Terry Davis" --

21  the controller -- on another matter, it was something, a piece

22  of litigation, an investigation the company was involved in at

23  the time -- he said, "When I was working with Terry Davis, one

24  day he made a comment about the stock price.  And I said, 'That

25  doesn't really affect me; my options are underwater.'"

1          And Mister -- I'm now relating what I recall

2    Mr. Roberts saying to me.

3    **Q**    Understood.

4    **A**    He said, "I said to Terry -- Terry said, 'I can fix that.'

5    And I said to him, 'Really?  How?'  And Terry said, 'I can go

6    in the system and change the date.'"

7          I recall Mr. Roberts saying, "I asked Terry, 'Are you

8    authorized to do that?'  And he said 'Yes.'"

9          And, then I'm not sure the exact words, he either

10   said, "Is it okay to do that," or "Is there anything wrong with

11   doing that," it was that flavor.  And Mr. Davis told him "No."

12   And, so, Mr. Roberts said, so he went in and did it.

13         He said, after -- "Some time after that, I

14   realized" -- and again, I don't remember whether the exact

15   words he used was that "it was a mistake" or that "we shouldn't

16   have done it" or what, but basically said "Some time after

17   that, I realized that that wasn't appropriate, and so I decided

18   to let the options expire unexercised, and never sell them."

19         So that was the bulk of the conversation.  We then --

20   I then said, "What are you going to do?"

21         And he said, "I want to tell George in person, and so

22   I'm going to -- I'm flying back to New York tomorrow" -- I

23   believe Wednesday -- "for the annual shareholder meeting.  I

24   will -- I want to tell him."

25         I believe he said that he would then tell the

1  directors who I think were on the audit committee, two or three

2  of them, "I will tell them, but I want to do it in person."

3  Q    And how did you respond to that information he had just

4  conveyed to you?

5  A    I mean, my own reaction was somewhat surprised.  I -- I

6  recall, there was probably some personal component to this,

7  because Kent and I were friends, and I probably expressed some

8  concern for him on a personal level.

9         I don't know whether it was that call or in the call

10 the following day, but I said something to the effect of,

11 "Look, when you talk to them, don't sugarcoat it, don't try to

12 BS them.  Just tell them what happened."

13        And I told him I wasn't going tell anyone, so that he

14 would be the one to be able to tell them what had happened.

15 Q    And can you recall anything else in that conversation?  Or

16 is that the sum, substance of the conversation?

17 A    That's all I recall.  And I don't think we spoke again

18 until the next day, when he landed in New York.

19 Q    And what happened next in time, now?  You've had this

20 conversation with the Defendant.  What happens next?

21 A    I recall Mr. Roberts calling me in New York.  I don't know

22 if it was just when he landed or when he got to the hotel.  I

23 recall him calling me and saying -- and again, I'm not positive

24 on the exact wording.  He either said, "They found it," or

25 "They're getting close to it."  And I'm not sure which it was.

1    He said, "Eric" -- which referred to the chief

2 financial officer, Eric Brown -- "Eric left me" -- Mr. Roberts

3 -- "a voicemail saying that 'There was'" -- either "a question"

4 or "a discrepancy" -- I don't remember which -- "'on

5 documentation involving a grant of yours'" -- Mr. Roberts --

6 "'and we need you to call me.'"

7    So, as I recall, originally Mr. Roberts was going to

8 meet with Mr. Samenuk and those directors on Thursday morning,

9 just before the annual meeting.  Or there may have been a board

10 meeting before the annual meeting.

11    And in light of that, he felt -- he told me, I can't

12 say what he felt -- he told me he wanted to accelerate that

13 discussion with Mr. Samenuk, so he would go tell him that

14 night.  And I think he was giving me a heads-up because he

15 expected that Mr. Samenuk would probably call me after that

16 discussion.

17 Q    And did you, did you have any response to these -- what he

18 was telling you at that point?

19 A    I -- none that I recall.  It was a short conversation.  It

20 was basically Mr. Roberts saying, "I'm going to go" -- it was

21 late in New York, I'm thinking maybe 9:00 or 10:00 in New York.

22 And, it was basically him saying, "I'm going to go tell George

23 right now."

24 Q    Do you recall having any further conversations with the

25 Defendant following that phone call, around this same period of

1  time?

2  **A**    So, they're a little fuzzier.  I think there were two.

3  **Q**    Can you give us your best recollection?

4  **A**    Yeah.  I believe that after Mr. Roberts talked to Samenuk

5  and talked to the directors, I recall that they said, "Don't go

6  the annual meeting.  You need -- just go home.  Just go home

7  and sit tight."  And somebody took custody of his laptop.  And,

8  as I recall, their reaction was quite negative in his meeting

9  with them, at least from what he conveyed to me.

10          And so, I -- I'm pretty sure I talked to Mr. Roberts

11  after that call, that he called to tell me that.  That --

12  again, it was a short call.

13          And then, I think -- this one's tougher to be sure

14  of.  I believe there was one more call that was more of a

15  personal nature, maybe Friday or Saturday, in which I basically

16  said, "Look, we're probably not going to get to talk to each

17  other for a while," and I just expressed some personal wishes

18  for him.  But nothing substantive about the events.

19          **MR. LUCEY:**  Just a moment, Your Honor.

20  **BY MR. LUCEY**

21  **Q**   Mr. Feldman, we've covered some of those conversations now

22  that you had, as best you can recall, in May of 2006.

23          I want to speak to you now about your understanding

24  of what the Defendant did at McAfee, based on your interaction

25  with him over time.  Do you know what his job was there?

1    **A**    Yes.  The title -- I mean, I don't know all of it, but I

2    know parts of it, from having worked with him.  His title was

3    not initially general counsel.

4           As I recall, some of the prior leadership there

5    hadn't wanted to give anybody the title general counsel.  So he

6    was clearly at some point the head legal officer, but not

7    general counsel.  Then I think he became general counsel.

8           He was the senior lawyer within the company.  He had

9    lots of outside lawyers -- my firm, other firms -- that would

10   help him on particular things.  But he was sort of the chief

11   legal officer at McAfee.

12   **Q**    What are you basing that on, when you say he was the chief

13   legal officer?  Is that based on your experience with him?

14   **A**    I -- I worked on a variety of matters with Mr. Roberts

15   from sort of when I -- I don't know if it's when he literally

16   started with the company, but early in his tenure there until

17   the day he left, we were in pretty close contact.

18   **Q**    And without conveying to us any privileged information

19   about various matters you may have worked on with Mister --

20   with the Defendant while he was at McAfee, can you give us some

21   sense, and the jury some sense, of what -- a general flavor of

22   what type of matters you worked on with the Defendant over

23   time?

24   **A**    So, my area was more focused.  We had people at my law

25   firm who were corporate lawyers and did corporate work with

1    Mr. Roberts, but mine was much more litigation.  It was some

2    SEC matters.  It was a variety of shareholder lawsuits.  And

3    so, that was principally what I worked with him on.

4            I know some of my colleagues worked on intellectual

5    property litigation with him, but I wasn't involved in that.

6    **Q**    And is it fair to say you worked on a number of matters

7    over the years?

8    **A**    I did.

9    **Q**    Okay.  Switching gears a little bit, Mr. Feldman, can you

10   tell us your understanding of what a controller does within a

11   public company?

12   **A**    So, it varies a little by company.  Typically, the

13   controller is a very senior accounting person.  Sometimes the

14   chief financial officer may have more of an investor relations

15   or investment community background.  But the controller almost

16   always has a strong accounting background.

17           They're sometimes the chief accounting officer of a

18   company; sometimes not.  Their seniority really varies within

19   different finance departments.  But, they're one of the people

20   who are supposed to make sure the accounting is getting done

21   right.

22           **MR. LUCEY:**  Just a moment.

23   **BY MR. LUCEY**

24   **Q**    And Mr. Feldman, in terms of speaking about controllers,

25   do you have an understanding about what -- first, did you ever

1  have occasion to work with an individual or have interaction

2  with an individual named Terry Davis, who was employed at

3  McAfee?

4  **A**    So, if -- if I met Terry Davis, it was sort of once,

5  briefly.  And I've tried to remember that.

6        I certainly knew about Terry, because in some of the

7  lawsuits that we were handling for the company, he had a lot of

8  the information, especially information back in time, as to

9  periods for which there weren't a lot of other employees still

10 in the company.  So people that I worked with would relate

11 things to me from Davis.

12       I don't -- I can't visualize having met him, although

13 I might have, once.

14 **Q**    And based on your involvement in some of that litigation,

15 are you able to give any summary of what his duties and

16 responsibilities were, as -- at McAfee during his time there?

17       **MR. NEAL:**  Your Honor, could we have a little more

18 foundation for that?

19       **MR. LUCEY:**  Sure.  Fair enough.

20       **THE COURT:**  With this witness?

21       **MR. LUCEY:**  Certainly.

22       **THE COURT:**  Okay.

23 **BY MR. LUCEY:**

24 **Q**    Mr. Feldman, on how many occasions and under what

25 circumstances were you involved in having to develop

1  information from the point of view of the company about

2  activities of the controller's office and Mr. Davis while he

3  was at McAfee?

4  **A**    So, two of the major lawsuits that we handled for the

5  company were principally over accounting issues.  So, he played

6  a role in those.  And in our figuring out what happened.

7           I'm not personally familiar with what he did, other

8  than those, but I know that in the lawsuits on accounting

9  issues, he was a pretty significant player.

10 **Q**    And again, without telling us any privileged information

11 that you may have learned during the course of that matter, can

12 you give us a sense about what you learned over time, either

13 directly or indirectly, from your involvement in those matters,

14 about what Mr. Davis's duties were, and responsibilities, in

15 regard to those accounting matters you just mentioned?

16 **A**    Yeah.  I think they didn't really differ from what I

17 described as a controller generally doing.

18           If one were to characterize the finance department at

19 McAfee or Network Associates versus other companies of its

20 size, I think the feeling was often that this was sort of a

21 smaller department, maybe not as fully-staffed as it might have

22 been for a company that size.

23           So, he -- Terry Davis was sort of at the center of a

24 lot of accounting issues.  Not from a seniority standpoint, but

25 there weren't a ton of people in finance, as I recall.

1    Q    And, just to give the Court and the jury some sense of

2    time, what time frame are you talking about now in terms of

3    Mr. Davis's involvement and activities at McAfee?

4    A    I'm not great on dates.  My recollection is that he was

5    involved pretty actively in both NETA 1, which was the first

6    set of shareholder lawsuits, that was sort of in the ninety --

7    it grew out of the '97-98 time frame.  And then in NETA 2,

8    which was post-2000, which, he was involved in those.

9           And then there were events at the company in November

10   of 2000 that resulted in some management changes and litigation

11   where he was pretty heavily involved.

12   Q    So, is it fair to say that based on your recollection, it

13   was in the years just preceding and just after the year 2000?

14   For your --

15   A    It was -- it was certainly in 2000.  And then I recall him

16   being let go some time after that.  But I'm not good on giving

17   you a start date and an end date, but no question that that

18   would have been true in 2000.

19   Q    Fair enough.

20        **MR. LUCEY:**  Again, just one moment, Your Honor.

21   **BY MR. LUCEY**

22   Q    Now, Mr. Feldman, you mentioned a few moments ago that

23   Mr. Davis, as you understood it from your time on those various

24   matters working on behalf of McAfee, was in charge of various

25   accounting issues, and various matters within McAfee.

1      Can you give us some sense, some more detail about

2  those, as best you recall, about what those matters might

3  entail?  Even sort of an overview of those, just a more

4  detailed breakdown of what types of matters Mr. Davis was

5  involved in?

6  **A**   I'll try.  So, the first lawsuit, the first shareholder

7  lawsuit that we handled for the company involved a restatement

8  of prior financials.  As I recall, the main issue in that was a

9  very technical issue, involving write-offs for in-process

10 research and development charges and some mergers.  My

11 recollection, but I'm not rock-solid on it, is that Terry Davis

12 was one of the people he went to, to understand those issues.

13      In that lawsuit, and then in NETA 2, which was over a

14 host of accounting issues, the principal issue in those was

15 over accounting reserves for channel inventory, which is

16 software that NETA or McAfee had sold to software distributors.

17 So there were issues about the reserves, there were issues

18 about inventory levels, there were issues about various credits

19 that were given to the distributors.

20      And, Mr. Davis was involved in all of those.  He was

21 sort of the guy we would go to in the Accounting Department to

22 learn about those.

23 **Q**   If you could give us some sense about what you and maybe

24 other people from your law firm were going to Mr. Davis for, in

25 terms of the type of information you were looking for from him,

1    and his role as controller?

2    **A**    Well, on the simplest level, we had to get the data.  And

3    as I recall, the systems weren't always that easy to get data

4    from, and we -- and there was a lot of turnover in the finance

5    department.  So, above all, Terry Davis was the legacy person

6    who had been there, and you could ask about a decision made in

7    1998.  So, he assisted in getting the information.

8         As I recall on some of the accounting decisions, he

9    was the person who had either prepared the supporting schedule

10   or put together the backup for the decision.  So people on my

11   team would sit down with him to work through how that judgment

12   was reached.

13   **Q**    And was he the person that you would go to for getting

14   access to records, in regard to certain issues?

15   **A**    Yes.  Not on everything, but in general, that was sort of

16   the first stop.  If we needed data either to produce to the

17   other side in a lawsuit, or to the SEC, or if we needed the

18   documents for ourselves just to work through it, typically one

19   would reach out to Terry Davis first to try to find out how to

20   get them.

21   **Q**    And obviously, saying "records" is a pretty broad term.

22   Can you give me some sense just in a little more detail what

23   kind of records you were going to and seeking from Mr. Davis?

24   **A**    So, a lot of them, accounting records, were electronic.

25   And it just required figuring out the right backup tape to go

1    to, or the right system in the accounting software.

2           Others were -- I have a dim recollection of people

3    spending a lot of time in warehouses, digging through boxes of

4    paper documents that had been sent to storage.

5    Q    And how about any kind of electronic or computer records?

6    Were those also searched for and gathered?

7    A    Yeah.  A lot of the information was computerized.

8    Q    Can you give any kind of detail or category about what

9    types of records we are talking about, in electronic form?  If

10   you know?

11   A    I just don't remember it well enough.  My -- my gut is

12   that as a rough divider -- but don't hold me to this -- that

13   many of the interaction with the distributors which entered

14   into some of these lawsuits tended to be paper in warehouses.

15   A lot of sales records were in warehouses.  But sort of the

16   core accounting records tended to be electronic.

17   Q    What type of accounting records are we talking about here?

18   Just, again, it's a very broad term.

19   A    So all the credits given, all the revenue recognition

20   entries, sort of the general ledger of the company where they

21   made all the accounting entries.

22          But you're reaching the edge of my knowledge on this,

23   because I wasn't that involved on a daily basis.

24   Q    Understood, understood.

25          **MR. LUCEY:**  Just one moment, Your Honor.

1          Your Honor, we would pass this witness to the

2   defense.

3          THE COURT:  Thank you.

4          How long will you be with Mr. Feldman on

5   cross-examination?

6          MR. NEAL:  I don't know.  Fifteen or 20 minutes, Your

7   Honor.

8          THE COURT:  That's fine, then.  Proceed.

9          MR. NEAL:  I -- she's going to hold me to that.

10         THE COURT:  I'm taking notes.

11                        **CROSS EXAMINATION**

12  **BY MR. NEAL**

13  **Q**   Good morning, Mr. Feldman.

14  **A**   Good morning.

15  **Q**   You mentioned that a number of other people from your law

16  firm were involved with McAfee over the years, correct?

17  **A**   Yes.

18  **Q**   One of those was a man named Jeff Saper?

19  **A**   Correct.

20  **Q**   And was he involved essentially throughout the same period

21  of time that you were involved?

22  **A**   Yes, on the corporate side.

23  **Q**   And I've looked at the minutes of board meetings, and my

24  sense is that Jeff Saper attended virtually all of the McAfee

25  board meetings.

1              Is that consistent with your understanding?

2    **A**   I don't know, all of them, but I know that as the lead

3    corporate lawyer on the account, he went to probably more board

4    meetings than anyone else from the firm.

5    **Q**   And knowing -- knowing both Mr. Saper, as you obviously

6    know well, and Mr. Roberts, how would you compare their

7    relative strength and experience from the standpoint of

8    expertise in corporate governance matters, for example?

9    **A**    Well, I think -- I think highly, both of them.  Jeff is my

10   partner, so I have to be very careful.  He's regarded as one of

11   the top corporate lawyers at our firm.  And I've worked with

12   him a lot, and think he's quite good.  Kent had -- and Jeff is

13   a corporate lawyer.  He doesn't do litigation or things like

14   that.

15             Mr. Roberts was more diversified, as a general

16   counsel.  So he was in charge of litigation, as well as

17   corporate matters and the like.  But in general, my experience

18   with him was that he was quite good on governance issues.

19             So, was he an expert in the way that Saper was?  No,

20   but I wouldn't say that he was a neophyte.  He was quite good.

21   **Q**   And Saper is not only sort of one of the star corporate

22   governance lawyers at your firm, but he's one of the

23   highly-regarded corporate lawyers in the country, would you

24   say?

25             And I'm going to show him the transcript, so --

1  **A**    Yeah, I do.

2         You owe me, Jeff.

3  **Q**    The change in Kent Roberts' option that brings us all here

4  took place in the year 2000.  You are aware of that, obviously.

5  Correct?

6  **A**    Yes, I am.

7  **Q**    Okay.  And, and I take it in your own career, in the last

8  eight years, you have had extensive involvement representing

9  and advising people and companies in connection with

10  option-related issues, correct?

11  **A**    Correct.

12  **Q**    And, would you agree that the terms and conditions and

13  governing rules with respect to options, the written documents

14  and the delegated authority and that sort of thing, vary from

15  company to company?

16  **A**    Yes.

17  **Q**    And that each company has -- within certain limits, each

18  company has the ability, sometimes subject to shareholder

19  approval, to adopt whatever plans they want to control the

20  administration of their options, correct?

21  **A**    Well, that could be read too broadly.  Companies have

22  latitude on options, but there are also accounting and

23  disclosure rules that restrict that latitude.  So they don't

24  all have to do it the same way, but they can't do it just any

25  way they want.

1  Q    Fair enough.  And in addition, companies, from company to

2  company to company, can make different decisions about who

3  within the company will have the authority to grant options of

4  various kinds.  Correct?

5  A    They have some authority, but there are also rules of

6  corporate governance.  So, grants at a particular level

7  generally have to be made by certain bodies.

8           I think -- I'm -- unlike Saper, I'm not a corporate

9  lawyer.  But my understanding is that, for example, a board

10 couldn't delegate to an employee within the finance department

11 or within the HR department a decision as to how many options

12 to award the CEO.  There are certain things that need to be

13 done at the board level or a committee level.

14          So, yes, companies have some latitude on it, but

15 there are also rules that govern.

16 Q    Okay.  But companies -- within certain limitations,

17 companies have the ability to delegate the authority over

18 options to varying levels within the company.

19 A    To a degree, correct.

20 Q    Kent Roberts was never a CEO at McAfee, or anywhere else,

21 to your knowledge, correct?

22 A    That's correct.

23 Q    Now, would you agree that by the year 2005, and 2006, the

24 climate in the country and the climate in California with

25 respect to stock options and the attention being given to stock

1  options was quite different than it was in 2000?

2  **A**    I think that's true, in 2006, yes.

3  **Q**    And, and there were a number of events, actually here in

4  California, one of which involved Mercury Interactive, and

5  another of which involved something called the CFRA report.

6       Are you familiar with both Mercury Interactive and

7  the CFRA report?

8  **A**    Mercury, only to a sort of general degree.  The CFRA

9  report, pretty well.

10  **Q**    Okay.  And, the result, one of the results of both Mercury

11  Interactive and CFRA's report was that the option-granting

12  practices at companies began to receive a heightened level of

13  scrutiny from the Government, from the SEC, from shareholders.

14       Correct?

15  **A**    Yes.  I -- I think that there was also a Wall Street

16  Journal article at that time that probably had a greater impact

17  than either of those.  But people started focusing on grant

18  dates for options.

19  **Q**    So it was a result, really, of three things -- mercury

20  Interactive, the Wall Street Journal and CFRA -- there became a

21  sort of heightened focus on options in roughly 2006, is that

22  correct?

23  **A**    Yes, that's correct.

24  **Q**    And one of the things that heightened attention did was

25  actually draw attention in particular to options either granted

1  to or options in which the general counsel was involved in the

2  granting process.  Correct?

3  **A**   I wouldn't have -- that may be accurate.  I wouldn't have

4  characterized it that way.

5       I think in general, because of the attention on stock

6  option grants and backdating issues, there was intense focus on

7  grants to all the executives and the directors, but also to the

8  rank and file employees, because those were often very large

9  grants.

10       So I -- my perception of it was not that there was

11  special focus on general counsels.

12  **Q**   All right.  After -- after the attention began to get

13  focused on options, it was after that sort of heightened

14  attention that you had the conversations with Kent Roberts that

15  you described this morning.  Correct?

16  **A**   Yes, it was -- as I recall, the Journal article may have

17  been in April.  You probably know better than I.  And I spoke

18  with Mr. Roberts in May.

19  **Q**   Now, when you spoke to Mr. Roberts in the conversation I

20  think you took from your driveway on your cell phone,

21  Mr. Roberts in that conversation told you that Terry Davis had

22  told him -- that is, had told Kent that he, Terry Davis, was

23  authorized to make this change.  Correct?

24  **A**   Yes.

25  **Q**   And Mr. Roberts didn't say to you in that conversation

1  that he believed the change had violated any rule or policy at

2  McAfee, correct?

3  **A**   He did not use those words.

4  **Q**   And he did not say to you that he thought the change that

5  had been made violated any law, correct?

6  **A**   He did not use those words.

7  **Q**   He said he -- he said that the change had occurred, and he

8  recognized it was going to get attention, correct?

9  **A**   No, I -- I don't think he said "attention."  In that call,

10  he didn't say "They're going to find it" or "They will pay

11  attention to it."

12  **Q**   Okay.

13  **A**   What he said is "I'm going -- I made a mistake.  I'm going

14  to tell Samenuk about it."

15       It was in the second call that he said either "I

16  think they found it," or "They're about to find it."

17  **Q**   Samenuk, at the time, was the CEO, correct?

18  **A**   Yes.  He may have also been chairman, I'm not sure.  But

19  he was the CEO.

20  **Q**   Mr. Lucey asked you a number of questions about Mr. Davis.

21  He was the controller.  There was also a time when he was the

22  acting CFO of the company, correct?

23  **A**   I'm really reaching.  I think so, but if so, it would have

24  been for a very short time.  Nobody ever really thought of him

25  as the CFO, but I have a dim recollection that he was interim

1    for a period.

2    **Q**    You said that Mr. Davis told you that some time after --

3    I'm sorry, you said that Mr. Roberts told you that some time

4    after Davis had said he was authorized to make the change in

5    the grant, that Kent had realized that there was something -- I

6    think you said it wasn't appropriate.

7            Do you recall for sure that he used the words "wasn't

8    appropriate"?

9    **A**    No, I -- I tried to be careful when the Government was

10   questioning me.  What I think he said was that he realized

11   after it, that it was a mistake.  But I can't swear that he

12   used the word "mistake."  I think "inappropriate" was my word.

13           But he said that after that happened, he realized

14   that it shouldn't have happened.  I don't remember exactly what

15   word he chose.  And so, he was going to remedy it by never

16   exercising.

17   **Q**    Okay.  So, you're not saying he said it was inappropriate,

18   and you can't swear that he said it was a mistake.  Correct?

19   **A**    I think he did not use the word "inappropriate."  That was

20   my word.  I think he said "mistake," but I'm not positive.

21   **Q**    Okay.  Did you understand that Davis was somebody who you

22   and others could turn to for accounting issues at the company?

23   **A**    Well, when you say "turn to for accounting issues," there

24   was some level of information that one could begin to get

25   through Terry Davis.

1              But if by "turn to" you mean "relying on," no, we

2   didn't actually -- there -- there were views about his

3   capability and competence that would not cause you to say,

4   "Let's go get the answer from Terry Davis."

5              He -- I don't know if that makes sense.

6   Q    Yes.  Terry Davis no longer works for McAfee, correct?

7   A    Correct.  He was terminated several years ago.

8   Q    But he is alive and living on the West Coast, to your

9   knowledge?

10  A    I -- I don't -- I don't know anything about where he is.

11  I hope he's alive, but I don't know where he is.

12  Q    As far as you know, he's alive?

13  A    I honestly -- I mean, no one has said Terry Davis passed

14  away, but I don't know.

15  Q    Okay.  After -- after -- or during the conversation you

16  had from your driveway, you said in addition to things you have

17  already talked about, you told Mr. Roberts that when he met

18  with the folks in New York to talk about this, he should be

19  contrite or he should say he was sorry.  Correct?

20  A    No, that's not what I said.  What I said was that in

21  either the first call in my driveway or the second call, when

22  he was in New York, I recall in one of those, saying, "Look,

23  when you go in and talk to them, don't sugarcoat it, and don't

24  BS them."

25              I don't recall using the word "contrite."  It's

1  possible.  But I'm pretty sure I remember saying "Don't

2  sugarcoat it, and don't try to BS them."

3  Q    Are you saying you didn't use the word "contrite"?

4  A    No.  I'm saying I may have.  I don't recall it.  I may

5  have.  But the words I remember is "sugarcoat" and "Don't BS

6  them."  But I might have used the word "contrite."

7         Your question was had I testified to that.  And no,

8  that's not what I answered to the Government.

9  Q    Well, have you testified to that previously?

10 A    One of your partners asked me about that at a deposition.

11 And what I thought I said was "I may have used the word

12 'contrite,' but I don't recall using it."

13 Q    After the conversation that Mr. Roberts had in New York

14 with Samenuk and others, did you have a conversation with the

15 Securities and Exchange Commission that related to the

16 conversations he had had in New York?

17 A    Yes.  The -- I called -- the board later fired

18 Mr. Roberts.  A couple of days later.  And, the company was

19 going to disclose that.

20        And because the SEC had been looking at the company

21 for matters, we decided rather than just letting them read it

22 in the paper, I would call the Government lawyers and give them

23 a heads-up.

24        And so, in that call, we gave them sort of a quick

25 summary of what had happened.

1  Q    You -- and that call took place after you had received

2  telephone calls or had had conversations by telephone with

3  either Samenuk, O'Leary, or Dutkowsky in New York, correct?

4  A    I don't recall talking to O'Leary and Dutkowsky about it,

5  other than maybe in a board meeting.  I recall Samenuk calling

6  me immediately after Kent talked to them.

7  Q    And the conversation with Samenuk occurred prior to your

8  conversations with the SEC?

9  A    Yes.

10 Q    And you had two conversations with the SEC on May 30 of

11 2006, correct?

12 A    I don't remember the date.  I know it was just after

13 Mr. Roberts was terminated.

14        And frankly, I don't remember a second one, but I

15 think at the deposition your partner showed me some notes from

16 the SEC that refreshed me a little bit on the second one.  But

17 I can't independently tell you I recall a second phone

18 conversation.

19 Q    So, you do -- do you recall talking with two people from

20 the SEC, one named Larry Renbaum, and the other named Yuri

21 Zelinsky?

22 A    Yes.  I don't recall the date, but I remember calling

23 them.

24 Q    And, do you remember that you talked to them about the

25 conversations you had had with Mr. Samenuk concerning

1  Mr. Roberts' grants?

2  **A**    I didn't think -- I know they took notes on it.  I don't

3  recall telling them about a conversation with Samenuk.  The

4  call was to say "Heads up, McAfee has terminated the general

5  counsel.  The general counsel met last week with the CEO and

6  told him the following.  And then the board terminated him."

7          But I don't recall telling them about a conversation

8  that I had with Samenuk, if I understand your question

9  correctly.

10  **Q**    Do you recall telling them what you understood

11  Mr. Roberts's conversations in New York to have included?

12  **A**    Yes.  At a high level.

13  **Q**    Okay.  And do you recall the representatives of the SEC

14  asking you questions during that conversation?

15  **A**    Well, it's the Government, so I'm sure they asked me

16  questions.  But I don't really recall what they were.

17  **Q**    And you recall -- well, to the extent they asked you

18  questions, I assume you answered the questions?

19  **A**    Yes.  If they had asked me about privileged material, I

20  would have declined to answer.  But it wasn't really -- I

21  recall it being sort of a quick heads-up.  "This is going on at

22  McAfee."

23          They were -- they always are concerned about

24  preserving evidence.  But, I don't recall them asking me a lot

25  about what happened.  And I can't really recall any particular

1   questions.

2   **Q**    Do you -- do you recall, though, that you answered --

3   other than if they involved privilege issues, you answered the

4   questions that were put to you?

5   **A**    I mean, as an honest person I always wants to say yes, I

6   answered whatever they asked me.  But I have trouble

7   remembering details of that call.  I gave them a heads-up.  I

8   have looked at their notes of the call, which your partner had

9   given me.  And nothing in that leapt out at me as, like, way

10  off.

11          But I don't recall -- the call was not momentous

12  enough for me that I can say, "And then he said this, and I

13  said that."  It was much more of a quick call.

14  **Q**    Was it an important call?

15  **A**    They needed to -- yes, in the sense that I didn't want

16  them to read about it in the paper.  I wanted them to hear

17  about it from the company.

18  **Q**    Was it a call that you made as part of the work that you,

19  as a lawyer, did for McAfee?

20  **A**    Sure.

21  **Q**    Is it a call that McAfee, based on your understanding, the

22  board would have expected you to make to the SEC?

23  **A**    It's hard to say what their understanding was.  I was a

24  lawyer representing the company, and so it made sense to give

25  the SEC a heads-up, instead of having them angry that they

1   learned about it from the paper.

2         I don't know if people would have expected that or

3   not, but it seemed like the prudent thing to do, as the

4   company's lawyer.

5   Q   Do you know whether you told Mr. Samenuk or anybody else

6   at the company that you had made the call?

7   A   Well, fortunately I don't remember, so I don't have to say

8   that may be privileged.  But I can't waive the company's

9   privilege here today.  I work for them.

10        And so, I can't give you conversations between me and

11  people at the company that are subject to the attorney/client

12  privilege.  But I can avoid that fight, because I don't

13  remember.

14  Q   But you had a conversation with the SEC concerning a man

15  who you say you had worked with, at the time, for almost ten

16  years, and who had been terminated.  But as you sit here today,

17  it's your testimony to this jury that you actually don't

18  remember the substance of that call?

19  A   No, I just said the opposite.  I do remember the substance

20  of it.  I don't remember in detail particular questions or

21  answers.  But the substance of the call I remember.

22        I gave them a heads-up at a high level about what had

23  happened, and why the general counsel was leaving the company.

24  Q   Did you tell the SEC that Kent Roberts, at the time the

25  grant was changed, had specifically asked Terry Davis if he,

1    Terry Davis, had authority to make the change?

2    **A**    So I -- again --

3    **Q**    Can you answer my question yes or no?

4    **A**    Based on the document that your partner gave me, I believe

5    I did tell them that.

6    **Q**    And, okay.  Let me just show you a document which has been

7    marked as Exhibit 1762.

8              **MR. NEAL:**  Your Honor, may I approach?

9              **THE COURT:**  Yes, you may.  And you don't have to

10   repeat the request.

11             **MR. NEAL:**  May I approach Your Honor?

12             **THE COURT:**  Yes.

13             (Witness examines document)

14   **BY MR. NEAL**

15   **Q**    1762 is a June 2nd, 2006 memo from Lawrence Renbaum of the

16   SEC to a file called "McAfee File," and it's a memo that

17   relates to two telephone conversations that the SEC had with

18   you, Mr. Feldman, on May 30, 2006.

19             So that's what it purports to be, correct?

20   **A**    That's what the document says, yes.

21   **Q**    Would you take a moment to read that document?

22   **A**    I -- I read it again the other night.  So --

23   **Q**    You read it, getting ready for today?

24   **A**    Yes.

25   **Q**    Okay.  Reading it, is there anything in that memo that you

1  believe is inaccurate as it reports the conversation that

2  Mr. Renbaum of the SEC says that he had with you, the

3  conversations he said he had with you on May 30, 2006?

4  **A**    Though -- when I -- as you know, Mr. Neal, I had never

5  seen this because it's a Government document, until the

6  deposition.  And I saw it then.  And then, recently, I saw the

7  handwritten notes that underlay it.  And those seemed to me to

8  be slightly more accurate than this.  The notes that the

9  Government took.

10       But in general, this seems to get the drift, but I do

11  recall that when I read this fellow Mr. Renbaum's handwritten

12  notes, those looked a little more accurate to me.  But, nothing

13  leapt out at me as wrong on this.

14  **Q**    I'm going to show you Exhibit 1763.

15            **THE COURT:**   Thank you.

16            (Witness examines document)

17  **BY MR. NEAL**

18  **Q**    1763, those are the handwritten notes you just referred

19  to?

20  **A**    Yes, exactly.  Thank you.

21  **Q**    And you have had an opportunity to review those a couple

22  of times, I take it?

23  **A**    Not a couple.  I just -- somebody gave them to me the

24  other night, and so I read them.  That was the first time I had

25  ever seen them.

1    **Q**    Reading those, do those -- those appear to you to be an

2    accurate record of the conversations that you had with

3    Mr. Renbaum on the 30th of May, 2006?

4         (Witness examines documents)

5    **A**    Yes.  So, when I mentioned a minute ago -- the answer is

6    yes.

7         When I mentioned a minute ago that I thought there

8    was some disparities between the handwritten notes and the

9    memo, the one that leapt out at me was that the memo talked

10   about the meeting with Samenuk on Thursday night in advance of

11   a Friday shareholder meeting.  Which was not my recollection.

12        Whereas, the handwritten notes refer to an annual

13   meeting on Thursday and a meeting with Samenuk and Roberts on

14   Wednesday night.  So the handwritten notes actually fit my --

15   my memory better.

16        But the question you asked initially on this was did

17   I tell -- I think you asked, did I tell the SEC --

18   **Q**    Right now, the question -- I think the question I asked

19   you is whether the notes that are in Exhibit 1763 are, to the

20   best of your recollection, an accurate reflection of the

21   conversation that you had with the SEC on May 30, 2006.

22   **A**    Yes, they appear to be.

23        **MR. NEAL:**  Your Honor, I'll offer Exhibit 1763.

24        **THE COURT:**  1763?

25        **MR. LUCEY:**  Your Honor, we would object.  There's

1  been no foundation laid.  This is not a document he created,

2  not a document that he wrote.

3          He certainly can be asked questions about it during

4  cross-examination, but --

5          **MR. NEAL:**  You don't dispute that these are notes

6  that were taken by the Securities and Exchange Commission when

7  they talked to Mr. Feldman, do you?

8          **MR. LUCEY:**  We do not dispute that, Your Honor.

9  Well, they may be, but --

10          **THE CLERK:**  Perhaps they may be, but I don't know

11  how you would lay a foundation for them.

12          You have used them to refresh his recollection, but

13  that doesn't get them into evidence.

14          **MR. NEAL:**  All right.  That's fine.  We actually have

15  the person from the SEC coming.

16          **THE COURT:**  Very well.  Okay.

17  **BY MR. NEAL**

18  **Q**    If you will look at the Exhibit 1762, other than the

19  discrepancy you just made about the day on which the

20  conversation occurred, does the memo appear to capture the

21  conversation that you had with the SEC accurately?

22          (Witness examines document)

23  **A**    There are statements that I believe I related to the SEC

24  in the call that are reflected in that person's handwritten

25  notes, but not fully reflected in the typed-up memo.  So, just

1   looking at these two, the notes appear to be more detailed and

2   accurate.

3   **Q**   Directing your attention at just one phrase or one clause

4   in the memo, and then I'm actually done, I think, do you see

5   that the June 2nd memo indicates that you reported to Lawrence

6   Renbaum of the SEC, that Kent Roberts -- or "...Roberts had

7   asked Davis" -- that is, Terry Davis -- "if he" -- that is

8   Terry Davis -- "had the authority to do that," that is, make

9   the change, "and whether it was allowable, and that Davis told

10  Roberts at the time that he had the authority, and that it was

11  okay to do it, and that Roberts apparently had relied on those

12  statements"?

13          Do you see that?

14  **A**   I see those words, in that document.

15  **Q**   And to the best of your recollection, did you say that to

16  the SEC on June 2nd, 2006?

17  **A**   I can't swear to particular words, but I don't think so.

18  So, I think the more accurate accounting is on the document

19  that you have numbered 1763, where it began by Kent telling me

20  that Terry Davis said, "I can fix that," which is in quotes in

21  the notes, but not in the memo.

22          And then, Renbaum's notes have the two questions that

23  Mr. Roberts had told me, "Kent, are you authorized," question

24  mark?

25          "Yes."

1              "Kent, are you okay with that," question mark.

2              Davis:  "Yes."

3              That's how I recall doing it.  I don't recall -- but

4    you know, it's hard to remember a particular word.  I don't

5    think I said "allowable," and I don't think I said anything

6    about reliance.

7    **Q**    Okay, but --

8    **A**    And that's not in the note, so I don't know where Renbaum

9    got it for the memo.

10   **Q**    But where the memo took the answers to the questions that

11   you had just given and wrote a summary that said Roberts had

12   asked Davis if he had the authority to do that, and that Davis

13   had told Roberts that he had the authority, that is consistent

14   with the answers you gave to the questions?

15   **A**    Absolutely.

16            **MR. NEAL:**  Thank you.

17            I have no other questions, Your Honor.

18            **THE COURT:**  Do you have anything on redirect?

19            **MR. LUCEY:**  Just briefly, Your Honor.

20                      <u>**REDIRECT EXAMINATION**</u>

21   **BY MR. LUCEY**

22   **Q**    Mr. Feldman, just a couple of questions to follow up on

23   some topics you discussed with Mr. Neal.

24            I believe you testified earlier that you said words

25   to the effect of "No one ever thought of Terry Davis as a CFO,

1    even if he had been at some point in time" -- I think you said

2    "briefly acting CFO."

3            Could you elaborate on what you meant by that?

4    **A**    Well, given that Mr. Neal asked me if he's still alive, I

5    don't want to speak ill of the potentially dead.

6            He, Mr. Davis, was viewed within the organization as

7    having a particular skill set.  And it was not the skill set

8    that one would want of a CFO.  Maybe that's a polite way to put

9    it.

10   **Q**    Can you give us some more detail about where those views

11   may have come from, or what they were based upon?  I apologize.

12   **A**    So, as I say, I'm not -- and this is through the people I

13   worked with.  It wasn't through my direct experience.

14           **MR. STEPHENS:**  Your Honor, I'll object.

15           **THE COURT:**  I think -- yeah, you can't go much

16   farther than that.

17           **MR. LUCEY:**  Fair enough.

18   **BY MR. LUCEY:**

19   **Q**    You also mentioned in passing during your testimony with

20   Mr. Neal, that -- in terms of the level of information that you

21   would receive from Mr. Davis, and the views about competence,

22   can you speak to that, based on your own personal experience,

23   where those views came from, you had mentioned during your

24   examination with Mr. Neal?

25   **A**    It was from -- we were defending accounting cases.  And

 1  Terry was our main resource at the company on them.  And it was

 2  frustrating for our team to deal with him.

 3          The -- the discussion I especially remember on

 4  several occasions is people saying that when you --

 5          **MR. NEAL:**  Your Honor, objection to this.

 6          **MR. LUCEY:**  These are issues that Mr. Neal went into

 7  on -- during examination.  I just want to understand what his

 8  basis for saying that is.

 9          **MR. NEAL:**  I did not go into what other people said.

10          **THE COURT:**  Well, what does it go to?  Because it

11  sounds like hearsay to me.

12          **MR. LUCEY:**  I don't want Mr. Feldman, again, to --

13  hearsay.  To the extent he has personal knowledge that he

14  understands, from his experience working on these matters with

15  Mr. Davis, both directly and indirectly, I think it's both

16  permissible and relevant to what Mr. Neal talked about.

17          **MR. NEAL:**  He just said anything he knew, he heard

18  from other people.

19          **THE COURT:**  This is one of the problems, because you

20  are offering it for truth of the matter.  It's not -- right?  I

21  mean, that -- that he behaved, and that people said he behaved

22  in a certain manner, or had certain skill sets, or -- whatever.

23  And --

24          **MR. LUCEY:**  And, Your Honor, I certainly agree with

25  that, that ruling, in terms of if he's speaking about what

1   other people have told him.  We're not looking for that answer.

2          But I think Mr. Feldman did testify, both during the

3   examination with myself and with Mr. Neal, that he had personal

4   interaction with Mr. Davis, as well.  And he --

5          THE COURT:  Well, he can only testify as to the --

6   the conclusions he arrived at based upon those personal

7   interactions, and not based upon what someone told him.

8          MR. LUCEY:  Fair enough, Your Honor.

9   BY MR. LUCEY

10  Q   So, with that in mind, Mr. Feldman, can you answer my

11  question?

12  A   I'm afraid with that limitation I can't, because I either

13  met him never, or once, briefly.  And my impressions of him

14  were derived from the people I worked with on my team, not from

15  sitting down with Mr. Davis.

16         MR. LUCEY:  Fair enough.  Thank you.

17         THE COURT:  Anything further?

18         MR. NEAL:  No, Your Honor.

19         THE COURT:  May this witness be excused, not subject

20  to being recalled?

21         MR. NEAL:  Yes.

22         MR. LUCEY:  Yes, Your Honor.

23         THE COURT:  You are excused, Mr. Feldman.

24         I will remind you, as with every witness, that you

25  are not to discuss your testimony with any other persons who

 1  may be witnesses, until trial is over.

 2          **THE WITNESS:**  Okay.

 3          **THE COURT:**  Thank you.

 4          **THE WITNESS:**  Thank you, Judge.

 5          (Witness excused)

 6          **THE COURT:**  And ladies and gentlemen, we will give

 7  you a recess now.  About time?  (Laughter)

 8          And, please recall the instructions.  Do not discuss

 9  the case amongst yourselves or anyone else.  And we will see

10  you in about 15 minutes.  Thank you.

11          (Recess taken from 10:50 to 11:18 a.m.)

12          **THE COURT:**  You may be seated.

13          **MS. BEELER:**  The Court's notebooks, if you like.

14          **THE COURT:**  Is this the exciting part of the trial?

15          **MS. BEELER:**  Yes.

16          **THE COURT:**  Okay.  Everybody had a lot of coffee?

17          **MS. BEELER:**  It's not a reflection of me.

18          **THE CLERK:**  Is this the rebuttal binder?

19          **MS. BEELER:**  I'm not going to talk about those.  I

20  put the extra exhibits in the binder.

21          **THE COURT:**  Call your next witness, please.

22          **MS. BEELER:**  United States calls Stuart Nightingale.

23          **THE COURT:**  Mr. Nightingale, if you would just come

24  right up here, please, and be sworn.

25          Stand and raise your right hand, please.

1              **STUART NIGHTINGALE,**

2  called as a witness for the Plaintiff herein, having been first

3  duly sworn, was examined and testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Please state your full name, spell your

6  last name for the record.

7              **THE WITNESS:**  Stuart Nightingale.

8  N-i-g-h-t-i-n-g-a-l-e.

9              **THE COURT:**  You may be seated.

10             **DIRECT EXAMINATION**

11 **BY MS. BEELER:**

12 **Q.**   Good morning, Mr. Nightingale.

13 **A.**   Good morning.

14 **Q.**   Where do you work?

15 **A.**   McAfee.

16 **Q.**   What do you do there?

17 **A.**   I'm the accounts manager in the stock administration

18 department.

19 **Q.**   Before we talk about your job at McAfee, why don't you

20 give us a little bit of your background, starting with your

21 education.

22 **A.**   I was born in England.  I'm a UK citizen.  I held an

23 engineering degree from the University of Oxford.  I'm a chart

24 accountant, which is equivalent to a U.S. CPA.  I have just

25 over 15 years of experience in the accounting and finance

1  industries.

2          I started my career with Arthur Andersen in the UK,

3  and moved to the Dallas office in 1997.  Held a couple of

4  different finance positions before I started working at McAfee

5  in November 2004.

6          At that time, I was in the finance department as a

7  contractor.  And I took a full-time position in the stock

8  administration department in March of 2006, as a senior

9  accountant.

10         I was promoted to accounting manager in 2007.  And

11 effective April 2008, I've been charged with the department

12 where my previous manager resigned from the company.

13 **Q.**   All right.  That's at McAfee?

14         **THE COURT:**  Hold on just a moment.

15         Ladies and gentlemen at the end of the jury, can you

16 hear the witness?  Not too well.  Can you pull the mic up here.

17         **THE WITNESS:**  I'm sorry.

18         **THE COURT:**  The preceding witness was a little

19 shorter.  Speak in the mic, please.  Thank you.

20         **MS. BEELER:**  Before I ask you about stock

21 administration, the parties have entered into a stipulation

22 about the company name, which has been previously marked as

23 Exhibit 71.  And with the Court's permission, I will now read

24 it into the record?

25         **THE COURT:**  Yes.

1          **MS. BEELER:**  "The United States and the defendant,

2    Kent H. Roberts, stipulate to the following:  McAfee, Inc. is a

3    Delaware corporation with its headquarters in Santa Clara

4    California.  Prior to June 2004 McAfee, Inc. was called Network

5    Associates, Inc., which originally was incorporated in 1990,

6    and also had its headquarters in Santa Clara, California.

7          "The company, both as Network Associates and McAfee,

8    Inc., is a publicly-held corporation whose stock was registered

9    with the United States Securities and Exchange Commission, the

10   SEC, pursuant to Section 12b of the Securities and Exchange Act

11   of 1934.  Its fiscal year ends on December 31st.

12          "The securities, or stock, of Network Associates,

13   later McAfee, are, quote, securities, closed quote, pursuant to

14   15 U.S.C. Section 78JB and 78FF, and 17 C.F.R. 240.10B-5.

15          "Network Associates shares initially traded on the

16   National Association of Securities Dealers Automated Quotation

17   system, or NASDAQ, under the symbol N-E-T-A, NETA.

18          "On February 12, 2002, Network Associates shares

19   began trading on the New York Stock Exchange, NYSE, under the

20   symbol NET.  After June 2004, its shares began trading on the

21   New York Stock Exchange under the symbol MFE.

22          "The NASDAQ and NYSE are national securities

23   exchanges.

24          "This stipulation, marked as 71, may be admitted in

25   evidence at trial, as stipulated by the parties."

1              And I offer Exhibit 71 into evidence.

2              **THE COURT:**  71 is admitted.

3              (Plaintiff's Exhibit 71 received in evidence.)

4  **BY MS. BEELER:**

5  **Q.**   So just tell us briefly what product -- what's McAfee's

6  product?

7  **A.**   McAfee is a publicly-traded company.  Our stock is on the

8  New York Stock Exchange.  We are a -- hold $1 billion of

9  revenues annually.  We have about 4500 employees.  And our

10  products are primarily software that's related to, for example,

11  antivirus software or security software for computers.  It

12  could be for individual home use or for all the way through to

13  large corporations.

14  **Q.**   For your computers?

15  **A.**   For computers, yes.

16  **Q.**   So turning now to your position in stock administration,

17  what's your -- tell us your official title again.

18  **A.**   Accounting manager of stock administration department.

19  **Q.**   And what does being in the stock administration department

20  entail?

21  **A.**   Basically, I'm mentoring all of the systems and records

22  relate to the company's equity programs, which includes stock

23  options that are issued to our employees and directors.

24  **Q.**   Could you just tell us, on a very meta level, what stock

25  options are?

1  A.   It's a form of compensation where the companies -- usually

2  publicly-traded companies can issue to their employees, such

3  that if the company stock increases over time those employees

4  can basically make money from that and realize compensation.

5  Q.   So in a very sort of fundamental level, what does a stock

6  option look like to an employee who gets one?

7  A.   Usually, quite commonly, an employee would receive a stock

8  option as part of their new hire offer letter or that could be

9  issued for employee retention.  But usually the employee would

10  know how many stock options they receive.  So it could be a

11  hundred stock options or a thousand stock options or 10,000

12  stock options, depending on the level of the employee.

13  Q.   What is an actual stock option?  What is it?

14  A.   It basically gives the holder the right to buy a share of

15  McAfee's common stock at a fixed price.

16  Q.   Can you just give an example of how that would work for on

17  employee?

18  A.   Right.  So if I'm an employee and I receive a stock option

19  grant, let's say June 30th, and the stock price of McAfee is

20  $30, then I -- I could -- I would hold the stock option with an

21  exercise price of $30.

22  Q.   What do you mean by "exercise price"?

23  A.   That's the price that I would have to pay in order to

24  purchase a share of McAfee's common stock in the future.

25  Q.   So it's a right to buy a stock for $30?

1  **A.**   At a specified price, yes.

2         Let's say the company performs well, and the stock

3  price increases such that let's say two or three years later

4  when I have vested in the right to exercise that stock option,

5  if the stock option is then trading at, say, $90, for example,

6  then I could buy -- buy a share of the company's stock for $30,

7  but it would be worth $90.  So I could sell that share on the

8  stock market for $90.  So in that example I would realize $60

9  of income.

10  **Q.**   You used the word "vesting."  What does vesting mean?

11  **A.**   Usually stock options are -- usually there's a -- they

12  aren't immediately exercisable.  Employees have to earn the

13  right to exercise the stock option over a period of time.

14  **Q.**   By "exercise" you mean just use it?

15  **A.**   Yes.

16  **Q.**   So you can't do it right away.  So what does vesting

17  actually mean?

18  **A.**   The -- the vesting is the period of time over which you

19  earn the right to those options.  So most commonly, for

20  example, if I had an option for 1,000 stock options, 25 percent

21  of those would vest after one year of employment.  So that

22  example I would be able to exercise 250 options after one year,

23  and then they vest monthly thereafter.

24  **Q.**   So is it fair to say that what you're given is the right

25  to buy a stock?

1  **A.**   Yes.

2  **Q.**   But you don't necessarily get to do it right away?

3  **A.**   Correct.

4  **Q.**   So you might get some after a year --

5  **A.**   Right.

6  **Q.**   -- and more after a second year?

7        Okay.  Now, what role does stock administration play

8  in keeping track of stock options?

9  **A.**   Well, we maintain the systems and records of all the stock

10  options.  So that would include a database.  That includes all

11  the newly-granted stock options, the exercises of stock

12  options, and cancellations of stock options that occur when

13  employees terminate their employment.

14  **Q.**   So you keep track of what you've given; is that what the

15  database is really for?

16  **A.**   Yes.

17  **Q.**   And, again, exercising is just using the option to buy the

18  stock -- to get the stock?

19  **A.**   Correct.

20  **Q.**   So one of your functions, it sounds like, is tracking

21  what's given to employees and also tracking what's sold.  Are

22  there any other functions that stock administration plays with

23  stock options?

24  **A.**   When an employee exercises the option, that's a -- that's

25  a form of taxable compensation.  So we have to report that

1   information to our payroll department.

2   **Q.**   And using your example of the paying -- paying 30 to get

3   $90, can you just tell us what you mean by it's a taxable

4   situation.

5   **A.**   Well, in that example the employee realized $60 of taxable

6   income.  So it's directly comparable to, say, a salary.  So

7   it's $60 of income that would be reported to the IRS as income.

8   And we as a company are obliged to withhold federal -- federal

9   taxes, state tax, local taxes, Social Security, on that income.

10  **Q.**   So it sounds very similar to salary --

11  **A.**   It is.

12  **Q.**   -- and withholding.

13         Okay.  Now, just very generally -- and I'm not going

14  to go into a lot of specifics, but are there special rules for

15  officers, high-level officers of the company?

16  **A.**   Right.  The SEC requires all -- all stock option

17  transactions that relate to officers and directors of the

18  company are disclosed on special forms that the company is

19  required to submit to the SEC.

20  **Q.**   Okay.  And in your position of working in the stock

21  administration department, do you know what the -- generally

22  what the purpose of those rules is?

23  **A.**   I believe it's to -- it's a disclosure requirement such

24  that the stock market can see what -- what those individuals

25  are doing with the company stock.  It's not just limited to

1  stock options.  Any type of purchase or sale of company stock

2  would be reported like that.

3  Q.  Okay.  So now I'd like to turn to some specific records

4  that -- from the stock administration department, about some of

5  Mr. Roberts' grants.

6        But I just want to make clear, before we start, you

7  weren't working in the year 2000, at McAfee, you already

8  testified, right?

9  A.  That's correct.

10  Q.  So you're going to talk about some of these records

11  because you're the head of stock administration and not because

12  you were there in the year 2000 --

13  A.  Correct.

14  Q.  -- is that fair?

15        MS. BEELER:  So I'm going to start with what's

16  previously been marked as Exhibit 12, and that also has a

17  custodial declaration authenticating it as a business record.

18  And I offer Exhibit 12 into evidence.

19        MS. EAGAN:  No objection.

20        THE COURT:  There is no objection.

21        (Plaintiff's Exhibit 12 received in evidence.)

22        MS. BEELER:  May I approach?

23        THE COURT:  Yes.

24        MS. BEELER:  I'll be approaching a few times.

25        THE COURT:  You don't have to repeat the request.

1        MS. BEELER:  Exactly.  I was just going to ask once.

2        THE COURT:  Now, do we have these exhibits in the

3   binders here?

4        MS. BEELER:  You do.

5        THE COURT:  Which of those binders?

6        MS. BEELER:  Binder --

7        THE COURT:  Binder 1?  That's it.

8        MS. BEELER:  Should be.

9        THE COURT:  Okay.  Thank you.

10  BY MS. BEELER:

11  Q.   So this is exhibit -- do you recognize what that is?  You

12  could pull it out.

13  A.   This is the hard copy stock administration file for Kent

14  Roberts.

15  Q.   So you're familiar with it?

16  A.   Yes.  Yes.

17  Q.   Is it a file that's maintained -- that's part of the stock

18  administration files?

19  A.   Yes, it is.

20  Q.   So you reviewed it and you're familiar with its contents?

21  A.   Correct.

22  Q.   Now, it's a paper file; is that fair enough?

23  A.   Yes.

24  Q.   Do you still maintain records in the same kind of paper

25  form in stock administration, or do you have a different way of

1    keeping track of documents now?

2    **A.**    We currently don't maintain individual folders for

3    officers and directors.  We maintain the records in electronic

4    files and folder.  We have the stock option database, and we do

5    have several other forms of hard copy binders.  But we do not

6    keep individual binders like this at this time.

7    **Q.**    So just sort of from a foundational perspective, is it

8    fair to say that this binder contains certain transactions up

9    to a certain period of time?

10   **A.**    That's correct.

11   **Q.**    And then after that you went electronic?

12   **A.**    That's my understanding, yes.

13   **Q.**    Okay.  Now, just generally, through what period of time

14   are some of the -- are the documents that we're looking at in

15   this folder?

16   **A.**    I believe the documents go all the way through mid 2004.

17   **Q.**    Okay.  And do you -- do you know now, based on your

18   position in stock administration, roughly what that period of

19   time in 2004 was?  Was that a transition to an electronic

20   system?

21   **A.**    Right.  We switched from -- we switched to a

22   fully-outsourced solution with our broker, which was UBS.

23            So previously a lot of the forms that were used by

24   stock administration were hard copy forms.  But when we

25   switched in 2004 to UBS, many of those forms were electronic or

1    could be handled online through individuals' accounts.  So

2    those aren't the same paper flow that was required from that

3    point onward.

4    **Q.**    Just to finish the loop on recordkeeping, have you

5    actually brought everything back in-house at this point,

6    electronically, from a recordkeeping perspective?

7    **A.**    Be more specific.

8    **Q.**    Are you still with UBS for your electronic database --

9    **A.**    No, we are not.  We are not with --

10   **Q.**    And how do you handle --

11   **A.**    -- UBS any longer.

12             (Reporter interrupts.)

13   **Q.**    So -- you were with UBS.  How do you keep track of records

14   electronically now?

15   **A.**    We are currently with E-Trade as our broker.  And

16   effective January 1st, 2006, we started using E-Trade's Equity

17   Edge database, which ran in parallel with the UBS system until

18   mid 2006.  And we fully -- fully transitioned to E-Trade as our

19   broker in June of 2006.

20   **Q.**    Okay.  So going back to the paper age, let's have a look

21   at the stock administration file.  I'd ask you to turn to

22   the -- I've labeled the -- the pages are A, B, C, D, E, F.  I

23   would ask you to turn to the back of the folder, at the board

24   labeled F.

25             **MS. BEELER:**  And for you it should be in the first

1   document on the top.  For Judge Patel it should be 12F-2.  And

2   for display purposes.

3   **BY MS. BEELER:**

4   **Q.**   So I'd ask you to look at this document.  And ask if you

5   recognize it.

6   **A.**   I do.  It's a personnel action form.

7   **Q.**   And who is it a personnel action form for?

8   **A.**   Kent Roberts.

9   **Q.**   And what does this form reflect?

10  **A.**   This form reflects a promotion to VP of legal affairs; the

11  issuance of a stock grant related to that promotion, for 20,000

12  shares, with an exercise price as of February 14th, 2000.

13  **Q.**   What is the date that this personnel action form is

14  signed?

15  **A.**   July 5, 2000.

16  **Q.**   Now, so this is a document reflecting a stock option; is

17  that fair?

18  **A.**   Yes.

19  **Q.**   Okay.  So I want to sort of continue -- we're going to

20  come back to that folder, but I want to continue to walk

21  through certain documents from stock administration.

22             **THE COURT:**  Ms. Beeler --

23             **MS. BEELER:**  Yes.

24             **THE COURT:**  Do you anticipate that these are to be

25  shown to the jury on the monitor?

1          MS. BEELER:  Yes.  I thought that was happening.

2          MS. BARBER:  No.  I have to wait for Tony to turn on

3    the monitor.

4          THE COURT:  Do you have to do this now?

5          THE CLERK:  Well, sometimes (inaudible response to

6    the Court).  So we have control of what gets published to the

7    jury.

8          THE COURT:  Okay.

9          MS. BEELER:  We'll just show it.

10          THE COURT:  All right.

11          MS. BEELER:  Now.  So that's what we were talking

12    about.  That must have seemed very obscure.

13          (Document displayed.)

14   Q.   Just to sort of look at that document again, we talked

15   about this being a personnel action form?

16   A.   Correct.

17   Q.   Showing a stock option grant.  And do you just want to

18   tell us, again, and maybe Robin can show us by popping it out

19   on the form, what the -- you said this is for Mr. Roberts, and

20   it has an effective date of February 14th.

21          MS. BEELER:  And what -- what does it give under the

22   comments section, Robin?  Pop that up to see.

23          (Document displayed.)

24   Q.   All right.  So that was what you just talked about?

25   A.   Correct.

1  Q.   That it was an option grant for 20,000 shares, with an

2  exercise price as of February 14.

3        MS. BEELER:  And just one more thing, and that will

4  catch us up.  The authorization at the bottom.

5        (Document displayed.)

6  Q.   And that's the July 5th date you just talked about?

7  A.   Correct.

8  Q.   Both in 2000?

9  A.   Yes.

10 Q.   Okay.  So we're going to now talk about some other

11 documents, and we'll come back to the stock administration

12 folder.

13       I am handing you what's previously been marked as

14 Exhibit 10, also with a business record authentication, which I

15 think the defense doesn't have any objection to.

16       MS. BEELER:  And I would offer Exhibit 10 into

17 evidence and ask to publish it to the jury?

18       THE COURT:  No objection?

19       MS. EAGAN:  No objection, Your Honor.

20       THE COURT:  10 is admitted.

21       (Plaintiff's Exhibit 10 received in evidence.)

22 BY MS. BEELER:

23 Q.   Now, so have you looked at these minutes before?

24 A.   Yes, I have.

25 Q.   And you're familiar with minutes generally, in your role

1 as -- in stock administration?

2 **A.** Yes, I am.

3 **Q.** Now, turning to the last page, which for display purposes

4 is 10-7, what is that report? What is that document that's on

5 that page? Which for you -- I guess it's the last page of

6 yours. Can you tell us what that document is, the document

7 that says, "Grant Recap Report."

8 (Document displayed.)

9 **A.** It's a grant recap report for grants dated between

10 January 1st, 2000 and June 30th, 2000, for grants over 15,000

11 shares.

12 **Q.** Now, does that grant recap report reflect a line entry for

13 Mr. Roberts?

14 **A.** It does.

15 **Q.** And what does that say?

16 **A.** A grant to Kent Roberts, the grant date of February 14,

17 2000. That's 20,000 options granted at an option price of

18 $29.625.

19 **Q.** Now, if you would turn on your exhibit two pages earlier,

20 and which would be 10-5, and just turning to the very bottom

21 paragraph on that page, that begins with the word, "Following."

22 Would you just read that paragraph.

23 (Document displayed.)

24 **A.** "Following a discussion regarding such goals, the board

25 addressed stock option grants for certain employees. The board

1  discussed the proposed option grants and upon a motion duly

2  made and seconded, the following resolutions were unanimously

3  approved."

4  **Q.**   And then turning to the next page, if you don't mind

5  reading the second paragraph.

6  **A.**   "Resolved that the individuals set forth on the grant

7  recap report, attached hereto as Exhibit A, are hereby granted

8  stock options to purchase the number of shares of company

9  common stock set forth opposite their names."

10  **Q.**   So going back to just -- the grant recap report on the

11  next page, is it -- what is a grant recap report?  Is it just a

12  listing of grant dates and options just as we see it here?

13  **A.**   Correct.

14  **Q.**   And from your -- just in your position as stock

15  administration, just generally how are these kinds of forms

16  generated?

17  **A.**   Usually would be generated from the stock option system,

18  and then quite commonly the data would be -- it could either be

19  left in the original form of the report or it could be perhaps

20  exported to Excel and formatted for the appropriate format of

21  the report.

22  **Q.**   When you talked before about maintaining a database of

23  stock options, this kind of a report generally comes from the

24  database that you previously described?

25  **A.**   Correct.

1  Q.    Have you reviewed the stock prices for the February 14th

2  date here on this grant recap report for Mr. Roberts?

3  A.    I have.

4  Q.    And at this point -- where did you review those, the

5  price?

6  A.    Wallstreetjournal.com.

7  Q.    And what did you determine the price to be?

8  A.    The price that's on the grant recap report, 29.65.

9  Q.    So that was the market price that day?

10  A.    Correct.  I don't remember 29.65 or 29.63, but it was at

11  that price.

12          MS. BEELER:  At this point, Your Honor, the parties

13  have another stipulation about the stock data, which is a

14  stipulation which has been previously marked as Exhibit 61.

15  And I'll just read it into the record now, with the Court's

16  permission.

17          THE COURT:  And also -- excuse me.  Ladies and

18  gentlemen, these stipulations are admitted into evidence.  So

19  if you don't remember all the details of them, you will have

20  these exhibits when you go to your deliberations.

21          MS. BEELER:  "The United States and the defendant,

22  Kent H. Roberts, stipulate to the following:

23          "Attached as Exhibit A to this stipulation is a true

24  and correct copy of an Excel spreadsheet, which contains the

25  2000 to 2006 stock price data for McAfee, Inc., which comes

1   from Bloomberg.

2          "Bloomberg is a service that provides information

3   about public companies.  It provides realtime trading data as

4   well as historical trading data.  This data is generally used

5   and relied on by the public and by persons in the business

6   community.

7          "The parties agree that it is admissible under

8   Federal Rule of Evidence 803-17 as a market report, and that

9   the Court may take judicial notice of it.

10         "This stipulation, marked as Exhibit 71, [sic] and

11  the attached Exhibit A, may be admitted into evidence at

12  trial."

13         And it's signed and agreed to by the parties.

14         I offer Exhibit 61 into evidence.

15         **MS. EAGAN:**  No objection.

16         **THE COURT:**  Admitted.

17         (Plaintiff's Exhibit 61 received in evidence.)

18  **BY MS. BEELER:**

19  **Q.**   Now -- so in your position in stock administration, did

20  you obtain some other documents from stock administration files

21  in the calendar year 2000 period, that were maintained as files

22  by stock administration?

23  **A.**   I did.

24  **Q.**   I would like to turn to some of those now.

25         **MS. BEELER:**  Exhibit 17, which is another -- just

1   make sure.  17 is another authenticated business record from

2   the stock administration files from the year 2000.  And I offer

3   Exhibit 17 into evidence.

4              **THE COURT:**  I'm going to assume all of these are

5   being admitted unless you jump up and say otherwise.  Okay?

6              **MS. EAGAN:**  Okay.

7              **THE COURT:**  Okay.  We don't have to go through this

8   every time.  They are admitted.

9              (Plaintiff's Exhibit 17 received in evidence.)

10             **MS. BEELER:**  Just so the Court knows, they have the

11  custodial declarations.

12             **THE COURT:**  Okay.

13             **MS. BEELER:**  All right.

14  **BY MS. BEELER:**

15  **Q.**   So were you able to obtain certain documents from the

16  stock administration files, that are these documents here?

17  **A.**   Yes.

18  **Q.**   So they are actual printouts that were maintained in the

19  stock administration files from the calendar year 2000?

20  **A.**   Correct.

21  **Q.**   And we talked before about how that grant recap report was

22  generated from the stock database.  Are these also documents

23  that are basically hard copies of data from the stock database?

24  **A.**   Yes.

25  **Q.**   And do they appear to be printouts in 2000, based on the

1  dates on the bottom of the documents?

2  **A.**    Yes.

3  **Q.**    All right.  So I'd like to walk through a couple of them.

4  And I'll start with Exhibit 17A.  Since it's offered into

5  evidence we'll show that, which is 17A1.

6          (Document displayed.)

7          Now, what is -- so we looked at a grant recap before.

8  What is this document here?

9  **A.**    This is a grant recap report from the period January 1st

10  2000, through March 31st, 2000.

11  **Q.**    And what's the printout date for the report?

12  **A.**    July 12, 2000.

13  **Q.**    And where -- so it says, "Grant recap report," and then it

14  lists people just like before.  It says, "1997 Stock Incentive

15  Plan" at the top.  What does that mean?

16  **A.**    That's the plan from which these particular options were

17  granted.

18  **Q.**    Okay.  So just very generally, is there -- it sounds like

19  stock options come from a stock option plan?

20  **A.**    Right.  This particular plan is the main plan that McAfee

21  uses.  It's a shareholder-approved plan, which basically

22  authorizes the board of directors to issue stock options to its

23  employees.

24  **Q.**    So you have a plan that says you can do it, and these are

25  the options that were given from that plan; is that fair?

1  **A.**    That's correct.

2  **Q.**    Now, on that report is there a grant reflected on that

3  report to Mr. Roberts?

4  **A.**    Yes.

5  **Q.**    And what is that, is that the same grant that we talked

6  about before?

7  **A.**    Yes.  It's a grant with a grant date of February 14, 2000,

8  for 20,000 shares, at an option price of 29.65.

9  **Q.**    Now, turning to Exhibit 17B.  Is that another similar sort

10  of printout?

11  **A.**    Yes, it is.

12              (Document displayed.)

13  **Q.**    And what is the date on that printout?

14  **A.**    July 24th, 2000.

15  **Q.**    From the same 1997 Stock Incentive Plan?

16  **A.**    Yes.

17  **Q.**    And is Mr. Roberts' grant also reflected on that form?

18  **A.**    Yes.

19  **Q.**    Same February 14th date and price?

20  **A.**    Correct.

21  **Q.**    Turning to 17C-1.  Is this another grant recap report?

22              (Document displayed.)

23  **A.**    Yes.  It's the same type of report.

24  **Q.**    From the 1997 plan?

25  **A.**    Yes.

1  Q.   What's the date of this data run?

2  A.   October 9, 2000.

3  Q.   Okay.  Now -- and it shows the same grant to Mr. Roberts,

4  of the option at the February 14th date?

5  A.   Yes.

6         MS. BEELER:  I have another document, marked Exhibit

7  19, authenticated, which I'll also offer into evidence.

8         (Plaintiff's Exhibit 19 received in evidence.)

9  BY MS. BEELER:

10 Q.   What is Exhibit 19?

11 A.   So, it's a grant recap report.

12 Q.   So this one looks more like the one from the minutes; is

13 that correct?

14 A.   Correct.

15 Q.   Where did you get this -- where did you find this

16 document?

17 A.   This was in another binder of stock administration

18 records.

19 Q.   From the year 2000?

20 A.   It was actually in a binder that was for the year 2001.

21 It relates to grants from the year 2000.

22 Q.   Okay.  But the grant date on the top of this is the

23 January 2000 to the June 2000 period that we previously talked

24 about?

25 A.   Yes.

1    Q.   All right.  I just want to make sure.  I have a

2    momentary -- I'm going to go back and talk about one other

3    exhibit.

4         So we kind of moved up into October.  I'm just going

5    to back up a little bit.  Talk about one more set of e-mails

6    from this particular time period.

7         So this is Exhibit 13, with attachments D and E.

8    Also authenticated as a business record.  And offer Exhibits

9    13D and E into evidence.

10        **THE COURT:**  Admitted.

11            (Plaintiff's Exhibits 13D and 13E received in

12            evidence.)

13            (Document displayed.)

14   **BY MS. BEELER:**

15   Q.   So just to place this in context, to move this back, we

16   had the personnel action form of the 5th and the minutes of the

17   13th of July.  And I want to ask you if you recognize what this

18   document is.

19   A.   I do.

20   Q.   All right.  Is it -- do you recognize it as certain

21   e-mails and printout -- certain e-mails that document the grant

22   process back in the calendar year 2000?

23   A.   Yes, I do.

24            **MS. BEELER:**  So let's turn, first, to Exhibit 13D1.

25   And why don't we display that.  And for you it's just 13D.

1          Just in case anyone is confused, I'm referring to the

2    electronic number so they can come up on the computer screen.

3          (Document displayed.)

4    **Q.**   So looking in the middle of this document, do you see an

5    e-mail on July 6th, 2000?

6    **A.**   I do.

7    **Q.**   Who is the e-mail from?

8    **A.**   It's from Terry Davis.

9    **Q.**   And who is it to?

10   **A.**   Sylvia Garcia-Lechelt and Marianne Snook.

11   **Q.**   And do you know, based on your job now, who Sylvia

12   Garcia-Lechelt and Marianne Snook are?

13   **A.**   I do.

14          Sylvia Garcia-Lechelt is the former vice president of

15   human resources at McAfee.  Marianne Snook is a former stock

16   administration employee.

17   **Q.**   Would you just read the text of the e-mail to us, please.

18   **A.**   It says, "we need to get a complete list of all grants

19   over 15,000 from Jan 1 to June 30 so that we can get board

20   approval at the meeting on June 13th.  The Jan focal grants

21   need to be included in this list so PWC can confirm NAI as

22   following board policy on grant approvals.  Also, the following

23   grants have been approved by Peter and Prabhat and I will send

24   paperwork to HR and stock today.  Kent Roberts - promotion to

25   VP - 20,000 shares dated 2-14-00."

1   Q.   That's fine.  It's fine to stop there.  Thanks.

2        So, all right.  We previously talked about -- one

3   question.

4        This e-mail, you said, was dated July 6, but it says

5   in there board meeting on June 13th.  From your review of the

6   minutes, do you think that's a typo?

7   A.   Yeah.  I believe the meeting was July 13th.

8   Q.   And those are the board minutes we just looked at a few

9   minutes ago?

10  A.   Correct.

11  Q.   And the board minutes with the grant recap report we

12  talked about?

13  A.   Yes.

14  Q.   All right.  Now we're going to go back to October, where

15  we left off before we went back to July.

16       MS. BEELER:  Now I'd like to turn to some other

17  exhibits.  Exhibit 18, which I'm offering into evidence with

18  its custodial declaration authenticating it as a business

19  record.

20       THE COURT:  18 is admitted.

21       (Plaintiff's Exhibit 18 received in evidence.)

22  BY MS. BEELER:

23  Q.   Do you recognize Exhibit 18?

24  A.   I do.

25  Q.   What is it?

1  **A.**   It's a stock options and awards grant report from our

2  current Equity Edge database.

3  **Q.**   And --

4  **A.**   I should say it's the Equity Edge database that was in

5  effect prior to our stock option restatement, just to be clear.

6  **Q.**   To make it easier, is this the data in 2006, as it existed

7  in 2006, about Mr. Roberts' grants?

8  **A.**   It is.

9  **Q.**   In the company's databases?

10  **A.**   Correct.

11  **Q.**   Now, let me just ask you a question, since we're looking

12  at a database printout.

13          Once you've put data into the system, does it stay in

14  the system?  Just wondering how it works from a very mechanical

15  standpoint.  This lists different grants.  How do you get this

16  list into the database so it looks like this?

17  **A.**   How do I get the list?

18  **Q.**   How does -- how does the data entry process work, just

19  generally?

20  **A.**   Generally, option grants, once they've been approved by

21  the board of directors they are subsequently imported into the

22  Equity database.

23  **Q.**   And then they -- when you have all the options in there,

24  you can look at them in a report that looks like this?

25  **A.**   Yes.

1  Q.   So these are Mr. Roberts' grants?

2  A.   Yes.

3  Q.   Now, looking at the calendar year 2000, is there -- is

4  there an option grant for calendar year 2000, that's reflected

5  on this printout in the amount of 20,000 shares?

6  A.   Yes.

7  Q.   And what is the grant date for that?

8  A.   April 14th, 2000.

9  Q.   And the price?

10  A.   $19.75.

11  Q.   Does this printout reflect whether there is anything in

12  the system about a 20,000 option -- an option grant for 20,000

13  shares as of February 14, with a $29 date?

14  A.   It does not.

15  Q.   As far as April 14th is concerned, are you -- did you

16  review on wallstreetjournal.com the market price for that day?

17  A.   I did.

18  Q.   And is this the price, the market value of the stock on

19  April 14th, 2000?

20  A.   Yes, $19.75.

21        MS. BEELER:   So the parties have another stipulation,

22  which, is Exhibit 16, which I will read into the record now,

23  with the Court's permission.  It is a stipulation regarding

24  Transcentive data, regarding stock option grants to Kent

25  Roberts.

1          "The United States and the defendant, Kent H.

2    Roberts, stipulate to the following:

3          "As of June 2006 McAfee, Inc. maintained electronic

4    data in the form of McAfee Equity Edge and Transcentive files,

5    which are files which reflect stock options granted to

6    different employees.

7          "Attached as Exhibit A is a true and correct copy of

8    an extract of information from that data, that includes all

9    grants reflected in the system that were issued to Kent

10   Roberts.

11         "Among those grants are a grant for 20,000 options,

12   with an option grant date of April 14, 2000, and an option

13   price of $19.75.  The data reflects a create date for this

14   option of November 29, 2000, at approximately 3:34 p.m.

15         "This stipulation, marked as exhibit" -- I think I

16   have it as "Exhibit 15."  It should be "Exhibit 16" -- "and the

17   attached Exhibit A may be admitted into evidence at trial."

18         And if we could show -- let me give this to the

19   witness first.  Offer Exhibit 16 into evidence.

20              **THE COURT:**  16 or 15?

21              **MS. BEELER:**  16.  It should be 16.

22              **THE COURT:**  16?

23              **MS. BEELER:**  Yes.

24              **THE COURT:**  Okay.  16 is admitted.

25              (Plaintiff's Exhibit 16 received in evidence.)

1    **BY MS. BEELER:**

2    **Q.**   Now, does this -- does Exhibit 16 basically reflect the

3    same data that we saw previously, or the same option grants?

4    **A.**   Yes.

5    **Q.**   All right.  And just turning -- do you see the grant to

6    Mr. Roberts for the 20,000 options, at the option price of

7    19.75, grant date of 4-14-2000?

8    **A.**   I do.

9    **Q.**   And all the way over, the second to right column from the

10   end, does that show a create date of November 29th, 2000, at

11   3:34 p.m.?

12   **A.**   Yes.

13   **Q.**   So now I would like to go back to the stock administration

14   file, which is Exhibit 12.  And for you it would be tab -- the

15   board B.  That would be the file that you have in front of you.

16            If you could go to the board that's E, which is --

17   should be the one just before the one you looked at last.

18            **MS. BEELER:**  And for display purposes it's the binder

19   12E, page 12.

20            (Document displayed.)

21   **BY MS. BEELER:**

22   **Q.**   Do you recognize what this is?

23   **A.**   It's a stock option agreement.

24   **Q.**   What's a stock option agreement?

25   **A.**   That's the official document that the company issues to

1  the recipient of a stock option.

2  **Q.**   And --

3  **A.**   It specifies the key terms of the option grant.  And the

4  employee accepts -- usually signs and accepts the agreement.

5  **Q.**   It's basically the piece of paper that the employee gets,

6  showing them that they've got this electronic record in the

7  system?

8  **A.**   Correct.

9  **Q.**   And this is the option we talked about before, the right

10 to buy the stock at that price?

11 **A.**   It is.

12 **Q.**   We talked a little bit about some of the things that apply

13 to options, when we first started -- when you first talked

14 about what you do at stock administration.

15        So let's just look at this grant.  What does -- does

16 the grant agreement tell you what plan the stock option comes

17 from?

18 **A.**   This particular option comes from the 1997 stock incentive

19 plan.

20 **Q.**   And that's right in the first paragraph of this agreement?

21 **A.**   Yes.

22 **Q.**   We already talked about the date of April 14, and the

23 price, and the options.  But we have this -- the vesting

24 schedule.  You talked about vesting before, but can you tell us

25 what vesting means in the context of this form?

1  **A.**   It's basically the amount of time that has to elapse

2  before the employee can exercise the stock option.

3  **Q.**   And -- okay.  So when it says "numbers of share to vest,"

4  is that part of it, of this schedule of the form?  What does

5  that mean?

6  **A.**   So on this particular option, 5,000 shares will vest on

7  April 14th, 2001.

8  **Q.**   And then it looks like you've got a certain amount of

9  shares that vest each month afterwards?

10  **A.**   Right.  After that the options vest monthly.

11         So in order for the grant to be fully vested, there's

12  a four year -- four years from the grant date.

13  **Q.**   And do the options ever expire?

14  **A.**   They -- they expire if an employee -- if an employee

15  leaves the company, then the vesting ceases.  So vesting only

16  continues as long as the individual is employed.  Other than

17  that, there's a 10-year expiration period for the options.

18  **Q.**   And this document reflects that 10-year expiration period?

19         If you look in the first paragraph, it says in

20  general --

21  **A.**   Yes, it does, yes.

22  **Q.**   "This option will expire 4/14/2010"?

23  **A.**   Correct.

24  **Q.**   That's what you mean by an expiration date?

25  **A.**   Yes.

1  **Q.**   Did Mr. Roberts sign this form?

2  **A.**   It appeared so, yes.

3  **Q.**   On the left-hand side, do you see something regarding

4  Mr. Davis?

5  **A.**   Terry Davis, yes.

6  **Q.**   So now I'd like to walk you through Exhibit 14.  This will

7  be the Elmo portion.

8          (Document displayed.)

9          And I'll first ask you, have you had an opportunity

10 to look through these documents here that are in Exhibit 14?

11 **A.**   Yes.

12 **Q.**   Do you recognize them as being a series of e-mails in the

13 2000 time period, that appear to relate to the granting of this

14 particular option that we've been discussing?

15 **A.**   I do.

16 **Q.**   And so they reflect the process as it was happening in the

17 year 2000?

18 **A.**   Yes.

19          **MS. BEELER:**  And I'll offer 14 into evidence.

20          **MR. STEPHENS:**  Do you have an extra copy?

21          **MS. EAGAN:**  No objection, Your Honor.

22          **THE COURT:**  Okay.

23          (Plaintiff's Exhibit 14 received in evidence.)

24 **BY MS. BEELER:**

25 **Q.**   Let's turn to the e-mail that is -- bears Bates range MFE

 1  00529.  And that is the e-mail that is sent August 9, 2000.

 2          Do you have that in front of you?

 3  **A.**   I do.

 4  **Q.**   And who is that e-mail --

 5          **MS. BARBER:**  What you're seeing is on the screen.

 6          **THE COURT:**  You have to use the Elmo screen.

 7          **MS. BEELER:**  Oh, I have to use the Elmo screen.  The

 8  magic of technology.  All right.

 9          **THE COURT:**  Use a different device, I guess.

10          **MS. BEELER:**  Did not compute.  That's why everyone

11  was looking at me that way.

12          All right.  So let's look at -- I'll bring another

13  copy with me then.

14          (Document displayed.)

15  **BY MS. BEELER:**

16  **Q.**   Now, starting as many e-mails strings go, you can see it

17  starts at the bottom and moves up.  So why don't we start with

18  the e-mail at the bottom.  Who's this e-mail from?

19  **A.**   From Kent Roberts to Terry Davis.

20  **Q.**   And when was it sent?

21  **A.**   August 7, 2000.

22  **Q.**   And what does it say?

23  **A.**   "Terry, still haven't seen anything on the Feb VP option

24  grant.  Can you check into this for me?  Thanks."

25  **Q.**   And is there a reply from Mr. Davis?

1   **A.**   Yes.

2   **Q.**   And when was that sent?

3   **A.**   August 9, 2000.  Says, "Can you check this one?  He should

4   have another grant.  Call Kent to get the numbers.  And I will

5   get PAF processed."

6   **Q.**   And is there a reply on top?

7   **A.**   Yes, there is.

8   **Q.**   And who is that from?

9   **A.**   It's from Marianne Snook.

10  **Q.**   And what does the message say?

11  **A.**   "I see a February 14th grant in the system.  Do you know

12  when that was sent out?  I'll check with him and see if that is

13  the missing grant.  Thanks, Marianne."

14  **Q.**   So now let's turn to an e-mail, the e-mail that's sent

15  November 16th, 2000, at 11:55 a.m.  Do you have that in front

16  of you?  Do you see that?  I can come help.

17          (Document displayed.)

18  **A.**   Which one?

19  **Q.**   It's the one --

20  **A.**   The very first one.

21  **Q.**   No.  It should say, "From:  Marianne Snook, Dated:

22  November 16, 2000."

23  **A.**   Okay.  I have it.

24  **Q.**   All right.  And I have it on the display, to show.

25          Starting again at the bottom from the e-mail string,

1  is there an e-mail there from Mr. Roberts?

2  **A.**   Yes.

3  **Q.**   And what's the date of that e-mail?

4  **A.**   November -- November 21st, 2000.

5  **Q.**   All right.  Let's just make sure we're on the same page,

6  because I think we're on different e-mails.

7  **A.**   Do you want me to look at page 2?

8  **Q.**   I think you're looking at a different version.  That's

9  fine.  Let's just see.  Let's just look at this one.

10            **MS. BARBER:**  Laurel.  Laurel.

11            **MS. BEELER:**  Yeah.  Okay.  This is a version of the

12  same e-mail.  So we'll start with this, and we'll move to this.

13  All right.  So, here.  We'll start here (indicating).  Okay.

14            (Document displayed.)

15  **BY MS. BEELER:**

16  **Q.**   So do you see an e-mail dated November 15th, from

17  Mr. Roberts?

18  **A.**   I do.

19  **Q.**   And who is it sent to?

20  **A.**   Terry Davis.

21  **Q.**   What does the subject line say?

22  **A.**   "Things I still don't have."

23  **Q.**   And would you read the text for us?

24  **A.**   "The actual agreement on the 20,000 VP grant in

25  April 2000.  Hate to be a pest, but, could you look into that?"

1    Q.    Does Mr. Davis reply?

2    A.    Yes.

3    Q.    What does he say?

4    A.    "Phone message just left with Marianne to get this to

5    you."

6    Q.    Is there an e-mail response from Marianne Snook at the

7    top?

8    A.    Yes.

9    Q.    And who does she send it to?

10   A.    Terry Davis and Kent Roberts.

11   Q.    What does she say?

12   A.    "I'll check into this.  Maybe they had made the change in

13   the system, but forgot to send out the new agreement.  Anyway I

14   promise it will be in the mill today.  Marianne."

15   Q.    Let's go back to the next e-mail you were looking at,

16   which is the one dated on the top, November 21st, 2000.

17             (Document displayed.)

18             And beginning just on the very first page, on the

19   bottom, is that the same e-mail that we just looked at?

20   A.    Yes.

21   Q.    So is this whole -- is this part of the e-mail that we're

22   looking at just a continuation of the same e-mail string?

23   A.    Believe so.

24   Q.    Let's move to the next e-mail.  And right above Marianne

25   Snook's November 16 e-mail, did you see the e-mail from

1    Mr. Roberts on Tuesday, November 21st?

2    **A.**    I do.

3    **Q.**    And what does it say?

4    **A.**    "Marianne, any further word on this?"

5    **Q.**    And does Ms. Snook reply?

6    **A.**    She does.

7    **Q.**    And what does she say?

8    **A.**    "Only that I forgot to give somebody this message last

9    week.  Are you in Santa Clara today?  If so, we will bring you

10   the package this afternoon.  If not, we will FedEx the package

11   tonight (no signature required) to your home address.  I

12   sincerely apologize for the delay.  Marianne."

13   **Q.**    Does Mr. Roberts reply?

14   **A.**    He does.

15   **Q.**    And is that the e-mail that we see there, dated November

16   21st at 10:37 a.m.?

17   **A.**    Yes.

18           (Document displayed.)

19   **Q.**    What does Mr. Roberts say in his reply e-mail?

20   **A.**    "Won't be there tomorrow.  Can you send it for Monday

21   delivery to my house in Dallas?"

22   **Q.**    Does Ms. Snook reply?

23   **A.**    Yes.

24   **Q.**    What does she say?

25   **A.**    "Yes, I can and will.  Have a great Thanksgiving.  Again

1   my apologies.  Marianne."

2   Q.    Finally, if we could turn to the e-mail that's dated

3   November 28th, 2000, at 12:03 p.m.  Do you see that?

4   A.    I do.

5            (Document displayed.)

6   Q.    All right.  And, again, starting at the bottom.  Do you

7   see the message from Ms. Snook, dated November 27th, at

8   7:39 p.m.?

9   A.    I do.

10  Q.    And who does she send the e-mail to?

11  A.    Kent Roberts.

12  Q.    The subject?

13  A.    "Agreement."

14  Q.    And would you read what the e-mail says?

15  A.    "Have you ever had one of those days?  Due to the holiday

16  schedule this weekend, I realized the best way to get your

17  agreement to you today was to e-mail it to you.  Of course, the

18  e-mailed version looks completely different from the standard

19  version.  So I now offer up two choices, 1) I can fax it to you

20  on Tuesday.  Just provide me with the number.  Or 2) I will

21  FedEx it on Tuesday, for Wednesday delivery to the address of

22  your choice.  This really isn't a hard thing to do.  I just

23  haven't been very successful at it.  Have I said how sorry I

24  am?  I truly am.  This will be my top priority on Tuesday

25  Marianne."

1   Q.   Is there a reply from Mr. Roberts?

2   A.   There is.

3   Q.   What does he say?

4   A.   "I will be in Santa Clara on Wed and Thurs.  My office is

5   on the 5th floor.  Why don't you bring it by to me?  I actually

6   have had one of those days."

7   Q.   And that's dated the 28th, the next day?

8   A.   Yes.

9   Q.   And is there a reply from Ms. Snook?

10  A.   Yes.

11  Q.   Is that on the 28th, as well?

12  A.   Yes.

13  Q.   What does she say?

14  A.   "I'll see you on Wednesday.  Thanks for understanding.

15  Marianne."

16  Q.   All right.  So now I want to ask you a little bit more

17  about the stock administration folder that you have in front of

18  you.

19          Just one more thing.  So going back to the last page

20  we looked at, on tab E, the stock agreement which is 12E-2.

21          MS. BARBER:  2 or 12?

22          MS. BEELER:  12E-12.  Sorry.

23          (Document displayed.)

24  BY MS. BEELER:

25  Q.   So, again, just the bottom line, is it fair to say that

1  this is the stock agreement reflecting the April 14th grant to

2  Mr. Roberts?

3  **A.**    Yes.

4  **Q.**    Okay.  Now, there's some other -- there are other tabs in

5  the stock administration folder.  And I just want to ask you a

6  couple of those -- a couple of things about those.

7           First, I wanted to ask you about just on the very

8  first tab, A, I see some data printouts there.  And looking

9  particularly at 12A-3, just turning a couple pages in to the --

10  I think it should be 12A-3, the third page.

11           (Document displayed.)

12           We talked about grant recap reports, grant detail

13  reports.  Are these the kinds of -- are these forms that are

14  actually filed in the stock administration folder?

15           This grant recap report that we are looking at is

16  actually physically in this folder; is that right?

17  **A.**    It is.

18  **Q.**    Is this an exam -- previously you testified about how

19  stock administration keeps track of stock options.  Is this the

20  kind of report that stock administration sometimes generates

21  about persons' stock options?

22  **A.**    Correct.

23  **Q.**    And the grant that we've been discussing, the April 14,

24  2000 grant, is that reflected on this page?

25  **A.**    It is.

1  **Q.**   And where -- the grants are the second from the bottom,

2  that's the one we're talking about?

3  **A.**   Yes.

4  **Q.**   Okay.

5         Now, turning to board -- to board C, and specifically

6  page 6, that's another kind of optionee statement, similar to

7  the one we just looked at?

8  **A.**   Correct.

9  **Q.**   And it also has Mr. Roberts' grants?

10  **A.**   Yes.

11  **Q.**   Turning to board D, if we could look at board D.  And in

12  particular we'll look at the first page of board D.

13         **MS. BARBER:**  I'm sorry.  The page number, please?

14         **MS. BEELER:**  12D-1.

15         **MS. BARBER:**  Thank you.

16         (Document displayed.)

17  **BY MS. BEELER:**

18  **Q.**   What is this document that we're looking at?

19  **A.**   Appears to be a record of option exercises or sell

20  transactions with stock options for Mr. Roberts.

21  **Q.**   And are these -- so it says -- they are columns across the

22  top:  "Name, shares, exercise."  Does this mean -- you just

23  said that this means that this is reflecting the actual sales

24  of different stocks?

25  **A.**   Correct.

1  Q.    And this is just a general form showing specific sales of

2  certain stocks that Mr. Roberts exercised?

3  A.    Correct.

4  Q    Now, the last column shows -- last two columns.  One says

5  "SEC Fee" and one says "Total Tax Gain."

6        What are those two columns?

7  A    Actually, I'm not sure what the SEC fee is.  The total --

8  total tax gain is the -- basically the -- the compensation that

9  Mr. Roberts realized from each of these individual

10  transactions.

11  Q    So you talked before about tax having to be paid.  Is

12  this -- this is a document that basically shows that being

13  calculated?

14  A    This, this document, the total tax gain would be the --

15  the pre-tax taxable compensation for -- this particular form

16  doesn't show the actual taxes, but this is the type of form

17  that would be used in order to calculate the tax withholdings

18  due.

19  Q    And turning to the very next page, which is 12D-2, so, is

20  this a form that actually shows the calculation of the taxes

21  for something that was sold?

22  A    It is.

23  Q    All right.  So, is that one of the reasons -- so that's

24  one of the reasons you mentioned before, that stock

25  administration keeps track of grants, to actually figure it so

1  the taxes can be calculated?

2  **A**    Correct.

3  **Q**    And just turning to -- well, essentially the pages that

4  follow reflect similar sorts of tax calculations about similar

5  kinds of sales?

6  **A**    Yes.  Yes.

7  **Q**    So, again, maintained as part of stock administration's

8  files?

9  **A**    Correct.

10  **Q**    Okay.  So, let's talk a little bit about proxy statements

11  and proxy data.

12         Does stock administration play a role in the proxy,

13  and data that's used in proxy statements?

14  **A**    It does.

15  **Q**    And so, can you just tell us what generally a proxy

16  statement is, as you understand it?

17  **A**    It's a -- it's a filing that public companies are required

18  to make, annually.  Basically, it summarizes all the different

19  types of compensation that the officers and directors of the

20  company have received during the preceding year.

21  **Q**    All right.

22  **A**    And that would include salary, bonuses, other perks, and

23  also stock options.

24  **Q**    All right.  So, it's basically data about compensation.

25  Is that --

1   **A**    Correct, for the benefit of the shareholders.

2   **Q**    Okay, for certain -- for certain people.

3   **A**    For the officers and directors, yes.

4   **Q**    So I have here, Exhibits 82, 83 and 84, also authenticated

5   business records for McAfee in the form of certain proxy backup

6   records that I'll offer into evidence at this time.  82, 83 and

7   84.

8             (Plaintiff's Exhibits 82, 83, and 84 received in

9             evidence.)

10  **BY MS. BEELER**

11  **Q**    So, what are Exhibits -- are you familiar with Exhibits

12  82, 83 and 84?

13  **A**    I am.

14  **Q**    What are they?

15  **A**    These are printouts of electronic files that the company

16  maintained in support of the proxy statement.

17  **Q**    And turning to Page 82-2, we will just -- so, what is

18  82-2?  So, for you, it's Page 2 of 82.

19            (Witness examines document)

20  **A**    It's a detailed report which shows the stock options held

21  by the officers of the company, as of December 31st, 2002.  And

22  it calculates certain disclosures that were -- or certain

23  numbers that were required to be placed in the proxy statement.

24  **Q**    Okay.  And, there are a number of people on this form.

25  Does Mr. Roberts appear on this form?

1   **A**    He does.

2   **Q**    And those are his options on the form, for the calendar

3   year 2002?

4   **A**    Yes.

5   **Q**    And so, these are records that you generated in stock

6   administration as part of the proxy -- so that the proxy,

7   itself, could be generated, is that fair?

8   **A**    It's a file that was generated by the stock administration

9   department at the time, yes.

10  **Q**    Right.  By "you," I mean in your capacity as stock

11  administration, but yes --

12  **A**    Yes.

13  **Q**    -- stock administration generates the file.  And then the

14  records, from your understanding, based on your position in

15  stock administration, these are the records that then are used

16  for certain disclosures in the proxy statements?

17  **A**    Correct.

18  **Q**    Okay.  And, is the grant to Mr. Roberts the 20,000 -- the

19  grant for 20,000 options on April 14th, 2010, at a price of

20  19.75, is that reflected on this form?

21  **A**    It is.

22  **Q**    How does the -- just generally, now, from your position

23  now, how does the data get from you to the proxy statement?

24  And, you can just tell me your part of it.

25  **A**    Stock administration would generate the report from its

1  database.  So right now, that would be our Equity Edge

2  database.

3        And I would provide that to the financial reporting

4  group, who is the -- the final owner of the entire proxy

5  statement.  So they would take that stock option information

6  and incorporate it into the overall document.

7  Q    But your job or your role is to generate the data?

8  A    Correct.

9  Q    And these records we have looked at, it sounds like, are

10  the backup data for those proxy statements?

11  A    Yes.

12  Q    And is part of your job as a stock administrator to

13  maintain basically electronic files as backup for what you gave

14  for the proxy process?

15  A    It is.  It could be electronic or hard copy records, yes.

16  Q    All right.  So, I have here, three proxy statements, which

17  are Exhibits 90, 91 and 92.  And, these are proxy statements --

18  let's see, they are proxy statements filed in 2003, 2004 and in

19  2005, for the calendar years 2002, 2003, 2004.

20        And, they're self-authenticating public records.

21  They're certified copies of public records from the SEC.

22        **MS. BEELER:**  And I would offer Exhibits 90 through 92

23  into evidence as self-authenticating public records.

24        **THE COURT:**  Admitted, 90 through 92.

25

1              (Plaintiff's Exhibits 90, 91 and 92 received in

2         evidence.)

3    **BY MS. BEELER**

4    **Q**    So, we're looking at the proxy chart at 82-2.  So, we're

5    looking at that, and I'm going to bring you the proxy.

6              So looking at that, there's a table now in the proxy

7    statement which should be reflected in the electronic record as

8    90-24.

9              (Short off-the-Record discussion)

10   **BY MS. BEELER**

11   **Q**    Looking at the copy of the proxy statement, is that the

12   table -- is the table that you generated, the data from the

13   table, essentially the table that's reflected in the proxy

14   statement?

15   **A**    Yes, it is.

16   **Q**    On the table that you generated that we were just looking

17   at a second ago, it reflects Mr. Roberts' grants in the

18   calendar year 2000.  We already discussed that.  Is that right?

19   **A**    It does.

20   **Q**    And there's the 20,000 grant we discussed.  Is there

21   another one, too?

22   **A**    Another one --

23   **Q**    In the calendar year 2000?

24   **A**    Yes, it is.

25   **Q**    And, looking at the proxy statement, which is the tab just

1  before 90-24, which is electronically 90-21, are those

2  30,000 -- there should be a -- let me see -- are the options

3  granted in 2000 also part of the proxy table?

4          (Witness examines document)

5  A    They are.  30,000 options, yes.

6  Q    Okay.  And that includes the 20,000 we have been talking

7  about.

8  A    It does.

9  Q    Now, so we have discussed in some detail the proxy data as

10  a backup from Exhibit 82, which was for the proxy filed in

11  2003, the proxy we have just looked at for calendar year 2002.

12          Are Exhibits 83 and 84 basically the same kinds of

13  proxy data that is the backup for the proxy statements for the

14  succeeding two years?

15  A    Yes, they are.

16  Q    And are you providing essentially the same kind of data

17  about Mr. Roberts' grants?

18  A    Correct.

19  Q    The same process that we have just discussed?

20  A    Yes.

21  Q    Okay.  Looking at Exhibit 90, and I think -- I think for

22  your purposes, Robin, it should be 90-28 -- Do you see that?

23          Who signed that proxy statement?

24  A    Kent Roberts.

25  Q    So, now I would like to go back to the stock

1  administration folder again, which is Exhibit 12.  And if you

2  could turn to the second -- sort of open at the beginning, and

3  then the second tab, which is marked on the B folder.

4          The document that it's on the top there, which is

5  12B-1, and -- 12B-1, do you recognize what that form is?

6          Let me just look at the folder.

7  **A**    Yes, I do.  I do.

8  **Q**    Okay.  What is it?

9  **A**    It's a Form 3.

10 **Q**    What's a Form 3?

11 **A**    This is the initial form that is required to be filed with

12 the SEC when an individual is appointed an officer of the

13 company.

14 **Q**    Is there a stamp on the first page?  Do you see that stamp

15 that says "January 10th, 2002"?

16 **A**    I do.

17 **Q**    Is that a stamp "Received" -- Can you read what that, the

18 stamp "Received" -- hard to read.

19         (Witness examines document)

20 **A**    It definitely mentions "Processing" and "Washington,

21 D.C.," and "Received January 10th, 2002."

22 **Q**    Does that appear to be the stamp "Received" from the SEC?

23 **A**    Appears so, yes.

24 **Q**    And turning to the next page, which is 12B-2, is there an

25 option there -- is that a list of Mr. Roberts' options?

1  **A**    It is.

2  **Q**    And, those are the same options we have been talking about

3  in different iterations up until now?

4  **A**    Yes.

5  **Q**    Does the 20,000 option granted at 19.75 appear on that

6  listing?

7  **A**    It does.

8  **Q**    And with a vesting date, expiration date of April 14th,

9  2010?

10  **A**    Yes.

11  **Q**    In the example we discussed before, you mentioned a

12  ten-year vesting schedule.  That means this is the same grant

13  that we've been talking about, the one issued on April 14th,

14  2000?

15  **A**    It does.

16  **Q**    And what does the signature line say?

17  **A**    It's an electronic signature by Kent Roberts.

18          **MS. BEELER:**  So, I have here, a self-authenticating

19  public record in the form of the Form 3, received by the SEC on

20  January 10th, 2002.  And I offer it into evidence.  Exhibit 20.

21          **THE COURT:**  It is admitted.  Listed as Exhibit 20?

22          **MS. BEELER:**  It is.

23          (Plaintiff's Exhibit 20 received in evidence.)

24  **BY MS. BEELER**

25  **Q**    Mr. Nightingale, could you look at that form?

1           (Request complied with by the witness)

2    **Q**    Is that the SEC's version of the same document we looked

3    at?

4    **A**    It appears to be so.

5    **Q**    So, back to the stock administration folder, and turning

6    to Tab E, in your position as head of stock administration, are

7    you familiar with the 1999 repricing?

8    **A**    Yes, I am.

9    **Q**    And, I would ask you to turn to E-17.  And, what is this

10   document?

11   **A**    It's a reprice grant agreement.

12   **Q**    Who is it a reprice grant agreement for?

13   **A**    Kent Roberts.

14   **Q**    And when -- so, so, what is this document?  What does it

15   show?

16   **A**    It's a document where Kent Roberts is agreeing that the

17   company can reprice his stock option grant.

18   **Q**    To a different price --

19   **A**    To -- to a different exercise price than the price that it

20   was originally granted at.

21   **Q**    So, is it repriced to a lower price than the one he was

22   originally granted, presumably?

23   **A**    Presumably, yes.

24   **Q**    Now, was this document signed by Mr. Roberts?

25   **A**    It is.

1   Q     And what is the date next to his signature?

2   A     July 19th, 1999.

3   Q     Now, just looking at the top of the agreement, let's just

4   walk through this.  What does the first paragraph say, to the

5   extent it's not obstructed by the "Received" stamp?

6   A     (As read) "Pursuant to the terms and conditions of the

7   company's NA 92 (the Plan), you have been granted a

8   non-qualified stock option/repricing to purchase 22,500 shares

9   (the Option) of stock as outlined below."

10  Q     And what is the option price listed below?

11  A     $11.06.

12  Q     Now, with reference to the paragraph right above

13  Mr. Roberts' signature, are there certain restrictions or

14  conditions on this reprice grant agreement?

15  A     There is.

16  Q     What are they?

17  A     "Reprice grants are subject to exercise restriction until

18  April 22, 2000."

19  Q     What does "exercise restriction" mean?

20  A     That would mean that this -- this particular repriced

21  option would not be able to be sold until April 22nd, 2000.  It

22  would basically be frozen for that one-year period.

23  Q     Turning to the document at Page E-19, two pages later, is

24  this document also signed by Mr. Roberts?

25  A     It is.

1  Q    And, what date is it dated?

2  A    April 26th, '99.

3  Q    Now, turning, just going back to the top of the document

4  and walking through it, underneath the -- it says "Option

5  Repricing Election, Agreement of Stock Option Cancellation."

6  What does that first paragraph say?

7  A    (As read) "I acknowledge that I have read the accompanying

8  memorandum to eligible employees holding stock options and

9  understand the terms of the proposed option repricing program.

10 I understand that I am free to decline the company's offer to

11 reprice my options and keep my current, higher priced options."

12 Q    And, the next line says, "I elect to, (check one)."  And

13 what is checked?

14 A    The box to "Reprice all of my eligible underwater

15 options."

16 Q    What does "underwater" mean?

17 A    Basically it means that the option exercise price is

18 higher than the price that the company's stock was currently

19 trading at.

20 Q    So, just to give a concrete example --

21 A    So, in the example we were using earlier, if my option

22 price was $30, and then subsequent to that point in time the

23 company -- company's stock price had fallen to -- let's say

24 $20, for example, then that -- that option is basically

25 worthless to me at that point, because I could -- I would

1  rather go out to the stock market and buy an option for $20

2  than use a $30 stock option.

3  **Q**    So that's what "underwater" means, is --

4  **A**    Right.

5  **Q**    -- you're not going to use it to buy something that costs

6  less?

7  **A**    Correct.

8  **Q**    Okay.  Now, so, would you just -- so, under "Reprice all

9  of my eligible underwater options," would you read that

10  paragraph?

11  **A**    (As read) "I accept the company's offer to cancel each of

12  my outstanding options meeting the eligibility requirements as

13  described and which has an exercise price greater than the

14  closing market price of the company's common stock on April 22,

15  1999 and to grant to me on April 22, 1999 in replacement of

16  each such cancelled option a new stock option (a new option)

17  for the number of shares remaining unexercised under my

18  cancelled option.  I agree that each new option will have an

19  exercise price per share equal to the closing price of the

20  company's common stock as reported on the NASDAQ national

21  market on the April 22, 1999, and will have the terms and

22  conditions described, including a 12-month restriction on

23  exercise as described in the memorandum."

24  **Q**    So, that 12-month freeze period is what we talked about

25  with the other document?

1  **A**    Yes.

2  **Q**    Okay.  So, I just have a couple of more documents to talk

3  to you about, and then we're finished.

4            **MS. BEELER:**  I have here Exhibit 2, board minutes

5  dated April 17, 1997, with custodial declaration authenticating

6  that it's a business record.

7            And a custodial declaration with the accompanying

8  business record of the 2000 -- of the 1997 stock plan as it

9  existed, as amended through May 25th, 2000.

10           And, offer Exhibits 2 and 3 into evidence.

11           **THE COURT:**  2 and 3's admitted.

12           (Plaintiff's Exhibits 2 and 3 received in evidence.)

13 **BY MS. BEELER**

14 **Q**    So, turning to Exhibit 2, and flipping past the custodial

15 declaration page, or if you can look at that too, do you

16 recognize what this document is?

17           (Witness examines document)

18 **Q**    Let me just say this.  Are these board minutes dated

19 April 17, 1997?

20 **A**    They are.

21 **Q**    Okay.  All right.  By "board minutes," minutes of a

22 meeting of the Board of Directors of McAfee?

23 **A**    Correct.

24 **Q**    So, let's turn to Page 2-6, which would be Page -- Exhibit

25 A, Page 1.

1          **MR. STEPHENS:**  May we have a copy?

2          (Short off-the-Record discussion)

3   **BY MS. BEELER**

4   **Q**    And the very first paragraph, would you just read the

5   first paragraph?

6   **A**    (As read) "Whereas, the board deems it advisable to adopt

7   the McAfee Associates, Inc. 1997 Stock Incentive Plan (the

8   Stock Incentive Plan), under which eligible persons in the

9   company's service may be provided with the opportunity to

10  acquire a proprietary interest in the company."

11  **Q**    Okay.  The next paragraph?

12  **A**    "Now therefore be it resolved that the Stock Incentive

13  Plan shall be adopted substantially in the form of the document

14  attached to these resolutions as Exhibit A."

15  **Q**    And, and does the third paragraph discuss submitting the

16  plan for shareholder approval?

17  **A**    Yes, it does.

18  **Q**    And are you familiar in your role as stock administrator

19  -- in stock administration, about -- you mentioned earlier that

20  it was in fact approved by the shareholders, is that correct?

21  **A**    Yeah.  The 1997 plan is a shareholder-approved plan.

22  **Q**    And the fourth paragraph, "Further resolved"?

23  **A**    "Further resolved that the Compensation Committee of the

24  Board of Directors as constituted from time to time be, and the

25  same hereby is, appointed as the committee contemplated by the

1  Stock Incentive Plan (the Committee), with full power to

2  authorize the issuance of shares of this corporation's common

3  stock, to grant options or rights to purchase such shares and

4  to take any and all other actions described in the Stock

5  Incentive Plan."

6  **Q**    Now, not the next paragraph which I'm calling Paragraph 4,

7  but the next paragraph, 5, would you read that for us?

8  **A**    "Further resolved that the chief executive officer of this

9  corporation, with full power to act alone, be, and the same

10 hereby is, authorized to carry out all of the powers of the

11 committee under the Stock Incentive Plan, including the power

12 to authorize the issuance of shares of this corporation's

13 common stock, and to grant options to purchase such shares,

14 provided that he, acting alone, shall not, 1, make any awards

15 or grants to any individual who thereafter would have received

16 aggregate awards or grants in excess of 15,000 shares of this

17 corporation's common stock, as adjusted from time to time to

18 reflect recapitalization, stock splits, the declaration of

19 stock dividends or similar events; or 2, make any awards or

20 grants with a purchase or exercise price of less than

21 100 percent of the fair market value of this corporation's

22 common stock on the date of the award or grant."

23 **Q**    And turning to the next page, Page 2, or Page 7 on the

24 electronic version, on just the very top paragraph, would you

25 read that?

1  A    "Further resolved that the committee and the chief

2  executive officer of this corporation shall maintain complete

3  and detailed records of all awards and grants made by them

4  under the Stock Incentive Plan."

5  Q    Okay.  Now, turning to Exhibit 3, which is the Stock

6  Incentive Plan, itself, just turning to Page 1, the actual page

7  1 of the plan, not the table of contents, but Page 1, which on

8  the electronic version is 3A-5, and Article -- Article 2, it

9  says "ADMINISTRATION."

10         Would you read just the committee responsibility --

11  would you read that, through lettered Paragraph (b)?  So, 2.1,

12  and then (a) and (b).

13  A    Okay, "2.1, committee composition.  The plan shall be

14  administered by the committee.  The committee shall consist

15  exclusively of two or more directors of the company who shall

16  be appointed by the board.  In addition, the composition of the

17  committee shall satisfy such requirements as the Securities and

18  Exchange Commission may establish for administrators acting

19  under plans intended to qualify for exemption under Rule 16B-3

20  or its successor under the Exchange Act, and (b), such

21  requirements as the Internal Revenue Service may establish for

22  outside directors acting under plans intended to qualify for

23  exemption under Section 162(m)(4)(C) of the Code."

24  Q    And just turning now to the paragraph that's 2.2, would

25  you read that, read that paragraph, and then continue just to

1    the end of the paragraph on the next page, which is Page 3A-6?

2    **A**    "Committee responsibilities.  The committee shall, (a),

3    select the employees, outside directors and consultants who are

4    to receive awards under the plan, and (b), determine the type,

5    number, vesting requirements and other features and conditions

6    of such awards, (c), interpret the plan, and (d), make all

7    other decisions relating to the operation of the plan.  The

8    committee may adopt such rules or guidelines as it deems

9    appropriate to implement the plan.  The committee's

10   determinations under the plan shall be final and binding on all

11   persons."

12           **MS. BEELER:**  Thank you.  I have no further questions

13   for this witness.

14           **THE COURT:**  Do you have any examination of the

15   witness?

16           **MS. EAGAN:**  Yes, Your Honor, just a little bit.

17           **THE COURT:**  All right.

18                       <u>**CROSS EXAMINATION**</u>

19   **BY MS. EAGAN**

20   **Q**    Mr. Nightingale, you were not involved in the processes

21   for selecting grant dates back in 2000, were you?

22   **A**    Was I not involved?

23   **Q**    Right.

24   **A**    Well, I was not employed with McAfee in 2000.

25   **Q**    Right.  You got to McAfee in 2004?

1    **A**    In the finance department of McAfee in 2004.  With the

2    stock administration department in 2006.

3    **Q**    Okay.  So you weren't involved in generating grant recap

4    reports back in 2000?

5    **A**    No, I was not.

6    **Q**    And you weren't involved in the repricing in '99?

7    **A**    Not personally involved, no.

8    **Q**    And you were not involved in the proxy process before

9    2000?

10    **A**    No.  I was not.

11    **Q**    You were not involved at all in the process related to

12    Kent -- Kent's 2000 grant, is that right?

13    **A**    That's right.  No, I was not.

14    **Q**    You didn't attend any board meetings in 2000?

15    **A**    No.

16    **Q**    In fact, you're not aware of anything that happened at

17    McAfee in 2000.  You have no personal knowledge.  Is that

18    right?

19    **A**    Personal knowledge, in the sense of actually being at

20    McAfee, no.

21    **Q**    Okay.

22            **MS. EAGAN:**  Jeff, can you pull up 12-A, please?  I'm

23    sorry, 12B.  Tony, could you switch the -- thank you.

24            **THE CLERK:**  Sure.

25            **MS. EAGAN:**  And if you can go to Page 2, please.

BY MS. EAGAN:

Q    Mr. Nightingale, you have no personal knowledge that Mr. Roberts actually signed this form, is that right?

A    That's right.  That -- sorry, that's an electronic signature.

Q    And you weren't at the company in 2002, either?

A    No.

Q    Okay.

        MS. EAGAN:  Can you do Exhibit 20 for me, Jeff, same page?

BY MS. EAGAN:

Q    Same questions, Mr. Nightingale.  You don't know that Mr. Roberts in fact signed this document (Indicating)?

A    No.

        MS. EAGAN:  I'm going to switch to the ELMO.

BY MS. EAGAN:

Q    Mr. Nightingale, do you have Exhibit 14 in front of you, still?  Let me see if I can help you find the right page.  The set of e-mails.

A    Okay.

Q    Okay.  Let's look together at the document that's dated November 16th, 2000.  Can you find that one for me?

        And, this is the document that begins on November 15th, where Kent Roberts writes, "The actual agreement on the 2000 VP grant in 2000," and the subject, "Things I still

1   don't have."

2   **A**     Okay.

3   **Q**     Do you see that document?

4   **A**     I do.

5   **Q**     Where did this document come from?

6   **A**     Where did it come from?  It appears to be an e-mail trail,

7   I presume from the company's e-mail records.

8   **Q**     And when was the first time you saw this document?

9   **A**     This particular e-mail?

10  **Q**     Yes.

11  **A**     I believe, I believe that was this morning.

12  **Q**     Okay.  Can you turn to -- the next document

13  chronologically in that set is November 21st, 2000.

14          (Request complied with by the Witness)

15  **Q**     Do you have that document in front of you, sir?

16  **A**     Yes, I do.

17  **Q**     Okay.  And again, this is the document where -- where at

18  the bottom, on the first page, Marianne Snook says she'll check

19  in to this?  Maybe they made a change in the system; do you see

20  that?

21  **A**     I do.

22  **Q**     Where did this document come from?

23  **A**     The same answer as previously.  I presume, from the

24  company's e-mail system.  I don't know exactly.

25  **Q**     Okay.  And, when was the first time you saw this document?

1  **A**    Today.

2  **Q**    This wasn't something you saw in the prestatement earlier,

3  during -- I'm sorry, in the restatement process?

4  **A**    I don't believe so.  I can't -- I couldn't say that with

5  certainty.  It's certainly a possibility.  I believe I was

6  presented these documents this morning.

7  **Q**    Okay.  And let's turn to the next document, which is

8  November 28, 2000.  It's the next one, in chron order.

9           (Request complied with by the Witness)

10  **Q**    Do you see it?  It's the one that begins, "Have you ever

11  had one of those days???"

12  **A**    I do.

13  **Q**    And what about this document?  Where does this document

14  come from?

15  **A**    The same answer as previously, from the -- I presume, from

16  the company's e-mail records.

17  **Q**    When did you first see this document?

18  **A**    Today.

19           **MS. EAGAN:**  No further questions at this time.

20           **THE COURT:**  Anything further?

21           **MS. BEELER:**  No.  My -- my colleague is telling me

22  that they heard that two exhibits, though, offered and

23  discussed, possibly weren't admitted.  And, just so to be

24  careful --

25           **THE COURT:**  I know there were a couple that were not

1  admitted.  And I was just going to ask you to do the cleanup

2  later.  We won't take the jury's time.

3          **MS. BEELER:**  Fine.  Exactly.

4          **THE COURT:**  You can go through your list.  But if you

5  can do that at the end of the day, to make sure you have got

6  everything in.  We will play catch-up then.

7          **MS. BEELER:**  That's fine.  Thanks.

8          **THE COURT:**  May this witness be excused, not being

9  subject to being recalled?

10         **MS. BEELER:**  Yes.

11         **THE COURT:**  You may be excused.  You are not to

12  discuss your testimony.  I can't think of any reason why you

13  would, but -- sorry about that.   (Laughter)

14         But seriously, you are not to discuss your testimony

15  with any other persons who may be witnesses in the proceeding.

16         **THE WITNESS:**  I understand.

17         **THE COURT:**  Thank you very much.

18         **THE WITNESS:**  Thank you.

19         (Witness excused)

20         **THE COURT:**  Do you have another witness?

21         **MS. BEELER:**  I do.

22         **THE COURT:**  Because we have got a few more minutes.

23         **MS. BEELER:**  All right.  May I just tidy up a little

24  bit?

25         **THE COURT:**  Yes.

1          **MS. BEELER:**  And, the United States calls Kandis

2    Thompson.

3          **THE COURT:**  Okay.

4          (Witness placed under oath)

5          **THE CLERK:**  Please state your full name, and spell

6    your last name.

7          **THE WITNESS:**  Kandis Lanae Tate Thompson,

8    T-H-O-M-P-S-O-N.  Lanae, L-A-N-A-E.

9          **THE COURT:**  You may be seated.

10                          <u>**KANDIS THOMPSON,**</u>

11   called as a witness for the Plaintiff herein, having been first

12   duly sworn, was examined and testified as follows:

13                          <u>**DIRECT EXAMINATION**</u>

14   **BY MS. BEELER**

15   **Q**    Ms. Thompson, where do you work?

16   **A**    McAfee.

17   **Q**    And what is your position there?

18   **A**    I'm currently the vice-president and worldwide controller.

19   **Q**    And, maybe you could use the microphone a little bit.

20   **A**    No, I'm sorry.

21   **Q**    No, that's fine.

22   **A**    Can you hear me?

23   **Q**    Yeah.

24   **A**    All right.

25   **Q**    Before we talk about what "vice-president and worldwide

1  controller" means, why don't you just give us a little bit of

2  background about yourself, starting with your education, and

3  sort of highlight your general career track.

4  **A**    I have Bachelor of Science in accounting, a Bachelor of

5  Science in business administration, and a minor in finance.  I

6  have a CPA license.  I went to Southwest Baptist University in

7  Bolivar, Missouri.  I then went into public accounting for a

8  couple of years.

9          I then went to work for ODS Networks, a privately

10  held company.  Was there through their IPO.  Eventually became

11  the chief accounting officer.  They were a NASDAQ

12  publicly-traded company.

13          I then did consulting on my own for several years,

14  and then I went to McAfee -- or Network Associates at the time,

15  in late 2002.

16  **Q**    All right.  Now, you said you are currently a

17  vice-president and worldwide controller.  And, actually, if I

18  could just turn to --

19          **MS. BEELER:**  Actually, if I could just, for a moment,

20  Your Honor, I'm looking at my exhibits, and I don't see the two

21  exhibits.

22          **THE COURT:**  I think they may just be arriving right

23  now.

24          **MS. BEELER:**  Oh.

25          (Short off-the-Record discussion)

BY MS. BEELER

**Q**    So, let's go back.  You were telling me about being vice-president and worldwide controller.  Let's talk about what "worldwide controller" means first.

**A**    Basically, me and my team are responsible for recording the financial transactions of the company.  And reporting those.  And the disclosures related to those.

So, the company buys goods, the company sells goods.  All of the financial transactions.

**Q**    All right.  So, on a worldwide basis.

**A**    On a worldwide basis.

**Q**    So, buying and selling, and all the money that goes along with it.  What does the controller do with those numbers?

**A**    We basically have to account for all of those numbers, report those in financial statements and disclosures.

**Q**    Okay.  And why is that?

**A**    Well, being a publicly-traded company, there are rules and regulations around that, and filings required by the Securities and Exchange Commission.  Ultimately, to report the information to our shareholders.

**Q**    Just on a very sort of general level, what kind of information, specifically, is reported to shareholders?

**A**    Information that is considered material.  So, from a financial statement perspective, it's the balance sheet, position of the company, the income statement, the cash flow,

1  and then discussions at the MDA (Phonetic) around the trends.

2  **Q**    So, much more simply, does that mean that the money the

3  corporation takes in, it's revenues?

4  **A**    Correct.  That would be one of the metrics.

5  **Q**    Okay.  And then -- you use a word like "metrics," and

6  you're going to confuse me -- no.

7           But, but it couldn't be -- are there other things

8  that are reported on the filings, besides revenues?

9  **A**    It would be revenues, expenses.  Taxes.

10  **Q**    And expenses may be things like salaries, are those sorts

11  of things reported?

12  **A**    Correct.

13  **Q**    So, is it a fair characterization of what a controller

14  does, is it looks at all that kind of financial data, with an

15  eye ultimately to reporting it, that -- under requirements that

16  the law has for public companies?

17  **A**    Yes.

18  **Q**    Okay.  And so what's -- so "worldwide controller," that

19  means that McAfee must have offices in places other than the

20  United States.

21  **A**    Correct.

22  **Q**    All right.  And so, just, just on a very meta level, do

23  you have different offices in different countries, or different

24  regions?  How does that work?

25  **A**    We have different offices in different countries, as well

1    as different geographies.

2    **Q**    So, as a worldwide controller, you are then in charge of

3    all -- all of those things for the entire company.

4    **A**    Correct.

5    **Q**    Are there such things as controllers on a -- on a

6    country-specific basis?

7    **A**    In certain instances we have country-specific controllers,

8    but typically we have more of a geographic-controller

9    organizational structure.

10   **Q**    Okay.  Now, just going back a little bit, you said you

11   started at McAfee in 2002, is that right?

12   **A**    Late 2002.  That's correct.

13   **Q**    And can you just describe some of the jobs that you've had

14   at McAfee?

15   **A**    When I originally started in late 2002, I was a director

16   and assistant corporate controller.  I did not have worldwide

17   responsibility at that time.

18   **Q**    And, and where were your responsibilities directed?

19   **A**    They were more of a corporate nature, and a U.S. nature.

20   **Q**    And, how did that differ from what you're doing now?

21   **A**    So, today, I have -- as worldwide controller, I have the

22   corporate compliance function, which is the Sarbanes-Oxley 404

23   requirements, and then I have the worldwide rollout functions,

24   so, the geographies.

25   **Q**    So you have certain specific requirements that the law

1  has, that Sarbanes-Oxley, is that what that meant?

2  **A**    Correct.

3  **Q**    And then, other worldwide areas.  Now, when you were the

4  assistant controller here, what, what was different about your

5  responsibilities, then?  So, you have described what you do

6  now.  What did you do then?

7  **A**    It was more financial reporting, SEC reporting, and U.S.

8  and corporate consolidation functions, as opposed to a

9  worldwide focus or having the Sarbanes-Oxley group.

10  **Q**    So the finance reporting is what we talked about before,

11  income, receipts, payments.  What was the other thing that you

12  did, that you just described?  You said, your two functions?

13  **A**    Okay.  Previously I had financial reporting.

14  **Q**    Yes, right.

15  **A**    And the Americas accounting function.  So, U.S.

16  accounting.  And then the corporate consolidation function.  A

17  roll-up of the worldwide.

18  **Q.**    And what does that mean?

19  **A.**    So rolling up the worldwide financial statement into a

20  consolidated view.

21  **Q.**    Okay.  So now I just want to turn your attention to

22  May 2006.  Were you involved, at that point, in looking at --

23  what was your title in May 2006?

24  **A.**    Right about that time I was promoted to vice president.

25  So I was either not a vice president or I was.  So I'm not

 1  sure.

 2  **Q.**    With the controller function -- with the worldwide

 3  controller functions then, or just limited to the

 4  United States?

 5  **A.**    I believe in May of 2006, I would have been vice president

 6  and assistant corporate controller, would be my recollection.

 7  **Q.**    Now, so at that time were you involved in looking at

 8  McAfee stock option practices?

 9  **A.**    Yes.

10  **Q.**    And what were you looking at?

11  **A.**    I was basically doing an internal review for management on

12  stock options, historical stock options prices.

13  **Q.**    Was there an event that triggered that examination?

14  **A.**    Yes, there had been a report to the media in the May time

15  frame of '06.

16  **Q.**    And did that report identify McAfee -- certain dates

17  associated with certain options practices at McAfee?

18  **A.**    Yes, it did.

19  **Q.**    On just a general level, could you tell us what the report

20  identified?

21  **A.**    It just identified five dates and McAfee at potential risk

22  for having option issues or accounting issues around options.

23  **Q.**    Okay.  And as a result of that, what -- you said you were

24  looking at the stock options process.  What was the scope of

25  your review?

1   **A.**   I had defined the scope of my review to be reviewing for

2   an 11-year time frame all grants to section 16 officers and

3   directors.

4   **Q.**   What's a section 16 officer, just in a very general sense?

5   **A.**   The executives at the company.

6   **Q.**   So you're basically looking at all the grants for the

7   executives of the company?

8   **A.**   Correct.

9   **Q.**   And I'm going to -- did you prepare a -- sort of an

10  evaluation -- during this May time period, did you prepare sort

11  of an evaluation of the -- what you had done as of May 25th?

12  **A.**   Yes, I prepared a preliminary review.

13  **Q.**   Was that in the form of a binder?

14  **A.**   Yes, it was.

15  **Q.**   Okay.  And just in looking -- and I'm going to hand you an

16  excerpt from that.  If I have my original exhibits.

17          So you've previously looked at this excerpt of this

18  binder; is that correct?

19  **A.**   That is correct.

20  **Q.**   And is this a part of the binder that you developed in the

21  time period in May, when you were looking at stock options

22  affiliated with the executives, just as you described?

23  **A.**   Yes, it is.

24  **Q.**   And it's attached with a document from you, acknowledging

25  that that's your actual record that you generated at the time,

1    and it's a business record of McAfee.

2              MS. BEELER:  And so I would offer Exhibit 133 into

3    evidence?

4              THE COURT:  133.

5              MR. NEAL:  No objection.

6              THE COURT:  This is your witness?

7              MR. NEAL:  Yes.

8              THE COURT:  133 admitted.

9              (Plaintiff's Exhibit 133 received in evidence.)

10             MR. NEAL:  It is now.

11             THE COURT:  It is now.  It is now, yes.

12   BY MS. BEELER:

13   Q.   So looking at Exhibit -- well, before we look at Exhibit

14   133, you mentioned that you were looking at these executive

15   grants.  What sorts of documents were you looking at in

16   examining the executive grants?

17   A.   I was looking at documents for -- that would support

18   authorization, communication related to the grants.  So things

19   such as board minutes, personnel action forms, grant

20   agreements, Form 3s, 4s and 5s.

21   Q.   Okay.  Just to separate those out, you said authorization.

22   By "authorization" do you mean the documents that show that

23   someone said -- that show the grant was issued?

24   A.   Yes, formal approval.

25   Q.   And so what documents -- of those documents you just

1    listed, what documents were you looking at as evidence of

2    formal approval, just generally?

3    **A.**     The PAFs, the personnel action forms, and then the board

4    minutes.

5    **Q.**     You said the second category you looked at, you mentioned

6    stock option agreements.  And are those the documents that

7    evidence the actual giving of the options to the employees?

8    **A.**     Correct.

9    **Q.**     All right.  And the third you said compliance.  What --

10   what role did that play in your examination process?

11   **A.**     That would be documents required to be filed under the

12   rules of being a section 16 officer, to report their holdings

13   and/or subsequent grants or sales.

14   **Q.**     I have here Exhibit 132.  Is that with your -- the same

15   custodial declaration.  Is that the binder that we were talking

16   about previously, that you did for the investigation?

17   **A.**     Yes.  This is the binder that was done for the preliminary

18   review.  But documents have been added subsequently, during the

19   investigative process, to that.

20   **Q.**     Now, the subsection of that Exhibit 133, is that the

21   information that appears behind tab 6 of that binder?  The

22   shorter version of the exhibit that we were just looking at a

23   second ago.

24   **A.**     No.  Tab 6, I believe, existed at the time of the

25   preliminary investigation.

1  Q.   So I guess to make my question a little simpler, is the

2  subset of the binder that's in Exhibit 34, in the folder, did

3  that -- those were the documents you generated as of May 25th,

4  2006?

5  A.   That is correct.

6  Q.   So there are other things you added to the binder in other

7  areas, but not in that particular section?

8  A.   That is correct.

9  Q.   So let me ask you this:  During the course of your

10 evaluation of the section -- the executive grants that you were

11 just discussing, did you -- did you identify certain -- a

12 certain grant that had been issued to Mr. Roberts?

13 A.   Yes.

14 Q.   And that's -- is that reflected in Exhibit 133, the

15 folder, and also in tab 6 of the binder?

16 A.   Yes, it is.

17 Q.   All right.  Now, you mentioned that you were looking at

18 things like authorization, the minutes, the PAF, the agreement,

19 and the regulatory forms.

20      Why were you looking at all three of them, those

21 three categories?

22 A.   Those were the three areas that I had defined that we

23 should look at to determine if there were any discrepancies in

24 the books and records of the company.

25 Q.   So you're looking to see if they match up or if they

1  don't?

2  **A.**    Correct.

3  **Q.**    Now, turning to Exhibit 133.  How did you identify or what

4  was the process by which you identified this particular set of

5  documents?  Was it just while you were looking --

6  **A.**    Specific to this one grant?

7  **Q.**    Yeah.  Was it while you were just examining section 16

8  officers, generally?

9  **A.**    It was detected by the team.  The paperwork was detected

10  by the team while searching for section 16 grant information

11  and supporting documentation.

12  **Q.**    Now, turning to the grant recap report behind tab 6.

13         **MS. BEELER:**  Which for identification purposes for

14  display --

15         **MS. BARBER:**  Excuse me, Tony.  Display.

16         **MS. BEELER:**  -- should be 133-9.

17         (Document displayed.)

18         **MS. BEELER:**  Let me make sure -- let's start with the

19  board minutes.  133-9.

20  **BY MS. BEELER:**

21  **Q.**    Are those minutes that you looked at as part of your --

22  133.  So it should be -- do you see the minutes in there in the

23  subset?  Do those minutes contain a grant recap report?

24  **A.**    They do.

25  **Q.**    Is that the document you looked at to see what was

1  reflected for authorization for Mr. Roberts' grant?

2  **A.**    Yes.  These were the ones that were reviewed.

3  **Q.**    Now, looking at page 133-9, that's the grant recap report.

4  Does that reflect a grant to Mr. Roberts?

5  **A.**    Yes, it does.

6  **Q.**    What does it say?

7  **A.**    It reflects a grant date of 2/14/2000, for 20,000 options,

8  at a price of 29.63.

9  **Q.**    And for all the different grants on the page, at the top

10  there's a grant range for those dates.  What is the grant range

11  or the grant -- it says, "Grant date January 1, 2000 to

12  June 30, 2000."  Is that generally the date range that's

13  reflected on the individual grants reflected on this grant

14  recap report?

15  **A.**    Yes.

16  **Q.**    Now, turning to the personnel action form that we just

17  discussed, which is on the electronic exhibits at 133-4, is

18  that another document that you pulled as part of your

19  evaluation process?

20          (Document displayed.)

21  **A.**    Yes.  This was pulled by the team.

22  **Q.**    And that reflects what?

23  **A.**    It reflects a grant to Mr. Roberts, with an exercise price

24  as of 2/14/2000.

25  **Q.**    Okay.  And then the final document I wanted to look at

1   with you is the stock option agreement, which is Exhibit 133-3.

2   Was that also a document that you identified during the course

3   of your May 2006 investigation?

4              (Document displayed.)

5   **A.**   Yes.

6   **Q.**   What does this document show?

7   **A.**   It shows a grant date of April 14, 2000, for 20,000

8   options, at a price of 19.75.

9   **Q.**   And based on this information you included these documents

10   in your summary of your investigation as of May 25th?

11   **A.**   Yes.

12   **Q.**   Okay.  Now, I just wanted to ask you a couple more

13   questions.  And I think that's it for documents.

14              During -- while you were at McAfee, beginning in late

15   2002, when you started, did you have an opportunity to work

16   with Mr. Roberts?

17   **A.**   Yes, I did.

18   **Q.**   And what kind of interactions did you have with him as

19   part of work?

20   **A.**   I interacted with him based on my roles and his role as

21   general counsel of the company on a regular basis, probably

22   more early in my years at McAfee, as opposed to later within my

23   tenure.

24   **Q.**   And what sorts of things did you work on together?

25   **A.**   One of the main things we worked on together fairly

1    closely would have been the restatement that was put on file at

2    10/31/03, related to revenue recognition.

3    Q.    All right.  So it's certain financial transactions that

4    you worked on as part of a public document that you were

5    filing?

6    A.    Yes.

7    Q.    And it sounds like you were doing some corrections in that

8    public document; is that basically a general characterization

9    of what you were doing?

10   A.    Yes.

11   Q.    All right.  What was your job and what was Mr. Roberts'

12   job?  Let's start with what you did.

13   A.    My job was I was new to the company, and I had been asked

14   to lead the effort in working on that filing for revenue

15   recognition.  And Mr. Roberts, as general counsel, was one of

16   the executive leads, what I would characterize as kind of the

17   steering committee overseeing that effort.

18   Q.    So as part of the steering committee, what kind of

19   particular interactions did he have with you during the course

20   of this restatement process?

21   A.    Uhm, one, reviewing the filings.  One, any footnotes or

22   legal documentation related to those filings.  And just

23   oversight and steering and project management.

24   Q.    Okay.  Did you work closely?  What was the frequency of

25   your contact?

1   **A.**   During that time frame I would say almost on a day-to-day

2   basis.

3   **Q.**   And with the financial disclosures -- I mean, obviously

4   your role is very different than the legal role.  You're the

5   numbers.  But what does it mean for the legal department or

6   Mr. Roberts to look at some of the notes?  What does that mean

7   specifically?

8   **A.**   Well, I think he was reviewing the filings from a legal

9   compliance standpoint.  And then, also, I believe at that time

10  he was interacting on behalf of the company with the Securities

11  and Exchange Commission, related to that investigation and

12  effort.

13  **Q.**   And, again, what was the time period for that effort?

14  **A.**   2003.

15  **Q.**   During your tenure at McAfee, did you have an opportunity

16  to observe Mr. Roberts acting in any other legal capacities, or

17  was it mostly confined to your finance role and your

18  interactions with legal?

19  **A.**   I would say mostly confined to my finance role and

20  interactions with legal.

21          **MS. BEELER:**  I have no further questions for this

22  witness.  Thank you.

23          **THE COURT:**  Mr. Neal.

24          **MR. NEAL:**  Thank you, Your Honor.

25

1                              <u>**CROSS EXAMINATION**</u>

2   **BY MR. NEAL:**

3   **Q.**   Good morning, Ms. Thompson.  My name is Stephen Neal.  I

4   represent Kent Roberts.

5          We have never met before, have we?

6   **A.**   No, we have not.

7   **Q.**   The McAfee board of directors formed a special committee

8   to oversee the investigation of McAfee option issues covering a

9   10-year time span roughly, correct?

10  **A.**   Correct.

11  **Q.**   And that special committee was formed in 2006, correct?

12  **A.**   Correct.

13  **Q.**   And the special committee looked at options going all the

14  way back from the time of its formation to 1995, correct?

15  **A.**   Correct.

16  **Q.**   And you assisted the special committee in various respects

17  in connection with its work, correct?

18  **A.**    In connection with the accounting restatement, yes.

19  **Q.**   And you assisted the special committee in helping to

20  locate historical information about McAfee's stock option

21  programs and stock option grants, correct?

22  **A.**   Correct.

23  **Q.**   And as part of the process of the special committee, they

24  were -- that is, the committee was trying to determine what

25  policies and practices existed at McAfee concerning stock

1  option processes during the 10-year period that they were

2  looking at, correct, among other things?

3  **A.**    Correct.

4  **Q.**    And that's part of the process that you helped them

5  participate in, correct?

6  **A.**    Correct.

7  **Q.**    Are you aware, by the way, I assume you are, but the

8  special committee was a committee of three members of the board

9  of directors of McAfee, correct?

10  **A.**    Correct.

11  **Q.**    It's a committee that was formed by the board of directors

12  in response to some of the publicity that you just talked

13  about, correct?

14  **A.**    That's my understanding.

15  **Q.**    And it was formed for the purpose of doing an unlimited,

16  sort of unrestrained view of the facts and the history as they

17  related to options at McAfee, correct?

18  **A.**    Would you say that again?  Sorry.

19  **Q.**    Yes.  They were -- the special committee was created for

20  the purpose, supposedly for the purpose of doing a complete

21  development and review of the factual history relating to stock

22  option policies and stock option grants at McAfee from 1995 to

23  2006, correct?

24  **A.**    I believe so.

25  **Q.**    And you're aware that the special committee, in turn,

1 retained special advisors to help it in its work, correct?

2 **A.** Correct.

3 **Q.** The special committee retained a law firm called Howrey

4 and Simon, correct?

5 **A.** Yes.

6 **Q.** And that law firm was retained specifically for the

7 purpose of advising and helping the McAfee special committee do

8 its work examining this whole 10-year period, correct?

9 **A.** That's my understanding.

10 **Q.** And, in addition, the special committee retained a

11 financial consulting -- forensic consulting firm called FTI,

12 correct?

13 **A.** Correct.

14 **Q.** And FTI is a firm that specializes in going in and

15 analyzing financial information, historical financial

16 information, among other things, correct?

17 **A.** Yes.

18 **Q.** And they were retained to work with both the Howrey law

19 firm and the special committee of the board of directors for

20 the purpose of doing as complete and unvarnished review as they

21 could do, correct?

22 **A.** That's my understanding.

23 **Q.** And as you understood it, was it your understanding that

24 the job of the special committee and its advisors, Howrey and

25 the accountants, that the job of that special committee was to

1  find the truth, the whole truth, and let the chips fall where

2  they may?

3  **A.**   That would be my understanding.

4  **Q.**   Do you understand that in connection with this

5  investigation the company, McAfee, spent $22 million in

6  connection with the special investigation?

7  **A.**   I cannot validate that figure, but --

8  **Q.**   They spent way in excess of $10 million, paid more than

9  $10 million to their advisors, correct?  Or should I ask

10  somebody else that?

11  **A.**   It doesn't sound unreasonable.  Yes, a lot of money was

12  spent.  But I can't validate that figure.

13  **Q.**   Who was the chairman of the special committee?

14  **A.**   Chuck Robel.

15  **Q.**   Pardon?

16  **A.**   Chuck Robel.

17  **Q.**   Who were the other members of the special committee?

18  **A.**   Dale Fuller, prior to his departure from the company, and

19  Bob Bucknam.

20  **Q.**   And what was Mr. Bucknam's background?

21  **A.**   I'm not that versed on his background, but I think he was

22  previously with the FBI.

23  **Q.**   He was previously chief of staff to the director of the

24  FBI, Louis Freeh; was he not?

25  **A.**   I do not know that.

1  **Q.**   Do you know that one of the reasons why he was put on the

2  board was supposed to be because of his law enforcement

3  background and his connections to law enforcement?

4  **A.**   I was not aware of that.

5  **Q.**   Okay.  Now, in addition to the work that you did with the

6  special committee, you also worked on the restatement during

7  the time period we're talking about, correct?

8  **A.**   Correct.

9  **Q.**   And, ultimately, the work of the special committee

10 resulted in the company doing a restatement of its earnings,

11 correct?

12 **A.**   Correct.

13 **Q.**   And part of your work on the restatement also included

14 reviewing historical information for the purpose of determining

15 what the policies and practices with respect to options

16 granting had been at McAfee in the 10-plus-year period that the

17 committee was looking at, correct?

18 **A.**   I specifically was not charged with reviewing the

19 historical policies and practices of the company.  The

20 investigative team was that, and provided that to my team.

21 **Q.**   Okay.  And the work that you did, therefore, and the work

22 that the special committee did, and the work that its advisors

23 did, included looking at the 2000 -- year 2000 time period that

24 involves the option grant to Kent that we're all here about,

25 correct?

1  **A.**   The 2000 time frame was included.

2  **Q.**   Now, I asked you a few minutes ago about a restatement.

3  Ultimately, the options investigation resulted in a

4  restatement, correct?

5  **A.**   Correct.

6  **Q.**   And a restatement is essentially -- you're more of an

7  expert in financial matters than I am, but a restatement

8  essentially means that the company, having looked at

9  everything, having looked at options grants for the prior

10  10-year period, had to essentially restate its financial

11  performance records in light of various charges that it had to

12  recognize because of options grant issues, correct?

13  **A.**   Yes, improper accounting around options.

14  **Q.**   And the special investigation led the company to conclude

15  that there had been more than $135 million in improper handling

16  of options at McAfee during the time period of 2006 back to

17  1995, correct?

18  **A.**   Yes.  That was the approximate amount of the non-cash

19  charge, yes.

20  **Q.**   You say "non-cash charge."  Because what these

21  restatements require the companies to do is to go back and

22  restate their earnings, restate their expenses.  But they don't

23  actually have to pay money out of pocket, correct?

24  **A.**   Correct.

25  **Q.**   So what the number represents is a statement by the

1  company of essentially the dollar value of the improper

2  activities that had occurred with respect to options during the

3  prior 11 years, correct?

4  **A.**   It reflected the accounting charge that needed to be taken

5  to make the books and records accurate for that time frame.

6  **Q.**   But the extent -- to the degree that books and records

7  were inaccurate for that time frame, it was because of

8  mistakes, errors, improprieties with respect to options during

9  that time period, correct?

10  **A.**   Yes.  Misaccounting for those options.

11  **Q.**   How many shares of stock were reflected in the options

12  that had to be restated?

13  **A.**   I actually don't know that any longer.

14  **Q.**   It was over 52 million shares of stock that were involved

15  in the restatement, was it not?

16  **A.**   I don't recall that figure.

17  **Q.**   Do you recall approximately, was it over 50 million?

18  **A.**   I'm sorry, I don't remember any longer.

19  **Q.**   Do you recall what the company concluded that the charge

20  related to Kent Roberts' 2000 promotion grant was?

21  **A.**   I'm sorry.  Say that again, sir.

22  **Q.**   Do you recall, in connection with the restatement, what

23  the company concluded the arithmetic value was of the stock

24  option grant to Kent Roberts, which brings us all to this

25  courtroom?

1  **A.**    Let me make sure I understand the question.  Is your

2  question what the charge was related to that option?

3  **Q.**    Yes.

4  **A.**    In the restatement?

5  **Q.**    Yes.

6  **A.**    I believe it was less than a hundred-thousand-dollar

7  charge.

8  **Q.**    It was $70,000, correct?

9  **A.**    Uhm, I believe closer to 80, but, yes, in the ballpark.

10  **Q.**    Well, even accepting your 80, would you agree with me that

11  $80,000, as compared to $137 million, which is what the total

12  restatement charge was, 80,000 -- even assuming it's

13  accurate -- represents one-half of one-tenth of 1 percent of

14  the charge that McAfee incurred as a result of improprieties

15  with its options between 1995 and 2006?

16  **A.**    It's a very small amount of the charge, yes.

17  **Q.**    Now, I know you're better at numbers than I am.  I mean, I

18  need somebody to do this for me.  Let's say it's $75,000 and

19  the restatement is $137 million.  That is approximately

20  one-half of one-tenth of 1 percent; is it not?

21  **A.**    Yeah.  I'd have to check on that, but I'll trust you.

22  **Q.**    All right.  The original grant date on the option of Kent

23  Roberts, which is in issue here, was February 14, 2000,

24  correct?

25  **A.**    Correct.

1  Q.    And the February 14th date is a date that was sometimes

2  referred to as a strike price, correct?

3  A.    Yes.

4  Q.    And in the middle or sometime in the year 2000, the strike

5  price date for that grant of Kent's was changed from

6  February 14th to April 14th, correct?

7  A.    That's my understanding.

8  Q.    The company and its special committee and its advisors to

9  the special committee all concluded, did they not, that the

10 original date on Kent's promotion grant, of February 14, 2000,

11 was an improper, incorrect date?

12 A.    That February 14th, 2000 --

13 Q.    Yes.

14 A.    -- was an improper and incorrect date?

15 Q.    Yes.

16 A.    Uhm, that's not my understanding.

17 Q.    What date -- what date did the special committee and its

18 advisors conclude should be the proper exercise date for Kent

19 Roberts' promotion grant in the year 2000?

20 A.    So when you say "exercise date," I assume you mean grant

21 date or revised measurement date?

22 Q.    The date on which the strike price should be determined.

23 A.    I don't know that they ever gave guidance on what the

24 strike price should be determined.

25         I believe what the special committee concluded was

1  that the July 2000 board minutes were when that grant was

2  formally approved.  And that should be the accounting

3  measurement date.

4  Q.   And -- I'm sorry, I didn't mean to interrupt you.

5  A.   That's okay.

6  Q.   So, ultimately, the committee and its advisors and the

7  company all agree that the proper date for which to measure

8  Kent's grant was July 13th, rather than February 14th, correct?

9  A.   That's my understanding.

10  Q.   And that -- that's the conclusion that was reached as a

11  result of the work of the special committee, the Howrey law

12  firm, FTI Consulting, and the company, and the company's

13  financial department all looking at the same issue, correct?

14  A.   That's my understanding.

15  Q.   And when they concluded that the date should have been

16  July 13 instead of February 14, they were inevitably,

17  therefore, concluding that the February 14 was the wrong date,

18  correct?

19  A.   Uhm, I'm not sure.

20  Q.   Well, faced with any date that they might have been able

21  to pick, they concluded that the right date was July 13th, not

22  February 14, correct?

23  A.   From an accounting measurement date perspective, yes.

24  Q.   And by doing that, they concluded that the proper date for

25  determining the strike price for Kent's grant should have been

1  July 13 rather than February 14, correct?

2  **A.**    I'm not aware of them determining that that was the proper

3  strike price for that grant.  I'm sorry.

4  **Q.**    But the effect of saying the July 13 date is the proper

5  measurement date is effectively to say that that would be the

6  date that would have to be used should be ever exercise the

7  option, correct?

8  **A.**    I really wasn't involved in that perspective as much as I

9  was in the accounting perspective on how I accounted for that

10  grant from a revised measurement date.

11  **Q.**    Are you aware, as a result of the work you did on this or

12  anything you've seen coming out of it, are you aware of

13  anything that suggests that Kent Roberts himself in any way had

14  any influence or role in picking the original date of

15  February 14, 2000?

16  **A.**    I am not aware of that.

17  **Q.**    You haven't seen anything that suggests he had any role in

18  picking the original date, correct?

19  **A.**    Not that I recall.

20  **Q.**    So I'm correct?  I just want to make sure.

21         How much time did you spend working with the special

22  committee and its advisors on this whole set of issues?

23  **A.**    So I did not work with the special committee as it related

24  to any kind of qualitative issues.  I really only focused on

25  the accounting and the proper accounting for those.

1  **Q.**   And you gathered documents for them on those subjects as

2  well, correct?

3  **A.**   I did gather documents for them.

4  **Q.**   Okay.  So, again, at any time during the work you did, did

5  you see anything in the work you did that indicated that Kent

6  Roberts in any way, shape or form was involved in the selection

7  of the February 14 date for that promo grant?

8  **A.**   I did not see anything, that I recall, related to that.

9  **Q.**   Options at McAfee were issued under and out of various

10 stock option plans over the years, correct?

11 **A.**   Correct.

12 **Q.**   For example, there's already been testimony about a 1997

13 stock option plan at McAfee, correct?

14 **A.**   There is that plan at McAfee.

15 **Q.**   And there is also a 1999 stock option plan, correct?

16 **A.**   I believe so.

17 **Q.**   And there is a 2000 stock option plan, correct?

18 **A.**   Yes.

19 **Q.**   Those plans were approved by McAfee's shareholders

20 correct?

21 **A.**   I'm not sure if all those plans required shareholder

22 approval, without researching.

23 **Q.**   Are you generally familiar with those plans?  I don't mean

24 line by line.  But have you seen those plans and --

25 **A.**   I'm generally familiar with those plans.  But I do

1  remember that not all plans require shareholder approval.

2  **Q.**   Okay.  The plans describe how the options at McAfee were

3  to be granted, among other things, correct?

4  **A.**   Yes.

5  **Q.**   They describe how many total shares could be granted, and

6  they describe who is eligible under the plans, correct?

7  **A.**   Yes.

8  **Q.**   And they also describe who was authorized to make grants

9  under the plans, correct?

10 **A.**   Uhm, who is authorized to make grants under the plan?  I'm

11 not sure.

12 **Q.**   Kent's 2000 grant was issued pursuant to the 1997 stock

13 option plan, correct?

14 **A.**   That would be my recollection.

15         **MR. NEAL:**  Your Honor, I'm going to be a while.  And

16 I'm happy to keep rolling along.

17         **THE COURT:**  Yes.

18         **MR. NEAL:**  Pardon?

19         **THE COURT:**  How much longer are you going to be?

20         **MR. NEAL:**  I'm probably going to be an hour and a

21 half or two hours.

22         **THE COURT:**  Well, it's time for us to take our break

23 and recess for the day.  And recess for the day.

24         So, ladies and gentlemen, please follow the

25 instructions you've been given about not discussing the case

1    amongst yourselves or anyone else.

2           And we'll see you tomorrow morning promptly at 8:30,

3    please.  Thank you.

4           (Jury out at 1:35 p.m.)

5           (Recess taken.)

6           (The following proceedings were held in open court

7           outside of the presence of the jury:)

8    **THE COURT:**  You may step down.

9           I gather she will come back at 8:30 and be the next

10   witness?

11          **MS. BEELER:**  It really is going to be an hour and a

12   half, do you think?

13          **THE COURT:**  Okay, but -- you can have that discussion

14   separately, but -- you may step down, but do not discuss your

15   testimony with any other persons who may be witnesses until the

16   trial is over.

17          **THE WITNESS:**  Understood.

18          **THE COURT:**  Thank you.

19          (Witness excused)

20          **THE COURT:**  And do you -- you know, who's going to be

21   your next witness?

22          **MS. BEELER:**  My next witness?

23          **THE COURT:**  Yes.

24          **MS. BEELER:**  Well, I have to double-check now,

25   because of different people's schedules.

1          It was going to be Mr. O'Leary, next, but because of

2   the scheduling issues and people coming from out of town, I

3   definitely have Clarence Brown tomorrow, Bill Radtke, Diohonne

4   Beltramo, maybe  Mr. O'Leary or Mr. Dutkowsky, probably not

5   both, not -- probably is going to be a full day, I'm guessing.

6          **THE COURT:**  And, --

7          **MS. BEELER:**  But, what with the hour and a half

8   cross-examination.

9          **THE COURT:**  And if we give you, you know, since you

10  are going to have the afternoon, I assume you can maybe pare

11  that down, right?

12         **MR. NEAL:**  Well, this is a very important witness,

13  actually, Your Honor.

14         **THE COURT:**  I understand.

15         **MR. NEAL:**  This is a very important witness.

16         **THE COURT:**  I know.  But maybe you can pare it down a

17  little.

18         **MS. BEELER:**  He can think about pairing it down, how

19  about that?

20         **THE COURT:**  Yeah.  At least give it serious

21  consideration.

22         Okay.  We have got some other matters we need to take

23  up.  Let's take a short break.  I need to have a short break.

24  So we will, about five minutes -- or maybe the reporters, I

25  don't know -- they're all right, I guess, because you are

1   alternating.  It's just I'm not alternating.

2          (Recess taken from 1:38 to 1:50 p.m.)

3          **THE COURT:**  Ms. Beeler and Mr. Neal, are the

4   attorneys that I instructed to be here present?

5          **MS. BEELER:**  Yes.

6          **MR. NEAL:**  I don't know.  Certainly it's up --

7   Ms. Beeler's word.

8          **MS. HERMLE:**  We're here, Your Honor.

9          **THE COURT:**  Where are they?  All in the front row?

10          Would you state your appearances, please?

11          **MR. GOODING:**  Yes, Your Honor.  Your Honor, I'm

12   Robert Gooding from the Howrey firm.  I represent the Special

13   Committee of the Board of Directors of McAfee.

14          **THE COURT:**  Yes.  Good afternoon.

15          **MR. CUNNINGHAM:**  Good afternoon, Your Honor, I'm Leo

16   Cunningham from Wilson, Sonsini.  And my partner, Rodney

17   Strickland, is with me.

18          **MR. STRICKLAND:**  Good afternoon, Your Honor.

19          **THE COURT:**  Good afternoon.

20          **MS. HERMLE:**  Good afternoon, Your Honor.  I'm Lynne

21   Hermle, I represent McAfee.  And with me is Mark Cochran, who

22   is the general counsel of McAfee.

23          **THE COURT:**  I see, okay.  Thank you.  Why don't you

24   just go back and have seats where you were, for now, then.

25          Ms. Beeler, and Mr. Neal, can you just put on the

1    Record -- because I think yesterday it may have been a little,

2    you know, disjointed, as this issue unfolded -- can you put on

3    the Record when you began to receive documents shortly before

4    the trial, and what those documents were?

5          **MS. BEELER:**  We received, on the 15th of September,

6    in the late afternoon, --

7          **THE COURT:**  Which was Monday.

8          **MS. BEELER:**  Which was Monday, one e-mail.  And then

9    later that evening, we received an additional 18 pages, some of

10   which were duplicates of e-mails, with a series of e-mails.

11   Those e-mails generally are included in what was talked about

12   today with Stuart Nightingale, as Exhibit 16.  So, now the

13   Court has a context for knowing what those e-mails were.

14         And I'll just summarize, there were some specific

15   e-mails in November that talked about the series of events

16   leading up to the change of the date of the Transcentive

17   system, I'll just characterize, for purposes of today's

18   discussion, and a couple of other earlier e-mails.

19         Now, the context for those being provided to us was

20   something along the lines of this.  I had obtained some travel

21   records in the form of credit cards, account statements for

22   Mr. Davis, suggesting travel in New York on November 29th.

23   Which, as the Court may recall from the testimony today, was

24   the date the grant date was changed in the Transcentive system.

25         Now, I went back to the company.  I mean, all --

1  anything having to do with Mr. Roberts' grant, as we

2  established at the last hearing, was asked in our grand jury

3  subpoena.  I had on previous occasions, but I reiterated my

4  request, asked for thing like Mr. Davis's Outlook calendar,

5  asked for his expense reports.  And there was nothing there

6  that reflected any reimbursement for travel expenses to

7  New York during this time period, that seemed to be relevant to

8  establish where Mr. Davis was.

9           Then, as I understand it -- and I don't actually have

10  a copy of the defense subpoena, and then Mr. Neal can chime in

11  now -- I sent an e-mail to Wilson, Sonsini, as my general point

12  of contact, here, and I said, is there -- how about e-mails?

13  Is there any e-mails from Terry Davis's -- from Terry Davis, to

14  or from Terry Davis?

15           I don't know that I was that specific, but during

16  this time period, to see whether he might be in New York?  Can

17  we look in November, 2000?

18           And my understanding is that there was a simultaneous

19  defense subpoena.  And then, what happened, and, you know, we

20  can --

21           **THE COURT:**  When did that -- when did you make that

22  request?

23           **MS. BEELER:**  I would have to look at my e-mail.  It

24  might have been Sunday night at -- Sunday, the 14th of

25  September, very late at night, at 1:00 in the morning,

1    something like that.

2         But I previously asked -- this was information that

3    was responsive to the subpoena, but I said -- and I could look

4    at my e-mail and check, but it was about that time period, it

5    was the day before.  And then in response -- my recollection,

6    but I can look at my e-mail.

7         And then the next day, I think Mr. Strickland got

8    back to me and said "We got this" -- there was the same request

9    from the defense, and that they were checking.

10        And then later that afternoon at 4:00-ish -- and I

11   have the exact documents here, so I can tell the exact date

12   stamp -- I got one e-mail.

13        And then, based on that, --

14        **THE COURT:**  "One e-mail," meaning from

15   Mr. Strickland?  Or was it one e-mail that was responsive to

16   the subpoena?

17        **MS. BEELER:**  One e-mail that was responsive --

18        **THE COURT:**  That was a piece of evidence.

19        **MS. BEELER:**  Right, correct.

20        **THE COURT:**  Potential evidence.

21        **MS. BEELER:**  And that e-mail was on the -- again, I

22   would have to look at the exact document, but I think it's here

23   in Exhibit 14, but it was in the middle of November.

24        And then after that, later that night -- and I

25   understand what -- and again, the company can speak to this,

1   Howrey can speak to this.  But what they did, my understanding

2   is that the databases of Mister -- the Outlook e-mails from

3   Mr. Davis and Mr. Roberts, there were no e-mails in those.

4          But by doing a to-from query, any e-mails to-from,

5   they were able to obtain other e-mails stored in the Outlook of

6   other people, and then provided this additional information to

7   me at ten -- later that evening, my recollection is, but I have

8   the stamps on the e-mails, around 10:40 at night on Monday

9   evening.

10          So, that's the chronology from my perspective.

11          **THE COURT:**  Now, is it your view that those e-mails,

12   the material that you got on Monday, was -- was there any that

13   came in a few days before that?  Or was that --

14          **MS. BEELER:**  They all came in together.

15          **THE COURT:**  Is it your understanding and belief that

16   those e-mails, the materials you got, were responsive to the

17   grand jury subpoena that was originally served?

18          **MS. BEELER:**  Yes.  But I -- just so you know, there's

19   a forensic query geared towards getting those e-mails.  And

20   again, the company can speak to this.  And they didn't find --

21   those e-mails did not exist in Mr. Davis's or Mr. Roberts'

22   e-mail accounts, so they got them from somewhere else.  And

23   they can explain where they got them from.  My understanding,

24   it was a stock administration file, electronic file.

25          But yes, the answer is that these were documents

1   about Mr. Roberts' grants, and those are responsive to the

2   subpoena that was issued two years ago.

3           **THE COURT:** And, do you believe that those documents

4   are responsive to the Government's subpoena?

5           **MR. NEAL:** Your Honor, they were not only responsive

6   to the Government's subpoena, they were responsive to document

7   requests that were served by us in the SEC case on

8   Wilson, Sonsini; they were responsive to document requests that

9   were served on the SEC; and they -- they are -- and I don't

10   know how Your Honor wants to proceed.

11         I have assembled for both Ms. Beeler and Your Honor,

12   as well as for myself, a notebook that we put together last

13   night that establishes three things beyond, I think, any

14   dispute.

15         One, they were clearly and unequivocally called for.

16   Secondly, they -- the -- the inference is irresistible that

17   these documents were known to and in the possession of the

18   parties that they were being requested from, for two years or

19   more.

20         And I say that, because the search terms that caught

21   these documents were in place, and the stock administration

22   documents had been searched. We have documents that were

23   produced in response to the grand jury, and in response to our

24   own discovery requests, that were produced from the exact same

25   sources that these documents came from, using search terms that

1  had to have caught these documents.

2        And third, we are prepared to show that this Court,

3  as well as we, have been systematically treated with

4  substantially less than candor on critical discovery issues,

5  including statements made in this courtroom, to Your Honor, in

6  February of this year, about matters relating to whether we

7  should or should not get discovery from the SEC, relating to

8  matters as to what had been shared by the special committee

9  Counsel, with the SEC representations that I believe Your Honor

10 relied on in ruling on our motions to compel, representations

11 that we now know were simply incorrect.  I won't try and judge,

12 but they were blatantly incorrect.

13        So, we have a collection of materials here that show

14 three things.  Unequivocally these documents were called for.

15 It is fanciful if anybody stands up and say they didn't know

16 and didn't find them.

17        I mean, if it's really true that they didn't know

18 about them and didn't find them, it's the most irresponsible

19 search conducted on the face of the Earth.  Because they are a

20 series of documents that go to one of the most critical issues

21 in this case, which is, was Terry Davis involved, or was he not

22 involved?

23        And these documents, as you saw today, show

24 unequivocally that Terry Davis was involved.  We can argue

25 about what his involvement was, but unequivocally, he was all

1   over it.  Terry Davis has told the Government for two years in

2   interview after interview after interview that he had no

3   involvement in it.

4           Marianne Snook, these documents show, was

5   unequivocally involved.  She told the Government under oath --

6   or in 302 interviews, that she knew nothing about it until last

7   night when her counsel now made a new proffer, saying, "Oh, not

8   only did I know about these documents, these documents were all

9   over the place, and there was nothing unusual about the way

10  Terry Davis's option -- about the way Kent's option was

11  handled.  It was handled the same way they all were."  That

12  came in even later last night.

13          So, I'm prepared to make a showing on all of those

14  subjects today, or any other way that Your Honor wants, but

15  it's pervasive.  I mean, the number of requests that called for

16  these, including the grand jury subpoenas that were specific to

17  e-mails, specific to e-mails relating to this grant, specific

18  to e-mails involving Mr. Davis.  I mean, it's just -- it's

19  overpowering, the degree to which these documents were called

20  for.

21          And the Government was assured over and over, and we

22  were assured over and over, and implicitly, Your Honor was

23  assured over and over that they had all been produced to us.

24  And those assurances were just false.  And again, as I said a

25  minute ago, other materials that we have got here show that it

1   is irresistible they had these documents.

2          And then thirdly, the course of conduct,

3   misrepresentations to this Court, misrepresentations to us.

4   And I also have in this notebook, because it's maybe one of the

5   most sickening things at all, I have this production that I

6   referred to yesterday involving the Art Matin grant, where the

7   Government almost indicted Mr. Roberts on a grant related to

8   Art Matin after the McAfee lawyers produced to the Government

9   two pages from Mr. Roberts' notebook, they sequentially

10  numbered them, 102 and 103, but the Pages 102 and 103 were

11  Pages 194 and 196 out of his notebook.  And Page -- and the

12  company was in possession of these.

13         And Page 195 out of his notebook told an utterly

14  different story.  It showed that the very thing that they were

15  talking about had been approved by the comp committee, approved

16  by George Samenuk.

17         And they pulled that document out because it was in

18  fact part of this ongoing effort to protect Samenuk and protect

19  the other members of the Board of Directors.  And it is

20  obscene, Your Honor.  That one, alone, is obscene.

21         So, anyway, I can go through this and walk through it

22  all right now; I can give it to Ms. Beeler; I can give it to

23  the Court.  But, it is overpowering.

24         **MS. BEELER:**  And just for a little bit more context

25  -- and again, I don't know any of the circumstances of why it

1    wasn't produced.  I just know that it wasn't produced.  And I

2    know that there was some explanation given to me in the course

3    of this production that I shared with the defense immediately.

4           One small factual correction, by the way, the proffer

5    from Marianne Snook was -- it was just about the documents, not

6    any specific remembrance of the time period.  But, but, again,

7    what Mr. Neal said about the facts and the relevance of these

8    facts to this case is accurate.

9           What, what on some level precipitated this was that

10   the chronology never really made sense to me, so I kept on

11   looking for more documents.  I just didn't understand why there

12   wasn't something else.  And so, that's why I kept on pushing

13   for these additional documents.  Looking at the credit cards of

14   Terry Davis, looking for expense reports.  And just, there has

15   to be something, there has to be something, there has to be

16   something.  And there just wasn't.

17          And that causes one to think one thing, and then all

18   of a sudden there was something.  I think we were both pretty

19   surprised to actually get e-mails that were directly responsive

20   to the subpoena, that much later.

21          The reasons for that are not within my knowledge, and

22   I know that Mr. Neal's not saying that it's my -- but it was

23   our subpoena that they were supposed to be produced to.

24          **THE COURT:**  Can it be argued that any of these

25   documents were somehow protected by privilege --

 1          MR. NEAL:  No.

 2          THE COURT:  -- that we had a such a hassle about?

 3          MS. BEELER:  Not these e-mails.

 4          THE COURT:  It doesn't sound like it.

 5          MR. NEAL:  It's interesting, because they certainly

 6  were never on any privilege log, and nobody -- they're not

 7  marked "Privileged," and anybody looking at it couldn't say

 8  they were privileged.  But if anybody wanted to make that

 9  argument, they should have made it.

10          There was a different privilege issue that you did

11  rule on.  And that had to do with getting information from the

12  SEC and from the Special Committee.  And you will recall, we

13  were pushing to get the Special Committee notes on the theory

14  that they had been shared with the SEC.

15          And Counsel for the Special Committee stood in front

16  of Your Honor, on the Record, on February 25th, and said to

17  Your Honor that the only thing that had been given to the SEC

18  were facts, that they had not shared any impressions or

19  conclusions.  And, I can't speak to whether that was important

20  to your ruling or not, but as we read your ruling, that was one

21  critical part of your ruling.

22          Well, it's now clear as a bell from the notes that we

23  ultimately got from the SEC, that the Special Committee and its

24  counsel did share conclusions.  What they did is they

25  systematically said they found the directors credible, they

1  believed the directors, they believed O'Leary, they believed

2  Leann Wilson (Phonetic).  Again, directors are in one category,

3  Roberts is in another.

4           And then separately, because Your Honor's ruling had

5  seemed to suggest that there would be a waiver of the Special

6  Committee's notes if the notes, themselves, were shared with

7  the SEC, we sent a letter to Counsel for the Special Committee,

8  in which we specifically didn't come back to Your Honor.  We

9  said, "Lookit, if you tell us you didn't share your notes with

10 the SEC, then we will accept that, and we won't go any

11 further."

12          So they write back to my partner, Mr. Freeman, and

13 they say, "We didn't share any notes with the SEC."  We dropped

14 the matter, didn't come back here.

15          Inadvertently, the SEC gives us some notes, and the

16 notes -- some of them specifically -- one of the SEC notes

17 specifically says on the face of the note, that a Howrey

18 attorney named Roman Darmer was reading to them from the Art

19 Matin interview notes.  It is blatantly inconsistent with what

20 we were told when we followed up on Your Honor's ruling.

21          So, we have got them saying they didn't share

22 opinions or conclusions, which is blatantly false, but

23 influenced Your Honor's discovery ruling.  We have got them

24 saying they didn't share or read notes, which is blatantly

25 false, and it underlaid Your Honor's discovery ruling.

```
 1              So it's a problem that goes back to February, as it
 2    relates to discovery from the Special Committee, for us, in
 3    front of Your Honor.  The Art Matin issue goes back further
 4    than that.
 5              And again --
 6              THE COURT:  But, was any of this, the knowledge you
 7    now have about this, a result of this latest disclosure,
 8    Monday's disclosures?  Or is this something else?
 9              MR. NEAL:  Well, the SEC notes that reveal this have
10    been coming in, in chunks.  Maybe we got another 150 pages last
11    night.
12              THE COURT:  But that's from the SEC, right?
13              MR. NEAL:  Yeah.
14              MS. BEELER:  That's from me, because I'm giving them.
15    Not the SEC.
16              THE COURT:  I see.
17              MR. NEAL:  But the notes that show these
18    inconsistencies which I just referred to -- came in this week,
19    Neal?
20              MR. STEPHENS:  Yes.
21              MR. NEAL:  They just come in this week.  And they are
22    notes that just put to absolute falsehood the statements that
23    were made to you, on the Record, that you relied on, and
24    statements made to us that led us not to come back and seek
25    further relief from Your Honor.
```

```
 1              THE COURT:  But you are saying, these are -- these

 2    are separate and apart from --

 3              MR. NEAL:  But it's part of a pattern.  And again,

 4    it's stuff we got just --

 5              THE COURT:  Propensity of it.  Is that what you're --

 6              MR. NEAL:  Exactly.

 7              THE COURT:  -- you are offering it for?

 8              MS. BEELER:  The defense asked me to get it, and I

 9    did.  And that's why I disclosed it, not the SEC.

10              MR. NEAL:  As I told you yesterday, the prosecutors

11    are blameless in this.  I don't usually say that about

12    prosecutors, either, Your Honor.  Not sure I ever have.

13              THE COURT:  Would you like a copy of the -- of that

14    page of the transcript?

15              MS. BEELER:  Only if Mr. Neal will autograph it for

16    me.

17              THE COURT:  Now, to whom was this subpoena directed?

18    Your subpoena, first of all.  And then you had a subpoena.

19              MS. BEELER:  To the company.  McAfee.

20              THE COURT:  To the company.  And, when was your

21    subpoena issued, and to whom?  Subpoena or subpoenas?

22              MR. NEAL:  Well, we -- so, the grand jury issued

23    subpoenas back in the middle of 2006.  We issued subpoenas --

24    well, we issued the one that -- we issued one in October of

25    2007.
```

 1              Neal, can you help me on just a --

 2              THE COURT:  That's in this case, in the criminal

 3  case.

 4              MR. NEAL:  In the criminal case, we just issued the

 5  one on Monday.

 6              THE COURT:  I see.

 7              MR. NEAL:  But we issued one --

 8              MS. BEELER:  Same time I asked for the information.

 9              MR. NEAL:  Yeah.

10              THE COURT:  You were asking for the same thing?

11              MR. NEAL:  Yeah.  We issued one to -- we issued one

12  in connection with the SEC case, to the company, a year ago.

13  And, and asked for clearly the same thing.  Sort of

14  indisputably the same thing.

15              For example, a document request requests -- and this

16  is Request No. 44 --

17              THE COURT:  And to whom did that go?

18              MR. NEAL:  This went to the company.  The company

19  responded on October 31st of 2007.  And the request read as

20  follows, Your Honor.  It was -- and the -- and it was returned

21  to us by Wilson, Sonsini.  I don't know whether we served it on

22  the company, itself, or on Wilson, Sonsini.

23              But the request called for all documents reflecting

24  any communication related to the company's stock options

25  between Terry Davis and any person, including but not limited

1   to current and former employees, officer, directors, auditors

2   and/or accountants of the company, SEC, and the DOJ.

3          And what they said in response to that was that they

4   would not produce the documents to us, because we had said to

5   them, "If you've already given them to the Department of

6   Justice, if you have already given them to the prosecutors,

7   we'll get them from them; you don't need to give them to us."

8          So they to us, in accordance with that instruction,

9   (As read) "McAfee will not produce documents in response to

10  this request because the company has already produced to the

11  DOJ and/or the SEC, non-privileged documents that are

12  responsive to this request."

13         We had another request, No. 12 -- I mean, there are a

14  whole bunch that should have called for this.  We had --

15  Request 12 read "All communications to and from George Samenuk,

16  Sylvia Garcia-Lechelt, Terry Davis," a number of other people,

17  "Kent Roberts, and/or any current or former member of the board

18  relating to stock options."

19         And again, they said to the extent it had been given

20  to the Government, or either the SEC or the DOJ, they wouldn't

21  give it to us.

22         Those requests went out over a year ago.

23      **THE COURT:**  Did you get any responses at all?  In

24  other words, any documents in response to that subpoena?

25      **MR. NEAL:**  We got some but not in response to those

1   categories, because they said "That stuff's already with the

2   Department of Justice; get it from them."

3          And so we, of course, looked to the Department of

4   Justice, who, I think again, they have produced to us, as far

5   as we know, everything that's ever come across their transom.

6   But we didn't get it.

7          **MS. BEELER:**  There's been a lot of material produced,

8   a lot, to the U.S. Attorney's office, to the SEC, to the

9   defense, all with different Bates ranges, that's all we all

10  share.  Many -- tens of thousands of pages.

11         But these specific e-mails were not.

12         **MR. NEAL:**  And just, Your Honor, just to -- I mean, I

13  won't keep imposing if you want me to be quiet, but just to

14  follow up on one thing, on November 3rd, 2006, Wilson, Sonsini

15  responded to the grand jury subpoena which had been issued on

16  August 15.

17         And the grand jury subpoena, Category 8 called for,

18  quote, "All documents relating to communications with Kent

19  Roberts regarding stock options, including e-mails."  Again.

20         And then, I can show Your Honor if you want, this

21  notebook has it, they then set up search terms that had to have

22  called these out, because one of the search terms was "Option,"

23  one of the search terms was "Grants."  The documents that came

24  in Monday night, the most critical ones, use the word "Grant."

25         And they searched --they came from the stock

1   administration files, we are told, which is the same set of

2   files at McAfee that a whole bunch of other less relevant

3   documents that they have given us over the last two years also

4   came from.

5        So, the idea that they suddenly had this idea that

6   they could get them by going here or there, which, if it's

7   true, should have occurred to them two years ago, but the idea

8   that that's what happened doesn't stand up because they did go

9   to them two years ago, and they applied search terms that

10  inevitably had to call out these documents.  And then they

11  didn't turn them over to us.  Or to the Government.

12       **THE COURT:**  Now, does the Special Committee bear any

13  responsibility for turning over documents that -- in connection

14  with the grand jury subpoena?

15       Was there a special -- was there a -- you know, or do

16  you understand that to cover the -- you know, whatever

17  documents the Special Committee may have had as well?

18       **MS. BEELER:**  Well, it's directed to the company.  The

19  documents at issue are from the company.

20       **THE COURT:**  Uh-huh.

21       **MS. BEELER:**  And whatever documents --

22       **THE COURT:**  Were there Special Committee documents

23  that you received as well?

24       **MS. BEELER:**  There were minutes of Special Committee

25  meetings and things like that, and reports.  But all of that I

1  consider company documents.  And those were produced as being

2  responsive to the subpoenas that we issued to the company,

3  because it's a Special Committee of the Board of Directors of

4  the company.

5        THE COURT:  Right.  But did you ever get the

6  impression that the Special Committee or counsel on behalf of

7  the Special Committee thought somehow that that subpoena didn't

8  apply to them?

9        MS. BEELER:  No.  But these are company e-mails.  So,

10 these are company e-mails from -- literally the e-mails from

11 the people --

12       THE COURT:  I'm trying to see what role the Special

13 Committee played in any of this.

14       MS. BEELER:  They did a lot of -- well, Mr. Neal can

15 weigh in, but they did a lot of the forensic examination of the

16 databases, for example.  And, I presume, retrieval of -- I came

17 into the case a bit late, or I wasn't there at its inception,

18 but there are different categories of documents we have seen

19 today.  Paper files that were maintained, electronic records,

20 in the form of just about everything, from data compilations to

21 e-mails to correspondence, all in the electronic system.

22       So, my understanding -- and again, this could be

23 directed to the company, but my understanding is that the

24 forensics folks were hired by the -- by the Special Committee

25 as part of the Howrey Special Committee investigation.

```
 1              And so some of the -- the means of accessing the
 2    company electronic records was through Wilson, my point of
 3    contact representing the company, to Howrey and its forensic
 4    folks, who got us these e-mails.  That's my understanding.
 5              MR. NEAL:  Yeah.
 6              THE COURT:  Is that correct?
 7              MR. NEAL:  Yeah, that's my understanding, too.  I
 8    can't imagine the Special Committee or its counsel will stand
 9    here and say that somehow documents that they had taken
10    physical possession of were beyond the reach of the subpoenas
11    or beyond the reach of our document requests.
12              And then, when it came to these notes that I'm
13    talking about, it was the Special Committee directly whose
14    counsel were in here addressing our --
15              THE COURT:  Right.  That's in the SEC case.
16              MR. NEAL:  Yes, but obviously we would --
17              THE COURT:  Well, I want to hear from Counsel for the
18    company.
19              MR. NEAL:  Your Honor, would you like one of these
20    books at this point?
21              THE COURT:  I don't know.  I'm not going to read it
22    at this point, but -- and, and, I think that's -- essentially
23    it's the Wilson, Sonsini firm that I really want to hear from.
24    Do you want to -- you know, for the time being.
25              MR. CUNNINGHAM:  Sure.  I'm Leo Cunningham.
```

 1          **THE COURT:**  Mr. Strickland, were you the one who was

 2    managing the document production, or responsible, ultimately?

 3    Apparently you have corresponded with or talked with

 4    Ms. Beeler.

 5          **MR. STRICKLAND:**  Depends on the time frame to which

 6    you are referring, Your Honor.  Mr. Cunningham -- I think

 7    Mr. Cunningham is going to go through the August 2006 time

 8    frame, when got the grand jury subpoena, which we actually

 9    responded to on August -- on August 31, including to Request

10    No. 8, that Mr. Neal spoke about.  I was involved.  I would not

11    say I was handling it at that point.

12          If you are talking about this week, I was the contact

13    with Ms. Beeler and Mr. Stephens, who provided the

14    documentation on Tuesday evening.  I can explain that --

15          **THE COURT:**  I don't want to go back to Genesis, or

16    back to the grand jury subpoena and have -- you know, and go

17    down through everything that, you know, transpired, and what

18    was turned over and so forth.

19          What I would like to know is why these particular

20    documents were not turned over before.

21          **MR. CUNNINGHAM:**  Your Honor, if I could, I believe

22    that Mr. Gooding from Howrey is going to be able to give you a

23    clear answer as to why -- I think we are talking about seven

24    e-mail strings -- why seven e-mail strings appeared to be been

25    recently produced.  He has explanations.

```
 1            The reason he will give you those explanations is
 2   that although Wilson, Sonsini responded to the grand jury
 3   subpoena, beginning with correspondence at the end of August of
 4   2006, it's actually my former partner, Bob Feldman, who was
 5   writing letters to former Assistant U.S. Attorney Chris
 6   Steskal.
 7            But what Wilson, Sonsini made clear in those letters,
 8   and what the Government knew, not only because of those letters
 9   but because it was in a detailed dialogue with the Howrey
10   lawyers, was that what we were providing in response to the
11   subpoena were the fruits of the investigation and the document
12   production that had been overseen by the Howrey lawyers.
13            So, I believe that Mr. Gooding is well-situated to
14   explain the extensive and thorough production that was done in
15   response to the grand jury subpoena, which my firm then served
16   to transmit at various times to Mr. Steskal and his successor.
17            MS. BEELER:  Can I make one clarification?
18            THE COURT:  Yeah.
19            MS. BEELER:  Because Mr. Strickland reminded me of
20   this.  Just my -- getting my dates wrong.  It was Tuesday
21   night, the 16th, that we got the e-mails in response to my
22   late-night e-mail to Rod Strickland on Monday night, when I
23   said, "What about e-mails?"
24            And then there was a simultaneous request on Monday,
25   apparently, by the defense.
```

 1           **MR. STRICKLAND:**  The actual search was generated by

 2    the subpoena from the Cooley firm on Monday.

 3           **MS. BEELER:**  Right.

 4           **THE COURT:**  Well, what I want -- first of all, how is

 5    it that you get into the act here, since you are only

 6    representing the Special Committee?

 7           **MR. GOODING:**  That's correct, Your Honor.

 8           **THE COURT:**  And I'm only asking now about this recent

 9    production of e-mails.  I'm not asking about the other issues

10    that Mr. Neal raised with regard to, you know, the SEC case.

11           **MR. GOODING:**  Understood, Your Honor.

12           If I may, I think I can help to put all of this in

13    context and explain what happened with respect to these

14    documents that were produced on Monday and Tuesday, in response

15    to this most recent subpoena, based on everything issue of fact

16    able to determine in the last 24 hours.

17           There are 18 pages that are in issue here.  A number

18    of those documents are duplicates.  When you eliminate the

19    duplicates and put the documents together, there are seven

20    e-mails or e-mail chains that are at issue.

21           **THE COURT:**  Are you saying they're duplicates of each

22    other?  Of that production?

23           **MR. GOODING:**  Of each other.  Yes.

24           **THE COURT:**  Not duplicates of something that had

25    already been turned over.

1          **MR. GOODING:**  No.  Duplicates of each other.  So when

2     you put the duplicates together, in -- among the 18 pages, it

3     boils down the seven e-mails or e-mail chains.

4          **THE COURT:**  Uh-huh.

5          **MR. GOODING:**  We have looked carefully at what

6     happened with those seven documents.  Two of them we've

7     determined were in fact produced to the Government and, I

8     assume, turned over to the Cooley firm.  Two of them produced.

9     Two of the documents --

10          **THE COURT:**  Which are those?

11          **MR. GOODING:**  Your Honor, they are --

12          **THE COURT:**  We need to be specific.

13          **MR. GOODING:**  I can be specific.  The first one is an

14     e-mail that -- that is the top e-mail, is August 31, 2000, at

15     3:28 p.m. from Marianne --

16          **THE COURT:**  August 31?  What date?  What year,

17     rather?

18          **MR. GOODING:**  August 31, 2000, 3:27 in the afternoon,

19     from Marianne Snook to Terry Davis.  That document was

20     produced.

21          The second one is an e-mail on November 29, 2000,

22     from Marianne Snook to Terry Davis.  So, those two documents

23     were produced.  As best we can determine it.

24          Two of the documents were marked "Relevant" in our

25     process of going through electronic documents, which I can

1  explain to Your Honor in detail, if you wish.  But we had a

2  process of culling down what started with about 3.4 million

3  e-mail documents.

4          And we used search terms to whittle those documents

5  down to some more manageable group, key word search terms,

6  "Stock option, stock option grant," et cetera.

7          And then there was a review process from that point,

8  involving lawyers who reviewed the documents and applied

9  various categories to the documents.  Relevant, non-relevant,

10  hot, for further review, and privileged.

11          So, there was a detailed review process that was --

12  and we were very transparent about this, by the way.  This was

13  fully described to the Government back in August, and

14  thereabouts, in 2000.  And, described to --

15          **THE COURT:**  In 2000?

16          **MR. GOODING:**  In 2000, when the --

17          (Short off-the-Record discussion)

18          **MR. GOODING:**  I'm sorry, 2006, when the grand jury

19  subpoena was served.  I'm sorry.

20          So, two of the documents were marked "Relevant" in

21  that process.  But they weren't produced, because they were not

22  responsive to the grand jury subpoena, because they are not to

23  or from Kent Roberts.  They're not communications with Kent

24  Roberts.

25          What they are -- and I can tell you exactly which

1  documents they are.  They are both dated July 6, 2000.  One,

2  the first one at 2:48 p.m., from Marianne Snook to Terry Davis.

3  And it attaches -- it's basically a transmittal e-mail that

4  transmits a so-called grant recap report.

5          That's simply a list of proposed stock option grants

6  that was to go to the McAfee Board of Directors for their

7  directors meeting on July 13th of 2000.

8          THE COURT:  And that, that particular document is

9  July what?

10          MR. GOODING:  July 6th, 2000.

11          THE COURT:  Uh-huh.

12          MR. GOODING:  From Marianne Snook to Terry Davis and

13  Sylvia Garcia-Lechelt, attaching this grant recap report.

14          The second document, later that same day, from

15  Marianne Snook to Sylvia Garcia-Lechelt, with a copy to Terry

16  Davis, another transmittal e-mail, transmitting a slightly

17  different version of that grant recap report.

18          And by the way, the final grant recap report that

19  went to the board on July 13th of 2000 and that was approved by

20  the board on July 13th, of 2000, was produced, was included in

21  our presentations to -- first to the Board of Directors, then

22  to the SEC, and then to the Department of Justice, these were

23  simply transmittal memos -- or e-mails.

24          The e-mails, themselves, are not communications with

25  Kent Roberts.  That's what the grand jury subpoena asked for.

1   They're not responsive to the subpoena, and that's why they

2   weren't produced.

3        **THE COURT:**  Well, do they -- did the subpoena ask

4   just for what was transmitted to Mr. Roberts?  Or about -- or

5   from -- not just to, but --

6        **MR. GOODING:**  Your Honor --

7        **THE COURT:**  -- Mr. Roberts?

8        **MR. GOODING:**  -- there are two requests, two relevant

9   requests to the grand jury subpoena.  We are talking about the

10  subpoena of August 15th, 2006.

11       **THE COURT:**  Uh-huh.

12       **MR. GOODING:**  No. 3, "All documents reflecting or

13  relating to any and all communications with Kent Roberts

14  regarding his stock option grants, including but not limited to

15  any notes from communications with Roberts regarding his stock

16  option grants."  That's Request No. 3.

17       Request No. 8 is a little bit broader:  "All

18  documents relating to communications with Kent Roberts

19  regarding stock options, including e-mails."

20       These documents are not communications with Kent

21  Roberts.  They were marked "Relevant" in our review process.

22  But they weren't responsive to the -- the subpoena.  And so, as

23  best we can determine, they weren't produced.

24       So, that's four of the seven documents.

25       One of the documents, and again, I can tell you

1  precisely which one, it is the e-mail dated November 28, 2000,

2  at 12:03 p.m. from Marianne Snook to Kent Roberts, regarding

3  "Agreement."

4          This document we have ascertained through the -- the

5  electronic database, that's maintained by our consultants, FTI

6  Consulting -- we retained them at the very beginning of this

7  litigation to assist us with electronic document retrieval.

8          This document was not reviewed in our process,

9  because it was not responsive to any of the key words used in

10 the key word search process.

11         The word "Agreement" is used in this document, but

12 none of the other key words appear in this document.

13         **THE COURT:**  Wasn't a search done by name, as well?

14         **MR. GOODING:**  Your Honor, yes.  We, for example,

15 imaged Mr. Roberts' computer.  And, and searched everything on

16 his computer.  This document did not -- did not turn up.

17         But we had -- we had a process in place.  And with

18 that many documents, 3.4 million e-mail documents, we had a

19 process that was well-devised and described to everybody in

20 great detail, to winnow down those documents and do a search.

21 And this one simply didn't come through the process because, as

22 I say, it wasn't responsive to any of the key words.

23         There were 30 or 40 key words that we used.  Those

24 were described in full to Mr. Steskal back in August of 2006.

25 The Government fully understood what our process was.  We were

1  completely transparent about that.

2          My partner, Mr. Darmer, sat down with Mr. Steskal,

3  and walked him through it in great detail.  And later, we

4  produced both to the Government and to the Cooley firm detailed

5  memos describing the process that we used.

6          But in any event, this document didn't make it into

7  our process.

8          **THE COURT:**  I'm just puzzled about why you would not

9  plug in names, and essentially do a search with the names.

10         And you have -- you referred to Mr. Roberts'

11 computer, but if these e-mails are stored in -- on company --

12 you know, in the way that all the other e-mails obviously were,

13 and you were searching, this would have turned up if you had

14 used the names.  Right?

15         **MR. GOODING:**  Well, but Your Honor, if you had --

16 bear in mind, the database here, which encompasses documents

17 from a variety of sources.

18         One, it includes documents from laptop computers that

19 we imaged of a number of individuals.  Kent Roberts was only

20 one of them.  So, that's in the database.  Documents from the

21 company's server at the time were in the database.  Documents

22 from backup tapes that we identified at the very beginning of

23 our investigation in consultation with the IT people at the

24 company.  And, we -- restored certain of the backup tapes.

25 Those are in the database.  All of that adds up to the

PROCEEDINGS

 1  3.4 million documents.  Not pages, documents, that I mentioned

 2  to you.

 3          So, in that database are thousands, if not tens of

 4  thousands, of documents that have Kent Roberts' name on them.

 5  Now, we concluded early on in our investigation, if you -- if

 6  you ask for every --

 7          **THE COURT:**  Did anybody try with Roberts and Davis

 8  and Roberts and Snook, and -- whatever other names may have --

 9  should have given you concern that maybe there would be

10  documents, you know, that -- e-mails as among those people,

11  that would -- somehow you would flag in that fashion?

12          **MR. GOODING:**  We did try to flag those documents,

13  through our process.  And, and, and these -- this e-mail did

14  not make it into the process.

15          The point, though, is we didn't know about this

16  document until Monday or Tuesday when we first -- when we first

17  saw it.  I can represent to the Court that I had never seen

18  this document before.  And the other two documents that I'm

19  going to talk about.  They -- they simply didn't make it in to

20  our process.

21          **THE COURT:**  Well, let me hear about the other two,

22  then.

23          **MR. GOODING:**  The other two, Your Honor -- and again,

24  I can tell you which ones they are.  One is dated August 9,

25  2000, from Marianne Snook to Melissa Salcedo and Cherie Walter,

1   with a copy to Terry Davis.

2          This document was inadvertently marked "Not Relevant"

3   in the initial review process back in July of 2006, at the very

4   beginning of our investigation.  It was inadvertently marked

5   "Not Relevant."

6          In retrospect, as I look at it now, it should have

7   been marked "Relevant."  It wasn't.  It was human error.

8   Somebody either pushed the wrong button on the computer as they

9   were reviewing documents, or misjudged the relevance of this

10  document.

11         The same --

12         **THE COURT:**  And this was from Snook to Salcedo, and

13  who was the other person?

14         **MR. GOODING:**  Cherie Walter.

15         The second document, Your Honor, is dated -- the top

16  e-mail is dated November 21, 2000.  It's from Marianne Snook to

17  Kent Roberts.

18         And, it also was marked -- inadvertently marked by

19  the review -- the initial-stage reviewer as "Not relevant."  It

20  should have been marked as "Relevant."  It was inadvertently

21  mismarked in the process.  I can tell you the date on which it

22  was mismarked.  It was mismarked on July 13th of 2006.

23         I know the individual who mismarked it.  It was a --

24  a staff attorney or a contract attorney working for our firm,

25  among ten or so reviewers who were reviewing the documents that

1   had made it through the key word search process.

2          I'm sorry that that happened.  But in document

3   productions of this size, these kinds of things do happen.  It

4   was inadvertent; it was a mistake.

5          But Your Honor, we didn't know about this document.

6   I never saw this document, either of these documents, until

7   this week, when they turned up in the search and the expanded

8   search that we -- that we ran in response to the subpoena.

9          And I can tell you about that as well.

10         **THE COURT:**  Is there another document or -- okay,

11  there were two documents, I guess, from Snook to Davis, the

12  first two you referred to.  Is that -- was that one or two?

13  From Snook to Davis?

14         **MR. GOODING:**  Well, one --

15         **THE COURT:**  August 31st, the very first two.

16         **MR. GOODING:**  That was produced.  Yes, Your Honor..

17         **THE COURT:**  And -- and you were saying those two were

18  provided to the Government, so that --

19         **MR. GOODING:**  And the last one, which is on

20  November 29, from Snook to Davis, also produced.

21         **THE COURT:**  Uh-huh.

22         **MR. GOODING:**  To the Government.

23         **THE COURT:**  Uh-huh.  Well, what is there about this

24  second subpoena and this later search -- this recent subpoena

25  and the latest search, that caused these to come to the

1   surface, that had not caused them to come to the surface

2   before?

3           MR. GOODING:   Let me walk you through that.  And I

4   think I can explain how they turned up now, and didn't turn up

5   before.

6           On Monday, as I understand it -- I wasn't involved in

7   this process.  But as I understand it, the Cooley firm issued a

8   subpoena to the company for e-mails regarding Terry Davis in

9   November of 2000.

10          In response, Mr. Strickland called Bartels, of my

11  office, and asked us to have FTI, our electronic consultants,

12  run the database.  They have got custody of the electronic

13  database.  And, to run those documents to determine whether

14  there was anything responsive to that.

15          The first search that was done, just where Terry

16  Davis was the custodian, in November of 2000, showed zero

17  documents.  No documents turned up in the database in response

18  to that.

19          And so a second search was done, seeking documents to

20  or from or copying Mr. Davis, with no filters at all.  In other

21  words, the entire database, with no filter for categories of

22  markings, relevance, no key words.  Just the entire database.

23  And that --

24          THE COURT:  For what period of time?  November, 2000?

25          MR. GOODING:  For November of 2000, initially.  Now,

1   we expanded it after that, but initially, in this second

2   search, it was November of 2000.

3          And that yielded about 300 documents, which, again,

4   my understanding is, the lawyers at Wilson, Sonsini reviewed.

5   And in response to that -- in reviewing those 300 or so

6   documents, this -- one document turned up.  The -- the

7   November 21, 2000, document that I referred to earlier.

8          **THE COURT:**  Mr. Roberts?

9          **MR. GOODING:**  That's right.  November 21, 2000,

10  between -- basically between Snook and Roberts.  And, and,

11  Mr. Strickland, as he indicated, realized from looking at the

12  documents that he hadn't seen it before, it wasn't familiar to

13  him.  And that's when he called the Government.

14         Now, because we -- again, Mister -- Mr. Strickland

15  and Bartels, I think in consultation with the Government,

16  concluded that the document had in all probability not been

17  produced.  We have now determined it hadn't been produced.

18         They expanded the search.  This was on either Monday

19  night or Tuesday morning.  Expanded the search in the database,

20  to any e-mails from July 1 of 2000, to initially through the

21  end of November, 2000, and then expanded further to the end of

22  December of 2000, to or from or involving any combination of

23  the following people:  Kent Roberts, Terry Davis, Prabhat

24  Goyal, or Marianne Snook.  With, again, no filters, no -- no

25  category markings or key words over the entire database.  That

1   time frame, those individuals.

2          And the reason, my understanding, that they chose

3   those individuals, is that based upon our investigation, all of

4   the interviews we did and documents we looked at -- e-mails,

5   hard-copy documents and everything else -- we concluded that

6   those were the individuals at the company at the time who would

7   be most likely to be involved in one way or another, in a grant

8   of options to somebody at Mr. Roberts' level, or above.  Our

9   best judgment.  Our best professional judgment, based upon what

10  we learned.

11         And that's when, when they ran that search, that's

12  when these 18 pages of documents (Indicating) turned up.  A

13  very specific search, designed to see -- we knew one document

14  had not been produced, that had turned up in the first search.

15  This was a -- an expanded search designed to see, is there

16  anything else.  And, these documents turned up.

17         And then, as I've indicated, we determined two of

18  them were produced, two were relevant, but not responsive.  And

19  I've explained the rest of them.

20         **THE COURT:**  Well, but you're saying that all of those

21  documents turned up, but there's duplication among those that

22  you did turn up?  Because, I understand that you were saying

23  that there was some duplication among these 18 documents.

24         **MR. GOODING:**  There's duplication among those 18

25  documents.  But when --

```
1          THE COURT:  So there was duplication then, and then
2   there were duplicate copies of various --
3          MR. GOODING:  Of the same document.  Yes, that's
4   correct.
5              (Reporter interruption)
6          THE COURT:  So, there were duplicates in the system.
7          MR. GOODING:  Yes.
8          THE COURT:  In some fashion.
9          MR. GOODING:  Correct.  Now --
10         THE COURT:  Now, the November 28th document, I though
11  the word "Agreement" -- you said, and maybe I in misunderstood
12  you, that the word "Agreement" was one of the search terms?
13         MR. GOODING:  No, "Stock Option Agreement."  Not just
14  the word "Agreement".
15         THE COURT:  Oh, "Stock Option Agreement."
16         MR. GOODING:  "Stock Option Agreement."
17         THE COURT:  So, why did this not come up, then, this
18  particular document?  I'm not sure which document it is.  I
19  would have to see it.  And I don't have that material up here.
20         MR. GOODING:  Your Honor, again, it's the October --
21  I'm sorry, the November 28, 2000 document.
22         THE COURT:  Right.
23         MR. GOODING:  And --
24         THE COURT:  I'm not sure where that is in the volume.
25   But why don't you tell me, it's from Snook to Roberts?
```

 1           MR. GOODING:  It's -- the original e-mail is from

 2   Snook to Roberts, yes, Your Honor, on November 27.  And it

 3   makes reference to "Agreement," but there's no reference to

 4   "Stock Option" -- "Stock Option Agreement" or any other term

 5   that relates to stock options.

 6           THE COURT:  So the term "Agreement," in and of

 7   itself, was not put in --

 8           MR. GOODING:  Was not a search term.  Because there

 9   could be thousands of different kinds of agreements that this

10   company could be involved in.  And that wouldn't narrow things

11   down in any way, to just put in "Agreement."  So that was not

12   one of the search terms.  And that's why this document

13   didn't -- didn't show up in our review process.

14           Again, the point, Your Honor, is Mr. Roberts' counsel

15   has accused the company, and I guess us, of deliberately hiding

16   documents.  That is categorically and absolutely not true.

17           Mistakes were made.  These documents that were marked

18   "Not Relevant" should be marked "Relevant."  But it was through

19   either clerical error or mistake in judgment, and was not

20   deliberate in any way, shape or form.

21           THE COURT:  Now, how was it that you were involved in

22   all of this, as opposed to the attorneys for the company?

23           MR. GOODING:  Well, Your Honor, it goes back to

24   the -- I think it goes back to when the grand jury subpoena was

25   initially served.  Bear in mind, that's in August of 2006.

1          And, at that time, our -- our investigation was

2   really, in many ways, just getting started.  We were retained

3   at the beginning of -- actually over the Memorial Day weekend,

4   2006.

5          **THE COURT:**  You are talking about, for the Record,

6   you are talking about the Special Committee investigation?

7          **MR. GOODING:**  The Special Committee.  That's correct,

8   Your Honor.

9          And our review of documents and electronic documents

10  didn't really begin until early July of 2006.  The first couple

11  of weeks was involved in, you know, interviewing various people

12  at the company, their IT people, for example, to try to get --

13  and others, to try to get some understanding of the grant, the

14  stock option granting process of the company, to get our arms

15  around that.  So, we would have some idea what documents to ask

16  for, what kind of search terms to use, and so forth.

17         The actual review of documents began in early July.

18  And the subpoena, the grand jury subpoena came on August 15th.

19  So, when the subpoena came -- and it was directed to the

20  company -- Wilson, Sonsini, as outside counsel to the company,

21  took charge of responding to the subpoena.

22         But as they advised the Government at the time -- and

23  this is in their cover letter to the Government on August 31,

24  responding to the subpoena -- they did not do their own

25  independent search.  Instead, they relied on the investigation

PROCEEDINGS

 1   that we, the Special Committee, had done up until that time.

 2          And, and produced -- and again, this was all laid out

 3   to the Government, specifically to Mister -- to Mr. Steskal --

 4   produced all relevant e-mails retrieved as of that date in our

 5   investigation.  That was fully explained to Mr. Steskal.  My

 6   partner, Roman Darmer, went through with Mr. Steskal the

 7   process we had gone through.  And the Government was satisfied

 8   with that -- with that production at that time.

 9          We -- we continued to make documents available to the

10   Government in response to the subpoena, as our investigation

11   continued.  And, eventually produced a large volume of

12   documents, including -- I think I've described this to Your

13   Honor before, in the SEC case -- hundreds of stock option

14   binders that we organized after all of our review of documents

15   and interviews and so forth, stock option binders that

16   contained relevant or hot documents related to particular

17   individuals and related to specific option grants.  All of that

18   was turned over.

19          And again, we were completely transparent with the

20   Government about what our process was, and what they were

21   getting, and they -- and -- and made it clear that what they

22   were getting were -- Wilson, Sonsini made it clear in their

23   cover letter that what the Government was getting were relevant

24   documents that had been -- that we had obtained and reviewed at

25   the time.

PROCEEDINGS

1          **THE COURT:**  Now, were any of those productions run to

2     the -- the subpoena, originally, run through Wilson, Sonsini?

3     Or was that handled directly by Mister -- your office?

4          **MR. GOODING:**  No, it was handled by Wilson, Sonsini,

5     with -- with the Government.  Although Mr. Darmer, my partner,

6     Mr. Darmer and I, on occasion, sat down with the Government.

7     At one point, as I think I have described to you before, we ran

8     through our PowerPoint presentation with both the SEC and then

9     with the Department of Justice.  And we -- and we walked them

10    through the entire process that we had gone through.

11         So, we were involved in -- we were communicating with

12    the Government, all along.  But the actual process of

13    responding to the subpoena was handled by -- by

14    Wilson, Sonsini.

15         **THE COURT:**  Well, but it sounds as if you were -- the

16    people operating under the Special Committee and your direction

17    who essentially searched the documents, is that correct?

18         **MR. GOODING:**  That's correct, Your Honor.

19         **THE COURT:**  Okay, so then, just -- was any of that

20    taken up with Wilson, Sonsini when you were deciding, you know,

21    what search terms you would use, and what kind of -- you know,

22    the breadth and the scope of the search?

23         **MR. GOODING:**  Your Honor, the -- Wilson, Sonsini was

24    not involved in the investigation process.  That was deliberate

25    on our part.  And so, they had no part in determining or

1 designing the process or the search terms. That was -- that

2 was our firm that did that.

3 We did it in consultation with our consultants at

4 FTI. We did it, in part, in consultation with the auditors for

5 the company, but not in consultation with Wilson, Sonsini. So,

6 we designed --

7 **THE COURT:** So, sounds like they were just acting as

8 a vehicle, I guess, for the receipt of the subpoena, and then

9 notifying the Government about the -- the documents.

10 And then the physical -- the actual physical turning

11 over of the documents, was that accomplished by the company

12 that was working on it, was it FTI, working under your

13 supervision? Or do you know?

14 Did they go to Wilson, Sonsini, and then

15 Wilson, Sonsini turned them over?

16 **MR. GOODING:** That -- I can't answer that question,

17 Your Honor. I don't know exactly, physically, how it happened.

18 **THE COURT:** And did the Special Committee, and you,

19 representing the Special Committee, or the people working with

20 you, have access to all of the databases and all of the

21 materials and files, et cetera, necessary in order to respond

22 to the subpoena? Because you are representing the select

23 committee.

24 **MR. GOODING:** Correct.

25 **THE COURT:** So, did you have access to all of the

1    company's records and e-mails and everything, that -- that are

2    implicated by the -- by the grand jury subpoena?

3              **MR. GOODING:**  I think the answer to that is yes, Your

4    Honor.  Certainly we thought we did.  And I believe that we

5    did.  As I mentioned to you, the -- there were literally

6    thousands of boxes of hard-copy documents that we reviewed.

7    There are these 3.4 million electronic documents.

8              So -- now, there were some -- there were backup tapes

9    that we concluded at the very beginning of the investigation,

10   we -- we couldn't restore, because it would have cost,

11   according to the people we talked to in the company, and our

12   own experts, literally tens of millions of dollars, and months

13   and months and months, just to restore those backup tapes.  So

14   we made some decisions about what backup tapes to restore.

15             But we believe we had access to all of the company

16   records, if you will, that needed to be -- that needed to be

17   reviewed.

18             **THE COURT:**  And, the documents that you refer to were

19   not from any of those backup tapes.  The -- these 18 documents,

20   they were not from any of the backup tapes or --

21             **MR. GOODING:**  I don't know that I -- I don't know

22   that I -- that I can answer that question.  I don't know.  They

23   might have been.  Because in the database is, as I mentioned

24   before, documents from a variety of sources.  So, it's

25   conceivable some of them came from backup tapes.  I just don't

 1  know.

 2          **THE COURT:**  Who did the search pursuant to the this

 3  most recent Government subpoena, and Monday's subpoena, and the

 4  Defendant's subpoena?  Was that accomplished by your people, or

 5  by the Wilson firm?

 6          **MR. GOODING:**  It was a combination, Your Honor.  As I

 7  indicated, Mr. Strickland called my colleague, Mr. Bartels, --

 8          **THE COURT:**  Uh-huh.

 9          **MR. GOODING:**  -- who in turn called FTI, and asked

10  them to run these series of searches that I mentioned to you.

11  And so, it was a combined effort.

12          There was also some discussion with the Government --

13  I can't remember -- I don't know whether it was Monday night or

14  Tuesday night -- to expand those search terms to try to see,

15  are there any more documents that got missed.

16          And, and by the way, Your Honor, based upon that

17  search, and one further search that we did last night in an

18  excess of caution, we believe we're comfortable with saying to

19  this Court that we don't believe there are any other documents

20  responsive to the subpoena, that were missed.

21          The other search we did last night was to add to that

22  group of four people I told you about, one other individual,

23  Sylvia Garcia-Lechelt, who appears on some of these e-mails, to

24  see if by adding her to the mix, any other documents fell out

25  responsive to the subpoena.  And none did.  People were

PROCEEDINGS

1   reviewing those documents into the wee hours of the night, last

2   night.  So, no further documents fell out.

3          And so, we're -- based on that expanded search that

4   was done, and adding to it, Ms. Lechelt, we're comfortable in

5   saying that we don't believe there are any other documents that

6   got missed.

7          **THE COURT:**  Did you ever have any information at any

8   time prior to when you got the subpoena from the Government,

9   that these other documents existed?

10          **MR. GOODING:**  No, Your Honor.

11          **THE COURT:**  No information, whatsoever.

12          **MR. GOODING:**  No information.

13          **THE COURT:**  Ms. Beeler, do you --

14          **MS. BEELER:**  Well, I would just --

15          **THE COURT:**  And, you want to respond, and also tell

16   me, what are the critical documents here, that are -- you

17   consider so important that you didn't have before?

18          **MS. BEELER:**  All right.  Let's start with -- I just

19   have a couple of observations, and then I'll talk about the

20   critical documents.

21          One, I can understand arguments that maybe there are

22   mistakes made, and it might be that I'm misunderstanding some

23   of the argument made here.

24          But, in our document requests, it was "All documents

25   relating to the conduct that led to Kent Roberts' termination,

PROCEEDINGS

1    including documents relating to or reflecting how the grant

2    date for Roberts' stock option was changed."

3           Now, a very plain reading of that for me, and the

4    Government's case has been entirely from the beginning, as

5    reflected in the indictment, even though the indictment is

6    pared down now, that there was a stock issued at one price on

7    one date, and then later, on another date, it was changed.

8    Pretty simple.

9           Now, so I think that the two documents categorized as

10   non-responsive, I can appreciate how there might be an argument

11   that they were difficult to find by defining search terms.  But

12   I don't think it's fair to say that they are not responsive.

13   The two documents are -- they're grant recap reports showing

14   the process by which the original grant was given.  The grant

15   that was changed.

16          All that being said, I think that we had at least one

17   document that was similar enough to that, that I think we had a

18   fair snapshot of what happened in July, which is -- there was a

19   document that was admitted into evidence today as Exhibit 13-D.

20   So I think that was a different argument, and maybe I

21   misunderstood -- I don't think I misunderstood the argument.

22          Now, as far as -- I agree that there were two e-mails

23   that we got, the two e-mails that were produced.  And that was

24   the e-mail dated August 31st, and the e-mail dated

25   November 29th.  So, we did receive those.

1    **THE COURT:**  So you had had those.

2    **MS. BEELER:**  We had those, that's correct.  But then,

3    within -- then I want to make one more observation before

4    talking about the specific e-mails that seemed so very

5    relevant, and surprising, actually.  And again, I can

6    understand that there may be arguments about human error.

7    But, but the -- there was -- it sounded like there

8    was a comment that by meeting with Mr. Steskal and having

9    the -- Mr. Steskal say at the time, "Great, we're happy with

10   the production" is somehow some kind of context.  And I

11   probably am just misunderstanding the argument.  But it'll

12   say -- and I will talk about these documents in particular,

13   they illuminate the grant, the change-date process in a way

14   that the documents never revealed before.

15   So, I -- I don't think it's fair to say that by

16   showing the search terms, if that happened to Mr. Steskal or by

17   having us say, "Wow, this is a lot that you are producing to

18   us, very helpful, this is great," that's at all relevant to

19   whether documents that were responsive to the subpoena were or

20   weren't produced.  I mean, they weren't produced.  And these

21   are documents that explicitly refer to grants.

22   So, I mean, there may be human-error arguments, but I

23   don't think that some kind of a Government sign-off that

24   everything's fine has any residential to the fact that e-mails

25   directly responsive -- directly relevant to the grant change at

1    issue are now provided, just the night before trial was due to

2    start.

3            But as far as the documents --

4        **THE COURT:**  Why, all of a sudden, was this -- this

5    subpoena on Monday night?

6        **MS. BEELER:**  Well, I will tell you, from my

7    perspective, what happened is that it never made any sense to

8    me that I couldn't figure out with more detail what happened on

9    November 29th.

10           I had one very oblique e-mail, dated November 29th,

11   from Marianne Snook to Terry Davis.  "Hi there" -- this was the

12   date that the grant was changed in the system.  (As read) "Hi

13   there.  I have a fairly urgent matter to talk with you about on

14   Thursday.  Please make sure we get to talk for about five

15   minutes some time on Thursday.  Thanks, Marianne."  That's sent

16   at 5:45 p.m.

17           The system reflects a change at roughly 3:30 in the

18   afternoon for Mr. Roberts' option grant.  So, it just didn't

19   make any sense to me.  And, and there were no e-mails, there

20   were no nothing -- now, I understand that forensically, things

21   could be difficult, that there may be documents that don't

22   exist eight years after the fact, because of document retention

23   policies.  There could be all sorts of explanations.

24           But it still just bothered me that I didn't know what

25   happened on November 29th.  And --

1          **THE COURT:**  Well, is the question maybe it should

2    have bothered you earlier?

3          **MS. BEELER:**  No.  I have been after that from the

4    moment I came on the case.  I have interviewed every single

5    person, from the lowest level in the company, who had anything

6    to do with IT, who had anything to do with stock option

7    solutions.  I just -- I mean, it didn't -- on some level,

8    people would say to me, "It doesn't matter, it doesn't matter,

9    if Terry Davis did it or not, it doesn't matter."

10          But it just bothered me that I didn't know what

11    happened.  I wanted to know what happened.  So I just kept at

12    it.

13          And then, finally, I got some travel records through

14    Mr. Davis's lawyer, showing on the 28th of November, that he

15    was in New York.  And then I got more credit card records

16    showing that he was in New York possibly on the 29th.

17          And then I went back to the company, and I asked for

18    -- to see if Mr. Davis applied for reimbursement.  And then

19    finally, I -- and he didn't.  And it didn't make any sense.

20          And then finally I thought, you know, one more -- I

21    had asked for the Outlook calendar before.  It was blank.  And

22    then finally I said -- late at night, I thought, well, you

23    know, just -- can someone just check any to-from e-mails,

24    because -- to see if he was in New York, visiting -- I think

25    there's a plant in New Jersey, or some kind of office in New

1   Jersey.

2           And I just thought, well, maybe there's a to-from

3   that would show -- I talked to his secretary from the year

4   2000, to see if she kept his Outlook calendar in someplace

5   other than on the computer system.  I mean, in many ways, you

6   know, these are small details I was trying to nail down.

7           So, that's just the context for why it always

8   bothered me that there wasn't anything there.  And this is a

9   little bit of the context, where I was sincerely shocked to get

10  the e-mails.

11          I'm not even ascribing any fault.  I don't know.  But

12  I know that it was very surprising for me on Tuesday to get the

13  e-mails -- to get the one e-mail, and then the set of e-mails,

14  because there it was, that -- I always thought there had to be

15  something, and there was.

16          And what there was was a series of e-mails.  There

17  were the two, kind of earlier in the game.

18          **THE COURT:**  Will you hand those up?

19          **MS. BEELER:**  Yes.  Of course, if I hand them up, I

20  can't talk about them.

21          **THE COURT:**  Anyone have additional copies?

22          **MS. BEELER:**  But I probably can muddle along with an

23  extra set, if you'd give me a second.  Let me just write down

24  the dates really quickly.  If I just write down the dates

25  quickly, I have an extra set here.

 1              **THE COURT:**  Just hand them up.  I'll take a quick

 2    look at them.

 3              **MS. BEELER:**  All right.  And, they're in order.  And

 4    I put "Got" on the ones that I -- these are the ones that I

 5    think are very relevant.  There's "Got" on the upper right-hand

 6    corner of the ones that I did get.

 7              **THE COURT:**  The ones that you did get before, you

 8    mean.  You had --

 9              **MS. BEELER:**  Two I had before.

10              **THE COURT:**  The ones you received before.

11              (The Court examines document)

12              **MS. BEELER:**  And I do have extra copies, so I can

13    talk about them.

14              **THE COURT:**  Was the term, was the term "Grant" -- was

15    the term "Grant" ever used in any of the -- as a search term?

16    "Grant," or "Option grant"?

17              **MR. GOODING:**  "Option grant" I believe was a search

18    term.

19              **MR. NEAL:**  "Grant" was a term also, Your Honor.

20              **MR. GOODING:**  I believe that's right.

21              **MS. BEELER:**  And I would just make one other comment

22    when the Court's ready for it.

23              **THE COURT:**  Well, hold on.  Yes, do go ahead, and

24    I'll hand these back to you.

25              **MS. BEELER:**  Just to give one more bit of context,

1  which is -- I was a little taken aback by if there was any kind

2  of government approval of the things being finished, if that

3  was part of the argument.

4        I will say that both Wilson Sonsini and Howrey have

5  been extremely responsive to repeated document requests by me,

6  ever since I came on the case, to get to the bottom of things.

7  I did want to say that.

8        Part of this process and the company, too, some of

9  these additional documents.  I will say that we've gotten a

10 bunch of documents from different places in the company's files

11 that we didn't get in the initial production, pursuant to the

12 grand jury subpoena.

13       I would talk to witnesses and I would find out how

14 files were stored and how files were maintained.  And then I

15 would ask them to go look in binders and boxes.  And with all

16 of those requests I got pretty rapid responses.

17       But I will say that those were all again in my

18 pursuit of trying to find out what happened in the year 2000,

19 during this time period from July, the board minutes, to

20 November 29th.

21       I gave many directed requests to the company, and

22 they were quite responsive in return -- in response to those

23 requests.  But the fact remains that these e-mails are pretty

24 relevant to the conduct here.  And we did get them Tuesday

25 night.

1              **MR. NEAL:**  Maybe --

2              **THE COURT:**  Well, when you say that "these

3     documents" -- it looks like the August 9th may be one of the

4     more critical ones.

5              **MS. BEELER:**  One of the more what?

6              **THE COURT:**  Critical ones.

7              **MS. BEELER:**  That's from the government's

8     perspective, yes.

9              **THE COURT:**  Yes.

10             **MS. BEELER:**  But all the November e-mails are, too,

11    because --

12             **THE COURT:**  November 21st, et cetera.

13             **MS. BEELER:**  -- all we had previously was what

14    Mr. Roberts said.  And now we have documents confirming it.

15    That's pretty significant.

16             The government knew what Mr. Roberts said, but

17    they're documents about what happened that do confirm things he

18    said.  And that was pretty relevant to the defendant.

19             **MR. NEAL:**  He could have been convicted on the

20    government's November 29th theory, which was a theory we didn't

21    necessarily embrace.  But he could have been convicted on that

22    theory if these documents hadn't been produced Tuesday night.

23             I do, at some point, want to address some other

24    things.  I don't mean to butt in.

25             **THE COURT:**  Well, who was the person who marked these

1  August 9th and November 21st e-mails as -- when you say they

2  are marked -- inadvertently marked "not relevant"?

3         One of them uses the term "option grant" in it.

4         **MR. NEAL:**  Both do, Your Honor.

5         **MR. GOODING:**  Both of these documents made it through

6  the keyword search term.  So they didn't get trapped before

7  they got down to that level.

8         **THE COURT:**  So somebody marked them.  As I understand

9  it, they did -- they did capture the documents.  But then they

10 marked them as "not relevant."  What I want to know is, who did

11 that?

12        **MR. GOODING:**  They were either contract lawyers or

13 staff attorneys at our firm who did that first level of review

14 of documents.  And there was something like eight hundred

15 and -- eight hundred and fifty or sixty thousand documents that

16 made it down through the keyword search process.

17        So there were ten or so contract lawyers or staff

18 attorneys, mostly from our Washington, D.C. office, who did

19 that review and were instructed to mark documents either

20 "relevant," "non-relevant," "hot," "privileged," or "for

21 further review."

22        These documents, we've determined, were marked --

23 mismarked "not relevant" in -- both, in July of 2006 by --

24 there were two different staff attorneys or contract attorneys

25 who did that.  And it was a mistake.  It shouldn't have

1   happened.  I apologize for it.  But it was human error.  And

2   there was nothing deliberate about it.

3           We did not have these documents.  I've never seen

4   these documents before Wednesday morning, yesterday morning.  I

5   was surprised by it, too.

6           That's all I can say, Your Honor.  But there was

7   nothing deliberate about it.

8           **MR. NEAL:**  May I --

9           **THE COURT:**  Now, did the general counsel of McAfee

10  see the document requests?

11          **MS. HERMLE:**  No, Your Honor.

12          The general counsel of McAfee, whose name is Mark

13  Cochran -- and he's here in the courtroom -- has only been the

14  general counsel of McAfee since last year.

15          He was not present when the subpoena and the document

16  requests were issued by the government.  And he would not have

17  been involved, in any event.  That was handled by the Howrey

18  and the Wilson firms.

19          **THE COURT:**  But since the time he has been on as

20  general counsel, have there been requests to the company

21  even -- by attorneys for additional documents, other than this

22  last request that we're talking about?

23          Because it sounds as if Ms. Beeler at least -- and we

24  can talk about defense counsel, but, you know, have been in

25  contact to obtain further documents.

1            MS. HERMLE:  Yes.  The government, through

2    Ms. Beeler, has been in contact for those documents.  All of

3    those communications, to my understanding, have been directly

4    through the Wilson and Howrey firms.  Not through the company,

5    but through the outside firms.

6            THE COURT:  Now, did the Wilson and/or the Howrey

7    firm have contact with the general counsel with regard to the

8    document requests and --

9            MS. HERMLE:  I'll let the Wilson --

10           THE COURT:  Were they involved, or was the general

11   counsel involved at all in any of those document requests?

12           MS. HERMLE:  The general counsel, to my knowledge --

13   and the Wilson and Howrey firms can correct me if I'm mistaken,

14   but it is my understanding that the general counsel was not

15   involved in any way, shape or form in either the specific

16   collection or the production of those documents.  That was all

17   done directly by outside counsel at the Wilson and the Howrey

18   firms.

19           The company has cooperated in every way that I know

20   of.  Now, if I'm incorrect, then Ms. Beeler can tell me.

21           MS. BEELER:  There's a little bit of a -- certainly

22   the way the internal -- the special committee ran -- I don't

23   know how that ran.  In recent months, as I've had specific

24   requests based on specific interviews with witnesses -- and

25   I'll give you an example.  There are two different kinds of

PROCEEDINGS

1   examples.  One would be authentication of corporate records.  I

2   have a photocopy of minutes.  I want to make sure the minutes

3   are direct from the corporate binders as they appear there.

4   That's an easy category of authentication.

5        But there's more that -- but I would always include

6   Mr. Strickland in my requests.  We ended up roping in Steve

7   Tompkins from McAfee when I would learn things.  And I'll give

8   a concrete example --

9        **THE COURT:**  Who is Mr. Tompkins?

10       **MS. HERMLE:**  Mr. Tompkins is an in-house attorney

11  with McAfee.  He is not the general counsel.  He reports up

12  through a chain.

13       I believe Ms. Beeler will agree with me that the

14  general counsel has never been involved in any way, in any of

15  the document issues.

16       **THE COURT:**  I always hold general counsel as

17  responsible.  They are the ultimate responsibility.  That's

18  where the buck stops.

19       **MS. HERMLE:**  I'm sure Mr. Tompkins would agree with

20  you.

21       **MS. BEELER:**  That's true.  Actually, Mr. Tompkins has

22  been very helpful.

23       I thought that there ought to be hard-copy printouts

24  from the calendar year 2000, that were maintained by stock

25  administration.  And, in fact, there were in storage.

1          And so the company, with Mr. Strickland's

2   participation in this process, got the boxes out of storage,

3   looked in hard files for printouts from the calendar year 2000,

4   so I could try to chart what happened in the Transcentive data

5   system.

6          The electronic data system didn't have a check

7   changes function so I couldn't see what happened before 2003.

8   It only presented a snapshot of a certain -- certain data.

9          I thought, well, let's try to find some hard copies.

10  So that's when we -- the -- I asked with Mr. Strickland, the

11  company, to gather these documents.  And the company was very

12  helpful.

13          **THE COURT:**  When was that?

14          **MS. BEELER:**  Over the past several months.

15          **MR. STRICKLAND:**  Over the past two months, I would

16  say.

17          **THE COURT:**  What has been your involvement or your

18  firm's involvement with respect to document production?  You're

19  the ones, I guess, who are seeing the subpoena, probably, for

20  the first time.

21          **MR. STRICKLAND:**  Your Honor, the original grand jury

22  subpoena was provided to our firm.  We then provided it to the

23  Howrey firm.  And the -- as Mr. Gooding explained, the Howrey

24  firm interacted with Mr. Steskal, and the Howrey firm collected

25  the documents, provided them to us.  We Bates numbered,

1   photocopied them, and provided them to Mr. Steskal.

2           And our August 31 of 2006 letter to Steskal even

3   reflects, with respect to category A, which was the one that

4   Mr. Neal mentioned, that we understand you have met and

5   conferred -- not the exact quote, but that concept -- with Mr.

6   Darmer of the Howrey firm, regarding the scope of this

7   response.  We weren't privy to those conversations, but we're

8   providing to you what you received what -- based on your

9   discussions with Mr. Darmer.

10          So originally our involvement was essentially getting

11  the documentation, Bates numbering it, copying it.  Getting it

12  from the Howrey firm, Bates numbering, copying it, and it

13  providing it.

14          In the more recent months, which is what Ms. Beeler

15  was referring to a moment ago, we were getting direct requests

16  from the government for documentation.  We would -- depending

17  on what it was, would either contact the Howrey firm, which is

18  what happened this week, for the documents that bring us here

19  today, or in-house lawyers at the company.

20          Mr. Cochran, the general counsel, has a staff.  It's

21  a big company.  There are numerous lawyers who work for

22  Mr. Cochran.  It was not Mr. Cochran directly we were

23  contacting for the documentation.  It was lawyers lower in his

24  organization.

25          And they would -- they would essentially do the

1    mechanical work of collecting the documentation recently

2    requested by Ms. Beeler, providing it to us.  We would then

3    review it, provide it to the government.

4            **THE COURT:**  Now, with respect to what you received

5    from Howrey, were there ever any documents removed from the

6    production that Howrey turned over to you?

7            **MR. STRICKLAND:**  There were privilege reviews and

8    documents that were removed for privilege and logged.  The

9    e-mails that bring us here today were not a part of that.

10   Those documents were not removed.

11           But occasionally there were documents that were

12   removed for privileged reasons and logged.

13           **THE COURT:**  Were there any other documents removed,

14   for any reason whatsoever, other than what you just described?

15           **MR. STRICKLAND:**  Not that I know of, Your Honor.  But

16   there could have been document -- not as part of the original

17   response to the subpoena, to my knowledge.  But more recently

18   there could have been documents that say, okay, that's not

19   responsive to the exact request.  Let's take it out.

20           That I'm not sure about, Your Honor.

21           **THE COURT:**  Were any of these documents that

22   Mr. Gooding has just gone over responsive to any of these

23   recent requests that the government has made, as opposed to the

24   original request?

25           **MR. STRICKLAND:**  No, Your Honor.  What they were

1  responsive -- if you don't count prior to Monday, no.

2         On Monday I received -- McAfee received, and I

3  accepted service, a subpoena from Mr. Stephens, which -- for

4  four very narrow categories.

5         Category 1 was the documents from Terry Davis's

6  e-mails for November of 2000.  That was consistent with a

7  request, although slightly broader, that Ms. Beeler had made

8  more or less contemporaneously.

9         And, in fact, I responded to Ms. Beeler in saying,

10  essentially, you know, funny you should ask, I just got a

11  subpoena from Mr. Stephens calling for those same documents.

12         That was on Monday.  What we then did was contact the

13  Howrey folks and say, we need all -- because as Mr. Gooding

14  said, they had the documentation -- we need all of the

15  documents, all of Mr. Davis's e-mails from November 2000.

16         Mr. Gooding has explained to you what they did

17  internally.  Those were then provided to us on Tuesday of this

18  week, approximately 300 e-mails, I believe.  They were

19  reviewed.  And all of them were responsive to the new subpoena.

20  There may have been some privileged ones.  And they have since

21  been produced.

22         The one document at issue here was -- caught my eye.

23  Actually caught the eye of an associate working for me because

24  she hadn't seen it before.  And unlike the other documentation,

25  this seemed relevant to this --

 1          **THE COURT:**  Which one was that?

 2          **MS. BEELER:**  It's actually a subset of one of the

 3    e-mail strings here.  We have a standalone document.  It was an

 4    e-mail in the middle of November from Mr. Roberts.

 5          And you heard testimony about it today, saying

 6    something like, "Things I don't have" or "I don't have yet."

 7    And it was inquiring, "Where's my April 14, 2000?"

 8          And so that's the e-mail.  Mr. Strickland called me

 9    up and said, "I don't think we've seen this before."  And we

10    have definitely not seen that before.

11          **MR. STRICKLAND:**  And I immediately provided it in the

12    same e-mail to Ms. Beeler and Mr. Stephens at the Cooley firm,

13    because I had not seen it before.  As my cover e-mail to them

14    reflects:  I'm providing this to you; we've just seen it; here

15    it is.

16          So in advance of producing the documents responsive

17    to the subpoena, which are actually due this morning, I got

18    this to them at 4 o'clock on Tuesday.

19          **MS. BEELER:**  Then we broadened the data request, at

20    that point, and got the additional documents.

21          I do want to say, though, it is my position -- again,

22    this is leaving aside whatever arguments might excuse the

23    production -- it is my position that all of my requests during

24    the past several months geared towards hard copies of documents

25    are all responsive to the original subpoenas request for

1   documents relating to his stock option grants.

2          So there are different categories that it can be

3   responsive to, but the fundamental point of the grand jury

4   subpoena is that we're looking for documents.

5          Now, that's not to say that people weren't very

6   helpful in getting additional documents along the way in the

7   past couple of months.

8          But I just want to make it clear that all of my

9   requests have been made -- are within the scope of my

10  original -- our original, the government's original request.

11         **MS. HERMLE:**  If I could point out from the company's

12  perspective, Your Honor, the reason these documents were

13  available at this late date is because the company did provide

14  all of them to the Howrey firm at the outset of the

15  investigation.

16         There were well over 3 million documents provided.

17  That was culled down to over 850,000 documents from the search

18  terms.  Then the process of review began.  And that resulted in

19  the -- I believe it's well over 80,000 documents that were

20  produced.

21         So the company has never withheld, destroyed, pulled

22  out anything.  From the outset it has produced everything to

23  the Howrey firm, and believes it has cooperated fully with the

24  government.

25         **THE COURT:**  Some employee motivated at all to slip

1   out a couple of things that they thought might be, you know,

2   particularly critical or contradict their view of what

3   happened?

4            **MS. HERMLE:**  Well, Mr. Gooding can address that since

5   those two attorneys were in his firm.

6            But from the company's perspective that would be

7   incomprehensible because the Howrey firm had been hired to

8   investigate.  It was in the company's interest that they have

9   access to everything that would allow them to conduct a full

10  investigation.  And the company's position was: full

11  cooperation with the firm and its investigators.

12           **THE COURT:**  Yes.  Was there something else you wanted

13  to say?

14           **MS. BEELER:**  Well, my only --

15           **THE COURT:**  I thought you were going to add something

16  because I asked about some specific documents.  But go ahead.

17           **MS. BEELER:**  I think I've talked about the specific

18  documents.  I will just say --

19           **THE COURT:**  No, I think you have.

20           **MS. BEELER:**  Great.

21           **THE COURT:**  I thought there was a more general kind

22  of conclusion you wanted.

23           **MS. BEELER:**  No.  Just that the company has provided

24  me additional information over the past few months that's been

25  relevant to the charges here, that I think cleared up a lot of

PROCEEDINGS

1  what I thought was ambiguity for the time period from July to

2  November.  And then we had the final clear-up Tuesday night.

3          **MR. NEAL:**  May I?

4          **THE COURT:**  Yes.

5          **MR. NEAL:**  So, Your Honor, actually, I've tried not

6  to be leveling accusations.  I've been trying to bring out the

7  facts.  And if the facts accuse, so be it.

8          It's interesting Mr. Gooding says there were only 18

9  pages that weren't produced.  I don't mean to lighten this

10  proceeding by saying this, but Rose Woods only deleted 18

11  minutes from her famous tape-recording machine.  And it happens

12  that the 18 pages --

13          **THE COURT:**  I was wondering, where is Monica Goodling

14  when you need her, right?  Maybe she would have -- maybe

15  there's a job for her somewhere now.

16          **MR. NEAL:**  The 18 pages, though, include a series of

17  what truly are among the most critical documents that you could

18  imagine in this case, because they go to a core issue relating

19  to my client's guilt or innocence.

20          **THE COURT:**  Well, that's why I asked the last

21  question I just asked of Ms. Hermle.  Any reason why somebody

22  in the company would be motivated to, you know, or could they,

23  or anybody else involved in the production?

24          **MS. HERMLE:**  Would not be in the company's interest,

25  Your Honor.  Simply would not be.

1          **MR. NEAL:**  But, Your Honor, I actually thought we

2    might hear people come in today and say for some reason these

3    documents just never surfaced.

4          My breath is almost taken away because what we now

5    know is they had them in their possession, they've looked at

6    them.  And through some system they had set up, they decided

7    simply not to produce them.

8          The idea they could conclude --

9          **THE COURT:**  As I understand it, two of them, only two

10   of them, I believe, had been marked -- not that those aren't

11   critical documents.

12         **MR. NEAL:**  Two were marked "not responsive."

13         **MR. GOODING:**  "Not relevant."

14         **THE COURT:**  Inadvertently marked "not relevant."

15         **MR. NEAL:**  And two were marked "not responsive."  So

16   there were four.

17         **MR. GOODING:**  No.

18         **MR. NEAL:**  Two you said were relevant but not

19   responsive.  You said two were relevant but not responsive, and

20   were withheld for that reason.

21         **MR. GOODING:**  No, they weren't withheld.  They were

22   not withheld.  They simply, in our judgment, looking at them

23   now, are not responsive to the subpoena.  You could argue about

24   that.

25         **MR. NEAL:**  Were they produced?

PROCEEDINGS

```
 1              MR. GOODING:  They were not produced.

 2              MR. NEAL:  We're talking about four documents, Your

 3   Honor.  We're talking about two --

 4              THE COURT:  Which documents are you talking about

 5   now?

 6              MR. GOODING:  I'm talking about --

 7              THE COURT:  The August 9th and November 21st, as I

 8   understand it, were inadvertently marked "not relevant," right?

 9              MR. GOODING:  Those are the two that I believe are

10   the two most important documents for purposes of this

11   proceeding.  The two -- the one dated August 9 and the one

12   dated November 21.  Those documents were inadvertently marked

13   "not relevant."

14              THE COURT:  Now --

15              MR. GOODING:  And they weren't produced because they

16   weren't in our process.  There was nothing deliberate about it.

17              And I resent Mr. Neal suggesting in any way that

18   somehow we deliberately did not produce documents.

19              MR. NEAL:  It's clear --

20              THE COURT:  Hold on.  Just hold on.

21              MS. BEELER:  I think, Judge, those are the wrong two.

22   I think these are the documents.

23              THE COURT:  Okay.  Well, these are -- yes, these are

24   the August 9 and the 11th.  No, November 21st, I believe, is

25   the one.
```

1          **MR. GOODING:**  Yes, Your Honor.  August 9 and

2    November 21.

3          **THE COURT:**  And not November 16.  But, in any event,

4    did any of these other documents surface?  Well, two of them

5    you said had been turned over already --

6          **MR. GOODING:**  Yes.

7          **THE COURT:**  -- right?

8          **MR. GOODING:**  Yes, Your Honor.

9          **THE COURT:**  Is that correct or not?  You didn't find

10   them?

11         **MS. BEELER:**  No, no, no.  The two documents that were

12   produced we all knew about.  But they could be seen as bookends

13   to things that we didn't know about in between.

14         **THE COURT:**  Okay.  So you had -- there's no dispute

15   you had the August 31st and the November 29th, right?  Maybe

16   you couldn't make that much sense of them, but you had those

17   two; is that correct?

18         **MS. BEELER:**  Yes.

19         **THE COURT:**  And then the July 6th and the -- well,

20   there were two on July 6th.  Did those surface at all in your

21   search, or only in this most recent search?

22         **MR. GOODING:**  Well, they surfaced at some point early

23   on because they're both -- they're marked "relevant" in our

24   process.  So some reviewer looked at these documents, probably

25   in the July 2006 time frame, and marked those documents

1    "relevant."

2            **THE COURT:**  So what happened then?

3            **MR. GOODING:**  To the best of our understanding, they

4    weren't produced because the e-mails themselves are not to or

5    from or mentioning Kent Roberts.

6            In August --

7            **THE COURT:**  May I see those two documents, please?

8    There are two July 6 e-mails?

9            **MR. GOODING:**  Yes, Your Honor.

10           **THE COURT:**  Snook to Davis.

11           **MR. GOODING:**  Yes, Your Honor.  One of them is Snook

12   to Davis.  The other one is Snook to Garcia-Lechelt, copied to

13   Davis.

14           **THE COURT:**  And then the November 28, did that ever

15   surface at all?

16           **MR. GOODING:**  No, Your Honor.  That is the one that

17   did not make it through the keyword -- that was not keyword

18   responsive, so it didn't make it into our process.

19           So any suggestion that we or anybody else at the

20   company deliberately did not produce that document is an

21   absolute falsehood.

22           **THE COURT:**  Now, who would have determined that this

23   was not responsive, since appended to it is the list -- the

24   grant recap report?

25           **MR. GOODING:**  The -- that's correct.  The grant recap

1  report, grant recap reports do reflect the proposed grant, the

2  February grant to Mr. Roberts.

3       And as I said, the final version of that grant recap

4  report that went to the board of directors was produced, was

5  referred to in our presentations to the board and to the

6  government.

7       These, as I see them, Your Honor, are cover e-mails

8  attaching earlier versions of those same grant recap reports.

9  They weren't produced, I believe because they were neither to

10 or from nor mention Kent Roberts. And as I look at the

11 subpoena now, don't appear to be responsive because the

12 subpoena, categories 3 and 8, ask for communications with Kent

13 Roberts.

14      **THE COURT:** But this is an e-mail. And I'm not quite

15 sure how it works on the system they had, but it says, "Here is

16 the list." So I gather that this document would have been an

17 attachment, would it not, of some sort?

18      **MR. GOODING:** Yes, Your Honor.

19      **THE COURT:** And that one does have his name in it.

20      **MR. GOODING:** That one does, Your Honor.

21      **THE COURT:** So that's somewhat inexplicable. But on

22 the other hand, what does this add to the whole --

23      **MR. GOODING:** Your Honor, to me it doesn't add

24 anything because it simply --

25      **THE COURT:** Because we have a number of these --

PROCEEDINGS

```
 1              MR. GOODING:  Yes.

 2              THE COURT:  -- right?  So what does this add to the

 3    whole --

 4              MS. BEELER:  The Court may remember at the beginning

 5    I said, well, I actually think it's responsive to category 2.

 6    My trouble was not with that as much, because I think that's a

 7    distraction.  I think that it's illuminating because the grant

 8    recap report is attached.  But I actually knew that information

 9    from hard copies that I got recently from company --

10              THE COURT:  We have other --

11              MS. BEELER:  We do.

12              THE COURT:  We've had other grant recap reports that

13    have the same information on them, right?

14              MS. BEELER:  Right.  But I think -- that's what I

15    said.  One can say -- regardless, that was not what I thought

16    was the real issue with getting e-mails at the last minute.

17    It's the November e-mails that are the rub.  And so those are

18    the ones that really illuminate what happened.

19              Whatever characterization of them one wants to place

20    on it, it's really -- I think that's a bit of a distraction.  I

21    think what the focus -- what I think took me aback when I got

22    the production was that I had actual e-mails, both the one

23    e-mail in August that we talked about previously from

24    Mr. Roberts, and then the two -- the e-mail strings in November

25    leading up to the November 29th e-mail that we already had.
```

1          Those were all new, all very relevant to both sides.

2   And it exactly shows the course of conduct after the grant in

3   July.  So whatever the reasons are, they are very important.

4          **THE COURT:**  And what's the significance of the -- of

5   the other July 6th memorandum?

6          It has another report attached to it, but it doesn't

7   mention anywhere in here anything particularly, seems to me,

8   with respect to Mr. Roberts.  Some of the -- the cover e-mail

9   referred to other, looks like, other employees.

10         **MS. BEELER:**  Those -- I don't personally care about

11  those two.  It's the November ones.

12         **MR. NEAL:**  There's no question that the most relevant

13  ones are the November ones.

14         **THE COURT:**  They don't really add anything at all, do

15  they?

16         **MS. BEELER:**  I agree.

17         **MR. NEAL:**  Except it may raise questions about the

18  process.  Because the idea that those documents, when you look

19  at them, could be deemed nonresponsive, they were clearly

20  responsive to requests that we served, that were broad enough,

21  not restricted to to/from kinds of things.  And I believe they

22  were responsive to the subpoenas of the government.

23         Putting that to one side, what we are now hearing is

24  that two critically responsive documents that meet all the

25  search terms -- they have "grant" in them -- were in fact seen

1    by some people.  But now what we're hearing is that, I guess

2    the two copies that we're seeing, one of each document, were

3    marked "not relevant" by somebody whose identity we don't know.

4         But the other thing that assumes -- maybe they are

5    representing this -- is that this entire search of all these

6    documents only turned up one copy of each of those two e-mails.

7    If that's the case, they are the only e-mails in this entire

8    litigation for which only one copy surfaced.

9         I mean, we have been inundated with multiple copies.

10   So we hear an explanation as to how one particular copy of each

11   document might have been marked "not relevant."  And I think we

12   are entitled to know more than that.  But what makes no sense

13   is why there were not additional copies, and what happened to

14   them if there were.

15        At the very least, the search terms called -- the

16   search terms, they searched "Davis," they searched "Roberts"

17   they searched "Snook," they searched "grant."

18        I'm not sure exactly what Mr. Gooding said about

19   searching backups.  They told the SEC that they reviewed 344

20   backup tapes.  I think today we didn't hear that.

21        So what we're being told is that apparently only one

22   copy of each of these documents appeared, and those two copies

23   somehow were managed to be marked "not relevant."

24        And, Your Honor, maybe that's what happened.  But

25   they are the most critical --

1          **THE COURT:**  Don't you find it somewhat unusual that

2    when you have -- like this one, I don't have the 21st one.  I

3    think I handed it back down.

4          But, for example, this August 9th one, it -- you

5    know, there should have been, you know, four copies of this in

6    various and sundry places at least, I gather.  Right?  Because

7    Mr. Davis was copied on it.  It went to two different

8    individuals.  And then you've got the sender.

9          **MR. NEAL:**  And then, Your Honor --

10          **THE COURT:**  But only one of them shows up?

11          **MR. GOODING:**  Your Honor, as far as we know, only one

12    of them showed up.  And I believe that the search that was done

13    over this past couple of days reflects that, that one copy of

14    each of those documents turned up.

15          So I can't explain why there's only one of each, but

16    that's apparently the way it is.

17          **MR. NEAL:**  I'm going to make two other comments, and

18    then I'll be quiet.

19          **THE COURT:**  Yes.

20          **MR. NEAL:**  We heard a lot about the supposed

21    parameters for searching, that were worked out and agreed to by

22    the government, although I don't hear Ms. Beeler agreed to

23    those.

24          We were never told by McAfee that the documents that

25    we sought in our document requests and subpoenas, and which

1    they told us had all been produced to the government, had been

2    produced to the government through filters that were not

3    disclosed to us by the government or by anybody at McAfee.

4           What I'm hearing today makes me feel like we were

5    sort of duped.  They are now saying that they -- either with or

6    without the agreement of the government -- used a series of

7    filters that led them to make judgments about documents that we

8    obviously have a profoundly different view of --

9           **MR. GOODING:**  I have to correct something that Mr.

10   Neal said.

11          We did not arrive at the search terms in agreement

12   with the government.  We developed those search terms on our

13   own and in consultation --

14          **THE COURT:**  I didn't understand you said that.

15          **MR. GOODING:**  We described them to the government

16   afterwards.

17          **THE COURT:**  What were the filters filtering?

18          **MR. GOODING:**  The keyword -- the keyword search

19   phrases are filtering the initial 3.4 million documents.

20          **THE COURT:**  Okay.  There was not any other kind of

21   filter as with respect to privilege documents or some other

22   kind of document, etc.?

23          **MR. GOODING:**  As I mentioned, Your Honor, one of the

24   marking categories, once you get through the keyword search and

25   get the 3.4 down to about 850,000, then one of the categories

1   was privilege.  And so we had a process for identifying

2   privileged documents, and then we reviewed those further.

3           By the way, I should add, I should add, that our

4   entire process was described in letters, actually letters

5   written to the auditors, so-called process memos, that describe

6   the entire process in great, excruciating details.

7           Those memos have been produced to the government and

8   to the Cooley firm.  So they know exactly what our process was.

9   And any suggestion that they don't is just absolute -- they

10  know exactly what our process was.

11          **THE COURT:**  There is another question I had, though,

12  with respect to the process.  Someone is having the first cut

13  at deciding whether something is relevant or not, responsive or

14  not.  Is that then reviewed by somebody else?

15          **MR. GOODING:**  Yes, Your Honor.

16          **THE COURT:**  How does that work?

17          **MR. GOODING:**  We had a quality-control process built

18  into the entire process.  Again, that process is described in

19  detail in the process memos that we -- that we did.

20          So there were -- there were more senior lawyers at

21  the firm and more senior staff attorneys who reviewed the

22  initial cuts that had been made by the initial-layer reviewers

23  that I told you about on a -- on a sampling basis.

24          And these documents did not show up in the -- in the

25  QC process, in the quality control process.  But there was a

PROCEEDINGS

1  process to try to make sure that relevant documents were

2  caught.  And, unfortunately, these documents were not picked up

3  in that process.

4          **THE COURT:**  Is there any investigation or other

5  investigation you think needs to be done?

6          **MS. BEELER:**  No.  I've actually been very happy with

7  the -- that I've gotten responses, and I'm glad that we got the

8  documents before the trial started.

9          I -- I mean, if -- everyone has assured me that

10 they've done -- scrubbed everything, to make sure that there's

11 no conceivable way that there could be any other information

12 responsive to our requests.

13         I -- again, mistakes happen.  That's fine.  But my

14 concern --

15         **THE COURT:**  It's not quite fine.

16         **MS. BEELER:**  It's not fine.  My concern -- I have a

17 little bit of a concern that there's some suggestion, again,

18 that by giving process memos with forensic search terms

19 designed to get the government's request, that Steskal read

20 them, I'm sure he did, it's produced, that's all very well and

21 fine.

22         But forensic retrieval of information is how one

23 responds to a subpoena.  It's not something that the government

24 signs off on.

25         What I see is there are documents that weren't

1    produced.  Now they are produced.  Fine.  If there is anything

2    else, that would be a real problem.

3            I have some concern if there's any trying to shift it

4    back on the parties somehow understanding of what the process

5    was as any kind of an excuse.  It's just not.  Things sometimes

6    happen that they are not produced.

7            **MR. GOODING:**  I'm not saying that.

8            **THE COURT:**  I don't want to get into that.

9            Is there any further investigation or inquiry that

10   needs to be made?

11           **MR. NEAL:**  Well, Your Honor, I mean, in the final

12   analysis -- we're in the middle of a trial now.  But in the

13   final analysis, I guess that's an issue for the Court.  It's

14   not an issue for me.

15           I will say we've had -- we've had representations

16   that these documents were inadvertently marked "not relevant"

17   or "don't produce."  We haven't seen those markings.  I think

18   it would be interesting to see those markings.

19           We are told that there are a couple of individuals

20   who made those decisions.  We haven't heard from those

21   individuals to confirm that.

22           We have this what I think is a huge question about

23   how could there only, in fact, have been one copy of each of

24   two of the most critical documents?

25           So if I was interested in ensuring that this process

1   had, in fact, been as wholesome and as careful as we are being

2   assured, those are certainly questions that would occur to me

3   to follow up and ask.

4           My concern is for my client.  He went to trial

5   exposed on a government theory that until Tuesday night --

6   which we had been telling the government was wrong, but until

7   Tuesday night we didn't have the evidence.  We now hear, three

8   days into this trial, a statement that these were all --

9           **THE COURT:**  This is the first day of testimony.

10          **MR. NEAL:**  First day of testimony.  -- that these

11  were all clerical errors.  This is the phrase that Mr. Gooding

12  used.

13          Well, you know, there's an irony, Your Honor, because

14  when they did their restatement in their 8-K, McAfee said that

15  all of the grants that the directors got or knew about that had

16  hair on them were all clerical errors.

17          And the only reason that Mr. Kent Roberts is sitting

18  here today is because he said, "There could be an issue with my

19  grant now that we're looking at these things."

20          Everybody else is guilty of clerical errors, and he

21  stands accused of a criminal offense, on trial with documents

22  coming in at the eleventh hour.  And sitting here today, I

23  guess I'm not convinced that you or we or the government can

24  say with certainty that we really do know that everything was

25  produced, that we've got the whole story.  And we're in the

1   middle of a trial, a criminal trial.

2          THE COURT:  Well --

3          MS. BEELER:  Much more practically, I actually think

4   that we have the illumination for the transactions that I was

5   looking for.  I always felt there was something -- well, I

6   didn't know what the answers were.  But I think that they're

7   there.

8          I think a lot of it is relevant to the defense theory

9   about what happened.  But it happens to provide real insight

10  into the process that we didn't have before.

11         So as far as these transactions, not about other

12  things, I don't know, but these transactions I feel like we've

13  covered the chronology.  And that was my goal.  And I think

14  we've gotten there.

15         So that's -- from this -- these specific requests for

16  these specific documents I think we've closed the loop.  I

17  think it works for both sides as relevant evidence.

18         So that's, I think, the -- what happened with these

19  documents.  I don't -- I can't conceive of anything more about

20  these transactions.

21         THE COURT:  Well --

22         MR. NEAL:  Can we see the ones that were marked "not

23  relevant"?

24         THE COURT:  Don't you have them now?

25         MR. NEAL:  We haven't seen the copies that were

1   labeled "not relevant" or marked "not relevant."

2            **THE COURT:**  You're talking about the ones that

3   actually had the markings on?

4            **MR. NEAL:**  Yes.

5            **MR. GOODING:**  The markings are made electronically,

6   Your Honor, they are in the database.  I don't know if it's

7   possible to take a picture of those or not.

8            **THE COURT:**  Well, but then I thought that then

9   attorneys take a look at them.  There was that first screening

10  and then somebody -- you know, and then you had the quality

11  control.  Is all of that on the computer?

12           **MR. GOODING:**  Yes, Your Honor.

13           **THE COURT:**  Not written on a hard copy anywhere?

14           **MR. GOODING:**  No.  That was on electronic.

15           **THE COURT:**  Well, is there any way of retrieving that

16  from the system?

17           **MR. GOODING:**  Your Honor, I -- I can't answer this

18  question just because I don't have the technical expertise.

19           I do know that we were able to go into the electronic

20  database and determine when those markings were made by date,

21  and who the individuals were who made those markings.

22           **THE COURT:**  Can we do this?  We get a declaration

23  with, I guess, our own PMK, whatever, but from someone about,

24  first of all, how one is able to determine that, how the system

25  works in terms of determining that, in fact, they had been

1   reviewed, and how documents are reviewed, and determine that,

2   in fact, they were determined not relevant, nonresponsive, and

3   how you can go back into the system and determine that, number

4   one.

5           And, number two, an explanation of why there would be

6   only one copy that surfaced of these documents when there are

7   several recipients of the e-mails.  And, certainly -- as well

8   as the sender.  Because it would seem to me that there would be

9   more than one in the system.

10          **MR. GOODING:**  Yes, Your Honor.  We'll provide --

11          **THE COURT:**  Is there anything else you want in that

12   declaration from the person who does -- would know the system?

13          **MR. GOODING:**  I think that's likely to be somebody at

14   FTI Consulting.  Yes, we will get such a declaration.

15          **MR. NEAL:**  Can we get declarations from the people

16   who made this determination that they weren't relevant?

17          **MS. BEELER:**  Contract lawyers.

18          **THE COURT:**  I think at this point we just want to

19   know what the system was.  And then I'll see.

20          But I think, you know, whether they were right or

21   wrong then, you know -- well, now we know they're wrong.

22   Forget the "right" part of it.

23          But unless -- maybe the thing to do is identify,

24   without having a declaration from them, but identify who made

25   those determinations.

 1          MR. GOODING:  Yes, Your Honor.

 2          THE COURT:  Okay.

 3          MR. GOODING:  Yes.

 4          THE COURT:  And then if there's any need to proceed

 5   any further, we can do that.

 6          MR. GOODING:  Very well, Your Honor.

 7          THE COURT:  Okay.  Anything else?

 8          MS. BEELER:  No, Your Honor.

 9          MS. HERMLE:  Thank you, Your Honor.

10          MR. NEAL:  The only other thing, Your Honor, is we

11   are going to file -- with the Court's permission, we are going

12   to file a motion to dismiss the second superseding indictment

13   as a result of what's taken place.

14          THE COURT:  Well, you can file it, okay.  But we're

15   going to go ahead and proceed tomorrow with trial.

16          MR. NEAL:  I understand.

17          MS. BEELER:  Can we reserve responding to this until

18   after the trial?

19          MR. NEAL:  It's a short motion.

20          THE COURT:  Well, get -- tomorrow is Friday.  Get a

21   response in next Tuesday, because Monday we're not in session

22   in this trial.  So you can get it in next Tuesday.

23          Okay.  Nobody's head rolled, but -- and I know when

24   there are a lot of documents that it's very hard to sometimes

25   make sure that everything is turned over.  And I don't -- you

```
 1   know, I'm not sure that this necessarily just -- it's not

 2   like -- you know, it's not a Perry Mason moment.  Let's put it

 3   that way.  I think, nonetheless, really, great scrutiny has to

 4   be paid on all parties' sides.

 5          Also, making requests for documents the evening

 6   before the trial or after -- well, I guess it was the evening

 7   before the trial.  One would have hoped that there would have

 8   been an awareness earlier that there must be more out there,

 9   and pushed and pushed for it.

10          MS. BEELER:  I mean, I appreciate what the Court is

11   saying.  But I am very specific about going after information.

12   All of these things were -- the original document requests.  It

13   just never made sense to me.  So I kept at it.  I think that

14   many people wouldn't have.  I'm glad I did.

15          With all due respect -- that's the worst term to use,

16   but I don't think it's a fair observation to say we should have

17   made requests earlier.  We did.

18          This is just about the government trying to do its

19   job to make sure that truth is illuminated --

20          THE COURT:  I know that.

21          MS. BEELER:  -- as much as it can be.

22          THE COURT:  But on the eve of trial, to issue a

23   subpoena --

24          MS. BEELER:  I didn't issue a subpoena.

25          THE COURT:  The week before.  However you did it,
```

1  okay.

2          **MS. BEELER:**  I hear what the Court is saying, but I

3  totally disagree with that characterization of what we've done

4  here.

5          We're only trying to figure out, in the face of a

6  production that was represented as complete, for whatever

7  perfectly good reasons perhaps, to make sure, to make

8  absolutely sure.

9          Because, as the Court knows, this is a criminal case.

10  And it's always important for the government to assess its

11  evidence fresh and not rely on what people have done months or

12  years or even weeks before.

13          **THE COURT:**  I understand.

14          **MS. BEELER:**  That kind of fresh eye should always be

15  taken.

16          **THE COURT:**  I understand.  A couple of weeks in

17  advance always helps, right?

18          **MS. BEELER:**  I have been doing nothing for the past

19  months but trying to nail down details.

20          **THE COURT:**  I'm sure.

21          **MS. BEELER:**  And I don't think the defense would

22  disagree with that, under the circumstances.

23          **THE COURT:**  I'm not prepared to assign any ill motive

24  to someone.  After I hear some of the testimony in the case

25  maybe it will become apparent that there are people with such

```
1   motives.  I just don't know.  But I don't know whether they had

2   any involvement at all in any of the document production.

3           But at this point that's -- I would like the

4   declaration I referenced with you.

5           And we'll see you tomorrow morning --

6           MR. NEAL:  See you tomorrow morning.

7           THE COURT:  -- at 8:30.

8           MS. HERMLE:  Thank you, Your Honor.

9           THE COURT:  Thank you.

10          (At 3:43 p.m. the proceedings were adjourned, to

11           recommence Friday, September 19, 2008, at 8:30 a.m.)

12                              -  -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          <u>INDEX</u>

2                                            **PAGE**    **VOL.**

3   Initial Jury Instructions               211         4
    Opening Statement by Mr. Lucey          228         4
4   Opening Statement by Mr. Neal           240         4

5

6   <u>**PLAINTIFF'S WITNESSES**</u>              <u>**PAGE**</u>    <u>**VOL.**</u>

7   **FELDMAN, BORIS**
    (SWORN)                                  261         4
8   Direct Examination by Mr. Lucey         261         4
    Cross Examination by Mr. Neal           277         4
9   Redirect Examination by Mr. Lucey       296         4

10  **NIGHTINGALE, STUART**
    (SWORN)                                  301         4
11  Direct Examination by Ms. Beeler        301         4
    Cross Examination by Ms. Eagan          360         4

12
    **THOMPSON, KANDIS**
13  (SWORN)                                  366         4
    Direct Examination by Ms. Beeler        366         4
14  Cross Examination by Mr. Neal           382         4

15

16

17

18

19

20

21

22

23

24

25

| PLAINTIFF'S EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 2 | | | 356 | 4 |
| 3 | | | 356 | 4 |
| 10 | | | 315 | 4 |
| 12 | | | 309 | 4 |
| 13D | | | 324 | 4 |
| 13E | | | 324 | 4 |
| 14 | | | 333 | 4 |
| 16 | | | 329 | 4 |
| 17 | | | 320 | 4 |
| 18 | | | 326 | 4 |
| 19 | | | 323 | 4 |
| 20 | | | 351 | 4 |
| 61 | | | 319 | 4 |
| 71 | | | 304 | 4 |
| 82 | | | 345 | 4 |
| 83 | | | 345 | 4 |
| 84 | | | 345 | 4 |
| 90 | | | 347 | 4 |
| 91 | | | 348 | 4 |
| 92 | | | 348 | 4 |
| 133 | | | 374 | 4 |

1

2                      **CERTIFICATE OF REPORTERS**

3          We, KATHERINE POWELL SULLIVAN and BELLE BALL, Official

4    Reporters for the United States Court, Northern District of

5    California, hereby certify that the foregoing proceedings in CR

6    07-0100 MHP, UNITED STATES OF AMERICA vs. KENT H. ROBERTS were

7    reported by us, certified shorthand reporters, and were

8    thereafter transcribed under our direction into typewriting;

9    that the foregoing is a full, complete and true record of said

10   proceedings at the time of filing.

11

12

13                      s/b Katherine Powell Sullivan
                   -----------------------------------------
14                 Katherine Powell Sullivan, CSR #5812, RPR, CRR

15

16                         s/b Belle Ball
                   -----------------------------------------
17                   Belle Ball, CSR #8785, RMR, CRR

18

19                  Thursday, September 18, 2008

20

21

22

23

24

25