Volume 5

Pages 484 – 686

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
  vs.                          )  NO. CR 07-0100 MHP
                               )
KENT H. ROBERTS,               )
                               )  San Francisco, California
            Defendant.         )  Friday
                               )  September 19, 2008
_____)

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          DAVID L. ANDERSON
                            Acting United States Attorney
                            450 Golden Gate Avenue, 11th Floor
                            San Francisco, California  94102
                  **BY:  LAUREL BEELER, AUSA**
                        **TIMOTHY J. LUCEY, AUSA**


**For Defendant:**          COOLEY GODWARD KRONISH LLP
                            Five Palo Alto Square
                            3000 El Camino Real
                            Palo Alto California 94306-2155
                  **BY:  STEPHEN C. NEAL, ESQUIRE**
                        **NEAL J. STEPHENS, ESQUIRE**
                        **SHANNON M. EAGAN, ESQUIRE**




**Reported By:  Katherine A. Powell, CSR #5812, RPR, CRR**
             **Belle Ball, CSR #8785, RMR, CRR**
             **Official Reporters – U.S. District Court**

```
 1                     P R O C E E D I N G S

 2   SEPTEMBER 19, 2008                              8:39 A.M.

 3            (The following proceedings were held in open court in

 4            the presence of the jury:)

 5            THE COURT:  You may be seated.  And Counsel, would

 6   you recall the witness to the stand, please?  You were in the

 7   middle of your cross-examination?

 8            MR. NEAL:  Yes, Your Honor.

 9            THE COURT:  And you've pared it down, perhaps, over

10   the  -- the last evening?

11            MR. NEAL:  I'm working on it.

12            THE COURT:  If you will step up here, I'll remind you

13   that you are still under oath.  And the oath will not be

14   readministered.

15            THE WITNESS:  Okay.

16            THE COURT:  Have a seat, please.  You may proceed.

17            MR. NEAL:  Thank you, Your Honor.

18            Good morning, ladies and gentlemen.

19                        KANDIS THOMPSON,

20   called as a witness for the Plaintiff herein, having been

21   previously sworn, resumed the stand and testified further as

22   follows:

23                   CROSS EXAMINATION RESUMED

24   BY MR. NEAL:

25   Q    Good morning, Ms. Thompson.
```

1    **A**    Good morning.

2    **Q**    Yesterday, there was a statement made that Mr. Roberts

3    received his 2000 -- initially received his 2000 promotion

4    grant in February of 2000.

5            And what I would like to ask you is, in all the work

6    you did in connection with the investigation, have you seen any

7    indication in any documents that Mr. Roberts received that

8    promotion grant, or any discussion relating to that promotion

9    grant, prior to the July 5 personnel action form?

10   **A**    Well, originally in the preliminary review I had done in

11   May of '06, the grant recap report was attached to the

12   April 13th, 2000 minutes in that binder.  Which reflected a

13   grant date of 2-14-2000.

14   **Q**    Have you seen any document dated earlier than July 5th of

15   2000?  A document?  The grant reports were dated later,

16   correct?  Whatever they were attached to, the grant dates --

17   the grant recaps were later.

18           So, my question is, have you seen any paper that was

19   created earlier than July 5th of 2000, that in any way

20   reflected a 2000 promotion grant for Mr. Roberts?

21   **A**    And I think what I'm trying to say is in my preliminary

22   review, I found that grant recap attached to the April 13th,

23   2000 minutes.  Rightly or wrongly, that is what I --

24   **Q**    Pardon?

25   **A**    Rightly or wrongly, that was what I located.

1  Q    But what was the date of preparation of the grant recap

2  report that was attached?

3  A    I don't recall, without the documentation.

4  Q    It was July, was it not?

5  A    I don't recall.

6  Q    I want to show you a document that's been marked as

7  Exhibit 1638.

8  A    Okay.

9           THE COURT:  You can hand it to --

10 BY MR. NEAL

11 Q    1638 is a multi-page document, the first page of which is

12 dated June 27, 2000.  And it's an e-mail from Marianne Snook to

13 Kent Roberts, correct?

14 A    Yes.

15 Q    And, again, who was Marianne Snook?  What was her

16 position?

17 A    I believe she was within the stock administration

18 department of McAfee.

19 Q    All right.  And attached to the e-mail is a two-page

20 document entitled "Network Associates Optionee Statement,"

21 correct?

22 A    Yes.

23 Q    And this is a statement for Kent Roberts' options,

24 correct?

25           (Witness examines document)

1    **A**    Yes.

2    **Q**    And this is a recap of all of Kent Roberts' options as of

3    June 27, 2000.  Correct?

4    **A**    That's what it appears to be.

5    **Q**    And it's a two-page recap summarizing all of his options,

6    correct?

7    **A**    Yes.

8            **MR. NEAL:**  Your Honor, I will offer 1638.

9            **THE COURT:**  Any objection?

10           **MS. BEELER:**  No, Your Honor.

11           **THE COURT:**  And I'm going to handle it the same way.

12   If I don't hear an objection, then the document will be

13   admitted.  And this document is numbered --

14           **MR. STEPHENS:**  1638, Your Honor.

15           **THE COURT:**  Okay.  That is, in fact, the correct

16   number that's at the bottom of the page.  I thought maybe that

17   was a --

18           **MR. NEAL:**  No, that's our exhibit number.

19           **THE COURT:**  Okay.  1638 is admitted.

20           (Defendant's Exhibit 1638 received in evidence.)

21   **BY MR. NEAL:**

22   **Q**    So, looking at the grant recap summarizing all of Kent

23   Roberts' options as of June 27th, 2000 -- and it's on the

24   screen as well, for members of the jury -- nowhere on either of

25   the two pages of the optionee statement is there any indication

1   that as of June 27th, 2000, Mr. Roberts has received a

2   promotion grant for the year 2000.  Correct?

3   **A**    It is not reflected on here.

4   **Q**    There is one grant in January of 2000 for 10,000 shares,

5   but that is not the promotion grant that we are discussing

6   here.  Correct?

7            (Witness examines document)

8   **A**    That would be my understanding.

9   **Q**    So, as of June 27, 2000 -- the optionee statement that we

10  are looking at was prepared by the company, correct?

11  **A**    I would -- that would be my assumption, but I would not

12  know.

13  **Q**    Is this a document that you pulled out and remember

14  preparing or finding and giving to the Special Committee?

15  **A**    I do not remember.  This --

16  **Q**    We were talking yesterday, when we broke, about the 1997

17  stock option plan.  Do you recall that?

18  **A**    Yes.

19  **Q**    And, the 1997 stock option plan is a plan that you at

20  least are generally familiar with as a result of your work on

21  this case.  Correct?

22  **A**    To a certain extent, yes.

23  **Q**    And I think you already said this, but still not clear,

24  the 2000 promotion grant that we are talking about came out of

25  the 1997 plan, correct?

1   **A**     That would be my recollection, but I'm not sure.

2   **Q**     Under the terms of the 1997 plan, it was actually -- it

3   was permissible for the company to make grants that were at the

4   money, correct?

5   **A**     Um, yes.

6   **Q**     And a grant that's at the money means that if the stock is

7   trading at $20 on the day that the option is granted, and the

8   option is granted with a measurement price or date of $20,

9   that's an at-the-money grant, correct?

10  **A**     Correct.

11  **Q**     The 1997 plan also allowed the company to make grants that

12  were in the water -- in the money, correct?

13  **A**     That is my understanding.

14  **Q**     The 1997 plan actually allowed the company to make grants

15  that were in the money, as long as they were within 85 percent

16  of the market price when granting, correct?

17  **A**     I think that's correct.

18  **Q**     So to illustrate that, not only could the company make a

19  grant that was at the money, under the 1997 plan, the company

20  could also, for example, if the stock was at $10, make a grant

21  for a price of $8.50.  Correct?

22  **A**     That's correct.

23  **Q**     And if the company did that, the people receiving those

24  grants would be in the money, in the sense that they would

25  already have an ability, if it vested, to sell and recognize a

1   cash gain.  Correct?

2   **A**     The grant at the time would be an in-the-money grant.

3   **Q**     And, the 85 percent rule in the '97 plan applied to what

4   were called NSO grants, correct?

5   **A**     I believe that's the case.

6   **Q**     NSO stands for non-statutory stock option, correct?

7   **A**     Yes.

8   **Q**     And Kent Roberts' 2000 promotion grant was a non-statutory

9   stock option, correct?

10  **A**     That is my understanding.

11  **Q**     Now, with respect to the 1997 plan -- and when I talk

12  about "the plan" at least for now, all I'm going to be focusing

13  on is the 1997 plan.

14            But with respect to the 1997 plan, the McAfee Board

15  of Directors explicitly authorized the CEO, as opposed to the

16  board, to grant options under certain conditions, correct?

17  **A**     I would have to look at the plan.

18  **Q**     Well, do you recall in your work with the Special

19  Committee, looking at board resolutions that were adopted in

20  1997, concerning the authority of the CEO to act alone without

21  the board in granting stock options?

22  **A**     I do recall from Special Committee that there was

23  delegated authority to the CEO at some time frame for a certain

24  amount of options.

25  **Q**     Do you recall that initially, the CEO was granted the

1  authority to issue options without any involvement of the board

2  as long as the options were for no more than 15,000 shares of

3  the corporation's common stock?

4  **A**    I don't remember that specific number, but --

5  **Q**    All right.  Well, let me show you Exhibit 2, which I

6  believe is already in evidence.

7         **MR. NEAL:**  And let's put that on the screen.  And

8  Jeff, can we -- let's go to the first page first.  Let me get

9  the witness a paper copy.

10  **BY MR. NEAL:**

11  **Q**    Would you like a paper copy of this?

12  **A**    Oh, that would be easier for me.  Thank you.

13         (Witness examines document)

14  **Q**    Now, if you look at the first page, this document is a

15  copy of the minutes of the meeting of the Board of Directors of

16  McAfee Associates, dated April 17, 1997.  Correct?

17  **A**    Correct.

18  **Q**    And if you look at the first page, it lists the various

19  directors who are present, correct?

20  **A**    Correct.

21  **Q**    It also indicates that Jeff Saper of Wilson, Sonsini,

22  Goodrich and Rosati was present, correct?

23  **A**    Correct.

24  **Q**    Mr. Roberts didn't work for the company as of this time,

25  correct?

1   **A**     That's my understanding.

2   **Q**     And this, among other things, this meeting dealt with the

3   1997 stock option plan, correct?

4   **A**     I would have to read down, sorry.

5   **Q**     If you look at the top of the second page of the minutes,

6   you see where it talks about the adoption of the 1997 stock

7   option plan?

8   **A**     Yes, I do.

9   **Q**     And then do you see in the second sentence of that where

10  it says "After discussion, upon motion duly made, seconded and

11  unanimously approved, the board documented the recitals and

12  resolutions in the form attached to these minutes as Exhibit

13  A"?  Do you see that?

14  **A**     Yes, I do see that.

15  **Q**     And then if you turn to Exhibit A -- and this is also in

16  evidence, but if you look at the first page of Exhibit A, it

17  relates to the adoption of the 1997 stock incentive plan,

18  right?

19  **A**     Correct.

20  **Q**     If you look at the bottom resolution on that page, you see

21  where it says (As read), "Further resolved that the chief

22  executive officer of this corporation, with full power to act

23  alone, be, and the same hereby is, authorized to carry out all

24  of the powers of the Committee under the Stock Incentive Plan,

25  (including the power to authorize the issuance of shares of

1   this corporation's common stock and to grant options to

2   purchase such shares) provided that he, acting alone, shall

3   not, 1, make any awards or grants to any individual who

4   thereafter would have received aggregate awards or grants in

5   excess of 15,000 shares of this corporation's common stock as

6   adjusted from time to time to reflect recapitalizations, stock

7   splits, the declaration of stock dividends or similar events,

8   or, 2, make any awards or grants with a purchase or exercise

9   price of less than 100 percent of the fair market value of this

10  corporation's common stock on the date of the award or grant."

11           Do you see that?

12  **A**   Yes.

13  **Q**   Do you know if the Special Committee discussed or

14  considered those provisions in its work?

15  **A**   I would not know.

16  **Q**   Looking at those two paragraphs of that resolution, what

17  the board did on this date, in 1997, was it said that the CEO,

18  acting alone, without consulting the board or without approval

19  from the board, and without approval from the Comp Committee,

20  can grant awards of options, as long as they don't exceed

21  15,000 shares, and as long as they are not in the money.

22           Correct?

23  **A**   Correct.

24  **Q**   Now, the language in the first paragraph of that

25  resolution talks about stock splits.  Correct?

1    **A**    Correct.

2    **Q**    In the course of your work for the Special Committee, or

3    maybe independent of it, you know that McAfee's stocks split

4    three for two in June of 1998.  Correct?

5    **A**    The stock did split.  I can't validate the dates, but yes,

6    there was a three-for-two split.

7    **Q**    Pardon?

8    **A**    There was a three-for-two split.

9    **Q**    Well, let me show you an exhibit.  You're not able to

10   confirm that there was a three-for-two split in June of 1998?

11   **A**    Not without documentation.

12   **Q**    Well, let me show you an exhibit which has been marked

13   1581.

14           (Witness examines document)

15   **Q**    1581 is a summary of Network Associates' or McAfee's 1997

16   Stock Incentive Plan, plan history, that was produced by McAfee

17   to the Government.

18           Do you recognize this document?

19   **A**    I do not.

20   **Q**    Looking at this, does this in fact constitute a summary

21   prepared by the company of activities under the 1997 stock

22   history?

23           (Witness examines document)

24   **A**    I cannot validate who prepared it, but it does reflect

25   that.  The stock summary.

1  Q     I'm sorry.

2          **MR. NEAL:**  I will offer 1581.

3          **THE COURT:**  Any objection?

4          **MS. BEELER:**  No.

5          **THE COURT:**  1581 is admitted.

6          (Defendant's Exhibit 1581 received in evidence.)

7          **MR. NEAL:**  May we display it?

8  **BY MR. NEAL:**

9  Q     If you look at 1581, the fourth entry on the page, you see

10 where it states in June, 1998, the Board of Directors declares

11 a 3 for 2 stock dividend, resulting in a share reserve of

12 11,775,000 shares?

13 A     Yes.

14 Q     So, after June of 1998, the authority that had been given

15 to the CEO to make grants up to 15,000 shares was effectively

16 increased, so that the CEO, acting alone, without talking to

17 the board or the Comp Committee or anybody else, could issue

18 grants up to 22,500 shares, correct?

19 A     That's my understanding.

20 Q     So, at the time of Kent Roberts' grant in 2000, of 20,000

21 shares, 20,000 shares was within or below the level of

22 authority that the CEO had for making grants without any

23 consultation with the Comp Committee or the Board of Directors,

24 correct?

25 A     It's within the split-adjusted authority of the CEO, was

1    my understanding.

2    Q    I'm sorry, I didn't hear that.

3    A    It was within the split-adjusted authority of the CEO, was

4    my understanding.

5    Q    Thank you.  Will you go back to the resolution for just a

6    second, Exhibit A to the minutes of April, 1997?

7         Do you see in that first paragraph there's language

8    that says the CEO shall not make any awards or grants to any

9    individual who thereafter would have received aggregate awards

10   or grants in excess of 15,000 shares, do you see that language?

11   A    Yes.

12   Q    So, looking at that language, one might interpret that as

13   saying that you had to look at all of the shares that had been

14   granted to an individual and decide whether a particular grant

15   would roll that individual over 15,000 shares, or later roll

16   that individual over 22,500 shares before determining whether

17   the CEO could make the grant.

18        I mean, you see that interpretation that's possible

19   there?

20   A    Because of the "aggregate" word?

21   Q    Yeah.

22   A    I can see that view.

23   Q    Would you agree with me that you haven't seen anything in

24   the course of any work you did for the Special Committee where

25   anybody ever interpreted that language the way I just did?

1   A    From an accounting standpoint, we did not interpret it as

2   aggregate.  We interpreted it as individual awards.

3   Q    So, from all of your time and experience at the company,

4   the way the 1997 board resolution in Exhibit A was interpreted,

5   was that you looked at any particular grant that was made, and

6   if it was below 22,500 shares, then the CEO, acting alone, was

7   authorized to make that grant.  Correct?

8   A    So, I would just clarify, in the restatement that's how we

9   applied it.  Since my tenure with stock administration, we have

10  not been going by this rule, under the '97 plan.  We have

11  different policies and procedures.

12  Q    Okay, but my question was a little -- I think you answered

13  it, but so the Record's clear, there's no -- there's no

14  circumstance in which you have seen any indication that the

15  company ever interpreted the language that I read from

16  Paragraph 1 of the last resolution on Page 1 of Exhibit A the

17  way I interpret it.  Correct?

18          That is, you haven't seen any language or any grant

19  that you have seen in the course of working for the Special

20  Committee where the company or anybody else concluded that what

21  that resolution actually meant was that you had to look at the

22  aggregate, correct?

23  A    No, I'm not aware of that.

24  Q    So, I was correct.

25  A    Okay.  Yeah.  I think what was confusing me is I think you

1    said had we applied this during my entire tenure with the

2    company.

3    **Q**    Okay.

4    **A**    That's what I was trying to clarify, because that would

5    not be an accurate statement.

6    **Q**    All I meant to say was in your entire tenure with the

7    company, you didn't see any instance where anybody interpreted

8    the language to say you looked at the aggregate rather than

9    the -- rather than the amount of an individual grant.  Correct?

10   **A**    Agreed.

11   **Q**    So that as of June -- as of 2000, the CEO, acting alone,

12   had the authority to make grants up to 22,500 shares on a

13   grant-by-grant basis, correct?

14   **A**    Yes.  That's how we had documented it within the

15   restatement.

16   **Q**    And the Special Committee concluded, did it not, that the

17   grant that was made to Kent Roberts which brings us all here

18   was in fact within the authority that had been delegated to the

19   CEO under the 1997 plan?

20   **A**    My recollection would be their memo reflected that.

21   **Q**    I'm sorry, I didn't --

22   **A**    My recollection would be that the Howrey/Special Committee

23   memo provided to me for accounting purposes reflected this

24   grant to be within the delegated authority of the CEO as

25   split-adjusted.

1    **Q**    And in fact, the Special Committee, with all its expert

2    advisors, concluded as follows with respect to Mr. Roberts'

3    grant.  The Special Committee concluded that, quote, "The grant

4    is within the authority delegated to the CEO under the 1997

5    plan, up to 22,500 split-adjusted, and thus no other

6    authorizing action by the Board of Directors or Compensation

7    Committee was required."  Correct?

8    **A**    I don't remember the last part.  I remember the first part

9    of the statement.  I don't remember no other authorizing action

10   was needed.

11   **Q**    All right.  Well, let me show you, then, for a moment,

12   Exhibit 1548.

13           Do you recognize 1548?

14           (Witness examines document)

15   **A**    Yes, I do.

16   **Q**    What is 1548?

17   **A**    It is the writeups of executive grants.

18   **Q**    Prepared by whom?

19   **A**    Well, that's what I'm looking, to see if it's --

20           (Witness examines document)

21   **A**    I believe the -- these are all prepared by Howrey.

22   **Q**    So this is -- this is a -- a document that was prepared by

23   Howrey and Simon, working with and for the Special Committee

24   during the investigation into the stock option issues at

25   McAfee.  Correct?

1  **A**    That would be my understanding.

2              **MR. NEAL:**  I offer 1548.

3              **THE COURT:**  Hearing no objection, 1548 is admitted.

4              (Defendant's Exhibit 1548 received in evidence.)

5              **MR. NEAL:**  Thanks.  Can we show -- let's look at the

6  first page, just --

7  **BY MR. NEAL:**

8  **Q**    Just to put this in context, this is a McAfee stock

9  options review, Directors and Officers/CMT grant analysis, and

10  it's 88 pages, 90 pages -- it's 88 pages long.  Correct?

11  **A**    Correct.

12  **Q**    And, and in this recap, Howrey and the Special Committee

13  review tons of options, of which the one that we're talking

14  about involving Kent Roberts is only one.  Correct?

15  **A**    I'm sorry, say that again?

16  **Q**    Pardon?

17  **A**    Can you repeat that?  I'm sorry.

18  **Q**    Yeah.  The document reflects reviews and corrections with

19  respect to scores and scores of options, of which Kent's is

20  one.  Correct?

21  **A**    Correct.

22  **Q**    Then, if you look at Page 71 of 88, it's got the Howrey

23  stamp on the bottom, it's Page 000500.  Do you see that page?

24  **A**    Yes, I do.

25  **Q**    And, if you look at Paragraph numbered 6, on that page,

1   that is a discussion by Howrey and the Special Committee of the

2   Kent Roberts grant that is in issue here.  Correct?

3   **A**    Correct.

4   **Q**    And that's the only thing that's being discussed in that

5   section of their analysis.  Correct?

6   **A**    Correct.

7   **Q**    I would like you to look about two-thirds of the way down

8   the paragraph, and you will see a sentence that begins with the

9   word "The grant amount."

10          Can we highlight that whole -- what Howrey and the

11  Special Committee concluded with respect to the very grant that

12  brings us all to this courtroom is, quote (As read), "The grant

13  amount is within the authority delegated to the CEO under the

14  1997 plan (up to 22,500 split-adjusted), as outlined in the

15  Board of Directors meeting minutes dated 4/17/1997, and thus no

16  other authorizing action by the Board of Directors or

17  Compensation Committee was required."

18          Do you see that language?

19  **A**    Yes.

20  **Q**    And that was the conclusion of the Special Committee and

21  of Howrey and Simon and of FTI, the various advisors to the

22  Special Committee.  Correct?

23  **A**    Correct.

24  **Q**    Hmm?

25  **A**    Correct.

1  Q     Now, in addition to the Special Committee, and all of its

2  advisors, concluding that this grant to Kent Roberts was fully

3  within the authority delegated to the CEO, the finance

4  department at McAfee, itself, agreed with that conclusion.

5  Correct?

6  A     That it was within -- is the question was it within the

7  split-adjusted authority?

8  Q     Yes.

9  A     Yes.  We agreed with that conclusion.

10 Q     And let me show you Exhibit 1578.  Handing you 1578, what

11 is 1578?

12        (Witness examines document)

13 A     It is a memo prepared by me and my team, regarding any

14 adjustments or differing conclusions from the Howrey

15 conclusions and the Special Committee conclusions.

16 Q     So in other words, in the document we just looked at,

17 1548, Howrey and the Special Committee set forth their

18 conclusions and analysis with respect to a whole host of

19 grants.  Correct?

20 A     That's correct.  I believe that would be their preliminary

21 conclusions.

22 Q     Yeah.  But the conclusion with respect to the Kent Roberts

23 grant that you just read to the jury never changed, correct?

24 A     No.  It did not.  It never changed.

25 Q     After Howrey and the Special Committee prepared their

1  analysis, then your -- you and your department reviewed their

2  analysis and indicated whether you agreed or disagreed with

3  various things, correct?

4  **A**    Correct.

5  **Q**    And what the 1578 is, is a December 4, 2007 document

6  prepared by the McAfee finance department, commenting on

7  various of the things that had been addressed by the Special

8  Committee.  Correct?

9  **A**    Yes.

10            **MR. NEAL:**  I offer 1578, Your Honor.

11            **THE COURT:**  1578 is admitted, there being no

12  objection.

13            (Defendant's Exhibit 1578 received in evidence.)

14  **BY MR. NEAL:**

15  **Q**    And if you look at the first page, just so the jury sees

16  what this looks like, first page is "To the stock option

17  restatement file from the McAfee Corporate Accounting

18  Department, December 4, 2007, Revised Measurement Dates for

19  Directors and Officers/CMT and Non-executive Management."

20            And you are in that department, correct?

21  **A**    I'm sorry, am I in that department?

22  **Q**    You are in the department that prepared this?

23  **A**    Oh, yes.  Me and my team prepared this.  Yes.

24  **Q**    And if you look at the page that has in the lower

25  right-hand corner the number 004170 -- and let's start with 169

1  first, Jeff -- if you look at the very bottom of Page 169, you

2  will see that this begins a discussion about the Kent Roberts

3  promotion grant that we have been talking about.  Correct?

4  **A**    Right.

5  **Q**    And then if you turn to the top of the next page, the

6  first bullet on the next page reflecting the view of the

7  finance department reads, quote, "This grant was within the

8  approval threshold of 22,500 options for the CEO, and was a

9  promotion grant -- "and was a promotion grant."

10           Do you see that?

11 **A**    Yes.

12 **Q**    Now, you then go on in the conclusion discussion to

13 indicate that the CEO -- who was the CEO at the time, by the

14 way?

15 **A**    In 2000?

16 **Q**    Yeah.

17 **A**    I think my recollection would be Prabhat Goyal or -- I

18 don't know -- he was CFO, sorry.

19 **Q**    I'm sorry, pardon?

20 **A**    He was CFO.  Sorry.

21 **Q**    You see it says while the CEO may have approved the grant

22 and instructed the CFO and VP of Finance to prepare the PAF on

23 7-5, it says there is no evidence of that approval.  Do you see

24 that?

25 **A**    Yes.

1  Q    You didn't find anything one way or the other on that,

2  correct?

3  A    Yes.  I believe what we are indicating there is we never

4  could locate CEO approval of the grant.

5  Q    But the grant was at least clearly within the authority

6  that had been delegated to the CEO at that time.  Correct?

7  A    Yes.

8  Q    Now, though the -- through the work that the Special

9  Committee did, with your assistance, the Special Committee and

10 its advisors determined, by reviewing documents, that the CEO

11 who received the delegation of authority under the 1997 board

12 resolution had in turn delegated his authority to various other

13 people.  Correct?

14 A    Can you repeat that?

15 Q    Yeah.  You learned and the Special Committee learned from

16 reviewing documents at McAfee, that the authority that had been

17 delegated to the CEO in 1997 was in turn delegated by the CEO

18 to other people within the company.  Correct?

19 A    Um -- I can't -- I can't say that I'm aware of that.

20 Q    You're unaware of that?  You are unaware that the Special

21 Committee, with you working with the Special Committee,

22 determined that the evidence in fact showed that the CEO had

23 delegated his authority to department managers to grant options

24 for new hires and for promotions?

25 A    I am aware of that as it relates to new-hire grants.

1  **Q**    Are you aware that the Special Committee also concluded

2  that the authority that had been delegated to the CEO in 1997

3  was in turn delegated by the CEO to various people who worked

4  for the CEO?

5  **A**    I cannot say I'm aware of that.  I don't recall that.

6  **Q**    Did you ever participate in preparing any documents that

7  said that?

8  **A**    I just don't recall.

9  **Q**    I mean, we have established that the grant -- that a

10  20,000 grant was within the authority of the CEO.

11           If the CEO had in turn delegated that authority to

12  people downstream, like Terry Davis, that would be a critically

13  important piece of information for the prosecution to know, for

14  the Special Committee to know, and for the Board of Directors

15  to know.  Would it not?

16  **A**    That would be a critical piece of information.

17  **Q**    And are you saying as you sit here on this witness stand,

18  that with the millions of dollars that were spent on this

19  investigation, you don't remember whether you figured out that

20  in fact the CEO authority had been delegated to other people,

21  including Terry Davis?

22  **A**    I do not recall the CEO authority being delegated to Terry

23  Davis.

24  **Q**    All right.  Let me withdraw the word "Terry Davis."  Do

25  you recall the CEO authority being delegated to other people

1  downstream for both new-hire grants and promotion grants?

2  **A**    As I stated earlier, I remember it for new hire grants.  I

3  don't remember promotion grants.  I --

4  **Q**    Okay, but that's what sort of surprises me, because this

5  whole case is about a promotion grant.

6         And so, you agree it would be important to figure out

7  whether the CEO authority had been delegated downstream with

8  respect to promotion grants as well as with respect to new-hire

9  grants, correct?

10 **A**    Yes, I agree that would be important to figure out.  And

11 what I'm trying to say is in our documentation, which we are

12 looking at from an accounting perspective, I don't believe that

13 we believed or were aware that the CEO had delegated any

14 authority down, related to promotions.

15        And therefore, that's why we're saying we could not

16 locate any authority or approval other than the July board

17 minutes.  And so, that is where we placed our reliance, from an

18 authorization and approval perspective.

19 **Q**    But, so sort of the whole perspective on what happened

20 with Mr. Roberts' grant in 2000 would be changed dramatically

21 if in fact the CEO authority had been delegated downstream, not

22 just for new-hire grants but also for promotion grants,

23 correct?

24 **A**    Say that one more time, just to make sure I get it right.

25 **Q**    Yeah.  From the standpoint of this case, the whole sort of

1  circumstances of this case and the whole circumstances of the

2  company's looking at Kent Roberts would be very different if it

3  turned out that the CEO authority to make grants had been

4  delegated downstream, not just for new-hire grants, but also

5  for promotion grants.  Correct?

6  A    The authorization that I would rely on from an accounting

7  perspective would be different.  How it would change this case,

8  I cannot speak to.

9  Q    But, recognizing how important it might be to this

10 situation, if in fact the CEO authority had been delegated for

11 promotion grants as well as new-hire grants, you're still

12 saying you just don't remember whether you concluded that the

13 delegation had taken place for promotion grants.

14         Is that right?

15 A    I'm -- I'm well aware of what we concluded, which is that

16 for this grant, that we did not find approval, other than the

17 board minutes of July 13th, 2000, that I was aware of, and that

18 is where we placed our reliance.

19 Q    Well, you're aware of the July 5th personnel action form

20 that was signed by Goyal, the CFO and by Terry Davis, correct?

21 A    I would have to refresh on who it was signed by.  But --

22         MR. NEAL:  Can you pull up for me Exhibit 1612.  I'll

23 do this by hand.

24 BY MR. NEAL:

25 Q    1612 may already be in evidence, but let me approach and

1  show you, 1612 is the July 5th personnel action form for Kent

2  Roberts' promotion, correct?

3  **A**    Correct.

4  **Q**    And this is a document that actually reflects his -- the

5  signature and the authorization of 20,000 shares in connection

6  with his promotion, correct?

7  **A**    Correct.

8  **Q**    And again, you haven't seen any document signed by anybody

9  authorizing any shares in connection with this promotion that

10  was earlier than this.  Right?

11  **A**    Other than I testified earlier, it was attached to the

12  April 13th, 2000 board minutes.

13  **Q**    Well, that wasn't an authorization -- I am asking whether

14  you have seen any other signatures anywhere.

15  **A**    I've not seen any other signatures.

16      **MR. NEAL:**  I don't know if you all can see this, I

17  showed you this yesterday, and I think 1612 is in evidence.

18      **MS. BEELER:**  Part of Exhibit 12-F1.

19      **MR. NEAL:**  So, we will offer it as 1612, just as a

20  free-standing -- may it be admitted that way, Your Honor?

21      **THE COURT:**  Yes.

22      **MR. NEAL:**  Thank you.

23      (Defendant's Exhibit 1612 received in evidence.)

24  **BY MR. NEAL:**

25  **Q**    So, looking, looking at the personnel action form that

1  reflects the authorization of this grant to Terry -- to Kent

2  Roberts -- let me just back up.

3          This is a document that purports to authorize the

4  grant that is in issue in this case to Kent Roberts.  Correct?

5  **A**    Yes, this is a personnel action form authorizing that

6  grant.

7  **Q**    And if you look at the bottom portion of the document,

8  which is on the screen, first of all, under "Comments," this is

9  what indicates that in connection with his promotion to

10  vice-president of legal affairs, he's received a stock grant of

11  20,000 shares.  Correct?

12  **A**    Correct.

13  **Q**    And at the bottom, under authorization and approval, do

14  you see it is signed both Goyal and Terry Davis?

15          (Witness examines document)

16  **A**    Correct.

17  **Q**    Okay.  So, this one, at least, shows signatures for those

18  two people.  Correct?

19  **A**    Correct.

20  **Q**    Now, in considering the later grant that was dated

21  April 14, 2000, don't you agree it would be critical to know

22  whether the CEO authority to make grants had been delegated

23  downstream with respect to promotion grants, as well as with

24  respect to new-hire grants?

25  **A**    That would be information, yes, that would be good to

1    know.

2    **Q**    All right.  I would like to show you Exhibit 1754.

3              **MR. NEAL:**  May I approach, Your Honor?

4              **THE COURT:**  Yes.  While you are doing that, what do

5    the initials in this document, "SPAC," stand for?

6              **THE WITNESS:**  Stock Plan Administration Committee.

7    **BY MR. NEAL:**

8    **Q**    Handing you 1754, what is that document?

9              (Witness examines document)

10   **A**    This document is a letter prepared by me and my team in

11   preparation of potentially requesting clearance from the office

12   of the chief accountant on our accounting treatment prior to

13   filing the restatement, although we never sought that

14   preclearance.

15   **Q**    But you and your team prepared a series of draft letters

16   for potential submission to the SEC, reflecting your views and

17   analysis of a whole host of issues related to stock grants that

18   were looked at in connection with the investigation.  Correct?

19   **A**    That is correct.

20   **Q**    And you prepared those drafts in the ordinary course of

21   your business, correct?

22   **A**    Yes.  We did.

23   **Q**    And you made every effort to make them as accurate as

24   possible, correct?

25   **A**    Correct.

1  **Q**    And even though you didn't send them in, you maintained

2  them at the company thereafter.  Correct?

3  **A**    Correct.

4             **MR. NEAL:**  I will offer 1754, Your Honor.

5             **THE WITNESS:**  I just want to say one thing.  This was

6  not the final letter.  It's just a draft.

7             **MR. NEAL:**  I understand that.  I understand that.

8             **THE COURT:**  Hearing no objection, 1754 is admitted.

9             (Defendant's Exhibit 1754 received in evidence.)

10 **BY MR. NEAL:**

11 **Q**    1754 was prepared in August of 2007.  Correct?

12 **A**    That's what the cover letter would reflect.

13 **Q**    And let's just look at the first page.  And, can we blow

14 that up a little bit?

15            So, this was a draft of a letter that you prepared to

16 go to the Securities and Exchange Commission of the United

17 States of America.  What is the Securities and Exchange

18 Commission?

19 **A**    Governing body of public companies.

20 **Q**    And you were preparing this to send it to the SEC in

21 connection with the restatement work, correct?

22 **A**    That is correct.

23 **Q**    And if you look at the bottom of the first page, it

24 indicates that this was actually going to be sent -- while you

25 prepared it, it was actually going to be sent by your lawyers

1    at Wilson, Sonsini, Goodrich and Rosati, correct?

2    **A**    Yes.  That was the plan.  It would have been sent from

3    Wilson, Sonsini.

4    **Q**    Now, ultimately, the company decided not to seek or to

5    send any kind of preclearance letter, correct?

6    **A**    Ultimately, that was the decision.

7    **Q**    You didn't -- you didn't make that decision because you

8    thought there were inaccuracies in the letter, correct?  You

9    made that decision for other reasons?

10   **A**    We made that decision for other reasons.  I don't believe

11   because of inaccuracies in the letter, no.

12   **Q**    All right.  Then would you look at Page 29 of 62, which in

13   the lower right-hand corner has the number 146-4798.

14          And do you see the very top paragraph, talks about

15   grants by delegated authority from March 1, 2000 through

16   January 20, 2003?

17          Do you see that?

18   **A**    Yes.

19   **Q**    Kent Roberts' promotion grant was made -- the grant that

20   brings us here, that had the April 14 date -- was made in the

21   middle of that period.  Correct?

22   **A**    Correct.

23   **Q**    And, if you would look at the second sentence of the first

24   paragraph, you see where it says, "Although there is no formal

25   documentation of such delegation, it appears that department

1    managers had the delegated authority from the CEO to grant

2    options to new hires and existing employees (for promotions) in

3    accordance with predetermined amounts based on the job

4    classification."

5              Do you see that?

6    **A**    Yes.

7    **Q**    That conclusion never changed in any subsequent drafts of

8    your letters, did it?

9    **A**    I do not believe so.  But how we --

10   **Q**    That was my only question.  Let me show you Exhibit 1655.

11   **A**    Uh-huh.

12   **Q**    What is 1655?

13             (Witness examines document)

14   **A**    A draft of the letter earlier, from July, 2000, it

15   appears.

16   **Q**    And this is another draft prepared by you in your

17   department, concerning the restatement issues, correct?

18   **A**    Correct.

19             **MR. NEAL:**  I will offer 1655.

20             **THE COURT:**  There being no objection, 1655 is

21   admitted.

22             (Defendant's Exhibit 1655 received in evidence.)

23   **BY MR. NEAL:**

24   **Q**    If you would look first on -- I'll ask you one thing that

25   we touched on briefly yesterday.  But if you will -- if you

1   will look -- well, first of all, let's show the first page of

2   this to the jury.

3           And this is another draft letter prepared by you, in

4   connection with the restatement.  Correct?

5           (Witness examines document)

6   **A**   Yes.

7   **Q**   If you will look at the page that says "15 of 58."

8           Do you see -- you recall yesterday, I asked you how

9   many total shares of stock had been involved in the restatement

10  that resulted from the work you and the Special Committee did?

11  **A**   Yes.

12  **Q**   And you said you didn't know, and you couldn't estimate

13  it, do you recall that?

14  **A**   Correct.

15  **Q**   If you look at this page -- which is a document you

16  prepared, correct?

17  **A**   Correct.

18  **Q**   If you look at the middle of that page, it indicates that

19  the total number of shares that was involved in the restatement

20  at McAfee was almost 53 million shares, correct?

21  **A**   At the time of preparation, that's correct.

22  **Q**   52,000,888 shares, correct?

23  **A**   At the time of preparation of this memo.

24  **Q**   Did that number change materially?

25  **A**   I don't recall.  I would have to look at the 10-K.

1  **Q**    Pardon?

2  **A**    I don't recall, without reviewing the 10-K.

3  **Q**    So, just to go back to a question I asked you yesterday,

4  Kent Roberts' option was for 20,000 shares.  Correct?

5  **A**    Correct.

6  **Q**    What percentage of 53 million does 20,000 represent?

7  **A**    A very small percentage.

8  **Q**    So I'm going to -- this shows you how simplified my math

9  is, but if I just run through it, 10 percent of 52 million is

10  5.2 million.  Correct?

11  **A**    Correct.

12  **Q**    One percent of 52 million is 520,000.  Correct?

13  **A**    Correct.

14  **Q**    One tenth of one percent would be 52,000 shares.  Correct?

15  **A**    Correct.

16  **Q**    Mr. Roberts had 20,000 shares.  Correct?

17  **A**    Correct.

18  **Q**    So his shares involved less than one half of one tenth of

19  one percent of the total shares that McAfee had to restate

20  because of errors and mistakes in their options.  Correct?

21  **A**    This specific grant for Mr. Roberts, yes.

22  **Q**    You learned during the -- or, other documents were

23  prepared as a result of the restatement, reflecting the fact

24  that McAfee honored grant dates that had been selected by

25  vice-presidents and others to whom the CEO had delegated his

1    authority between 2000 and 2003.  Correct?

2    **A**    Other individuals that were not executives, I believe

3    would be the correct statement.

4    **Q**    So, let me show you Exhibit 1577.  What is 1577?

5              (Witness examines document)

6    **A**    It -- it is a memo provided -- prepared by me and my team,

7    related to what we refer to as the bucket group, which is small

8    grants to non-executives.

9    **Q**    And this was an analysis that you all prepared in the

10    ordinary course of your business, correct?

11    **A**    In the ordinary course of the restatement, yes.

12              **MR. NEAL:**  I will offer 1577.

13              **THE COURT:**  No objection?  1577 is admitted.

14              (Defendant's Exhibit 1577 received in evidence.)

15    **BY MR. NEAL:**

16    **Q**    And I think you said this, but this is something that was

17    referred to as a bucket analysis, correct?

18    **A**    Correct.

19    **Q**    And if you look at the very top, at the very first page,

20    do you see that the title is "MCAFEE INC. AMENDED SUMMARY OF

21    CONCLUSIONS, STOCK OPTION GRANTS-BUCKET ANALYSIS, November 30,

22    2007," correct?

23    **A**    Correct.

24    **Q**    And this indicates that your department prepared this on

25    or about November of 2007?

1    **A**    That would appear correct.

2    **Q**    If you would look, please, at Page 8 of your bucket

3    analysis, which bears sequential numbering in the lower

4    right-hand corner, it has number 004131, if you will turn to

5    that page?

6    **A**    Yes.

7    **Q**    Do you see in the middle of the page, there's a paragraph

8    that starts with "Group III"?

9    **A**    Yes.

10   **Q**    And the heading of Group III is "Grants from March 1, 2000

11   to January 20, 2003."

12            Do you see that?

13   **A**    Yes.

14   **Q**    And do you -- again, Kent Roberts' grant fell in that

15   period.  Correct?  That is, the grant that brings us here?

16   **A**    His grant fell within that time frame.  It did not fall

17   within Group III of this memo.

18   **Q**    No, but it fell within that time frame, correct?

19   **A**    Time frame.

20   **Q**    So do you see in the third line of that paragraph, it says

21   that "During this period, grant-making authority was deemed to

22   have been informally delegated to department heads (usually

23   vice-presidents or above) through the 'Focus on Compensation'

24   process"?

25   **A**    Yes.

1    **Q**    Terry Davis was a vice-president, correct?

2    **A**    That would be my understanding.

3    **Q**    In fact, he was a senior vice-president at the time in

4    issue.  Correct?

5    **A**    I'm not sure if he was a senior vice-president.

6    **Q**    Let me show you Exhibit 1645.

7              **THE COURT:**  Thank you.

8              (Witness examines document)

9    **BY MR. NEAL:**

10   **Q**    1645 is a personnel action form with respect to Terry

11   Davis, correct?

12   **A**    Correct.

13             **MR. NEAL:**  And I will offer 1645.

14             **THE COURT:**  Hearing no objection, 1645 is admitted.

15             (Defendant's Exhibit 1645 received in evidence.)

16   **BY MR. NEAL:**

17   **Q**    This document indicates that as of January -- as of July 1

18   of 2000, Terry Davis was promoted from -- I'm sorry, July 7 of

19   2000, it looks like, he was promoted from vice-president to

20   senior vice-president at McAfee.  Correct?

21   **A**    Yes.  That's what this reflects.

22   **Q**    I'm sorry, I didn't hear you.

23   **A**    Yes.  That's what this reflects.

24             **THE COURT:**  Excuse me, but what is the significance

25   of the -- what is at the top, "Effective Date for all changes,"

1   what does that mean?

2           And what is that date, because I can't -- is that a

3   July 1 date?

4           **THE WITNESS:**  I'm actually unsure.  That date's kind

5   of unclear.

6           **MR. NEAL:**  I think it's July 1, Your Honor, but I'm

7   not --

8           **THE COURT:**  Well, would that be the sense, what it

9   says, "Effective Date for all changes"?  That that would be the

10  date that you would use?

11          **THE WITNESS:**  Yeah.  So, during my tenure at McAfee

12  -- I wasn't here during this time frame -- but that would be

13  the effective date that we would change the --

14          **THE COURT:**  And whatever it is --

15          **THE WITNESS:**  Records of the company.

16          **THE COURT:**  And however we read it, it looks like

17  July 1, does it not?

18          **THE WITNESS:**  My guess would be July 1.

19  **BY MR. NEAL:**

20  **Q**    In addition to being a vice-president and then senior

21  vice-president, he was the controller of the company.  Correct?

22  **A**    That was my understanding.

23  **Q**    And, he worked in the finance department.  Correct?

24  **A**    That's my understanding.

25  **Q**    And, during the year 2000, among other time periods, but

1   in the year 2000, the finance department was in charge of

2   managing the options program.  Correct?

3   **A**    I'm not sure on that.  I would assume.

4   **Q**    Terry Davis was the person in finance who oversaw the

5   options program in 2000.  Correct?

6   **A**    I'm not sure on that.

7   **Q**    Well, in connection with the work that the Special

8   Committee did, knowing that Terry Davis was involved in the

9   grant that brings us all here to Mr. Roberts, was it not

10  important to determine what Terry Davis's role was with respect

11  to options in 2000?

12  **A**    From an accounting perspective?  That would not have been

13  needed for me to know.

14  **Q**    How about just from a truth-and-fairness perspective?

15  **A**    That was handled more by the investigative team of Howrey,

16  as opposed to me doing the accounting.

17  **Q**    So if the investigative team from Howrey and the Special

18  Committee was concerned about truth and fairness, don't you

19  think they should have determined what Terry Davis's role was

20  with respect to options in 2000?

21  **A**    I believe they would have had to determine that.

22  **Q**    And do you know that there were documents available to

23  them, in 2000, that described Terry Davis's role with respect

24  to options in 2000?

25  **A**    I do not know that.

1  Q    Do you know if they looked at any documents that were

2  available to them, that described Terry Davis's role with

3  respect to options in 2000?

4  A    I would not know if they had reviewed those documents.

5  Q    Are you aware of anybody caring about truth and fairness

6  as it related Kent Roberts, in connection with that

7  investigation?

8  A    I have not had discussions related to that with the

9  Special Committee.

10 Q    I would like to show you Exhibit 120-D.

11        (Witness examines document)

12 Q    120-D is a report prepared by Deloitte and Touche, to

13 McAfee, then Network Associates, concerning stock option

14 reviews.  And it was prepared and presented to the company in

15 April of 2002.  Correct?

16 A    That's my understanding.

17        **MR. NEAL:**  I will offer 120D.

18        **THE COURT:**  There being no objection, 120D is

19 admitted.

20        (Plaintiff's Exhibit 120D received in evidence.)

21 **BY MR. NEAL:**

22 Q.   First of all, for the record, what is Deloitte & Touche or

23 what was Deloitte & Touche in April of 2000?

24 A.   I believe to the company -- Deloitte & Touche, at that

25 time, was providing consulting services to the company.

1  **Q.**   And Deloitte & Touche was brought in in the year 2002, to

2  do a total review and analysis of McAfee's options program,

3  correct?

4  **A.**   I'm not aware what they were brought in to do, as it

5  predates me.

6  **Q.**   Have you ever looked at this document before?

7  **A.**   Uhm, I have glanced through this document.

8  **Q.**   Have you ever looked at the executive summary before?

9  **A.**   Uhm, I believe I've glanced through the executive summary.

10 **Q.**   Well, let's look at the front page first.

11       The front page says, "Report to Network Associates

12 stock options review process."  It's dated April 2002.  That's

13 McAfee in those days, correct?

14 **A.**   Correct.

15 **Q.**   And it's done by Deloitte & Touche, correct?

16 **A.**   Correct.

17 **Q.**   The next page is a table of contents, correct?

18 **A.**   Yes.

19 **Q.**   And if you look at the third page, what Deloitte & Touche

20 reported to the company was that they had done a review of

21 Network Associates' stock option process as of January 2002,

22 and for the period from January 1, 2000 to January 31, 2002,

23 correct?

24 **A.**   Correct.

25 **Q.**   And did you say yes?

1    A.    I said, "Correct."

2    Q.    And the grant to Mr. Roberts, that brings all of us here,

3    fell right smack in the middle of that period that they did

4    their analysis off, correct?

5    A.    Correct.

6    Q.    And if you'll look at page 8 of the Deloitte & Touche

7    report, which has sequential number 338 at the bottom, the top

8    title says, "project background."  Do you see that?

9    A.    Yes.

10   Q.    And do you see the very first bullet on the -- on that

11   page says, "Prior to January 2001, stock option administration

12   was outsourced to Stock and Option Solutions, Inc. and managed

13   by the corporate finance department under Terry Davis, former

14   senior vice president."  Do you see that?

15   A.    Yes.

16   Q.    And that's what Deloitte & Touche concluded in their study

17   and analysis in 2002, correct?

18   A.    Correct.

19   Q.    Do you know if the special committee ever looked at this

20   document?

21   A.    I do not know if the special committee reviewed this

22   document.

23   Q.    Did you look at this document in connection with any of

24   your work?

25   A.    I glanced through it.

1  **Q.**   Do you know whether the board of directors, when it

2  approved the restatement, ever looked at this document?

3  **A.**   I do not know.

4  **Q.**   You see where it says that it was managed by the corporate

5  finance department under Terry Davis, former senior vice

6  president.  Do you see that?

7  **A.**   I see that.

8  **Q.**   As of -- from the documents we've just seen, as of

9  July 2000 he was still a senior vice president, correct?

10 **A.**   Uhm, that would be my understanding.

11 **Q.**   Now, in addition to what Deloitte & Touche concluded,

12 Terry Davis was the department manager of G&A for purposes of

13 options in 2000, correct?

14 **A.**   The manager of G&A?

15 **Q.**   Yeah.

16 **A.**   Do you mean general and administrative?

17 **Q.**   Yes.

18 **A.**   It appears he was over stock administration at that time.

19 **Q.**   What is G&A?  What is general and administrative?

20 **A.**   I would interpret that to be the day-to-day transactions.

21 **Q.**   Do you know whether the law department was, from an

22 organizational standpoint, part of G&A?

23 **A.**   I would consider the legal department part of general and

24 administrative expenses, yes.

25 **Q.**   And that was true in 2000 as well, correct?

1  **A.**   I don't know for a fact in 2000.

2  **Q.**   Let me show you Exhibit 1136.

3          **MR. NEAL:**  Your Honor, may I?

4          **THE COURT:**  Yes.  Thank you.

5          **MR. NEAL:**  1136 is a series of e-mails from McAfee,

6  concerning stock options, stock option focal process.  It's a

7  4-page exhibit.  The page 2, in the middle, has an e-mail dated

8  December 9, 2000, from Terry Davis to various people.  And then

9  there are follow-on e-mails on the first page.

10          And I will offer 1136.

11          **THE COURT:**  There being no objection, 1136 is

12  admitted.

13          (Defendant's Exhibit 1136 received in evidence.)

14          (Document displayed.)

15  **BY MR. NEAL:**

16  **Q.**   If you look at the very first page of this, it's not the

17  first e-mail chronologically but it's just talking about

18  calendar year 2001 stock option focal process.

19          Do you see that?  Do you see that?  Just at the very

20  title, I'm just trying to set the -- very top.

21  **A.**   Yes, I see that.

22  **Q.**   Then if you go to the e-mail that starts in the middle of

23  page 2, it's an e-mail dated December 9, 2000, from Terry

24  Davis.  And it's purporting to show information related to the

25  calendar year 2001 stock option focal process.  Do you see that

1  generally?

2  **A.**    Yes.

3  **Q.**    All right.  And then the only -- if you'll turn to the

4  second page of that e-mail, which is page 3 of the exhibit, do

5  you see under item 10 it says that for G&A Terry Davis is in

6  charge on a worldwide basis?

7  **A.**    Yes.

8  **Q.**    And I think you said that was consistent with your

9  understanding, even without looking at this document, correct?

10  **A.**    For this focal pool it looks like Terry Davis is the

11  executive head holding budget.

12  **Q.**    Do you know whether Terry Davis's role with respect to G&A

13  was any different in 2000, or any different in 2002, than it

14  was as reflected in Exhibit 1136?

15  **A.**    I would not know that.

16  **Q.**    Let me show you Exhibit 1594.

17          1594 is a multi-page exhibit that relates to Network

18  Associates' calendar year 2001 worldwide stock option focal

19  grant, focal grant 15,000 shares or more.

20          Do you see that --

21  **A.**    Yes.

22  **Q.**    -- do you see that title?

23          **MR. NEAL:**  I will offer 1594.

24          **THE COURT:**  1594 is admitted, there being no

25  objection.

1          (Defendant's Exhibit 1594 received in evidence.)

2          (Document displayed.)

3  BY MR. NEAL:

4  Q.   If you look at the page 3 of this exhibit, it's the last

5  page of the document.  Let's look at the first page first, just

6  to set the context.

7          What this purports to do is indicate who's in charge

8  of options for various people in various groups within the

9  company, correct?

10  A.   Yes.  It lists the person in charge and then the employee

11  name.

12  Q.   And then if you just sort of scan down the first page,

13  there are lots and lots of people for which it indicates that

14  Terry Davis is the person in charge, correct?

15  A.   Correct.

16  Q.   And if you look at the last page of the exhibit, do you

17  see in the first -- let's just look at the first three lines.

18          Can you see the first column indicates the region,

19  then the function, then the person in charge, and then the last

20  name of the people the person's in charge are, correct?

21  A.   Correct.

22  Q.   And if you look, the first three entries are all

23  corporate, they are all G&A, they are all Terry Davis, correct?

24  A.   Correct.

25  Q.   And if you look at the third one -- so it indicates that

1  Terry Davis was in charge of G&A grants over 15,000.  If you

2  look at the third one, it specifically says that at least at

3  this time he was in charge of the grants over 15,000 for Kent

4  Roberts, correct?

5  **A.**   As it relates to this focal grant, correct.

6  **Q.**   And do you know whether the situation was in any way

7  different in 2000 or in 2002?

8  **A.**   Related to focal grants?

9  **Q.**   Related to Terry Davis's responsibility for G&A.

10 **A.**   I would not know.

11 **Q.**   Do you know whether the special committee ever looked at

12 this document?

13 **A.**   I do not know.

14 **Q.**   Do you know whether the special committee ever made any

15 effort to determine -- well, if we don't know if they looked at

16 it, my next question is not going to work because I was going

17 to ask you if they ever did anything beyond that.

18          As part of the work that you did on the

19 restatement -- I think you said this yesterday -- you looked

20 back at historical documents and activities relating to options

21 all the way from 1995 through 2006, correct?

22 **A.**   That is correct.

23 **Q.**   And, again, you did this for the purpose of trying to

24 understand and determine factually and truthfully what was

25 going on, correct?

1   **A.**   I did that from an accounting perspective, to determine if

2   the accounting was correct or incorrect.

3   **Q.**   So truth and completeness was the job of the special

4   committee?

5   **A.**   As it relates to qualitative issues, yes.

6   **Q.**   Do you know -- I guess you already said this.  You don't

7   even know if they looked at the documents I just showed you,

8   and you don't even know if they looked at the Deloitte & Touche

9   2002 study, correct?

10  **A.**   I'm not privy to that information.

11  **Q.**   During the calendar years 1999 through 2000, did your

12  review of documents confirm for you that Terry Davis was the

13  person in the finance department who people routinely went to

14  when there were mistakes or errors with respect to options?

15  **A.**   My work did not involve that.

16  **Q.**   Did you look at and review documents showing that Davis

17  routinely fixed mistakes in options in the year 2000 and

18  earlier?

19  **A.**   My work did not involve that.

20  **Q.**   I would like to show you Exhibit 1008.  Do you know if the

21  special committee's work involved that?

22  **A.**   Involved Terry Davis's role in fixing grants?

23  **Q.**   Yes.

24  **A.**   I do not know if their work involved that.

25  **Q.**   Given the interest and attention that was paid to Kent

1   Roberts, that led us all here, don't you think the special

2   committee should have worked night and day to figure out what

3   Terry Davis's role had been in the grant-making process in

4   2000?

5   **A.**   It seems prudent that they would have done so.

6   **Q.**   Let me show you Exhibit 10 -- 1008.

7           **MR. NEAL:**  1008 is a series of e-mails involving

8   Chris Peterson, in sales at McAfee.  And they're back and forth

9   between Chris Peterson, Terry Davis and Marianne Snook,

10  concerning options of Chris Peterson's.

11          And I will offer 1008.

12          **THE COURT:**  You're offering it?

13          **MR. NEAL:**  Yes.

14          **THE COURT:**  1008, no objection, admitted.

15          (Defendant's Exhibit 1008 received in evidence.)

16  **BY MR. NEAL:**

17  **Q.**   Would you just look at this document briefly yourself.

18          Have you ever looked at this document before?

19  **A.**   I don't recall looking at it.

20  **Q.**   This is --

21          **MR. NEAL:**  If you put the whole first page of this

22  2-page exhibit on the screen.

23          (Document displayed.)

24  **Q.**   And this begins with an e-mail from Chris Peterson.  Do

25  you know who he was in 2000?

1   A.   I do not.

2   Q.   It indicates he was in sales, correct?

3   A.   The address indicates he was in sales.

4   Q.   Do you see the first e-mail on the page is from Peterson

5   to Terry Davis, and it's June 23rd, 2000, sort of right in the

6   time period that's at issue in this case, correct, close to it?

7   A.   Correct.

8   Q.   And Chris Peterson says to Terry Davis, "Just as a

9   reminder, as we discussed, to put in the additional 5,000 share

10  grant from the January focal."

11          Do you see that?

12  A.   Yes.

13  Q.   And then Terry Davis in turn sends a message to Chris

14  Peterson and to Marianne Snook, who was involved in the options

15  process, correct?

16  A.   That is the e-mail that is sent.

17  Q.   And he directs her to add another 5,000 shares to the

18  January focal for Chris Peterson, and then to send him a stock

19  option statement showing all of his grants, correct?

20  A.   Correct.

21  Q.   And then Chris Peterson sends an e-mail to Marianne and

22  Terry, thanking them, correct?

23  A.   Yes.

24  Q.   Are you aware -- did you see anything in connection with

25  any of your work on the restatement indicating that the board

1  or anybody other than Terry Davis ever approved the addition of

2  these shares to Mr. Peterson's grant?

3  **A.**   I don't recall working on this grant.

4  **Q.**   That wasn't quite my question maybe you were answering.

5        So it's fair to say, then, that you didn't see

6  anything in your work suggesting that this addition to

7  Mr. Peterson's grant obtained or required the approval of

8  anybody -- of anything -- anybody other than Terry Davis,

9  correct?  You didn't see anything suggesting that, correct?

10 **A.**   I'm just saying I don't remember working on this grant in

11 any form.

12 **Q.**   Pardon?

13 **A.**   I don't remember working on this grant at all or seeing

14 documentation related to this grant at all.

15 **Q.**   So the answer to my question is you didn't see any

16 documents suggesting that this grant was ever the subject of

17 board approval or approval by the CEO or anybody else, correct?

18 **A.**   Not that I recall.

19 **Q.**   Let me show you Exhibit 1007.

20        **MR. NEAL:**  1007 is another series of e-mails, also in

21 June of 2000, relating to -- between Mr. Peterson, Marianne

22 Davis -- Marianne Snook and Terry Davis, relating to grants not

23 for Peterson himself but for other members of his team.

24        And I will offer 1007.

25        **THE COURT:**  No objection, 1007 is admitted.

 1                    (Defendant's Exhibit 1007 received in evidence.)

 2                    (Document displayed.)

 3    **BY MR. NEAL:**

 4    **Q.**   So if you look at the second page of this exhibit, it

 5    begins with an e-mail from Peterson to Terry Davis.  And

 6    Peterson, on June 7th, writes to Terry Davis, "We spoke about

 7    an additional 7,000 share stock grant for the retail sales

 8    team.  Can you please execute the following and let me know

 9    when we can communicate."

10               And then there are a whole series of individuals who

11    are listed as people for whom Peterson is trying to get more

12    grants, correct?

13    **A.**   That's what this appears to do.

14    **Q.**   And Terry Davis, in an e-mail that begins on the bottom of

15    the first page, dated June 8, 2000, in an e-mail to Marianne

16    Snook and to Chris Peterson, says at the top of the page, quote

17    "These" -- referring to the grants that are being requested --

18    "are approved as June 7, 2000."

19               Do you see that?

20    **A.**   Yes.

21    **Q.**   And there's no indication in the e-mail that any further

22    approval was necessary or was going to be sought, correct?

23    **A.**   Not in this e-mail chain.

24    **Q.**   Have you seen anything anywhere else that suggests that

25    this grant required or ever got any approval other than that

 1   given by Terry Davis on June 8 of 2000?

 2   **A.**   I don't recall, once again, working on these specific

 3   grants.

 4   **Q.**   Well, you don't recall seeing any that would suggest any

 5   further approvals were ever sought or obtained, correct?

 6   **A.**   I don't recall that.

 7   **Q.**   Do you know whether the special committee looked at these?

 8   **A.**   I do not know that.

 9   **Q.**   Let me show you Exhibit 1009.

10           **MR. NEAL:**   1009 is a one-page exhibit that consists

11   of two e-mails between Sylvia Garcia-Lechelt and Terry Davis

12   concerning stock options for David Meisenzahl.  And I will

13   offer 1009 into evidence, Your Honor.

14           **THE COURT:**   There being no objection, 1009 is

15   admitted.

16           (Defendant's Exhibit 1009 received in evidence.)

17           (Document displayed.)

18   **BY MR. NEAL:**

19   **Q.**   Did you look at this document in connection with your work

20   and analysis with Mr. Roberts' grant in 2000?

21   **A.**   I don't recall seeing this document.

22   **Q.**   The bottom of the exhibit, the first e-mail is dated

23   Wednesday, November 1st, 2000, from Sylvia Garcia-Lechelt.  Do

24   you know who she was at the time?

25   **A.**   Human resources.

1   Q.   I'm sorry?

2   A.   Human resources.

3   Q.   And she is writing Terry Davis and Gerri Martin-Flickinger

4   concerning David Meisenzahl, correct?

5   A.   Correct.

6   Q.   And she is writes Terry Davis, quote, Terry, David is the

7   person Gerri spoke to you about who was hired in November 1999,

8   and does not have a stock grant to date.  David probably fell

9   through the crack because while he is in Japan he is not part

10  of NA KK and did not receive an NA KK stock allocation.  I

11  would recommend giving him 4500 shares with an effective date

12  of October 1, 2000.  Can you live with this for Gerri?

13          And November 2nd, the next day, Terry Davis writes

14  back to Sylvia Garcia-Lechelt and the others and says, quote,

15  This is approved and done.  Marianne's group will get the stock

16  option agreement out this week.

17          So in response to this request, Davis gave the

18  approval, the grant as executed and sent out, correct?

19  A.   Terry Davis is approving it, yes.

20  Q.   And have you seen any indication in any of your work or

21  analysis that anybody ever said or believed that this required

22  approval by anybody other than Terry Davis himself?

23  A.   I don't recall working on this grant.  But I don't recall

24  any documentation to that effect.

25  Q.   Let me show you Exhibit 1692.

1          **MR. NEAL:**  1692 is a document that is dated May 15

2   and May 16 of 2000.  And it has a handwritten note at the

3   bottom, signed by Marianne Snook, dated May 16 of 2000.

4          And I will offer 1692.  Is it admitted, Your Honor?

5          **THE COURT:**  1692.  There is no objection.  It is

6   admitted, yes.

7          (Defendant's Exhibit 1692 received in evidence.)

8          (Document displayed.)

9   **BY MR. NEAL:**

10  **Q.**   1692, in this exhibit an employee named Herbert Molina is

11  contacting Terry Davis directly, to indicate there is a mistake

12  with his options, correct?  If you look at the e-mail.

13  **A.**   Yes, that's correct.

14  **Q.**   That's reflected in the document right in the middle of

15  the page, where Herbert Molina, on May 15th, writes to Terry

16  Davis and says, "Terry, today I received the letter stating the

17  new focal grant signed by you.  It indicates only 14,000 shares

18  instead of 15 as we talked in CA last week.  What should I do?

19  Please advise."

20          And Terry Davis, at the top of the page, sends an

21  e-mail to Molina, dated May 16th, and copies Marianne Snook, in

22  which he says, "We will send you a separate grant for the 1,000

23  shares."

24          And then at the bottom Marianne Snook writes, "Please

25  issue him," Herb Molina, "another 1/4/2000 grant of 2,000 [sic]

1    shares and send it out," correct?

2    **A.**    Correct.

3    **Q.**    Did you see this document in connection with your work?

4    **A.**    Not that I recall.

5    **Q.**    Did you look at documents concerning grants and

6    communications between Terry Davis and Eric Wong in connection

7    with your work?

8    **A.**    I believe I did see some communications between Terry

9    Davis and Eric Wong, at some point.

10   **Q.**    So let me show you Exhibit 1693.

11           1693 is a document that consists of a pair of e-mails

12   as well as another handwritten note by Marianne Snook

13   concerning and responding to communications with Eric Wong,

14   correct?

15   **A.**    Yes.

16           **MR. NEAL:**  And I will offer 1693, Your Honor.

17           **THE COURT:**  No objection, 1693 is admitted.

18           (Defendant's Exhibit 1693 received in evidence.)

19           (Document displayed.)

20   **BY MR. NEAL:**

21   **Q.**    In the bottom half of the page, in the first e-mail,

22   somebody named Dean Au writes to Eric Wong and Terry Davis and

23   says "Terry/Eric, as part of Ted's director promotion and the

24   latest round Jan stock grant I had promised Ted the following:

25   October 1990 stock grant 5,000 shares, January 2000 grant, 5500

1  shares."  And then he says, "So far Ted has only received 8500

2  of those."

3           Do you see that?

4  A.    Yes.

5  Q.    And he's then asking Terry to take care of that?

6  A.    Yes.

7  Q.    And in the first e-mail on the top of the page it

8  indicates that Terry Davis is making the decision to grant him

9  an additional 2,000 shares and add it to the January 2000

10 grant, correct?

11 A.    Yes.

12 Q.    And he then directs Marianne Snook to have a stock grant

13 issued.  And at the bottom of the page she complies with that

14 direction and takes the steps to have the additional shares

15 granted, correct?

16 A.    Correct.

17 Q.    Any indication you've seen anywhere that that additional

18 grant was ever approved by anybody other than Terry Davis?

19 A.    Not that I recall.

20           MR. NEAL:  Let me show you Exhibit 1010.

21           THE COURT:  Is this series of exhibits essentially

22 the same, the same kind of notation and so forth?

23           MR. NEAL:  Yes.  And I'm almost done with this group,

24 Your Honor, and then I'm going to show somewhere he changed the

25 dates, as well as made additional grants.

1          **THE COURT:**  I have a question.  On each of these

2     two -- and maybe it's replicated on the others, I don't know --

3     but while we're looking at these two documents, these two most

4     recent documents, they are dated -- the e-mail exchanges are in

5     May of 2000, correct?

6          **THE WITNESS:**  Correct.

7          **THE COURT:**  What do you understand it to mean with

8     respect to the dating of the grant, where it says at the bottom

9     of each of these, one says "1/4 grant of 2,000," and then the

10    other says "1/4/2000 grant."

11         **THE WITNESS:**  Right.  So is the question about --

12         **THE COURT:**  The dating.  Is that telling someone to

13    date those as of the January date?

14         **THE WITNESS:**  Yes, that would be my understanding.

15         **THE COURT:**  Okay.

16    **BY MR. NEAL:**

17    **Q.**   Let me show you Exhibit 1010.

18         Exhibit 1010 is a pair of e-mails between Marianne

19    Snook and a person named Steven Johnson, concerning option

20    grants, correct?

21    **A.**   Correct.

22         **MR. NEAL:**  I will offer 1010, Your Honor.

23         **THE COURT:**  No objection, 1010 is admitted.

24         (Defendant's Exhibit 1010 received in evidence.)

25         (Document displayed.)

1   **BY MR. NEAL:**

2   **Q.**   And this concerns a grant, among other things, to Linda

3   Lee for stock options, okay?

4   **A.**   Okay.

5   **Q.**   Do you agree with that?

6   **A.**   Linda Lee?  Okay.  I see below, "Linda Lee."

7   **Q.**   Let's look at the bottom e-mail on the page.  And that's

8   an e-mail from Steven Johnson to Marianne Snook.  And, again,

9   Marianne Snook worked for Terry Davis in options

10  administration?

11  **A.**   That's my understanding.

12  **Q.**   At this time?

13  **A.**   I don't know at this time.

14  **Q.**   In August 25th, 2000, Steven Johnson writes to Marianne

15  Snook, subject option points [sic].  And she says, "Marianne,

16  any news for me on, 1, Linda Lee stock options?"

17          Do you see that?

18  **A.**   Yes.

19  **Q.**   And then she writes back to Steven Johnson four days

20  later, on August 29th, and she says, "Got written okay from

21  Sylvia Garcia-Lechelt to fix her grant up to 18,000 shares.  I

22  have a call into Terry to see if we just want to enter a new

23  grant for 2,000 shares or start over.  Will let you know once I

24  hear from him."

25          Do you know what happened with this?

1    **A.**    I do not.

2    **Q.**    Do you know if anybody higher than either Lechelt or Terry

3    Davis ever got involved with respect to this option?

4    **A.**    I do not know.

5    **Q.**    Let me show you Exhibit 1012.

6              1012 is a 2-page document, the first page of which is

7    a Network Associates optionee statement as of March 28th, 2000,

8    for Eric Wong.  And the second page is also a statement as of

9    March 28, 2000, for Eric Wong.

10             Do you see those two pages?

11   **A.**    I do.

12             **MR. NEAL:**  I offer 1012, Your Honor.

13             **THE COURT:**  No objection, 1012 is admitted.

14             (Defendant's Exhibit 1012 received in evidence.)

15             (Document displayed.)

16             **THE COURT:**  I guess for the jury's purposes, so they

17   know, when they see these documents, that something relevant

18   isn't being hidden, that what is redacted from some of these

19   would be things like Social Security numbers and addresses.  Is

20   that correct?

21             **MR. NEAL:**  That's correct.  My understanding, what

22   Her Honor is talking about is a number of these you will see

23   "Redacted."

24             We didn't do the redactions, nor did the government.

25   They were redacted by the company.  Our understanding was they

1    took off Social Security and other personal information like

2    that, that might not be relevant.

3          Sometimes you'll see redactions where what they took

4    out were what they contend were attorney-client communications.

5    I don't think we have seen any of those.

6          **THE COURT:**  No.  When that comes, we'll figure out

7    how to do deal with it, okay.

8          **MR. NEAL:**  In any event, neither she nor we did that.

9    Somebody else did it.

10   **BY MR. NEAL:**

11   **Q.**   So this is a form you're familiar with, correct?

12   **A.**   Correct.

13   **Q.**   Have you ever looked at this particular grant before?

14   **A.**   Uhm, I may have actually seen this particular document

15   before.  I'm not sure.

16   **Q.**   Do you know if you provided this one to the special

17   committee and its advisors?

18   **A.**   All documentation was provided to the special committee

19   and their advisors.  So if I had seen this it would be

20   provided.  I'm just not sure if I've seen this.

21   **Q.**   Do you recall seeing -- the special committee ultimately

22   did voluminous reports to the board of directors, correct?

23   **A.**   That's my understanding.

24   **Q.**   And you've seen those?

25   **A.**   I have not seen those.

1   Q.   If you look at the second page of Exhibit 1012, this lists

2   a grant to Eric Wong, dated March 2nd, 2000, correct?

3   A.   Or is it February 10, 2000?

4   Q.   I'm going to get to that.  I'm looking at the second page.

5   A.   Oh, I'm sorry.  Yes, March 2nd, 2000, on the second page.

6   Q.   But you know where I'm going with this one.  So it's

7   March 2nd, 2000.  Eric Wong was in the finance department,

8   correct?

9   A.   That's my understanding.

10  Q.   Is he still there?

11  A.   No.

12  Q.   If you look at this, the second page shows a grant of

13  20,000 shares, which is the same size grant as the one that is

14  involved in Mr. Roberts, correct?

15  A.   Correct.

16  Q.   And it's approximately the same time period, right?  I

17  mean within a few months.  It's mid 2000 or first quarter 2000,

18  correct?

19  A.   Correct.

20  Q.   And it's a grant out of the 1997 stock plan, which is the

21  same plan that Mr. Roberts' grant came from, correct?

22  A.   Correct.

23  Q.   Now let's look at the first page to what you had already

24  looked at.  The first page is a different issue or a different

25  version of the same optionee statement for Eric Wong, correct?

1   **A.**    Correct.

2   **Q.**    But on this one it is showed -- and it also shows a 20,000

3   share grant to Eric Wong out of the 1997 stock option plan,

4   correct?

5   **A.**    Correct.

6   **Q.**    But on this one it shows a date of February 10, 2000?

7   **A.**    Correct.

8   **Q.**    And do you see the handwritten note at the bottom says

9   that the date of this 20,000 share grant was changed to

10  February 10, 2000, per Terry Davis, on March 27th, 2000,

11  correct?

12  **A.**    Correct.

13  **Q.**    So what this document indicates is very similar to what's

14  at issue with Mr. Roberts.  A grant of 20,000 shares had one

15  date, and Mr. Davis directed that that date be changed to a

16  different date.  Correct?

17  **A.**    Per this documentation, yes.

18  **Q.**    And if you look at the two pages together, it does appear

19  that what happened is, on Mr. Davis's instructions, a grant

20  that had been dated March 2nd, 2000, was changed to

21  February 10th, 2000, correct?

22  **A.**    That is what it appears.

23  **Q.**    And do you know if that change that's reflected in Exhibit

24  1012 was ever approved by anybody other than Terry Davis?

25  **A.**    I am not aware.

1    **Q.**    Pardon?

2    **A.**    I am not aware.

3    **Q.**    Well, have you seen anything that suggested that this

4    grant was approved, that the change in the date of this grant

5    was approved by anybody other than Terry Davis?

6    **A.**    Not that I recall.

7    **Q.**    So we have a grant that was made in roughly the same -- it

8    was in the same year, same size as Mr. Roberts' grant, out of

9    the same plan, where Mr. Davis, and Mr. Davis acting alone,

10   directed that the date on that grant be changed from one date,

11   March 2nd, to another date, February 10, 2000, correct?

12   **A.**    That's what this appears.

13   **Q.**    Without seeking or requiring or getting the approval of

14   anybody else, correct?

15   **A.**    I don't know if other approval was --

16   **Q.**    Pardon?

17   **A.**    I don't know whether other approval was obtained.

18   **Q.**    You've not seen any other approval?

19   **A.**    I have not seen other approval, to my knowledge.

20   **Q.**    And you said this is one you looked at in connection with

21   your work?

22   **A.**    I said I don't recall if I've looked at it.  It's a

23   possibility I looked at it.

24   **Q.**    Don't you think it's relevant to the issues that bring us

25   here today?

1          **MR. NEAL:**  I'll withdraw that question.

2          Let me show you 1557 for a moment.  Let me show you

3  Exhibit 1557.

4          **THE COURT:**  I have a question about this document.

5  Can you tell from this document you were just looking at --

6          **THE WITNESS:**  That's document 1012, Your Honor?

7          **THE COURT:**  Yes.

8          **THE WITNESS:**  Okay.

9          **THE COURT:**  What's, essentially, the effective date

10  or what would appear to be the grant date as a result of the

11  subsequent change?

12          **THE WITNESS:**  So, my assessment would be that

13  historically when this occurred that they would have actually

14  changed the grant date to 2/10/2000, in the system, and the

15  strike price as well, to the 27.94.

16          **THE COURT:**  They would have changed it back to that.

17          **THE WITNESS:**  Back to that.

18  **BY MR. NEAL:**

19  **Q.**   Do you know how the price on March 2nd of 2000, which was

20  the original date, compared with the price on February 10th, to

21  which Terry Davis changed the date?

22  **A.**   Assuming these prices are correct on the statements, then

23  it would have been changed from 28.50 to the 27.94.

24  **Q.**   So it lowered the price by virtue of this change?

25  **A.**   That would be my assessment.

1   **Q.**   Let me show you Exhibit 15 -- I just handed you Exhibit

2   1557.  Do you have that in front of you?

3   **A.**   Yes, I do.

4   **Q.**   What is 1557?

5   **A.**   It appears it's a termination letter for Eric Wong.

6   **Q.**   And it's dated July 18, 2002, correct?

7   **A.**   Yes.

8              **MR. NEAL:**  I will offer 1557.

9              **THE COURT:**  No objection, 1557 is admitted.

10             (Defendant's Exhibit 1557 received in evidence.)

11             (Document displayed.)

12  **BY MR. NEAL:**

13  **Q.**   If you look at the optionee statement, it shows options

14  that are exercisable as of July 18, 2002?

15  **A.**   Yes, I do.

16  **Q.**   Do you know why Mr. Wong's March 2nd grant is not

17  contained in Exhibit 1557, given that there's an optionee grant

18  shown on that date?

19  **A.**   Why the March 2nd grant is not appearing?

20  **Q.**   Yes.  Yeah.

21  **A.**   I do not know for sure why it is not appearing.

22  **Q.**   Would you conclude that what happened is, in fact, Terry

23  Davis, acting alone in exercising his authority, made the

24  decision, essentially, to eliminate the March 2nd option and

25  replace it with the option that was dated February 10, 2000?

1   **A.**   I would say that it looks like the March 2nd option was

2   changed to the 2/10/2000 option with the lower price.  And that

3   is what was in place at the time of his termination.  But I

4   cannot validate any of that acting alone Terry Davis that you

5   discussed.

6   **Q.**   But if you look at the second page of Exhibit 1557, it

7   does, in fact, list the February 10th, 2000 grant to Terry

8   Davis, rather than the original March 2nd grant to Terry Davis,

9   correct?

10  **A.**   Correct.

11  **Q.**   Let me show you one more exhibit on this.  Let me show you

12  1159.

13          Do you know what 1159 is?

14  **A.**   Appears to be a grant recap report.

15  **Q.**   Is there a date on it?

16  **A.**   It's for the first quarter of 2000.

17  **Q.**   In the lower right-hand corner of the first page you'll

18  see a date of March 27, 2000.  Do you see that, lower left-hand

19  corner?

20  **A.**   Yeah, the first page, I'm sorry, is for the month of

21  March.  The second page is for the quarter of 2000, it appears.

22  **Q.**   So the first page is dated March 27, 2000.  And the second

23  page is dated April 7th, 2000.  Correct?

24  **A.**   Correct.

25  **Q.**   And if you look at the document, is Mr. Wong listed here?

1   **A.**   Yes, he is.

2   **Q.**   On the first page do you see where he's listed?

3   **A.**   Yes.

4   **Q.**   He's listed as having a March 2nd, 2000 grant for 20,000

5   shares, correct?

6   **A.**   Correct.

7   **Q.**   And the price that's shown is $28.50 correct?

8   **A.**   Correct.

9   **Q.**   And, again, the date of the document is March 27th,

10   correct?

11   **A.**   Yes.

12   **Q.**   Do you know what the price on March 27th of 2000 was?

13   **A.**   On March 27th?

14   **Q.**   Yeah.

15   **A.**   I do not.

16   **Q.**   Let me show you Exhibit 60, which is in evidence already.

17         **MR. NEAL:**   I didn't put this exhibit 1159 on the

18   screen.  I don't know if it was on the screen or not.  I'm

19   sorry.  Ms. Eagan just pointed that out to me.  Let's put up

20   1159.

21   **BY MR. NEAL:**

22   **Q.**   So 1159, the next to last entry on the first page, is one

23   of the two that Ms. Thompson just talked about.  That shows

24   Eric Wong's grant dated March 2nd, 2000, for 20,000 shares,

25   with an option price of $28.50, correct?

1  **A.**   Correct.

2  **Q.**   And then at the very bottom of that page, in the lower

3  left-hand corner, you'll see March 27th, 2000.  And on the next

4  page, at the very bottom, you'll see a grant to Eric Wong,

5  dated February 10, 2000, for 20,000 shares at $27.93, correct?

6  **A.**   Correct.

7  **Q.**   And so what we see is that in March he's listed as having

8  a 20,000-share grant, with a price of $28.  Then a month later,

9  less than a month later, in April, that has been changed to a

10 grant with a different date and a lower price, correct?

11 **A.**   Correct.

12 **Q.**   If you look at both pages of Exhibit 1159, would you agree

13 that nowhere on the grant report as of March 27, 2000, or on

14 the grant report as of April 7th, 2000, is there a grant listed

15 for Kent Roberts?

16 **A.**   Let me scan it.  Just a second.  I don't see a grant for

17 Kent Roberts on either page.

18 **Q.**   If you look back at Exhibit 1012, which is the optionee

19 statement --

20 **A.**   Yes.  Yes.

21 **Q.**   What was the date on which Terry Davis directed that

22 Wong's 20,000-share grant be changed from a March date to a

23 February 10th date?

24 **A.**   What was the date Terry Davis instructed that?

25 **Q.**   Yes.

1   **A.**   Per this, 3/27/2000.

2   **Q.**   Do you know what the stock price was as of March 27th,

3   2000?

4   **A.**   I do not.

5   **Q.**   Let me show you Exhibit 60, which is already in evidence.

6            **THE COURT:**   On what date, on March 27th?

7            **MR. NEAL:**   I had referred back to a different exhibit

8   at that point, Your Honor.  I was referring back to Exhibit

9   1012, which is --

10           **THE COURT:**   Okay.

11           **MR. NEAL:**   -- which is the document that reflects

12   Terry Davis's direction.

13           **THE COURT:**   So you want to know what it is on the

14   27th, not on March --

15           **MR. NEAL:**   Correct.

16           **THE COURT:**   The date March 1st.

17           **MR. NEAL:**   Correct.  I want to know on the day that

18   Mr. Davis directed that Wong's grant be changed to a

19   February 10 price, what was the price of McAfee stock.

20   **BY MR. NEAL:**

21   **Q.**   And there's no reason you would know that sitting here, so

22   I'm going to show you -- if you don't have it, I'm going to

23   show you what's in evidence as Exhibit 60, which is a

24   stipulated document reflecting the price history of McAfee

25   stock.

1           Can you tell the jury, looking at this exhibit, what

2   the price was of McAfee stock on March 27th of 2000, when Terry

3   Davis directed this change in Mr. Wong's grant?

4   **A.**    $34.69.

5   **Q.**    So when he changed the grant to be a February 10 grant, at

6   $27, he put this grant $7 or more into the money, correct?

7   **A.**    Correct.

8   **Q.**    Now, Terry Davis may have been delegated the authority by

9   the CEO to make grants up to 22,500 shares, but the CEO could

10  not properly have delegated to Davis the authority to make

11  grants that were in-the-money, because the CEO himself did not

12  have that authority, correct?

13  **A.**    It's my understanding that the CEO could only delegate his

14  authority to rank and file, not to executives of the company.

15  And, yes, it would have only been for fair-market-value grants.

16  **Q.**    Okay.  So that by putting -- by putting this grant

17  in-the-money, Terry Davis was exceeding the authority that had

18  been given to the CEO, and could not have gotten any authority

19  from the CEO to do this, correct?

20  **A.**    That would be my understanding.

21  **Q.**    Are you aware of anybody reporting Mr. Wong and this grant

22  to the Department of Justice?

23  **A.**    I would not be aware of that information.

24  **Q.**    Do you know where Mr. Wong is today?

25  **A.**    I do not.

1   Q.   Let me show you Exhibit 1005.

2        1005 is a pair of e-mails involving a Henley Hom,

3   correct?

4   A.   Correct.

5   Q.   Henley Hom worked for SOS, correct?

6   A.   I'm not sure on that.

7   Q.   Do you know what SOS was at the time?

8   A.   Stock Option Solutions, I believe.

9   Q.   They were an outfit the company was using to help

10  administer their -- their stock options, correct?

11  A.   That is my understanding.

12  Q.   Pardon?

13  A.   That is my understanding.

14  Q.   Mr. Hom writes Terry Davis on May 18th of 2000, with a

15  copy to Marianne Snook, concerning the January 4, 2000 stock

16  focal, correct?

17  A.   Correct.

18       MR. NEAL:   Your Honor, I'll offer 1005.

19       THE COURT:   There being no objection, 1005 is

20  admitted.

21       (Defendant's Exhibit 1005 received in evidence.)

22       (Document displayed.)

23  BY MR. NEAL:

24  Q.   And if we look at the bottom e-mail, he writes "Hi,

25  Terry," meaning Terry Davis, "Bill audited the January 4, 2000

1   stock focal to verify if NETA granted shares to any individuals

2   who are not employed by NETA as of the grant date (e.g. grant

3   date is before the hire date)."

4   Do you see that?

5   **A.**   Yes.

6   **Q.**   And then he goes on to say there are 24 employees

7   effective -- affected.  Do you see that?

8   **A.**   Yes.

9   **Q.**   NETA, as referred to here, is McAfee, correct?

10  **A.**   Correct.

11  **Q.**   And when he indicates that 24 employees were affected,

12  what Hom is saying is that there were 4 employees who had been

13  given options with the wrong date, correct?

14  **A.**   My interpretation would be 24 employees that were given

15  grants prior to their hire.

16  **Q.**   Which would be the wrong date because McAfee didn't give

17  grants to people -- new hire grants that were dated prior to

18  their coming onboard, correct?

19  **A.**   There were instances where grants were given to

20  non-employees, which would be the case of this.

21  **Q.**   But my -- okay.  So let's just do this one more time.

22  What this indicates is that there were 24 employees who were

23  given options that were dated prior to the time they actually

24  started working at the company, correct?

25  **A.**   Correct.

1    **Q.**    And that was deemed to be a mistake, correct?

2    **A.**    In the restatement we deemed that to be a mistake, yes.

3    **Q.**    You concluded in the restatement that giving new employees

4    grants that were dated before their start date was a mistake

5    that should have been fixed, correct?

6    **A.**    Correct.

7    **Q.**    And if you look at this in response to Hom's message,

8    Terry Davis directs Mr. Hom to use another date for the grants,

9    correct?

10   **A.**    Correct.

11   **Q.**    And he recommends using a date in April or May of 2000,

12   when the price was about the same, correct?

13   **A.**    Correct.

14   **Q.**    And that's when he says in the first paragraph of Exhibit

15   1005 -- Terry Davis to Hom, copy to Marianne Snook, says, "We

16   should grant on another date.  I recommend that we grant

17   sometime in April/May when the price is about the same as the

18   January price.  We can advise them that the grant do [sic] was

19   put in the system incorrectly, but the price is still the

20   same."

21          Do you see that?

22   **A.**    Yes.

23   **Q.**    So he's saying let's fix that just by picking another date

24   that's got a price similar to the price that was on the

25   mistaken date, correct?

1   **A.**    That is what he's saying.

2   **Q.**    Do you know if anybody higher than Terry Davis ever was

3   involved in or approved changing the dates on these 24 grants?

4   **A.**    Not that I'm aware of.

5   **Q.**    Do you know if the -- well, let me show you Exhibit 1694.

6           **THE COURT:**  How much longer are you going to be with

7   these particular documents?  Because I think the jury needs a

8   rest.

9           **MR. NEAL:**  I can probably -- I can probably finish up

10  this sort of whole group of questions in five or ten minutes.

11  But I can do it before break or after break.

12          **THE COURT:**  If you can get it done as close to five

13  as possible, please.

14          **MR. NEAL:**  Let me show you, real quickly, a series of

15  documents.  Let me show you 1694.

16          1694 is a list of employee stock option grants

17  provided by McAfee or by the special committee.

18          And I'll offer it into evidence, Your Honor.

19          **THE COURT:**  1694, no objection, it's admitted.

20          (Defendant's Exhibit 1694 received in evidence.)

21          (Document displayed.)

22  **BY MR. NEAL:**

23  **Q.**    All of the employees listed with -- where you see -- you

24  see in the lower half of the left-hand column are listed four

25  individuals, Eric Wong, Stephanie Compton, Justin Coope and

1  Gerri Pierce.  Do you see those people listed?

2  **A.**   I'm sorry.  Where are you seeing that?

3  **Q.**   Yeah, it's on the screen, too.  It's highlighted on the

4  screen.

5  **A.**   Okay.  Got it.  Yes, I see those.

6  **Q.**   They are all listed as having hire dates in February,

7  even -- and then having grant dates in January, on January 4,

8  correct?

9  **A.**   Correct.

10  **Q.**   They were all ultimately given grants as of May 25th,

11  2000, correct?

12  **A.**   Uhm, you're going by the note down here.

13  **Q.**   Yeah.  If you look at that first, I'll show you another

14  document if that doesn't --

15  **A.**   Yeah.  I mean, I don't -- that's what it would appear from

16  this, but I don't actually know what they did.

17  **Q.**   Well, what the note indicates, the handwritten note to

18  Marianne Snook, dated 5/19/00 says, "These individuals were

19  granted shares as part of the CY2000 focal.  The date 1/4 was

20  prior to their hire date.  The issue came to light after

21  mailing of grant dates per Terry Davis - leave as is."  And

22  then if you look to the right, it says, "5/25/1975."  [sic]

23          Do you see that?

24  **A.**   Yes.

25  **Q.**   Now let me show you Exhibit 1553.

1          THE COURT:   Now, this memo appears to have been

2    prepared as of May 2000?

3          THE WITNESS:   That would be --

4          THE COURT:   May 19?

5          THE WITNESS:   That would be my assessment.

6          THE COURT:   What is meant by the exercise price on

7    this list?

8          THE WITNESS:   That would be the price that the

9    individuals would need to pay for that option per share upon

10   exercise.

11         THE COURT:   That they would need to pay?

12         THE WITNESS:   Right.   That would be their strike

13   price.

14   **BY MR. NEAL:**

15   **Q.**   If you look at 1553, this is a listing of stock option

16   grants to various people at McAfee, with a whole host of

17   information about their grants.

18         **MR. NEAL:**   And I'll offer 1553.   Is it admitted, Your

19   Honor?

20         THE COURT:   Yes.   1553.   I'm studying the document.

21   Sorry about that.   It is admitted.

22         (Defendant's Exhibit 1553 received in evidence.)

23         (Document displayed.)

24   **BY MR. NEAL:**

25   **Q.**   All right if you look at 1553, and turn to page -- well,

1   let's show the first page first.  It's just a lengthy listing

2   of individuals who received grants at McAfee at various times

3   and prices, correct?

4   **A.**   Yes, it reflects grants.

5   **Q.**   This information was available to the special committee,

6   was it not?

7   **A.**   Uhm, I guess I need to understand what this document is,

8   and the source of the document, to better understand it.

9   **Q.**   All right.  Well, then look for a moment at page that

10  bears the number "6123" in the lower right-hand column.

11  **A.**   Down there?

12  **Q.**   Do you have that?

13  **A.**   I think so.

14  **Q.**   And I'm not going to ask you to go through the whole

15  thing, but if you look at the list of people on Exhibit 1694,

16  which I showed you a few minutes ago, and you look at page

17  6123, and you look at the names listed there, that confirms

18  that the instructions on 1694, to change certain individuals'

19  dates to May 25th, was, in fact, reflected and carried out on

20  this list which is Exhibit 1553.

21           For example, if you look at Eric Wong -- if you look

22  at 1553, you look at Eric Wong, you see the date has, in fact,

23  been changed to May 25, 2000, at a price of 19.75?

24  **A.**   Yes.

25  **Q.**   If you look at Justin Coope, for example -- you see that

Case3:07-cr-00100-MHP   Document100   Filed09/22/08   Page79 of 204

1    he's sort of a third of the way down the page -- do you see

2    that his grant has been changed to May 25 and 19.75?  And there

3    are other names.  You can do it with Stephanie Compton, for

4    example.

5    A.    Correct.

6    Q.    Do you see that?  So what it reflects with respect to

7    those individuals that I just talked about in 1695, Terry

8    Davis's direction to change was, in fact, implemented as shown

9    on Exhibit 1553, correct?

10   A.    That's what this appears.

11   Q.    Pardon?

12   A.    That is what this appears.

13   Q.    Compton, Coope, Pierce, all initially had hire dates of

14   February 14.  Do you know what the price was of McAfee stock on

15   February 14?

16   A.    On February 14, 2000?

17   Q.    It was 29.62, was it not?

18   A.    Right, 29.63, I believe.

19   Q.    And the stock price that they originally received the

20   options for, February 14, 29.62, was changed by Terry Davis to

21   May 25.  What was the stock price on May 25?

22   A.    Per these reports, 19.75.

23   Q.    Pardon?

24   A.    Per these reports, 19.75.

25   Q.    So it was changed to a price by Terry Davis that was $10

1   lower, correct?

2   **A.**   Correct.

3   **Q.**   Do you know if Compton, Coope or Pierce were ever talked

4   to by the special committee?

5   **A.**   I do not know.

6   **Q.**   Do you know if anybody from the Department of Justice or

7   the SEC ever talked to Compton, Coope or Pierce?

8   **A.**   I don't know.

9   **Q.**   They had changes in the dates of their price directed by

10   Terry Davis that were identical, as far as the pricing impact,

11   to the changes on Kent Roberts.  And, as far as you know, the

12   special committee never even talked to them or looked at these

13   grants, correct?

14   **A.**   I do not know if they did or did not.

15   **Q.**   Well, you have no information sitting there to suggest

16   they ever did, correct?

17   **A.**   Correct.

18        **MR. NEAL:**  Your Honor, that covers that series of

19   exhibits.

20        **THE COURT:**  Okay.  We'll take a rest then.

21        **MR. NEAL:**  Thank you.

22        **THE COURT:**  About 10 to 15 minutes.  Try to keep it

23   to ten, if you can.  But we'll get back in here around that

24   time.

25        You may step down.  But, again, do not discuss your

1    testimony with any persons who may be witnesses.

2            (Recess taken from 10:39 to 11:09 a.m.)

3            **THE COURT:**  You may be seated.  And, Ms. Thompson, if

4    you would come back up here, please.

5            (Request complied with by the Witness)

6            **MR. NEAL:**  Can I proceed, Your Honor?

7            **THE COURT:**  Yes, you may.

8            **MR. NEAL:**  Thank you.

9    **BY MR. NEAL:**

10   **Q**    Ms. Thompson, I would like to show you Exhibit 1838.

11           What is 1838?

12           (Witness examines document)

13   **A**    It's an e-mail from myself to executives, legal counsel,

14   members of the restatement team and members of the board.

15   **Q**    And, it is dated July 29, 2007.  Correct?

16   **A**    That is correct.

17   **Q**    And it concerns the draft pre-clearance letters that we

18   were talking about earlier, correct?

19   **A**    Yes.

20           **MR. NEAL:**  I will offer 1838.

21           **THE COURT:**  No objection, 1838 is admitted.

22           (Defendant's Exhibit 1838 received in evidence.)

23   **BY MR. NEAL:**

24   **Q**    In 1838, you are sending the materials to all of the

25   people who you just described, and the materials include the

1   draft prestatement letter that we were talking about earlier?

2   A    Preclearance letter, yes.

3   Q    Pardon?

4   A    Preclearance letter, yes.

5   Q    Yes.  And in particular, this meeting that's referred to

6   in this memorandum refers to the July draft preclearance letter

7   that we talked about earlier.  Correct?

8   A    I'm not sure if the two are connected.  There were many

9   drafts, on a weekly basis.

10  Q    But it pertains to a July draft?

11  A    Correct.

12  Q    Because the meeting's in July, right?

13  A    Correct.

14  Q    And the first paragraph says, "Attached are the materials

15  for the Audit Committee meeting on Tuesday, July 31st at 12:00.

16  The focus of the meeting will be to review the SEC

17  pre-clearance letter and other restatement adjustments."

18        Correct?

19  A    Correct.

20  Q    And did you attend this meeting?

21  A    To my recollection, yes.

22  Q    And who else attended this meeting?

23  A    I would have to look at the minutes to be sure.  My

24  recollection would be members of the audit committee, Eric

25  Brown, myself, Geoff McClanahan.

1  Q    Okay.  So then, I want to refer back for just one second

2  to the July draft preclearance letter which is in evidence as

3  Exhibit 1655, and we talked about this earlier.

4         Do you still have that in front of you?

5  A    Yes, I have it.

6  Q    And, if you will look at the first page, this is a

7  document that the jury has already seen.  We looked at it

8  earlier, but I would like to direct your attention to Page 27

9  of 58, which has the number 1977 in the lower right-hand

10 corner.

11        And this is another paragraph that deals with the

12 delegation of authority from the CEO down to department

13 managers.  Correct?

14        (Witness examines document)

15 A    For rank-and-file grants only.  Yes.

16 Q    And, again, it refers to the period March 1, 2000 through

17 January 20, 2003.  Correct?

18 A    Correct.

19 Q    And it says at the bottom, "Furthermore, the company -- at

20 the bottom of that paragraph -- "Furthermore, the company

21 operated as if grants approved by department managers were

22 final, and the required granting actions had taken place.

23 Based on the available evidence, the Special Committee

24 concluded that the department manager's grant approval

25 represented the required granting actions, and the approval

1   date was the appropriate measurement date."

2          So, what this says is that with respect to the grants

3   that are being discussed here, where the CEO authority had been

4   exercised by department managers, the exercise of authority by

5   the department managers was accepted as valid and binding by

6   the Special Committee with respect to the grants at issue here.

7   Correct?

8   A    As -- with respect to rank-and-file grants, that is

9   correct.

10  Q    Now, I want to ask you one additional question about

11  Exhibit 1694, which is -- should still be in front of you.  It

12  has the e-mail or the handwritten note from Marianne Snook.

13          And I just want to look again -- Jeff, let's put up

14  the -- first of all, if you highlight Eric Wong, Stephanie

15  Compton, Justin Coope and Jerry Peirce, you see three, three of

16  those folks were hired on February 14, 2000, correct?  Compton,

17  Coope and Peirce?

18  A    Three of those, yes.

19  Q    And Wong was hired on February 10 of 2000, correct?

20  A    Per this document, yes.

21  Q    And if the price -- if the options had been granted

22  effective on their hiring date -- which was the policy with

23  respect to new-hire grants, correct?

24  A    For rank and file during that time period, yes.

25  Q    If the grants had been made on their hire date, the grant

1  price for Compton, Coope and Peirce would have been $29.63,

2  correct?

3  **A**    Correct.

4  **Q**    And if Wong's date had been set on his hire date, the

5  grant price would have been -- if the grant for Eric Wong had

6  been set on his hire date, the price would have been $27.94,

7  correct?

8  **A**    Yes, per this report.

9  **Q**    And, Terry Davis, by setting the grant prices effective

10 May 24th, gave them a price of 19.75, correct?

11              (Witness examines document)

12 **A**    Per this documentation that we looked at earlier, yes, it

13 appears so.

14 **Q**    And by doing that, Terry Davis gave Compton, Coope and

15 Peirce prices that were $10 lower than the prices that should

16 have been given to them on their hire date, correct?

17 **A**    The price is $10 lower than on their hire date.

18 **Q**    And the price for Wong is about $8 lower, correct?

19 **A**    Yes, Wong's price is about $8 lower.

20 **Q**    So again, by using the May 25th date, instead of their

21 hire date, Terry Davis gave them adjustments in their option

22 prices that are exactly the same order of magnitude as the

23 adjustment in Kent Roberts' price that is at issue here.

24 Correct?

25 **A**    These were of the same in-the-money value, approximately,

1  yes.

2  **Q**    Kent's grant, when he got it, wasn't in the money,

3  correct?

4  **A**    Well, from the July price to the 19th price.

5  **Q**    When he -- when he was first given that February 14 price

6  in July, that was $10 out of the money, correct?

7  **A**    If you compare that to the July price.

8  **Q**    And, in all of the stuff that you've looked at in

9  connection with your work, have you seen any other option --

10  promotion option or new hire option granted to anybody which

11  when they got it was $10 out of the money?  Or $10 underwater?

12  **A**    We did see underwater options.  I don't --

13  **Q**    Can you identify any other that was that -- drowning that

14  deeply?

15  **A**    I mean, I wouldn't recall.  As you pointed out earlier,

16  there's 53 million options that we changed the dates for, so --

17  **Q**    But do you recall any that were drowning as badly as

18  Kent's grant?

19  **A**    There were a significant number of options out of the

20  money, yes.

21  **Q**    But, that far out of the money?

22  **A**    I do not know if it was that far out of the money, more or

23  less.

24  **Q**    All right.  There was talk about -- well, McAfee has

25  repriced employee options in the past.  Correct?

1   **A**    Yes.

2   **Q**    There's nothing in the 1997 plan that prohibits repricing

3   of options, correct?

4   **A**    I don't believe so.

5   **Q**    And in fact, there was nothing in McAfee's 1997 stock

6   option plan that prohibited repricing of options until the year

7   2004, correct?

8   **A**    Hmm, rephrase that again.  Nothing that prohibited

9   repricing of options until 2004?

10  **Q**    Yes, that was -- 2004 was the first time that McAfee put

11  anything in its plan, in the 1997 plan, that dealt with

12  repricing of options.  That is, there was no prohibition or any

13  restriction on repricing until 2004.  Correct?

14  **A**    I'm not aware of the 2004 stipulation.

15  **Q**    Are you not aware then in 2004, for the first time, the

16  company put in a provision in the 1997 plan that restricted the

17  ability to change the prices of options?

18  **A**    I'm not aware of that.

19  **Q**    Let me show you Exhibit 1621.

20          Were you at the company in 2004?

21  **A**    Yes.

22  **Q**    Exhibit 1621 is a copy of the minutes of the March 30,

23  2004 meeting of the Board of Directors of McAfee.  Correct?

24          (Witness examines document)

25  **A**    Yes.

1          **MR. NEAL:**  And I will offer 1621, Your Honor.

2          **THE COURT:**  No objection, then 1621 is admitted.

3          (Defendant's Exhibit 1621 received in evidence.)

4    BY MR. NEAL:

5    **Q**    This is about almost four years after the change in Kent

6    Roberts' stock option grant that is at issue in this case,

7    correct?

8          (Witness examines document)

9    **A**    Correct.

10   **Q**    Have you looked at these minutes before?

11   **A**    I don't recall.

12   **Q**    Would that in turn mean you don't know whether you gave

13   them to the Special Committee?

14   **A**    All minutes that I reviewed were provided to the Special

15   Committee.

16   **Q**    Okay.  If you would look -- so just the first page shows

17   the -- this is the minutes from March 30, and it shows various

18   people in attendance at the meeting, it shows the directors who

19   were there.  Correct?

20   **A**    Correct.

21   **Q**    It also shows that Mr. Roberts was there, for part of it,

22   at least.  Correct?

23   **A**    Correct.

24   **Q**    And it shows that Jeff Saper and other lawyers from

25   Wilson, Sonsini were present, either in person or by phone,

1   correct?

2   **A**    Correct.

3   **Q**    And it shows that Mr. Saper was there in person, correct?

4   **A**    Correct.

5   **Q**    If you will look at the second page, you see on the second

6   page that Mr. Saper presented proposals to the board that were

7   in turn going to be placed before the shareholders in the 2004

8   proxy statement?

9              (Witness examines document)

10  **A**    Correct.

11  **Q**    And, that the second thing that Saper said the company was

12  going to ask for from the shareholders was that the company is

13  going to ask the shareholders to amend the 1997 stock option

14  plan to expressly prohibit the repricing of options, correct?

15  **A**    Correct.

16  **Q**    So this is almost four years after Mr. Roberts's grant,

17  the board decides to seek to have the shareholders amend the

18  plan to prohibit repricing of options.  Correct?

19  **A**    Correct.

20  **Q**    The April 20th, 1999 focal grant was determined to have

21  been repriced during your investigation, correct?

22  **A**    Had also been a repricing historically in the company.  In

23  2000, it was then adjusted for accounting purposes.

24  **Q**    But you were aware that there had been a repricing of the

25  April 20 focal grant, either as part of your investigation or

1    before it, correct?

2    **A**    Yes.  Before it, I was aware of that.

3    **Q**    And, the focal grant of April 20, 1999, that was repriced,

4    was a grant under which the shares had originally been priced

5    at $40.63. Correct?

6    **A**    I don't recall the price.  And I don't -- I think the

7    repricing was broader than just the focal.

8    **Q**    Okay.  Do you recall that the price of the options was

9    originally $40.63?

10   **A**    I don't recall the price.

11   **Q**    Do you recall what the price of the grants was changed to?

12          (Witness examines document)

13   **A**    My recollection would be 11.06.

14   **Q**    Let me show you Exhibit 1752.  1752 is an October, 2007

15   document.

16          And, who prepared it?

17          (Witness examines document)

18   **A**    The restatement team.

19          **MR. NEAL:**  And I'll offer it into evidence, Your

20   Honor.

21          **THE COURT:**  No objection; 1752 is admitted.

22          (Defendant's Exhibit 1752 received in evidence.)

23   **BY MR. NEAL:**

24   **Q**    And if you will look at 1752, under -- on the first page

25   under "Relevant facts," you see it says that options totaling

1   2,058,000 shares were granted to 1246 individuals with a

2   recorded grant date of April 30, 1999.  The closing stock price

3   on this date was 11.06?

4   **A**    April 20, 1999?

5   **Q**    Yes, I'm sorry, thank you.  And then it goes on to say

6   Howrey -- those are the lawyers who worked for the Special

7   Committee -- FTI -- those are the forensic accountants the who

8   worked for the Special Committee -- could not locate any

9   evidence that formal approval by of the Board of

10  Directors/Compensation Committee -- of the Board of

11  Directors/Compensation Committee was obtained for any of the

12  1999 focal grants, regardless of whether these grants exceeded

13  the threshold whereby Compensation Committee approval was

14  necessary.  As grants were honored historically and the company

15  intends to honor them in the future, there is no accounting

16  impact or lack of approval -- of the lack of approval.

17          Do you see that?

18  **A**    Yes.

19  **Q**    And then if you look at the page with the number 3980 in

20  the lower right-hand corner, at the very bottom, you see where

21  it says (As read), "These options were determined (sic) to have

22  been repriced on April 20, 1999, as the exercise price was

23  originally determined on March 11, 1999, entered into in the

24  stock administration database as $40.63, and then reduced to

25  $11.06 on or around April 20, 1999"?

1          Do you see that?

2    **A**    Yes, I do.

3    **Q**    Does that refresh your recollection as to what the

4    magnitude of the repricing was?

5    **A**    Well, I think this is specific to the focals.

6    **Q**    Pardon?

7    **A**    I think this is specific to the focals.  The repricing was

8    broader than just this.

9    **Q**    Well, with respect to the focal -- are you saying the

10   adjustment in price might have been different for other grants?

11   **A**    I'm thinking there was another piece of the repricing that

12   was done on April 20th of 1999.

13   **Q**    And you don't know what the change in prices was for that?

14   Or you do?

15   **A**    Not off the top of my head, I do not.

16   **Q**    But you know it was changed to 11?

17   **A**    06.

18   **Q**    The Special Committee and Howrey were never able to

19   identify any indication of board authorization for this grant,

20   correct?

21   **A**    For these focal grants, that is correct.

22   **Q**    And McAfee, at least you never found any authorization

23   documents for this grant during your search for them, correct?

24   **A**    Correct.

25   **Q**    There's no evidence that the board ever approved this

1    change in pricing, correct?

2    **A**    I believe that would be my recollection.

3    **Q**    Pardon?

4    **A**    I believe that would be my recollection.

5    **Q**    No evidence that the Compensation Committee ever approved

6    this change in pricing, correct?

7            (Witness examines document)

8    **A**    Let me think for a second.

9            That's correct.

10   **Q**    But the board and McAfee's management concluded in 2007,

11   notwithstanding that, that they would honor these grants,

12   correct?

13   **A**    They did decide they would honor these grants.

14   **Q**    And the company intends to keep honoring these grants,

15   correct?

16   **A**    That would be my understanding.

17   **Q**    And is it also your understanding that -- we've seen

18   evidence of another repricing at the company where there were

19   repricing agreements distributed to the recipients of the

20   reprice -- do you recall that repricing?

21   **A**    That's the one I was referring to earlier, yes.

22   **Q**    That's the -- that's the other repricing that you are

23   referring to, correct?

24   **A**    On the same date, yes.

25   **Q**    Yeah.  In connection with that repricing, there were

1   repricing agreements issued, but there was no repricing

2   agreements of any sort issued in connection with the repricing

3   that's covered in 1752 (Indicating).  Correct?

4   **A**    I don't believe there were, that I'm aware of, repricing

5   agreements issued related to this.

6   **Q**    We talked yesterday about the fact that the Special

7   Committee ultimately concluded that the February 14 measurement

8   date for Kent Roberts' promo grant was the wrong measurement

9   date, and decided that the proper date for measuring that

10  promotion grant was July 13, 2000, correct?

11  **A**    The proper measurement date, by the Special Committee, I

12  believe to be July 13th, 2000, correct.

13  **Q**    And therefore concluded that the -- measurement date?

14  **A**    Measurement date, yes.

15  **Q**    The correction in the measurement date was made or

16  recommended by the Special Committee, and agreed to by the

17  company, correct?

18  **A**    That is my understanding, yes.

19  **Q**    And, the correction in that measurement date, if it had

20  been discovered earlier by somebody, you would have hoped and

21  expected it would be made earlier, correct?

22  **A**    I'm sorry, can you just, to make sure I understand --

23  **Q**    If somebody figured out there was a mistake with that date

24  earlier in time, you would have expect or hoped that the

25  systems within the company would work to catch it and fix it,

1  correct?

2  **A**    Let me rephrase, just to make sure I understand.  So

3  meaning that if in 2000 or 2001 that had been identified, it

4  would have been adjusted at that time from an accounting

5  perspective?  Is that the question?

6  **Q**    Yeah, that if somebody figured out it was a mistake

7  earlier, you would have hoped, the way things worked in the

8  company, it would have been fixed earlier, correct?

9  **A**    I would have hoped if that had been identified, then the

10 appropriate accounting charge and disclosures would have been

11 made and revised.

12 **Q**    And you would have expected those decisions and actions to

13 have been taken within the finance department, correct?

14 **A**    From an accounting perspective within the finance

15 department.  From a compliance perspective, the individual

16 responsible for that compliance under Section 16.  And the

17 legal department, from a proxy perspective, would be my

18 understanding.

19 **Q**    But, but you are saying -- I mean, the issue, the

20 responsibility for accounting for these properly was the

21 responsibility of the finance department, correct?

22 **A**    For taking the compensation charges, it's the

23 responsibility of the Accounting Department, based on the

24 information they're given.  But the compliance Form 3, 4, and

25 5s are the individuals in the legal department.  And then the

1  proxy is handled by the legal department within the company.

2  **Q**    And who else from -- who from the outside worked on the

3  proxy with McAfee?

4  **A**    I can only speak to my tenure with the company, but I

5  believe it would have been Wilson, Sonsini, and then we had

6  another consultant more recently that helped.

7  **Q**    Now, I think we talked yesterday about the fact that the

8  original personnel action form for Kent Roberts' promotion from

9  February of 2000 does not reflect any option grant.  Do you

10  recall that?

11  **A**    I'm sorry, say that one more time.

12  **Q**    Yeah.  Do you recall that the original personnel action

13  grant for Kent Roberts in February of 2000 did not include any

14  options?

15  **A**    Hmm, I don't think that's the personnel action form we've

16  looked at.

17  **Q**    Okay.  So maybe you haven't -- maybe you haven't seen

18  Exhibit -- let me show you Exhibit 150-B which is already in

19  evidence.

20           **MS. BEELER:**  (Inaudible)

21           **MR. NEAL:**  If it's not, I would move it, Your Honor.

22           **MS. BEELER:**  It has not been admitted yet.

23           **THE COURT:**  This one has not been admitted.  This is

24  another one that looks like -- but it is a different document,

25  yes.  So, and this is 150-B?

1          **MR. NEAL:**  150-B, yes, Your Honor.

2          **THE COURT:**  It is admitted.

3          (Plaintiff's Exhibit 150-B received in evidence.)

4  **BY MR. NEAL:**

5  **Q**   Have you seen 150-B before?

6          (Witness examines document)

7  **A**   I don't recall seeing 150-B, but I may have potentially

8  seen it.

9  **Q**   If you -- well, it's on the screen.  This is a personnel

10 action form for Kent Roberts, and it relates to his promotion

11 to vice-president, legal affairs, in February of 2000.

12 Correct?

13 **A**   Correct.

14 **Q**   And, if you will look, there's a stamp down in the lower

15 half of the page, that indicates that the document was received

16 in HR staffing on March 6th, 2000.  Correct?

17 **A**   Correct.

18 **Q**   So presumably it was filled out and prepared some time

19 prior to that date.  Correct?

20 **A**   Based on this documentation, yes.

21 **Q**   And what this shows is that there's going to be an

22 increase in his bonus.  But under the Compensation section, for

23 stock options, the February and March documentation concerning

24 his promotion shows that he's getting no stock options.

25          Correct?

1   A    This form would reflect no stock options, as I interpret

2   it.

3   Q    I couldn't hear you.

4   A    Oh, I'm sorry.  This form would reflect no stock options,

5   as I understand it.

6   Q    Okay.  Then we looked yesterday, at -- and maybe this

7   morning, at Exhibit 1612.  And I would like you to look at 1612

8   again.

9   A    I can't find 1612.  I'm sorry.

10  Q    Yes, we talked about this, this morning.  I just have a --

11          (Witness examines document)

12  A    Yes.

13  Q    And it's on the screen there, too.  So this is one we

14  talked about this morning.  This is, this is the document

15  signed by Prabhat Goyal and Terry Davis, on July 5th of 2000,

16  which authorized a promotion grant, 20,000 shares, for

17  Mr. Roberts.  Correct?

18  A    Correct.

19  Q    Do you know what the stock price was on July 5th of 2000?

20  Can you take a look at Exhibit 60?

21  A    I do not, but I will research it.

22  Q    Thank you.

23          (Witness examines document)

24  A    1969, I believe.

25  Q    So, on July 5th, Goyal and Davis, July 5th, 2000,

1   authorized a grant to Terry Davis -- and they date it

2   February 14th when the price was 29.62, even though the price

3   on the date that the grant was actually approved by them was a

4   price of $19.69.  Correct?

5   **A**    I'm sorry, you said "a grant to Terry Davis"?

6   **Q**    No -- I meant to say "signed by Terry Davis."  Let me

7   state it over.

8   **A**    Okay.

9   **Q**    On July 5th of 2000, Terry Davis and Prabhat Goyal

10   authorized a grant of 20,000 shares to Kent Roberts.  Correct?

11   **A**    Correct.

12   **Q**    And, this -- there's no earlier personnel action form

13   showing any authorization of such a grant to Mr. Roberts that

14   you've seen.  Correct?

15   **A**    Say that last part again?

16   **Q**    Yeah.  There's no -- there's no earlier personnel action

17   form that you have seen that reflects an authorization of a

18   20,000-share grant to Mr. Roberts in connection with his

19   promotion.  Correct?

20   **A**    Not that I recall.

21   **Q**    So, I'm correct.

22   **A**    Yeah.  To my recollection, I don't recall an earlier PAF

23   related to Roberts' grant.

24   **Q**    So on July 5th, as far as we know, for the first time,

25   Goyal and Davis authorized a 20,000-share promotion grant for

1   Kent Roberts.  And the price that they set it at is the

2   February 14 price.  Correct?

3          (Witness examines document)

4   **A**    Yes.

5   **Q**    The price on July 5th, the date that they approved and

6   authorized this grant, was $19.69.  Correct?

7   **A**    Correct.

8   **Q**    So, if the decision had been made to price Mr. Roberts'

9   grant effective the date that it was authorized by Goyal and

10  Davis, the price would have been $19.69.  Correct?

11  **A**    If that was an approval of -- appropriate approval

12  authorizing mechanism, which is not how we did it in the

13  restatement.

14  **Q**    I'm sorry?

15  **A**    Which is not how we did it in the restatement.

16  **Q**    I know it's not how you determined it in the restatement,

17  but you are aware of legions of grants in the company where the

18  price for the grant is determined as of the date that the grant

19  was actually authorized and approved.  Correct?

20  **A**    Yes.

21  **Q**    And in fact, would you say that the overwhelming instances

22  are that grants were priced effective the date that the grant

23  is authorized and approved, during this time period at McAfee?

24  **A**    I would say that in the restatement, there's a majority of

25  grants that the measurement date is the date they were

1  approved, based on our hierarchy of evidence, and for executive

2  officers, we used reliance on Compensation Committee minutes

3  for approval.

4  **Q**     But, okay.  Okay.  But, but you saw many, many -- and

5  there's nothing surprising about this, I don't think, but there

6  are an overwhelming number of instances where grants are priced

7  at McAfee on the date that they are actually authorized and

8  approved.  Correct?

9  **A**     Correct.  Based on the approving mechanism, which is

10 different per the tiers of employees.

11 **Q**     And one consequence of doing that is that you then are

12 authorizing a grant that is at the money.  Correct?  That is --

13 **A**     The measurement date is the date it's authorized.  That

14 doesn't --

15 **Q**     No, but if a grant is priced on the same day that it's

16 approved and authorized, that effectively means it's at the

17 money.  Not --

18 **A**     That would keep it as an at-the-money grant.

19 **Q**     Right.  And then if the company performed better from that

20 day forward, the employee would benefit from that.  And if the

21 company performed worse from that day forward, the employee

22 would share in the pain.  Correct?

23 **A**     Correct.

24 **Q**     But instead, what Davis and Goyal did, instead of using

25 the price that was in effect -- instead of using the stock

1   price on the July 5th date when they authorized this grant,

2   they reached back six months and used a price that was

3   $10 underwater.  Correct?

4   **A**     That is what this reflects.

5   **Q**     Pardon?

6   **A**     That is what this reflects.

7   **Q**     Now, in the course of your work -- so, so, by the way,

8   again, the price on July 5th, you just looked at, was what?

9   19.69?

10  **A**     I believe so.  Without looking it back up -- I think

11  that's correct.

12  **Q**     What was the price on April 14, the date that his grant

13  was ultimately changed to?

14  **A**     I believe, 19.75.

15  **Q**     So, they originally authorized a grant at a price that was

16  $10 out of the money, compared to the price on July 5th when

17  they authorized it, and then when Davis changed the date to

18  April 14th, he changed it to what?

19             (Witness examines document)

20  **A**     I was just verifying, but 19.75.

21  **Q**     So, he changed it to a number that was still a little bit

22  higher than what the price was on July 5th.  Correct?

23  **A**     Correct.

24  **Q**     In the course of your work on the restatement, you

25  reviewed, and your team reviewed, I take it, literally

1   thousands and -- tens of thousands of documents?

2   **A**    I don't believe we reviewed that many documents, from an

3   accounting perspective.  I believe the investigative team

4   reviewed in excess of that amount.

5   **Q**    And you did this -- I think you already said this, but you

6   reviewed the documents, and as you understand it, the Special

7   Committee reviewed documents in part to identify the prior

8   practices at McAfee with respect to approving option grants.

9           Correct?

10  **A**    Correct.

11  **Q**    And that was part of what then led you and the Special

12  Committee to make judgments about what the appropriate

13  measurement date should be in connection with the restatement.

14          Correct?

15  **A**    That is correct.

16  **Q**    In all of the review that you did, is it fair to say that

17  you did not identify any written policy that existed at McAfee

18  in 2000 regarding how they should select -- how people should

19  select a grant date for a promotion grant?

20  **A**    I don't recall looking at any of that documentation, or if

21  that documentation exists.

22  **Q**    What -- so, is it true you can't identify any written

23  policy that existed at McAfee in February, 2000, regarding how

24  to select a grant date for a promotion grant?

25  **A**    I am not aware of that documentation.

1  Q    So I think you're saying the same thing; I just want to

2  make sure.  You cannot identify any such document.  Correct?

3  A    I cannot identify any such document.

4  Q    You didn't find any policy in place in 2000, for example,

5  that would have prohibited granting an option the day after a

6  board meeting, did you?

7  A    I don't recall any such documentation.

8  Q    You can't point to a single McAfee policy that existed in

9  2000 that would say it was wrong to select, as a pricing date,

10  the day after a meeting of the Board of Directors, correct?

11  A    Did you say a policy?  Policy documentation?

12  Q    Any written policies or documents?

13  A    I'm not aware of any.

14  Q    Are you aware of any evidence that Kent Roberts determined

15  that the price of April 14 should be used for his option when

16  it was changed?

17  A    I'm not aware of any such documentation.

18  Q    I want to talk to you about the April 14th date, which is

19  the date that Terry Davis changed the grant to.

20        Are you aware that there was a Board of Directors

21  meeting at McAfee on April 13, 2000?

22  A    Just due to the minutes of April 13th, 2000, I'm aware of

23  that.

24  Q    So, so those -- Exhibit 1801 demonstrates that there was

25  in fact a meeting of the Board of Directors of McAfee on April

1    13, 2000.  Correct?

2    **A**    Sorry, which exhibit number, so I can verify that, if you

3    want me to verify that?

4    **Q**    Here, I'll show you.

5    **A**    Sorry.

6            (Witness examines document)

7    **A**    So, Exhibit -- was the question Exhibit No. 151 reflects

8    the April 13th, 2000 minutes?

9    **Q**    Hold on one second.

10   **A**    Okay.

11   **Q**    Yeah, looking at 1801, 1801 is a cover e-mail attaching

12   minutes of the April 13, 2000 Board of Directors meeting of

13   McAfee, correct?

14   **A**    Correct.

15           **MR. NEAL:**  I will offer 1801, Your Honor.

16           **THE COURT:**  Any objection?

17           **MS. BEELER:**  (Shakes head)

18           **THE COURT:**  1801 is admitted.

19           (Defendant's Exhibit 1801 received in evidence.)

20   **BY MR. NEAL:**

21   **Q**    So, 1801 indicates that there was a meeting of the Board

22   of Directors on Thursday, April 13.  Correct?

23   **A**    Yes, it does.

24   **Q**    Kent Roberts' promotion was in -- on February 14 of 2000.

25   Correct?

 1            (Witness examines document)

 2   **A**    I'm not sure of the exact date of that promotion, due to

 3   the conflicting paperwork.

 4   **Q**    Well, let's look again, briefly, at Exhibit 150-B.  This

 5   is the personnel action form, the first personnel action form

 6   that reflects Mr. Roberts' promotion to vice-president of legal

 7   affairs.  Do you see that?

 8   **A**    Yes.

 9   **Q**    And it actually, at the top, it says effective date, one

10   date is scratched out but above it the effective date is said

11   to be February 15th, correct?

12   **A**    Correct.

13   **Q**    The first board meeting that occurred at McAfee after

14   February 15th, 2004 -- or 2000, was the April 13th board

15   meeting.  Correct?

16   **A**    I do not know if that was the first board meeting after

17   February 15th of 2000.

18   **Q**    Well, are you aware of any Board of Directors meeting that

19   occurred at McAfee between February 14th and April 13 of 2000?

20   **A**    I would not know without a listing of the board minutes.

21   I'm sorry.  I wasn't there during that time frame.

22   **Q**    Well, let's assume, let's assume for a moment that the

23   first board meeting at McAfee, after Mr. Roberts was promoted

24   on February 15th, occurred on April 13th.  Are you with me for

25   that assumption?

1   **A**    Yeah, we can make that assumption.

2   **Q**    Then the date that Terry Davis changed Mr. Roberts' grant

3   to was the day after that board meeting.  Correct?

4   **A**    The grant was changed, I believe, is my understanding, to

5   April 14, 2000.

6   **Q**    In the course of your review of information, in connection

7   with the restatement, you determined, did you not, that in the

8   1999 to 2000 time frame, it was common to see price -- prices

9   for promotion options being set on the day after the first

10  Board of Directors meeting following the promotion?

11  **A**    I don't believe that I can say that that was a common

12  practice that I've seen.

13  **Q**    In the course of your review, and work, did you determine

14  that there were a number of instances where the pricing date

15  that was used for promotion grants, was the date the day after

16  the first board meeting following the promotion?

17  **A**    I don't believe I can validate that statement.

18  **Q**    Did you make any effort to determine that when you were

19  doing your work?

20  **A**    I did not.

21  **Q**    Do you know if the Special Committee did?

22  **A**    I do not know.

23  **Q**    I'm going to show you Exhibit 2502.

24          (Short off-the-Record discussion)

25  **BY MR. NEAL:**

1  Q    I don't think you've seen this document.

2         (Witness examines document)

3  Q    This is a three-page document, it was prepared by people

4  helping us in this case, working off of records of McAfee.  So

5  I don't think you've seen it.

6         But I would like you just to take a look at it.  I'm

7  not going to put it on the screen yet.  I would like you to

8  take a look at it, and start by looking at the back page of

9  this exhibit.

10         (Request complied with by the Witness)

11  Q    And, and I'll ask you whether in the course of your work

12  on this restatement, you reviewed any of the files relating to

13  the option -- or relating to the option promotion grants of the

14  people who are listed on that schedule.

15  A    Did I -- I want to make sure I get the question correctly.

16  Did I review any of the options for people on this schedule?

17  Q    Yes.

18  A    And my recollection would be the only one that I would

19  have reviewed would have been related to Dale Cline with the

20  50,000 grant, due to the size -- and being considered an

21  executive, due to the size of the grant.

22  Q    And his grant is an example of a grant where the pricing

23  date for the grant was determined by picking the day, one day

24  after the first board meeting, following the promotion.

25         Correct?

1  A    This reflects his as a repriced grant, the sheet I'm

2  looking at.

3  Q    Are you aware that in 1999, 13 promotion or merit grants

4  were priced by using the day after the first board meeting

5  following the grant?

6  A    I am not aware of that.

7  Q    Were you aware that in 2000, at least two grants were

8  priced exactly the same way?

9  A    I'm not aware of that.

10            MR. NEAL:  I'll offer 2502.

11            MS. BEELER:  Objection, foundation.

12            MR. NEAL:  I thought I was going to hear that, but

13  what the heck.

14            THE COURT:  Yes, no harm in trying.  She's been

15  silent for so long, right?  So, what -- do you have a backup

16  plan?

17            MR. NEAL:  Oh, I do.  I do, Your Honor.  I just

18  thought, you know --

19            MS. BEELER:  Another witness maybe as a backup plan.

20  BY MR. NEAL:

21  Q    So if you would look at the last --

22            THE COURT:  I gather your backup plan is not with

23  this witness, is that correct?

24            MR. NEAL:  Well, no, Step 1 of my backup plan is with

25  this witness.

1          **THE COURT:**  Oh, I see.  Oh, dear.  I'll be watching.

2  **BY MR. NEAL:**

3  **Q**    If you look at the last page of this exhibit, the one I

4  directed your attention to, that's a document you prepared, is

5  it not?

6  **A**    The last page?

7  **Q**    Yeah, this is all data out of your consolidated grant

8  master --

9  **A**    I don't -- my recollection would be we did not prepare

10  this, but I'm sure we have the data to prepare this.

11  **Q**    So you cannot tell me that the data that's shown here is

12  all data out of the McAfee system?

13  **A**    I cannot tell you that.  And I can affirmatively tell you,

14  I have not reviewed this, if it was prepared by my team.

15          (Short off-the-Record discussion)

16          **MR. NEAL:**  All right, we'll do this.  This wasn't my

17  plan, this was Mr. Stephens' plan.

18          She asked for this.

19          **MS. BEELER:**  Yeah, thanks.

20          **MR. NEAL:**  I was going --

21          **THE COURT:**  Oh, I get one too?  Oh, good.

22          **MR. NEAL:**  I was going to do this more benignly, but

23  I actually like this.

24  **BY MR. NEAL:**

25  **Q**    What is Exhibit 2511?

1           THE COURT:  Heavy.

2           MR. NEAL:  Yes.  I tried to do it the easy way but --

3           THE WITNESS:  I believe this would be from our --

4    what we refer to as our, probably, final consolidated grant

5    master from the restatement.

6           MR. NEAL:  I will offer 2511, Your Honor.

7           THE COURT:  No objection?

8           MS. BEELER:  No objection.

9           THE COURT:  2511 is admitted.

10          (Defendant's Exhibit 2511 received in evidence.)

11   BY MR. NEAL:

12   Q    If you look at the last page of Exhibit 2502, again, it

13   indicates that the source of all of the data listed there comes

14   from your consolidated grant master list.  Correct?

15          (Witness examines document)

16   A    Yes, I believe so.

17          MR. NEAL:  So Your Honor, what I think I'll do is I

18   think I'll reserve the right to -- I am not done yet, I'm

19   getting close, but I think what I will do is reserve the right

20   to recall this witness in the event I want her to go through

21   the whole master list and confirm the data that's on here.  But

22   I won't take that time now.

23          THE COURT:  Well, if in fact, after -- Ms. Beeler,

24   after you review 2502 and this monster, 2511, and you

25   determine, you know, that there -- that they do correspond, you

1  know, the information that's contained there, would that be

2  necessary?  Could you just not stipulate, then?

3           **MS. BEELER:**  And I also think that if the defense

4  would like a summary witness to talk about it, they can have a

5  summary witness to talk about it.  It doesn't have to be

6  Ms. Thompson.  So, that was my foundation objection.

7           **THE COURT:**  Uh-huh.

8           **MS. BEELER:**  It probably will be able to come in,

9  just not through her.

10          **MR. NEAL:**  But will you agree to have your folks

11 check --

12          **MS. BEELER:**  Of course.  But I would actually -- if

13 you put on someone to say that, I'm sure you could establish

14 without me, but I'm happy to do it.

15          **THE COURT:**  But you are here.

16          **MS. BEELER:**  No, no.  Of course.  I'm happy to do

17 it.

18          **THE COURT:**  One last witness.  And if you can

19 determine that in fact it accurately reflects the contents of

20 this document, insofar as the particular question, then that

21 would make that much easier.  Right?

22 **BY MR. NEAL:**

23 Q    So if, indeed, the first board meeting after Mr. Roberts'

24 promotion in February of 2000 occurred on April 13 of 2000,

25 using an April 14 day for pricing his promotion grant would be

1   consistent with practices that had previously been used by

2   McAfee for at least a number of other promotion grants.

3            Correct?

4   **A**    No, I cannot agree with that statement, based on my

5   knowledge.

6   **Q**    You -- are you saying that there were not grants where the

7   promotion grant was dated the day after the Board of Directors

8   meeting?

9   **A**    I'm not saying there aren't.  I'm just saying I'm not

10  aware of that being a practice.

11  **Q**    Okay.  And you didn't make any effort to determine whether

12  that had been a historical practice?

13  **A**    I did not.

14  **Q**    And, as far as you know, the Special Committee and its

15  advisors didn't make any effort to determine whether that had

16  been a historical practice.  Correct?

17  **A**    I do not know if the Special Committee worked on that.

18  **Q**    Okay.  Now, we talked a few minutes ago about the fact

19  that July 5 is the date when Goyal and Davis authorized the

20  grant, and if that authorization was within delegated

21  authority, then based on practices historically at the company,

22  using a July 5 date for the grant would have been consistent

23  with prior practices at the company.  Correct?

24  **A**    A July 5 date for an executive grant I do not believe

25  would be consistent with prior practices at the company.

1   Q    If there -- there were prior grants at the company where

2   the date of the grant was the date that the promotion or the

3   grant was authorized by the appropriate levels of authority,

4   correct?

5   A    For rank-and-file grants.

6   Q    And if Davis and Goyal had the authority to approve and

7   authorize that grant on July 5, and if they had picked a price

8   for the grant that was the date of authorization, that would

9   have been July 5.  Correct?

10  A    If they had that authority.  For an executive grant.

11  Q    And if they had that authority, if they had that authority

12  for that grant, then July 5 would have been a more appropriate

13  date to use than July 13, correct?

14  A    Our methodology in the restatement was for these type of

15  grants, to move them to the approval.  Based on our hierarchy,

16  we have to be consistent across the entire population of

17  grants, a large body of grants.  And for executive-level grants

18  of this nature, we moved them to board approval.

19  Q    But that's a hierarchy that you all imposed for purposes

20  of the restatement, correct?

21  A    Correct.

22  Q    That's a hierarchy that you and the Special Committee and

23  the Special Committee's advisors devised and applied for

24  purposes of the restatement.  Correct?

25  A    That is correct.

1 **Q** And for purposes of the restatement, you all made the

2 decision that for executive level grants, you were going to

3 look to some board or committee approval rather than look to

4 actions by people who may have had authority delegated by the

5 CEO. Correct?

6 **A** It was decided that delegated authority from the CEO

7 downward to lower-level employees would only apply to

8 rank-and-file grants. It would not apply to focal grants, nor

9 would it apply to executive or director grants.

10 **Q** No, I understand you are saying that, but that wasn't

11 quite my question.

12 My question is that that delineation, those rules

13 that you just described, are rules that you all devised for

14 purposes of the restatement. Correct?

15 **A** Purposes of the restatement, and based on practices of

16 what we thought happened at that time.

17 **Q** Well, you -- but you --

18 **A** Would have been appropriate at that time. I'm sorry.

19 **Q** You imposed a hierarchy on how you treated these for

20 purposes of the restatement. Derived from whatever things you

21 looked at. Correct?

22 **A** Correct.

23 **Q** So you -- so you made the decision -- when I say "you," I

24 mean you and a special advisors and the committee -- you made

25 the decision that with respect to grants like the grant to Kent

1  Roberts, you were going to look for some board action rather

2  than accept the proposition that Davis or Goyal could have

3  authorized that grant.  Correct?

4  **A**    We looked to the hierarchy that we believe would have been

5  in place at that time, and what would have been the most

6  reasonable and appropriate accounting to restate the 2000

7  accounting related to that grant.

8  **Q**    You set up a hierarchy in 2007 that you thought would lead

9  to a reasonable, rational way to account for all these grants,

10  correct?

11  **A**    Correct.

12  **Q**    And you then applied that across the board, regardless of

13  what might have happened in the paperwork for those particular

14  grants -- let me withdraw that.  That is not an artful

15  question.

16         You then attempted to apply that hierarchy of rules

17  in what you thought was sort of a consistent basis across the

18  board, correct?

19  **A**    We tried to apply that hierarchy to the evidence that we

20  had around each grant to determine what we thought was the

21  appropriate measurement date and the appropriate accounting for

22  that time period or that individual grant.

23  **Q**    Is there anything in the 1997 board authorization that

24  says that the CEO authority to make grants without board

25  approval is restricted to rank and file?

 1  **A**    No, I don't think it allows -- specifically, I don't think

 2  it allows delegation downward at all.  It does not specifically

 3  allow that.

 4  **Q**    I'm asking about the delegation to the CEO in the first

 5  instance.  The resolution allows delegation to the CEO.

 6         Correct?

 7  **A**    Yes, it does.

 8  **Q**    Is there anything in the resolution that says that

 9  delegation to the CEO is solely for rank-and-file grants?

10  **A**    No.

11  **Q**    And so, when you made the decision -- and when I say

12  "you," the Special Committee, the advisors -- when you made the

13  decision to say that the CEO authority was only for

14  rank-and-file grants, you didn't base that decision on anything

15  that was contained in the authorization itself.  Correct?

16         Can you answer that yes or no?

17  **A**    I -- I just want to clarify.  I did not make that

18  decision.  That decision was made by the Special Committee and

19  the investigators, based upon the work they had done,

20  interviews of people at the time, all of that.  And then that

21  is what they had communicated.

22  **Q**    Okay.  All right.  Okay.  So, I'm glad you didn't just

23  answer that yes or no.

24         So, so the decision to -- the decision to say that

25  the delegation of authority to the CEO applied only to

1    rank-and-file grants was a decision made by the Special

2    Committee; Howrey, Simon; FTI; and not by you.  Correct?

3    **A**    That would be my understanding.

4    **Q**    And then, you and your department simply accepted that and

5    applied that rule across the board.

6    **A**    Correct.

7    **Q**    -- but you would agree there is nothing in the delegation

8    resolution which gives the CEO the authority over grants up to

9    22,500 shares, there is nothing in that delegation that

10   purports to restrict it to rank-and-file grants.  Correct?

11   **A**    There's nothing in that resolution that restricts it to

12   rank-and-file grants.

13   **Q**    And have you seen any other document in which the board or

14   the Compensation Committee at McAfee said, in a resolution or

15   otherwise, that the CEO authority was restricted to

16   rank-and-file grants?

17   **A**    Not that I'm aware of.

18   **Q**    And have you seen anything in writing, anywhere, that says

19   when the CEO at McAfee in turn delegated his authority to

20   grant -- to make grants, to department heads, have you seen any

21   document where the CEO says, "I am delegating this authority to

22   department heads, only for purpose of rank-and-file grants"?

23   **A**    I'm -- not that I'm aware of.

24   **Q**    So this idea that the CEO authority that was in turn

25   delegated to department heads was somehow an authority that

1  reached only rank-and-file grants, that is a decision that the

2  Special Committee and its advisors came to, wherever they were

3  sitting, talking, without, as far as you know, any documents

4  from the company or resolutions from the board, that in fact

5  said what they were doing comported with reality or the truth.

6  Correct?

7           **MS. BEELER:**  Objection, foundation.

8           **THE WITNESS:**  I'm not sure --

9           **THE COURT:**  It sounds like you are going to get an

10 answer that means you haven't laid a foundation.

11          **THE WITNESS:**  I'm not aware of the basis of their

12 conclusion.

13          **THE COURT:**  You don't have to answer.  Try it again.

14 **BY MR. NEAL:**

15 **Q**    You have no idea how they came to the conclusion that the

16 CEO authority and the CEO delegation would be restricted to

17 rank-and-file grants.  Correct?

18 **A**    I am not aware.

19 **Q**    You just lived with that -- I am not saying that

20 critically, you lived with that for the purpose --

21 **A**    That is how we did the accounting, yes.

22 **Q**    But you, you didn't -- you gathered documents and turned

23 them over to the Special Committee.  Correct?

24 **A**    Yes.

25 **Q**    And you didn't give the Special Committee any document

1 reflecting a board or CEO action saying that either the CEO's

2 authority or the authority that the CEO delegated downstream

3 was restricted to rank and file. Correct?

4 **A** Not that I'm aware of. But I want to be clear that I

5 didn't review every document prior to providing to them.

6 **Q** All I'm saying is you can't point to any document that you

7 know you gave them that would have supported that conclusion.

8 Correct?

9 **A** Not that I'm aware of.

10 **Q** So, again, my statement was correct. Correct?

11 **A** If you can repeat your statement, then I can say

12 "Correct." I'm sorry.

13 **Q** No, that's fine. So, so, the board or the Special

14 Committee made the decision to use a protocol which led them to

15 conclude that July 13 was the right measurement date for that

16 grant. Correct?

17 **A** Yes. They concluded July 13th, and it was based on the

18 hierarchy of evidence, would be my understanding.

19 **Q** But, if -- if instead, the Special Committee had said,

20 "Lookit, the delegation to the CEO by the board was not

21 restricted to rank and file, the CEO delegated to department

22 heads, and that delegation wasn't restricted to rank and file,

23 so we'll respect those exercises of authority," then in

24 connection with Kent Grant's (sic) grant in July of 2000,

25 July 5th would have been the appropriate date, rather than

1    July 13th, correct?

2    **A**    If they had concluded specific delegated authority for

3    that level of grant, yes.

4    **Q**    If they -- if they had accepted the same concepts of

5    delegated authority that they accepted for rank and file, if

6    they had accepted it for non-rank and file, then July 5th would

7    have been the right date for Kent's grant, not July 13th,

8    correct?

9            **MS. BEELER:**  Objection, assumes facts not in

10   evidence.

11           **THE COURT:**  The objection is overruled.  You may

12   answer.

13   BY MR. NEAL:

14   **Q**    Would you like my question read back?

15   **A**    I'll take a stab at it, and make sure that I got it right.

16           So, you're saying that if they had allowed -- the

17   CEO-delegated authority had been issued to Prabhat and/or

18   Davis, delegating that authority down, during the same time

19   frame as it was allowed for rank and file, which was the 2000

20   to 2003 time frame, then we would have used the date of

21   approval by the delegated authority, as opposed to the board

22   date, for an accounting measurement date perspective.

23   **Q**    And that would have been July 5th rather than July 13th

24   for Kent's promotion grant?

25   **A**    Based on the documentation here today, that would be my

1  understanding.

2  **Q**    And that July 5th date would actually have been a more

3  advantageous date for Kent Roberts than the February 15 date --

4  than the April 14th date that Terry Davis used, correct?

5  **A**    By a few cents, yes.

6  **Q**    You had meetings with the Special Committee and their

7  advisors from time to time, correct?

8  **A**    Correct.

9  **Q**    Did the Special Committee or its advisors ever show you a

10  piece of paper reflecting a decision or an action by the board

11  at any time prior to 2000, in which the board said that the

12  grant the CEO grant is restricted to rank and -- CEO authority

13  is restricted to rank and file?  Did they ever show you a paper

14  that said that?

15  **A**    No.

16  **Q**    Did they ever show you a paper that said that the CEO's

17  delegation of his authority to department heads was restricted

18  to rank and file?

19  **A**    I'm sorry, can you say that again?

20  **Q**    Did the Special Committee or its advisors ever show you a

21  piece of paper in which the board or the CEO of the company

22  said the delegation of authority to department heads is

23  restricted to rank-and-file grants only?

24  **A**    No.

25  **Q**    But because the Special Committee, through whatever

1   vehicles, decided to apply the hierarchy you describe, Kent

2   Roberts is sitting here accused of having a grant with the

3   wrong date, even though if the hierarchy -- authority hierarchy

4   would have been respected, the date he should have gotten of

5   July 5th would have been better than the date he actually got

6   of April 14, correct?

7            **MS. BEELER:**  Objection; calls for speculation.

8            **THE COURT:**  Objection sustained.

9            **MR. NEAL:**  Your Honor, I have no further questions

10   for this witness.

11            **THE COURT:**  Ms. Beeler?

12            **MS. BEELER:**  Yes.

13            **THE COURT:**  Do you have some redirect?

14            **MS. BEELER:**  Yes.

15                        **REDIRECT EXAMINATION**

16   **BY MS. BEELER**

17   **Q**    So, Ms. Thompson, I wanted to ask you some questions just

18   about the mechanics, just a very fundamental level, about the

19   grant process.

20            First of all, just to sort of establish your source

21   of knowledge, though you talked about it a lot on cross, it

22   sounds like you looked at lots and lots and lots of options

23   during this whole restatement process.

24   **A**    Yes.

25   **Q**    Yes.  And I think you mentioned briefly on cross, that

1    you -- at one point, sort of earlier in your career, stock

2    options fell under your area of supervision?

3    **A**    Correct.

4    **Q**    Okay.  So let's just talk a little bit about -- and, and

5    not only all of these -- you looked at all of these grants, but

6    you looked at all of these grants over an eleven-year period.

7    That's what you testified to on cross.

8    **A**    Correct.

9    **Q**    So you looked at lots of authorization documents, and lots

10   of board minutes, and -- in the scope of this review that you

11   undertook.

12   **A**    Yes.

13   **Q**    And also lots of grant recap reports?  Okay.

14   **A**    Lots of everything.

15   **Q**    Lots of everything.  Okay.  So I just want to talk a

16   little bit, then, based on all of this experience and exposure,

17   really just about some of the nuts and bolts of how it worked.

18             Now, different kinds of employees, we talked about

19   different kinds of employees just on cross-examination here.

20   You mentioned rank-and-file employees.  That's one category.

21   Right?

22   **A**    Yes.

23   **Q**    And there are executives or higher-compensated employees,

24   is that right?

25   **A**    Yes.

1   Q    So obviously, different -- and you even looked at, on

2   cross-examination, on all sorts of different numbers of

3   options, from small to large?

4   A    Yes.

5   Q    So, just, again, let's start with the CEO of the company.

6   And -- the CEO, and the CEO's getting options.  Who is the

7   person who decides how many options the CEO gets?

8   A    Typically the Compensation Committee or the full Board of

9   Directors.

10  Q    Okay.  So, I know this sounds like a painfully obvious

11  question, but -- the CEO is the Chief Executive Officer.  Is

12  that the person who's the head of the business?

13  A    Yes.

14  Q    Okay.  Now, we talked about the Board of Directors, we

15  talked about the CEO and the business, and we just, you just

16  mentioned the Board of Directors.

17          Just, on a very general level, what's the difference

18  between the Board of Directors and then the CEO as head of the

19  business?  Is there a -- an operational difference?

20  A    Well, the Board of Directors are typically independent

21  individuals that are not employed by the company, that are just

22  advising the company.

23  Q    Okay.  And do they represent the company's interests?  Or

24  whose interests do they represent?

25  A    The shareholders'.

1    Q    So it sounds like -- tell me if this is right, it sounds

2    like you have the business?

3    A    Correct.

4    Q    And in the case of McAfee, that would be the business that

5    sells -- you know, network security, the -- anti-virus systems

6    on our computers?

7    A    Correct.  Security software.

8    Q    So you have -- that's the business, and the CEO's the head

9    of that part of the business.

10   A    Correct.

11   Q    All right.  The chief of the whole business.  And that's

12   the part that sells the product, gets the money.

13   A    Corrects.

14   Q    All right.  So then you have the Board of Directors on

15   this side of it (Indicating), and they're advisory, you said?

16   A    Correct.

17   Q    And you had mentioned that they do the CEO's options.  Do

18   they also -- who hires the CEO?  If the CEO's the head of the

19   business, who hires the CEO?

20            MR. NEAL:  Your Honor, sorry to interrupt.  I have

21   two objections.  One, I think it is beyond the scope.  But two,

22   I think it needs to be more precise.  And, these are awfully

23   general questions.

24            Are we talking about McAfee, at what point --

25            MS. BEELER:  I'm talking about --

1          THE COURT:  Talking about McAfee, right?

2          MS. BEELER:  (Nods head) I'm going to talk about the

3    mechanics of the options process.  And I think that we need to

4    understand the entities that are part of it.  It's a very

5    general level.  So --

6          THE COURT:  But we are talking about McAfee.

7          MS. BEELER:  Right, right.

8          THE COURT:  Network Associates, whenever she was

9    there.

10          MS. BEELER:  Right, exactly.

11          THE COURT:  Go ahead.

12   BY MS. BEELER

13   Q    So we have the -- who hires the CEO?

14   A    My understanding would be the board.

15   Q    Okay.  And the board decides the CEO's salary?

16   A    Yes.  Or a subset, a compensation committee of the board.

17   Q    So now we're going to move back to the business side of

18   it, and everybody who works at McAfee.  So, it sounds like the

19   CEO's the ultimate boss of the business.

20   A    Yes.

21   Q.   Okay.  And, obviously, there are different managers at

22   different levels.  Sounds like you're a manager at one of those

23   levels, too?

24   A.   Correct.

25   Q.   So just from a very -- looking at all -- when we looked at

1  specific grants ourselves -- well, let's talk about the small

2  grants.

3          You mentioned something called focal, on

4  cross-examination.  What's a focal grant?

5  **A.**  So what we characterize as focal grants are annual merit

6  grants to employees.  So you have a population of employees,

7  and not only do they get maybe, you know, a 3 percent cash pay

8  increase, but then they might also get some options as a type

9  of equity incentive or retention vehicle to stay with the

10 company.

11 **Q.**  So for all the employees, is there a pool of options

12 that's used to sort of distribute to them?

13 **A.**  Typically, there's a pool of options.

14 **Q.**  And who decides what the total pool is?

15 **A.**  Uhm, well, currently that would be the board of directors.

16 That's approved by the board of directors.

17 **Q.**  And how does it get divvied up among the different

18 employees?

19 **A.**  Uhm, it just is basically passed down from the CEO to his

20 direct reports.  And then his direct reports can deem how they

21 want to delegate the authority on down.

22 **Q.**  Okay.  So let's just say I'm a regular employee, regular

23 salary, not an executive person, and you're my boss.  So -- and

24 it's under -- it's a small amount.

25          Is there a mechanism by which you know how many

1  options you have to give to the employees who work for you?

2  **A.**   I am usually typically given a budget.  But I don't have

3  final authority over that.  So I'm given a pool of options to

4  kind of propose what I think my team members should get.

5  **Q.**   Okay.  And now for me let's just say I'm a junior level

6  accountant working for you, though that would be a stretch.

7  And let's say I get a small grant, just something very small.

8  Is this the -- who would ultimately approve the individual

9  grant to me?

10  **A.**   Uhm, so ultimately the pool of options would be approved

11  at the board level.  And then the ultimate approval of the

12  allocation of that pool would be at the CEO level today.

13  **Q.**   So that's just one category of -- of options.  Let's talk

14  about some sort of higher-level people.  I'm just talking in a

15  very general sense, just to understand the mechanics of it.

16       But based on your review of all these options at all

17  these times -- and we don't have to get into particulars about

18  the specific amounts -- is it fair to say that sometimes

19  options are large enough that they have to go to the

20  compensation committee for approval because there's a number

21  that's set, and sometimes they're lower than that and they

22  don't have to go to the board for approval?

23  **A.**   Today all options go.  During this time frame that was the

24  rule.

25  **Q.**   Okay.  So now let's assume a person who's not a CEO, but

1   just a higher-level person who's getting an option grant that's

2   big enough that during this time period of our review it was

3   required to go to the board, the compensation committee for

4   approval, so I just want to ask about the mechanisms of how

5   that worked based on your review of all these documents here.

6              You testified that the board approves the CEO

7   grant -- salary.  But for all the different people who still

8   ultimately -- and we'll look at a grant recap as a basis for

9   discussion.

10             MS. BEELER:  Why don't we look at Exhibit 10-7.

11             MS. BARBER:  Excuse me, Tony.

12             MS. BEELER:  I just want to talk about the mechanics

13  of it.  I'll bring you a hard copy.  I think that might be

14  easier for you to look at.  This was previously admitted into

15  evidence as Exhibit 10.

16  BY MS. BEELER:

17  Q.   Again, I'm just talking about mechanics here.  When --

18  when grants go to the compensation committee for approval, does

19  that mean that the compensation committee looks at all the

20  different people and decides how much they're going to get?  Or

21  is it something that's presented to the compensation committee

22  for review and approval?

23  A.   It's something that's presented to the compensation

24  committee for review and approval, is my understanding.

25  Q.   So, basically, a manager or someone with authority has to

1  decide what -- to sort of come up with something that looks

2  somewhat like this grant recap report?

3  **A.**    Correct.  It's a proposal to the compensation committee to

4  approve or deny.

5  **Q.**    And then ultimately -- you've probably seen hundreds or

6  maybe not hundreds but lots and lots and lots of similar grant

7  recap reports just like this?

8  **A.**    Correct.

9  **Q.**    So it's just a proposal.  And so, in fact, on these

10  minutes that we're looking at now -- which I can't really see

11  from here -- in fact, this is a grant recap report that's

12  attached to minutes that -- minutes reflecting that the

13  compensation committee is addressing this particular grant

14  recap report?

15  **A.**    Correct.

16  **Q.**    And does Mr. Roberts' February 14th grant of options,

17  20,000 options, appear in that grant recap report?

18  **A.**    Yes.

19  **Q.**    And how about Eric Wong, do you see Eric Wong on there?

20  **A.**    I do not see Eric Wong on here.

21  **Q.**    I may be looking at the wrong document.

22  **A.**    Oh, I'm sorry, yes, he is on there.  Sorry.

23  **Q.**    And you testified -- remember testifying on cross or

24  discussing on cross that his hire date was February 10, 2000?

25  **A.**    Based on that documentation, yes.

1  Q.    And what's the date of the grant reflected on these

2  minutes for him?

3  A.    2/10/2000.

4  Q.    Now, let's talk a little bit about the -- we can put down

5  the minutes now.

6         You talked on cross-examination about accounting

7  measurement dates and authorization dates and grant dates.  And

8  I just want to kind of break it down a little bit so we can

9  understand the differences.

10        MS. BEELER:  We can keep this up just as a basis of

11  discussion.

12        (Document displayed.)

13  BY MS. BEELER:

14  Q.    So you talked about looking at different authorization

15  documents for grants that were given.

16  A.    Correct.

17  Q.    Now, you also mentioned -- and authorization dates, just

18  to make it very simple, you talked about a hierarchy of

19  authorization documents.  But very simply, an authorization

20  document you talked about it being minutes, often, for certain

21  kinds of grants?

22  A.    That would have been the highest level of evidence, yes.

23  Q.    So for these particular grants on this particular grant

24  recap report attached to these particular minutes, the

25  authorization document is the minutes?

1   **A.**   Correct.

2   **Q.**   Okay.  So from an accounting standpoint, you mentioned and

3   you called it -- that's the authorization date.  And you

4   also -- so-- is that right?  The authorization date for the

5   grant, that's -- I think that's what you were saying.

6   **A.**   Right.  That would be what we would deem to be final

7   approval or final authorization for these grants attached.

8   **Q.**   Okay.  But then you talked about measurement date.  What's

9   a measurement date?

10  **A.**   Well, a measurement date is more of an accounting

11  terminology.

12           But, simplistically, you would need to have

13  everything finalized.  And when everything is at a final state,

14  then you would have a measurement date to be able to have a

15  fixed date to do your accounting going forward.

16  **Q.**   All right.  Very simply, if I understand it, that means

17  that the measurement date would be the authorization date which

18  would be the board minutes date?

19  **A.**   In this instance, yes.

20  **Q.**   Yeah.  So measurement date basically means that's how you

21  account for it, that's the date you use to figure out whatever

22  dollars you have to assign to that from a financial purpose?

23  **A.**   Correct.

24  **Q.**   And this may be way overly simplistic, but it's kind of

25  like that's the date that you choose to expense it?

1  **A.**    That's the date you use from an accounting perspective to

2  say that it was fixed.

3  **Q.**    Right.

4  **A.**    And compare that to the strike price to determine at, in,

5  or out of the money.

6  **Q.**    Okay.   That's okay.

7          So -- so strike price.  Let's talk about grant date.

8  Maybe that will help us a little bit.   The strike price is the

9  price you get to buy it at; is that right?

10 **A.**    Correct.

11 **Q.**    So on these -- for this grant that we're talking about,

12 the 20,000 option, the strike price is the price of $29

13 whatever-70-some-cents that's on February 14th.

14 **A.**    Yes.

15 **Q.**    All right?

16 **A.**    Yes.

17 **Q.**    So that's the date -- that's the -- and so then there's

18 the -- and then you talked about the measurement date or the

19 authorization date as being you compare those two -- two dates?

20 **A.**    Correct.

21 **Q.**    And then that's how you figure out the dollar amount that

22 needs to be accounted for?

23 **A.**    Correct.

24 **Q.**    Okay.   So to make it very simple then -- so let's just try

25 to see what it's like for me as an employee and thinking that

 1  that's my grant, February 14, $29, for any grant on that.

 2  That's mine.  And now you've decided, as the accountant,

 3  that -- that it needs to be accounted for as of the

 4  authorization date of July 13th.

 5  **A.**    Correct.

 6  **Q.**    Does that for me, the employee, does that change the price

 7  that I get to buy the option at?

 8  **A.**    No.

 9  **Q.**    So for me it would stay $29?

10  **A.**    Correct.

11  **Q.**    So what we're really talking about then is how you account

12  for it as opposed to what the employee keeps?

13  **A.**    Yes, that's correct.

14  **Q.**    Okay.  All right.

15           So you spent a lot of time with these grants, looking

16  at -- to see if the authorization matched the grant date.  And

17  you -- and some of them didn't, right?

18  **A.**    Correct.

19  **Q.**    And this would be an example of that?

20  **A.**    Correct.

21  **Q.**    And then as a result you changed the way you accounted for

22  it, and picked a new measurement date?

23  **A.**    Correct.

24  **Q.**    Why is that important?

25  **A.**    It's important to get the books and records of the company

1    and the disclosures reported accurately to the shareholders.

2    **Q.**    And the mechanism for reporting it to the shareholders is?

3    **A.**    Through the financial statements as well as the Form 3s,

4    4s and 5s in the proxy.

5    **Q.**    That are filed with the SEC, too?

6    **A.**    That are filed with the SEC.

7              **MS. BEELER:**  I have no further questions.  Thank you.

8              **THE COURT:**  Do you have any further questions?

9              **MR. NEAL:**  No, Your Honor.

10             **THE COURT:**  May this witness be excused, not being

11   subject to being recalled?

12             **MS. BEELER:**  Yes.

13             **MR. NEAL:**  With one caveat.  We may need to recall

14   her if we can't get the government to stipulate.

15             **MS. BEELER:**  If the data is as he says it is, I'm

16   sure we'll be fine.

17             **THE COURT:**  I'm going to excuse you, and you will

18   only be subject to recall if they really can convince me.

19   Which is going to be pretty difficult --

20             **THE WITNESS:**  That's fine.

21             **THE COURT:**  -- that you should be recalled.  Please

22   do not discuss your testimony with any other persons who may be

23   witnesses, until the trial is over.

24             **THE WITNESS:**  Okay.

25             **THE COURT:**  Thank you.

```
 1              THE WITNESS:  Thank you.

 2              MR. NEAL:  Can we have --

 3              THE COURT:  Pardon?

 4              MR. NEAL:  Can we have a couple of minutes to clear

 5   our stuff out of here?

 6              THE COURT:  Yes.  Do you want to do a little cleanup

 7   there?

 8              Ms. Beeler, who is your next witness?

 9              MS. BEELER:  It's Mr. Lucey's witness.  It will be

10   Denis O'Leary.

11              THE COURT:  Okay.  Mr. O'Leary.

12              Mr. O'Leary, if you would step right up here and be

13   sworn.

14              THE CLERK:  Raise your right hand, please.

15              Let me clear off --

16              THE COURT:  Your housekeeping duties extend over

17   here.

18                         DENIS O'LEARY,

19   called as a witness for the Plaintiff herein, having been first

20   duly sworn, was examined and testified as follows:

21              THE WITNESS:  Yes, I do.

22              THE CLERK:  Please, state your full name and spell

23   your last name for the record.

24              THE WITNESS:  Denis O'Leary.  O-'-L-e-a-r-y.

25              THE COURT:  Be seated.
```

**DIRECT EXAMINATION**

**BY MR. LUCEY:**

**Q.**   Good afternoon, sir.

**A.**   Good afternoon.

**Q.**   Sir, where are you currently employed?

**A.**   I'm self-employed.

**Q.**   And what kind of work do you do?

**A.**   I do consulting.  I sit on boards.  And I invest in early-stage IT companies.

**Q.**   And what -- when you say "boards," what do you mean by that?

**A.**   I'm on the board of directors of McAfee, Incorporated. I'm on the board of directors of Fiserv, Inc.  Both public --

         (Reporter interrupts.)

**A.**   F-i-s-e-r-v.  I'm on the advisory board of the Hewlett-Packard Corporation.  And I'm on the advisory board of Information Week Magazine.

**Q.**   Sir, I'd like to talk a little bit more about your association with McAfee.

         When did you come to become a member of the board of directors of McAfee?

**A.**   In July of 2003.

**Q.**   And how did it come to pass that you became a member of that board?

**A.**   I was solicited by George Samenuk, and also by the search

1   firm Spencer Stuart.

2   **Q.**   What was going on in your life at that time, in terms of

3   your joining the board?  Were you in the same employment

4   situation you are now, self-employed?

5   **A.**   I had just retired from 25 years at JPMorgan Chase and its

6   predecessor companies.

7   **Q.**   And what was your reason for following up on the

8   solicitation from Mr. Samenuk to join the board of McAfee at

9   that time?

10  **A.**   I was interested in joining a few boards.  And I had been

11  invited by a sizable number to be on their boards.  And I had

12  known George during his time at IBM, when I was the CIO for the

13  corporation at JPMorgan Chase.

14  **Q.**   And what about joining the board of McAfee -- strike that.

15          In terms of the -- your joining the board of McAfee

16  at that time, what about joining a board of a company

17  interested you?

18  **A.**   Well, I felt I had a fair bit of knowledge, but didn't

19  want to spend 70 hours a week working, at that stage.  And

20  joining a few boards would keep me connected to businesses I

21  enjoyed.  And, also, I felt I could add a lot of value to some

22  companies.

23  **Q.**   And in terms of that process, fair to say you followed up

24  on the solicitation from Mr. Samenuk?

25  **A.**   Yes, I did.

1   Q.   And did you -- did you end up going out and meeting

2   individuals from McAfee?

3   A.   Yes.  I had some interviews with Spencer Stuart.  And I

4   also asked to go out and spend a day with some of the senior

5   managers of McAfee so I could do a little diligence about the

6   management team.

7   Q.   And when you traveled to McAfee, where did you travel to?

8   A.   San Jose, California.

9   Q.   And you met with individuals at the senior level of

10  McAfee --

11  A.   Yes, I did.

12  Q.   -- on that occasion?  Do you recall who you met with?

13  A.   I met with George.

14  Q.   Samenuk?

15  A.   Samenuk.  I met with Steven Richards, the CFO.  I met with

16  Kent Roberts, who was the general counsel.

17          I may have met with a few others, but those are the

18  three I remember.

19  Q.   Do you see Mr. Roberts in the courtroom today?

20  A.   Yes, I do.

21  Q.   Where is he sitting?

22  A.   Directly over there (Indicating.)

23          **MR. NEAL:**  We'll stipulate.

24          **THE COURT:**  The record will reflect he has identified

25  Mr. Roberts, the defendant.

1    **BY MR. LUCEY:**

2    **Q.**    What kind of company was McAfee both when you joined the

3    board in 2003 and currently?  How would you characterize it?

4    **A.**    A software company providing products around the area of

5    network and server and input security.  It was also a company

6    that had gone through some trouble and was emerging as a

7    restructured company.

8    **Q.**    And was the fact that it had gone through that trouble,

9    did that make it more or less likely for you to join the board

10   in considering your options at that point?

11   **A.**    It made it more likely.

12   **Q.**    And what about that?

13   **A.**    I enjoyed messy situations and cleaning them up.

14   **Q.**    Fair enough.

15            In terms of the company's structure, is it -- was it

16   and is it currently a public or private company?

17   **A.**    It's a public company.

18   **Q.**    What does that mean "public company," in your mind, in

19   your experience being on boards of directors?

20   **A.**    Well, it's a privately-held company, whose ownership is

21   available for anyone to buy through an exchange.  So the

22   New York Stock Exchange or American Stock Exchange would be a

23   public company.

24   **Q.**    What's the alternative to a public company, generally?

25   **A.**    Well, a private company, generally speaking.

1    Q.    What does that mean?

2    A.    Which means that the shares or ownership of that company

3    are not openly traded on the Exchange.  So there are

4    restrictions on who can buy into it.

5    Q.    It's not open to the public, essentially?

6    A.    That's right.

7    Q.    Now, in terms of -- you mentioned you're on the board of

8    directors at McAfee since 2003?

9    A.    Uh-huh, that's correct.

10   Q.    What exactly is a board of directors for a public company?

11   What does that mean?

12   A.    A board of directors is a group of individuals charged

13   with overseeing the governance of the company, and in

14   specifically the management of that company.

15   Q.    And what do that entail in more concrete terms?

16   A.    Well, the primary areas of focus would be ensuring that

17   the strategy of the company is appropriate, its mission and

18   purpose is on track with creating shareholder value for the

19   investors.

20          It's charged with making sure the leader of the

21   company, the chief executive officer, is an appropriate

22   individual.  The board will hire the CEO.

23          It's also charged with making sure the compensation

24   and incentives for the management of that company are

25   appropriate and competitive.

1            And it's also responsible for overseeing that the

2    controls and disclosures of that company are consistent with

3    the regulations for public companies.

4    Q.   And what's the role of a director within that process?  Is

5    that -- how does that work in terms of breaking it down as a

6    board of directors?

7            What's the role of the individual directors, at that

8    point, to follow through on those various tasks you just laid

9    out?

10   A.   Well, the board will generally meet numerous times each

11   year, generally, at a minimum, quarterly, when the company

12   announces its financial results or just prior to its

13   announcements.  And often many times in between those meetings,

14   by telephone.

15           And it will spend the time reviewing the results of

16   the company and the progress.  And it will also have a

17   governance structure that includes committees.  So that subsets

18   of the board will focus on different issues.

19           And typical committees would be an audit commit,

20   around reporting and controls, to make sure that the company's

21   controls are adequate and well-supervised.

22   Q.   Let me stop you there.  What do you mean by controls?

23   A.   That the information it's producing is accurate.  That the

24   way it conducts business is in an appropriate manner.  It does

25   what it expects it's going to do.  And that the accounting is

1    correct, essentially.

2             It allows investors, when they buy the stock, to know

3    that they've got good information about what they're buying.

4    **Q.**   And, Mr. O'Leary, aside from the audit committee, what

5    other committees have been constituted on the board while

6    you've been with the board of McAfee?

7    **A.**   Governance committee.

8    **Q.**   What does that committee do?

9    **A.**   A governance committee in charge of soliciting new

10   directors, so that there's the appropriate mix of talent on the

11   board to do the job properly.  And would also make sure that

12   the board is functioning appropriately.  So not only the right

13   people on it, but the way it's functioning is achieving the

14   purpose it's supposed to achieve.

15            And there will be a compensation committee, which is

16   charged with overseeing the incentive plans for the employees

17   of the company, particularly in senior management, and

18   reviewing compensation for the top management of the company.

19   **Q.**   Now, what do you mean when you say "incentives"?  What

20   does that mean?  That's a -- sounds like it's a term of art.

21   **A.**   Generally speaking, the compensation.  Which, for most

22   executives would include a base salary, an annual bonus.  And

23   for the more senior executives in the company, but sometimes a

24   broader group, equity incentives.  Which would include either

25   shares of stock, legal units that are consistent with the share

1  of stock, and/or options, or the right to the appreciation that

2  a share of stock would accrue over a period of time.

3          It would also oversee perks.  While we didn't have

4  any perks at McAfee, a number of things such as life insurance

5  or reimbursement for tuition, things like that, could be in the

6  compensation plan as well.

7  **Q.**   Could be additional benefits?

8  **A.**   That's correct.

9  **Q.**   Now, as a member of the board of directors of McAfee, have

10  you been involved in the day-to-day running of the company.

11  **A.**   No, I have not.

12  **Q.**   And why not?  You said you're overseeing the CEO, correct?

13  **A.**   Yeah.  The general expectation of a board is to do the

14  functions I spoke of, but not to get involved with the

15  day-to-day management.

16          The day-to-day management is the responsibility of

17  the CEO, and the team the CEO has put together to run the

18  company day-to-day.  Quite frankly, it causes a lot of trouble

19  if a board of directors starts to dabble in the day-to-day

20  management of the company.

21  **Q.**   And why do you say that, Mr. O'Leary?

22  **A.**   It creates ambiguity on responsibilities when there really

23  shouldn't be a lot of ambiguity.  It undermines the chain of

24  command and the clarity of who's in charge.

25  **Q.**   And when you say the team that works with the CEO, who do

1    you have in mind?  What positions are you referring to within

2    McAfee during your time there?

3    **A.**    Generally speaking, the general counsel, which is who is

4    the top legal officer of the company.

5            The chief financial officer, who is the chief

6    financial officer and oversees the accounting and reporting at

7    the company.

8            And then key operating positions, which would

9    normally include a head of global sales, in charge of selling

10   the company's products.

11           And then a number of operating jobs, which may

12   include a chief information officer or chief technology officer

13   who oversees the computers that operate the company day-to-day.

14           And then, also, a head of human resources, which

15   would be overseeing the employment and human resources of the

16   company.

17   **Q.**    And, Mr. O'Leary, you mentioned earlier that the board

18   would generally meet in person four times a year.  Is that fair

19   to say?

20   **A.**    That's right.

21   **Q.**    And those meetings would be in person?

22   **A.**    Yes, they would.

23   **Q.**    And you would all assemble in one location?

24   **A.**    That's correct.

25   **Q.**    And in terms of those meetings, how long, generally

1  speaking, would they last?  Would they be over in an hour, or

2  what are we talking about in terms of a meeting that you are

3  having quarterly?

4  **A.**    Just to be clear, the board would meet physically

5  approximately four times a year.  But it would meet on

6  telephone conference calls often 10 to 15 times in addition to

7  the physical meetings.

8           Physical meetings would normally go on from a Sunday

9  night through a full day's meetings on Monday, and then a half

10 day of meetings on Tuesday.

11          And that could shift back and forth to a day or two,

12 but that's the duration of our typical board meeting.

13 **Q.**    So if I'm following you correctly, we're talking about

14 maybe a span of at least several days?

15 **A.**    That's correct.

16 **Q.**    And, Mr. O'Leary, without telling us anything that may be

17 privilege at that those meetings, just maybe you could

18 characterize what sorts of topics or issues had to be covered

19 during the course of those several days on these quarterly

20 meetings?

21 **A.**    Typically, a review of the progress of the company.  It is

22 achieving the goals that we've set forth in our annual plan.

23          So are we making progress in selling our product,

24 developing our product, building our team of executives and

25 employees, and producing the financial results that reward our

1   investors.

2   **Q.**   Anything else?

3   **A.**   We'd also review committee meetings, along the lines I

4   mentioned earlier.  So the comp committee would meet to deal

5   with compensation issues.

6          The audit committee would meet to review audits done

7   by the internal and external auditors of the company, and also

8   focus on any that may not be as strong as it should be.

9          And the governance committee would meet to see if

10  there were any director searches or, for instance,

11  questionnaires or assessments of how the board's progress was

12  going.

13  **Q.**   And would there be a sharing of information, following

14  those committees, with the entire board as a whole?

15  **A.**   Yes, there would.  Each committee chairman would report to

16  the full board the summary of their meeting.

17         And, quite frankly, in the early years we had a small

18  board.  So, in many cases, for instance, I might sit in on the

19  audit committee meeting, even though I wasn't a member of the

20  audit committee.

21  **Q.**   Why would you be sitting in on those meetings?

22  **A.**   Because I had a strong interest in the progress the

23  company was making, and I -- quite frankly, when I'm there I

24  might as well work as opposed to sit around.

25         And, generally, the board had a pretty good team and

1  everyone was working together.  So it added to some of the

2  comradery that everyone was pitching in.

3  Q.  Was there any kind of reading material that you had to

4  digest either in preparation for those meetings?

5  A.  Yes.  There was extensive reading material.

6  Q.  When you say "extensive," what are we talking about?  10

7  pages, 50 pages?

8  A.  Generally, one or two large FedEx boxes would arrive about

9  three days before the board meeting.  And they would contain

10 somewhere between four to six vertical inches of reports and

11 documents to be read.

12 Q.  And those would all need to be reviewed and analyzed by

13 you prior to the meeting?

14 A.  Yes.

15 Q.  So -- and in terms of the other meetings you mentioned

16 earlier, aside from the in-person quarterly meetings you

17 mentioned, there were periodic meetings on the telephone?

18 A.  Frequent telephonic board meetings.

19 Q.  What were those meetings?  What was the purpose of those

20 meetings?

21 A.  Generally, updates on events occurring outside of the

22 normally quarterly meeting.

23      And they could be -- examples would be if we were

24 looking at selling one of our companies.  So if it was a

25 subsidiary, a portion of McAfee we decided we were no longer

1   going to operate and we want to sell it, we might have updates

2   of who was trying to buy it and how the deal was going.

3            At times, we would acquire new companies.  So in

4   those cases the CEO would need to get the approval of the

5   board, to make a major capital commitment to buy a company.

6            So a briefing would occur about the nature of the

7   target company, and also a request to get approval to spend the

8   money on it they needed to spend.

9   **Q.**   And, Mr. O'Leary, what committees were you a member of

10  during your time on the board of directors?

11  **A.**   I became a member of the comp committee when I joined the

12  board.  And I remain a member of the comp committee today.

13  **Q.**   And during your time at McAfee on the board, have you had

14  any leadership role on the compensation committee?

15  **A.**   I chaired the comp committee from 2004 through earlier

16  this year.

17  **Q.**   Earlier 2008?

18  **A.**   That's correct.

19  **Q.**   And, Mr. O'Leary, did that leadership role on the comp

20  committee carry with it any additional duties or

21  responsibilities, in your mind?

22  **A.**   Yes, it did.  I became the point person for the work that

23  goes through the comp committee.  And I became the primary

24  contact with management regarding issues of compensation.

25  **Q.**   And so given your time on the board of directors in

1 particular, your time on the comp committee, perhaps you could

2 help walk us through how the process whereby senior employee

3 compensation was set. How did that process work, in your

4 experience?

5 **A.** It changed over time. It became more process-based

6 formalized. But, generally speaking, we moved quickly to

7 getting a full summary annually of the compensation by

8 component for each executive in the company over a multiple

9 year period.

10 So if, for instance, we were looking at the CFO, we

11 would have for Steven Richards each component of compensation,

12 salary, bonus, the value of shares he may have gotten, and the

13 value of options he may have gotten, with the grand total.

14 And then we would show it for the current year and

15 the prior two years. We'd also show if they left the company

16 for any reason how much money they would receive in different

17 scenarios.

18 So if we fired them without cause, how much of a

19 going-away check they would get, or severance. And, also, if

20 they were fired with cause or if they retired, et cetera. So

21 for different reasons, how much money they would receive if

22 they left the company.

23 **Q.** And what was the purpose of the committee going through

24 those kind of scenarios?

25 **A.** Well, first was we were creating transparency. In other

1   words, everyone had a clear view of what everyone in senior

2   management was earning.

3          And we also benchmarked each of those scenarios

4   against what comparable executives in other companies,

5   oftentimes ones we compete with, were paying their executives.

6          (Reporter interrupts.)

7   **A.**   We would benchmark what we were paying our executives with

8   what our competitors were paying comparable executives in the

9   same industry.  So that made sure that we were paying a

10  competitive wage for the talent we were hiring.

11  **Q.**   And why is that important?

12  **A.**   Well, for our shareholders, paying more than you need to

13  wasn't a healthy event.  And, also, from the standpoint of

14  getting good talent, paying less than you should isn't a good

15  event.  So if you want to hire top people, you have to pay a

16  competitive price to get them.

17  **Q.**   Now, Mr. O'Leary, you mentioned earlier that one of the

18  components of the compensation package, the total compensation

19  package for these senior-level folks, that you were reviewing

20  as a member of the compensation committee, was stock option or

21  stock incentives?

22  **A.**   That's correct.

23  **Q.**   Could you help us walk us through and understand what a

24  stock option is, from your experience.

25  **A.**   Generally speaking, a share of stock is an ownership piece

1   of the company.  And over time, the expectation is it will gain

2   in value because everyone in that company is working every day

3   to add more value to the company.  So unless something goes

4   wrong, stock should go up in price.

5          A stock option is a contract that essentially

6   entitles the holder of the option to an increase in value in a

7   share of stock.  Not the share of stock itself, or the voting

8   rights that go with it, but the appreciation that accrues to a

9   share of stock over a period of time.

10  **Q.**   Are there any kind of parameters associated with the

11  exercise of that stock option?

12  **A.**   Yeah.  There are specific rules we have in our option

13  plans about when and how someone can obtain the value of that

14  option and turn it into cash.

15  **Q.**   What do you mean by "when and how"?

16  **A.**   Well, a typical option that we granted at McAfee -- matter

17  of fact, all the options we grant at McAfee, had a 10-year

18  life.

19          So, in essence, over a period of up to 10 years, the

20  appreciation on a share of stock could be available to the

21  holder of the option.

22          But we put strings on the options.  And the strings

23  were that we wouldn't allow anyone to access that money for

24  certain periods of time.

25          And by doing so, that created a glue that kept those

1    executives as employees, as opposed to quickly answering a

2    phone call to a competitor and leaving us.  So if they walked

3    away from us, there would be a financial sacrifice in doing so.

4              So, typically, the options we would grant would be

5    vested or available to the employee to be monetized or turned

6    into cash on a basis of one-third each year for three years.

7              So if we gave someone 30,000 options, at the end of

8    the first year of employment post the grant, 10,000 would be

9    available to them.  At the end of the second year, an

10   additional 10,000.  At the end of the third year, the final

11   10,000.

12             So at the end of three years, all the options we gave

13   them were now theirs, and they could exercise them as they saw

14   fit, up to the final date of ten years when they expired.

15             They also had to be in active standing with the

16   company as an employee.  And if they left the company, we

17   typically had a period where over 90 days they could exercise

18   their vested options before they expired.

19             But if you didn't stay with us, you couldn't keep

20   accruing the accretion on your options, the buildup in value.

21   Q.   And, Mr. O'Leary, you mentioned a one-third, essentially,

22   vesting, would that be fair to say, over time?

23   A.   That's correct.

24   Q.   What does vesting mean?

25   A.   Vesting means it's available to the employee to have

1    access to.  It's as if we put some money aside for them and

2    said, Here's some money for you.  And if you stay with us and

3    continue to work hard, each year you can take a portion of it.

4    And that will be the vested amount.

5    Q.   And do you know, thinking back over your time on the board

6    of McAfee, whether there were any options that were provided

7    for any other schedule besides one-third, or one-fourth, or

8    one-half, or other types of vesting schedules, besides

9    one-third?

10   A.   Specifically, I don't recall.  It's possible that we may

11   have at certain times done 25 percent a year for certain hires,

12   or occasional wiggled the formula to match a package someone

13   already had at a prior company, so that they could feel that

14   they were being made whole if they came and joined us.

15        But, generally speaking, the vast majority of our

16   options were one-third, one-third, one-third vesting.

17   Q.   Mr. O'Leary, when you were mentioning earlier, talking

18   about the stock options, that the design of it was to have the

19   people not leave immediately but stay with the company, is that

20   why you were talking earlier about calling them incentives?

21   A.   Well, there's a number of reasons we used options versus

22   just paying people cash.

23   Q.   Can you talk about that?

24   A.   Well, the primary reason was we wanted to create goal

25   congruity, or align the goals of the investors who owned the

1  stock with the managers who were operating the company

2  day-to-day.

3          In other words, if the company was wasn't creating

4  value for the inventors, we didn't want to be paying the

5  executives money because they were failing.

6          In other words, if the share of the stock isn't going

7  up, the option isn't gaining any value either.  So it's a

8  lose/lose.

9          Likewise, if the share of stock is going up rapidly,

10 the value of the option is going up rapidly, so it's a win/win.

11 The employees are making a lot of money.

12          (Reporter interrupts.)

13 **A.**    Likewise, if they both go up, if the share of stock goes

14 up quickly, the value of the option goes up quickly, and both

15 the employees and the shareholders are both winning.

16          So it was that alignment of incentives that we wanted

17 to create.  And it was very well-aligned with the stock option.

18 **Q.**    And, Mr. O'Leary, you mentioned earlier, when you were

19 talking about the total compensation package, that various

20 scenarios were contemplated to try and figure out what the

21 total compensation was, correct --

22 **A.**    That's correct.

23 **Q.**    -- for each package --

24          (Reporter interrupts.)

25 **Q.**    The total compensation package, as was being reviewed and

1   approved, by the compensation committee correct?

2   **A.**    That's right.

3   **Q.**    Could you explain how the committee, including yourself,

4   went about determining what if any value a stock option had?

5   **A.**    Well, the simple case on a stock option is the share of

6   stock is expected to appreciate at a rate that's faster than if

7   you went out and just bought a risk-free security like a

8   government bond.

9           If you went out today and had a government bond, you

10  would have a guarantee -- certainly, if it's not a Freddie or

11  Fannie bond, but a U.S. government bond, that it would go up at

12  about 4 percent a year for a typical bond.

13          So that means that you have to have no risk and you

14  can get your money whenever you want because you can always

15  sell that bond.

16          So that's a hurdle most investors look at before they

17  take on risk.  And if they want to take on risk, they expect a

18  higher reward.  So anyone in their right mind would not buy a

19  stock if they didn't expect it to go up at a faster rate than a

20  risk-free investment would be.

21          So, generally speaking, most people think equities or

22  stocks are going to appreciate at something closer to a 10 or

23  12 percent rate of increase.  And it would vary by the company

24  because some companies have more risk than others.

25          But, generally speaking, people expect a reward for

1  taking on the risk of a more volatile entity than the U.S.

2  government bond.

3          So, now --

4  **Q.**   Given all that --

5  **A.**   Now the question becomes, okay, if we expect it to

6  appreciate, how much is it likely to appreciate during a

7  10-year period?

8  **Q.**   And are you picking the ten years because that's the

9  entire life of the option?

10  **A.**   That's the entire life of the option.  So the option has

11  up to ten years before it's expired.

12          So just like asking yourself how much your house

13  might appreciate over ten years, or a piece of artwork might

14  appreciate over ten years, there isn't a specific science.

15          But there is some very fancy mathematics that have

16  won Nobel prizes on how to make a good estimate.  And they are

17  typically called either the Black Shoals model, which is named

18  after two mathematicians named Fisher Black and Myron Shoals,

19  or another model called the binomial model.

20          (Reporter interrupts.)

21  **A.**   And those are the two primary mathematical formulas people

22  in finance use to make that estimate of how much a share of

23  stock is likely to appreciate in a 10-year period.

24  **Q.**   And without getting into the particular nitty-gritty of

25  those formulations, can you walk us through in general terms

1    how that -- how that valuation is done and what that means at

2    the end of the day, once the valuation process is completed?

3    **A.**    Generally speaking, they are both ways of calculating a

4    weighted probability of a certain event occurring.

5              So, certainly, there's an opportunity where that

6    option could be worth zero because the company failed or the

7    stock didn't appreciate during the 10-year period.

8              And there's also opportunities where, with a company

9    like a Google or a Microsoft, that over a 10-year period the

10   stock could balloon into huge value.

11             These take a weighted probability and say best chance

12   for this kind of stock, based on how variables results are,

13   this is what we expect it to be.

14             Generally speaking, for technology stocks comparable

15   to McAfee, that don't pay dividends, an option is often worth

16   about somewhere between 40 and 70 percent of what a share of

17   stock would be worth on the day of its grant.

18   **Q.**    So is it fair to say, given that valuation process you

19   just walked us through, that a stock option has value as soon

20   as it's granted, essentially?

21   **A.**    Generally speaking, if I had a choice between taking a

22   share of stock or two options in a tech company, I would

23   generally grab the two options.

24   **Q.**    And why is that?

25   **A.**    First, I have a little capacity for risk.  So if it turned

 1  out that it didn't have any value, I'd still eat.

 2          But the other side is I like the leverage of options.

 3  Generally speaking, people who've accumulated a lot of wealth

 4  in the last 10 or 20 years have often done so more through

 5  options than from salary or bonus or even, for that matter,

 6  shares of stock.

 7          And if you believe in the company you're spending

 8  time in, you ought to put your money where your mouth is.  If

 9  you didn't believe the company is going to be successful, it's

10  probably time to get into the job market and find a better

11  company to work for.

12          (Reporter interrupts.)

13  **Q.**   And so does that go back, once again, to as you talked

14  about at the outset of this discussion of compensation, does

15  that go back to you used the term incentives to stay and work

16  hard at the company, essentially?

17  **A.**   That's correct.  Essentially, what we were doing is in the

18  process of making our compensation with the senior executives

19  competitive, we also aligned it with the shareholders so that

20  it would be a win/win model.

21          And we put the executives at risk, that the only

22  portion of their compensation that they'd know they'd get each

23  year was their salary.  After that, it was pay for performance.

24          So if you wanted a raise, you had to cook.  And if

25  you wanted your stock to be valuable, you wanted the company to

```
 1   do well.  And if you wanted your options to be valuable, the

 2   company had to do well.

 3          Generally speaking, the portion or amount we would

 4   grant each year, of new options, or in some cases new stock,

 5   was tied to how well we received an individual's performance.

 6          So it was like a report card.  And the people who

 7   were really performing well would get more options each year,

 8   and get a better increase in salary.  And also get a bigger

 9   bonus.

10          But the day that their performance started to ebb for

11   whatever reason, we could rapidly reduce how much money the

12   shareholders were paying them.

13          And that was the shared risk reward.  So if you're a

14   high performer, you would do very well.  If you were not a high

15   performer, you would have significant economic consequences.

16          For our senior executives, typically the salary

17   portion, which was certain, would only be in the sort of

18   20 percent of their total compensation range.  Maybe even less.

19   Q.  And so, Mr. O'Leary, you mentioned risk there a moment

20   ago.  Is there also a risk that notwithstanding somebody

21   working very hard at the company and the company doing well,

22   that the options that they are receiving over time don't accrue

23   in value, and maybe never able to be exercised?  Is that

24   still --

25          (Reporter interrupts.)
```

1  Q.   Is that still an issue of risk associated with stock

2  options?

3  A.   Yes, it is.

4          **THE COURT:**   I think you can slow down for the

5  question a little bit.

6          **MR. LUCEY:**   Yes, Your Honor.

7  **BY MR. LUCEY:**

8  Q.   Now, Mr. O'Leary, in terms of your attendance at these

9  meetings at the board, aside from the other members of the

10 board of directors, was there anyone else in regular attendance

11 at your board meetings?

12 A.   In addition to the directors, our general counsel, Kent

13 Roberts, would attend most of the board meetings.  Our CFO

14 would often attend most of the board meetings.  And our CEO,

15 who was also a director, would be there.  So those three

16 members of senior management were typically in attendance for

17 the board meetings.

18 Q.   They were regular attendees?

19 A.   Yes.

20 Q.   And in terms of Mr. Roberts, what was his role at these

21 board meetings?

22 A.   Well, he served as the secretary for the board.  So he

23 would record what occurred at the board meetings.

24 Q.   He's recording what's going on.  How is he recording it?

25 A.   He would take notes.

1        By the way, I left, outside counsel would also attend

2   the board meetings.  And what was typically Jeffrey Saper from

3   Wilson Sonsini.

4        So we had both our internal attorneys and our

5   external attorneys who would participate in the board meetings.

6   Sorry, I just want to correct it.

7        Kent's role would be to record the events of the

8   board meeting, and, then subsequent to the board meeting, do

9   two things.  One is make sure that those events got back to the

10  appropriate people in management, to ensure they were

11  communicated.

12       And, secondly, to record them in the minutes of the

13  board meeting, which would be produced and shared at a

14  subsequent date to the board, to be read and signed off on.

15  **Q.**  So is it fair to say that -- you mentioned earlier that

16  Mr. Roberts, as you understood it, during your time on the

17  board of directors, was a general counsel of McAfee, correct?

18  **A.**  That's correct.

19  **Q.**  And, also, you just mentioned now secretary for the board.

20  **A.**  That's correct.

21  **Q.**  Correct?

22       So he had two jobs at these board meetings; is that

23  fair to say?

24  **A.**  That's correct.

25  **Q.**  And what was -- what, if any, was Mr. Roberts' role or

1  duties, given his two jobs as secretary and general counsel, in

2  terms of balancing his work with the board and his work as

3  general counsel with the company?

4  **A.**   Well, they were pretty compatible.  As general counsel,

5  Kent was our primary legal officer.  And that meant he looked

6  over all the legal affairs of McAfee.  Which ranged from how we

7  did contracting with customers and suppliers.

8         So all the forms of creating agreements in our legal

9  obligations, to overseeing the intellectual property of the

10  firm, which would include patents and rights under our patents,

11  and also making sure we didn't infringe on other people's

12  patents.

13         And any kind of litigation that might come up over

14  time.  Whether it's related to purchase or sale of a company or

15  product or a division.  But any litigation.

16         So Kent oversaw a department of lawyers, and then was

17  assisted through outside counsel in certain specialty items but

18  pretty actively by Wilson Sonsini.

19  **Q.**   And do you know, Mr. O'Leary, if Mr. Roberts had any

20  responsibility as general counsel for any duties or

21  responsibilities associated with McAfee being a public company?

22  **A.**   Yes.  He was one of the section 16 officers, one of the

23  senior officers we had in the company, who was responsible for

24  signing off on our disclosure as a public company.

25         Part of the bargain about being able to sell your

1    shares on an open exchange is that you promise -- or not so

2    much promise, but the SEC tells you that you're going to have

3    to publish certain information on a regular basis.

4            And there are forms that are typically called things

5    like 10-Qs or 10-Ks or 8-Ks.  There's a number of forms.  But

6    anytime something important happens with the company, along

7    with anytime you produce your financial results once a quarter,

8    you have to lay it out in a specified format that makes it

9    clear and consistent with other companies to the general public

10   and to your investors.

11           And when those forms are filed, senior officers of

12   the company sign them, including the general counsel.

13   Q.   And what's the purpose of these forms and disclosures you

14   just talked about?

15   A.   Well, they're the underpinnings of having what I call a

16   fair market.  That if you can't trust the information about

17   what you're buying, the markets don't function well.

18           So the underpinnings of all the trading stocks in the

19   United States and globally is that there is some transparency

20   or willingness to share the realities of what's happening in

21   the company with the people who might be buying or currently

22   owning the shares.

23   Q.   So, Mr. O'Leary, you've already mentioned that, during

24   your earlier testimony, that on your time on the board the

25   board is having periodic telephone communications and having

1    quarterly meetings.

2           Was Mr. Roberts generally in attendance in both those

3    phone meetings and the in-person multiple-day meetings?

4    **A.**   Yes.

5    **Q.**   So did you have any interactions with the defendant over

6    the course of those various telephone in-person meetings over

7    the years?

8    **A.**   Regularly.

9    **Q.**   And based on those interactions with the defendant, did

10   you come to gather a sense of his personality and how he went

11   about doing his job?

12   **A.**   Yes.

13   **Q.**   And in terms of that, are you able to say that you gained,

14   in your regular contact with Mr. Roberts, a sense of when he

15   was having a good day or a bad day, or how his day was going,

16   if he was busy or stressed or --

17          **MR. NEAL:**  Object to the form of that question, Your

18   Honor.

19          **MR. LUCEY:**  It's a multiple question.

20          **THE COURT:**  What is the relevancy of whether he is

21   having a good day or a bad day.

22          **MR. LUCEY:**  Well, Your Honor, I'm trying to lay a

23   foundation for some questions I'm going to have later on about

24   some statements that Mr. Roberts made to Mr. O'Leary in

25   May 2006.

1          **MR. NEAL:**  I actually think this is what we discussed

2   in the pretrial conference.

3          **THE COURT:**  Well, I think in part -- I know what

4   you're trying to lay a foundation for, but I think there's some

5   other questions you could ask --

6          **MR. LUCEY:**  Fair enough, Your Honor.

7          **THE COURT:**  -- that would get us there more quickly.

8          **MR. LUCEY:**  Fair enough, Your Honor.

9   **BY MR. LUCEY:**

10  **Q.**   So, Mr. O'Leary, did you have occasion, when you were

11  interacting with Mr. Roberts through your time on the board of

12  directors, when you were able to notice that Mr. Roberts seemed

13  in a particularly good mood on a given day?

14         **MR. NEAL:**  Same objection, Your Honor.  First of all,

15  it's highly leading.  It's highly sort of speculative.

16         **THE COURT:**  It's not leading.  He's not being asked,

17  How could you tell?  You know.

18         You may answer the question.

19         Objection overruled.

20         **THE WITNESS:**  I think it's fair to say Kent and I got

21  along very nicely.  I don't recall him and I ever having a

22  single argument over the years that we worked together.

23         But I would also say I didn't know Kent that well.

24  We never socialized outside of McAfee.  So at the board

25  meetings we would be at the dinners together and in the room

1    together.  But outside of McAfee meetings, he never visited my
2    family.  I didn't visit his.
3            But over that multiple years you build up some
4    knowledge of people.  I would -- I wouldn't say Kent's the kind
5    of guy who lends himself to big emotional swings.  So he
6    doesn't read like a book, but you could get the usual feel you
7    would have with anybody, whether they are in a particularly
8    good or particularly bad mood.
9    **BY MR. LUCEY:**
10   **Q.**    Fair enough.
11           So, Mr. O'Leary, in terms of the process for figuring
12   out executive-level pay and the compensation package and the
13   stock options we talked about a moment ago, do you know, were
14   there any company rules or procedures that guided how those
15   stock options were awarded?
16   **A.**    Yes, there were very specific rules.
17   **Q.**    What kind of rules are we talking about?
18   **A.**    Well, there were rules on how the company was set up, and
19   also rules about how the SEC requires us to operate.
20           First, we have to file a plan that's approved by
21   shareholders that we lay out to our shareholders:  Here's what
22   we're planning on doing on compensation.  Here's the security
23   we're planning on using, and how much that we're planning on
24   using.
25           We don't have open-ended ability to pay anyone as

1  much --

2          (Reporter interrupts.)

3  **A.**    Sorry.  Open-ended ability to pay as much money as we

4  might like.  It has to be voted on by the shareholders.

5          So we had two plans for options.  One that had to do

6  with options being granted to directors of the company, and a

7  second one for options being granted to employees of the

8  company.

9  **Q.**    Maybe you could help us break down what the differences

10  are between those two types of options you just spoke about.

11  **A.**    Well, it gets to be technical, but they are generally

12  called NSOs or ISOs.  And they are slightly different

13  structures legally to have the option.

14          But, also, within the plans, the plans may have

15  different features that we're allowed to use on options,

16  depending on whether it's an ISO or NSO.

17          The key point I would mention is that, generally

18  speaking, the most important parts of the plans was how they

19  were granted, who they could be granted to, and how many.

20          And then the form we use throughout the years I was

21  with the company was consistent, whether it was an ISO or an

22  NSO.  It was always a 10-year option, and usually vesting in a

23  consistent fashion.

24          So we didn't do fancy stuff.  We didn't sort of do

25  options at a discount, granted on a forward basis, or ones that

1   had very unusual terms to them.  I would call them, regardless

2   of which plan, the same vanilla option, the same

3   characteristics to it.

4           There was also rules we had about the compensation,

5   about who was authorized to grant options to whom, and in what

6   way.

7   **Q.**   What kinds of rules did -- are you referring to there?

8   **A.**   Generally speaking, the options could only be approved by

9   the compensation committee at the board.

10          And in some situations, that compensation committee

11  delegated authority to a subset of the management team called

12  the spac (phonetic) or a special committee, that would be

13  allowed to do some option granting, for practical purposes,

14  that wouldn't require a full board or comp committee meeting.

15          Examples would be if we hired someone that wasn't a

16  particularly senior officer, and as part of that hiring we were

17  going to give them some options.  We wouldn't convene a meeting

18  just for a small grant for a single person.

19          So we delegated originally approximately 30,000

20  options could be granted by that committee.  And it had, my

21  recollection is, four executives from the company who would sit

22  on it and sign off, and could delegate a certain amount of or

23  issue a certain amount of options.

24          We later changed the number of options from

25  approximately 30,000 to something closer to 15- to 20,000, just

1  to keep tighter controls on what was given out other than

2  through the board.

3         But other than that committee and the comp committee,

4  no one else had the right to grant an option in the company.

5  **Q.**  Now, when you as a member of the compensation committee

6  acting as a group were considering and reviewing options, did

7  you consider one employee individually, or would you consider a

8  whole group of employees together in a group?

9  **A.**  We did both.  And depended on the situation.  At the

10 annual grant for senior executives, we would review each

11 individual executive and every component of their compensation,

12 including their options, to have a meeting of the minds that we

13 were paying them appropriately.

14        So there was a general buy-in from the full comp

15 committee that we were paying those senior executives the

16 appropriate amount of money.

17        The number of people getting options, in many case,

18 particularly at the annual grant, could include a thousand

19 employees or more.  So we would not review each of those people

20 in detail.  That was a process that we relied on management

21 for.

22        We would get a copy of the list of who was getting

23 options.  There would be a stack of paper, written in fine

24 font, of all the people getting options, and how many they were

25 getting.

1          And I can tell you personally, I would eyeball, page

2     by page with a pen, how many options were going out.  And if I

3     saw an unusually large number of options for someone at a more

4     junior level in the company, I may ask a couple of questions,

5     why is this person getting 5,000 options?

6          Just to give you an idea, an option might be worth,

7     as I said, 50 or 60 percent of a share of stock.  And if our

8     stock was trading at $30 a share, the value of the option could

9     be 15 to $18.

10          So if you saw someone getting 5,000 options, and

11     they're worth $18 each, that's $90,000 worth of compensation.

12     And if it was a junior-level person at the company, I wanted to

13     have a pretty good reason of why they were getting it.  There

14     had to be something special to suggest that that made sense.

15          But that's the level of review we would do beyond the

16     most senior officers.

17     Q.   Who would you depend upon to ensure that what the

18     compensation committee was doing was in compliance with the

19     rules and procedures of the company?

20          **MR. NEAL:**  Your Honor, just for clarity, the witness

21     joined the company in 2003.  So these questions are aimed at

22     what he has to say after he joined the company in 2003?

23          **MR. LUCEY:**  Correct.  For the time since he joined

24     the board.

25          **THE COURT:**  Yes.

1              **MR. LUCEY:**  Okay.

2  **BY MR. LUCEY:**

3  **Q.**   Do you have the question in mind?

4  **A.**   I'm sorry.  Could you repeat the question.

5              **THE COURT:**  I'm sure Mr. O'Leary knows that.  That

6  was for clarification, for the jury's purpose.

7  **BY MR. LUCEY:**

8  **Q.**   Mr. O'Leary, if you know, was there anyone that you as a

9  member of the compensation committee looked to, to ensure that

10  what you were doing in approving options was in conformity with

11  the rules and procedures of the company?

12  **A.**   Yes.

13  **Q.**   Who was that?

14  **A.**   Well, there were multiple people.  First, we relied on

15  human resources and the executives of the company to come up

16  with a recommendation on who should be getting how many options

17  and why and when.

18  **Q.**   Let me stop you there.  So the compensation committee is

19  not coming up with this list --

20  **A.**   No.

21  **Q.**   -- of folks --

22              (Reporter interrupts.)

23  **Q.**   The compensation committee is not putting together the

24  list of individuals who are going to receive annual grants or

25  grants as a group of employees?

1  **A.**   Quite frankly, the only executive that we would could up

2  with a recommendation on was the CEO.

3        Annually, we would decide how much the CEO should be

4  earning based on their performance.  And that was the one

5  executive where the comp committee would put down a number that

6  we think is the right number.

7        For everyone else in the company, the number would

8  essentially come from management.  Which, typically, pyramiding

9  through the company each person's boss would recommend how much

10 reward they should get.

11        And it would come up through the whole company, the

12 recommendations that your supervisor or the person who saw most

13 closely how well you were working.  And that would be

14 formulated into the general recommendation that we presented to

15 the comp committee.

16        So that included the management of the company.  The

17 heads of HR, would generally be the ones.  And then, finally,

18 including the management of the CEO, would look over that list

19 and say this is something I'm prepared to put before my comp

20 committee to get approval.

21 **Q.**   And what about ensuring that that list that you talked

22 about, of either individuals as a group or for particular

23 individuals who were maybe more senior, for all those

24 individuals that you were receiving proposed option packages,

25 besides HR being involved in that process, who else was

1    involved in ensuring there was compliance with the company's

2    rules and processes?

3    **A.**    Beyond the specific recommendations, we also have to make

4    sure that the aggregate number of options we were about to give

5    out was within the approved levels of the plans that were

6    approved by the shareholders.

7            So if the shareholders said they granted us the right

8    to give up to 30 million options over a period of time, we have

9    to keep track of how many times we had given out options and

10   what the running total was, so that we stayed in conformance

11   with that plan.

12           And we did that two ways.  One was periodically we

13   would have a review to say how much room do we have left on the

14   authority that the shareholders gave us?  So that at times we

15   would go back to the shareholders before we ran out of them, to

16   say, Recharge the bucket; give us another fresh bucket.

17           And, also, during the interim periods, each time we

18   did a grant we relied on our general counsel to make sure we

19   stayed in compliance with our plans.

20           The other person we relied on was once they were

21   granted -- I don't know if you want me to go through the other

22   part of it, once granted --

23   **Q.**    Please, yes.

24   **A.**    Once it was granted, we relied on the chief financial

25   officer and his staff that we accounted for them appropriately,

1  that we were following the current generally-accepted

2  accounting principles on how to record the expense associated

3  with the options the we had given out, so we were properly

4  recording them in the books and records of the company.

5          And we relied on HR to make sure that the

6  notifications got to the employees, and the employees

7  understood what they were getting.

8          And we relied on Kent to make sure that what we said

9  in the room, since the head of HR wasn't in the room with us,

10 and often on comp committee the CFO was not in the room with

11 us, we relied on our general counsel to make sure that what we

12 agreed to in the comp committee meetings was properly

13 communicated to the other executives.

14 Q.   And, Mr. O'Leary, during your time on the board of McAfee

15 and your time on the compensation committee, did you have an

16 expectation that once you and the other members of the

17 compensation committee approved a particular grant of options,

18 that grant would not be changed without receiving and obtaining

19 further board approval for that grant?

20 A.   That's correct.

21 Q.   And why is that?

22 A.   Well, there's no point in us going through the approval

23 process if the moment we approve it someone changes it to

24 something different.  That's prima facia to me, that there's no

25 point to having an authorized approval process if it can be

1  altered as soon as it's done.

2  Q.   Mr. O'Leary, you mentioned earlier and talked about McAfee

3  being a public company and McAfee having shareholders.

4        Did McAfee, as a public company over time, ever

5  conduct any meetings in order to convey information to their

6  shareholders?

7  A.   Yes, we did.

8  Q.   And what are those meetings called?

9  A.   Annual meetings.  Annual shareholder meetings.

10       (Reporter interrupts.)

11 Q.   And what takes place at annual shareholders meetings?

12 A.   Shareholders meetings can be beyond just an annual

13 meeting, but that's unusual.  It would be a special event might

14 call a shareholder meeting, like someone trying to buy the

15 company in a hostile way.

16       But, generally speaking, for most companies most

17 times, it's once a year.  And it's a time when the company is

18 doing business with its shareholders in a public way, and

19 invites them to attend physically to vote on issues and to also

20 go through a review of how the company's progress has been.

21 Q.   And did McAfee, in fact, conduct such annual shareholders

22 meetings since you've been on the board at McAfee?

23 A.   Yes, we did.

24 Q.   And do you recall McAfee conducting such a shareholder

25 meeting in 2006?

1    **A.**    Yes, I do.

2    **Q.**    Do you recall when in 2006 that shareholder meeting took

3    place?

4    **A.**    I believe it was May 27th.

5    **Q.**    And where was that meeting held?

6    **A.**    At the New York Hilton on Sixth Avenue in Manhattan.

7    **Q.**    And did you attend that meeting?

8    **A.**    Yes, I did.

9    **Q.**    And at some point during the -- the -- over the course of

10   the shareholder meeting in May, did you have a chance to meet

11   with the defendant?

12   **A.**    Yes, I did.

13   **Q.**    And what was -- was there anything that preceded that

14   meeting with the defendant around the time of the shareholder

15   meeting?

16   **A.**    Yes, there was.

17   **Q.**    And what happened?

18   **A.**    I arrived at the New York Hilton ahead of time for the

19   shareholder meeting, and went downstairs to the rooms where we

20   were holding these meetings.  And I -- well, do you want me to

21   talk about just when I met with Kent, or what happened that

22   morning?

23   **Q.**    Let me ask you this.  You met with Mr. Roberts at some

24   point during that day?

25   **A.**    Yes.

1  Q.   Did you have a meeting with anyone else prior to meeting

2  with Mr. Roberts?

3  A.   Yes, I did.

4  Q.   And without telling us what anyone else may have told you

5  prior to meeting Mr. Roberts -- I don't want to have you give

6  hearsay in court here -- did you take any action following a

7  meeting with anyone else?

8  A.   Yes, I did.

9  Q.   Who was this meeting with?

10 A.   I meet with George Samenuk, our CEO, and Bob Dutkowsky,

11 our lead director, immediately upon arriving at the Hilton.

12 Q.   Can you give any sense of how long that meeting lasted?

13 A.   That lasted between probably 10 to 15 minutes.

14 Q.   And, again, without tell us what they said to you, can you

15 describe their emotional state?

16 A.   Yes.  When I approached them, they weren't smiling.  And

17 that's a warning sign for me, because I like to have people

18 smile when they see me.  And we were very cordial and we

19 generally did like to see each other.  And they were clearly in

20 a negative mood.

21 Q.   What was your reaction to that?

22 A.   My reaction was I walked up and said, "What's cooking?"

23 Because I knew something was wrong.

24 Q.   And then you went ahead and had a conversation with the

25 two of them?

1   **A.**    I did.

2   **Q.**    And then following that conversation, did you take any

3   action in response to it?

4   **A.**    Yes, I did.

5   **Q.**    And what was that?

6   **A.**    And I made sure we altered the way we were going to handle

7   the shareholder meeting that morning.

8   **Q.**    In what way?

9   **A.**    Uhm, the original plan was that Kent Roberts would conduct

10  the meeting.  Our tradition was our general counsel would

11  oversee the general meeting and our CEO would speak at it.  And

12  then the directors would attend in case any shareholder had a

13  question.

14          I liked to be there each year in case someone didn't

15  like anything we were to doing, so I could respond to them

16  directly.

17          And that day, instead of having Kent oversee the

18  meeting I made sure -- along with George and Bob -- that Kent

19  would not conduct the meeting.

20  **Q.**    And I should ask you, who is Bob?

21  **A.**    Bob Dutkowsky, who's our lead director.

22  **Q.**    On the board of directors?

23  **A.**    On the board of directors.

24          (Reporter interrupts.)

25  **Q.**    So it's fair to say, up until this point in time, the

1  defendant, Mr. Roberts, would typically act as what amounted to

2  the master of ceremonies, the emcee, at these annual

3  shareholder meetings?

4  **A.**    That's correct.

5  **Q.**    But not on this occasion?

6  **A.**    No.

7  **Q.**    Who took over that role that day?

8  **A.**    Another attorney on Kent's staff, Clarence Brown.

9  **Q.**    And was that meeting, in fact, then conducted by Mr. Brown

10 leading it?

11 **A.**    Yes, it was.

12 **Q.**    And following that meeting, did you have an opportunity to

13 meet with Mr. Roberts?

14 **A.**    Yes, I did.

15 **Q.**    And where did that meeting take place?

16 **A.**    On the same floor, in a separate room.

17 **Q.**    And still in the New York Hilton?

18 **A.**    That's correct.

19 **Q.**    Was that meeting attended by anyone else, or was it just a

20 one-on-one meeting?

21 **A.**    That was Kent and myself one-on-one with the door closed.

22 **Q.**    I'm going to hand you now a document previously marked as

23 Government's Exhibit 136.

24         Now, Mr. O'Leary, before we talk about that meeting

25 with Mr. Roberts, is there anything that would help you

1    remember the conversation you had with Mr. Roberts that day?

2    **A.**    This exhibit is a copy of the notes I took directly after

3    my meeting with Kent Roberts, within -- within 30 minutes of

4    the meeting.

5    **Q.**    And did you write those notes yourself?

6    **A.**    Yes, I did.

7    **Q.**    And you mentioned you wrote them down within how many --

8    how long after the meeting took place?

9    **A.**    I would estimate no longer than 30 minutes following the

10    meeting.

11    **Q.**    Mr. O'Leary, could you just take a moment to review that

12    document?  And I'll have some questions for you.

13              **MR. NEAL:**  Well, Your Honor, I object to doing it

14    that way.  I think the witness should first be asked what he

15    remembers.

16              **MR. LUCEY:**  That's fine.

17              **MR. NEAL:**  It's a hearsay document.

18              **THE COURT:**  Yes.  If you're using this to refresh his

19    recollection, there has been no testimony that he doesn't

20    recall.

21              **MR. LUCEY:**  Fair enough.

22              **THE COURT:**  Okay.

23    **BY MR. LUCEY:**

24    **Q.**    So, Mr. O'Leary, do you recall having a meeting with

25    Mr. Roberts that day?

1  **A.**    Yes, I do.

2  **Q.**    Could you walk us through how that meeting proceeded?

3  **A.**    Well, I was told by George Samenuk that Kent wanted to

4  speak with me one-on-one.  And directly after the shareholder

5  meeting, within five minutes, I would say, at the end of it,

6  Kent and I went into a room together, and we sat at a table,

7  closed the door.

8          And Kent said he had something he had to discuss with

9  me.  And he told me that approximately early part of 2000, he

10  had been promoted in the company, and as part of his promotion

11  he had been given an option grant for 20,000 shares of the

12  company's stock.

13          Sometime thereafter -- my recollection was a number

14  of months had passed, four to six months, I don't remember the

15  exact number -- he was speaking with the controller of the

16  company, named Terry Davis, and making it clear to Terry that

17  in the interim period between the time he had gotten the

18  options and when they were speaking the stock had gone way down

19  in value, meaning the options were a lot less valuable than he

20  thought they might be.  And in response, Terry Davis said,

21  "Well we can fix that," and went into a computer system on the

22  spot and modified the option to a different date that had the

23  effect of increasing -- or decreasing the strike price of the

24  option by close to $10.

25          What that meant was that if the option was exercised,

1   for every share of the 20,000 shares there could be as much as

2   an extra $10 of value received by Kent.

3           So that modification could be worth in the area of

4   $200,000, give or take, at a future date.

5   Q.   Mr. O'Leary, just to be clear, that last part you gave us,

6   the explanation of strike price and the change, was that

7   something you talked about with Mr. Roberts on that day, or you

8   were trying to explain what strike price means?

9   A.   I'm explaining what the strike price -- Kent just said to

10  me that Terry had gone into the system and modified the strike

11  price by close to $10.

12  Q.   So as we go through this afternoon more of that

13  conversation, if you could limit yourself just to what you and

14  Mr. Roberts talked about.  We can follow up with further

15  questions if there are any issues that are outstanding.

16          So, Mr. Roberts' shares of that part of -- he tells

17  you the information regarding Terry Davis and the change in the

18  price.  What else did Mr. Roberts say, as you recall?

19  A.   Well, Kent said he was somewhat surprised at Terry's

20  actions.  But based on what Terry said to him, and also his

21  respect for Terry's integrity as an officer, that he went along

22  with it.

23  Q.   Did he tell you anything else that day?

24  A.   Yes, he did.

25          So at this point I wasn't speaking at all.  I was

1  just listening.  I didn't want to interfere or put any -- cast

2  any judgment to what I was hearing.

3         He said that he had thought about it subsequent and

4  didn't feel right about it.  He had spoken to his wife about it

5  and decided that the -- he would not monetize the options, so

6  that he would not sell them and get the cash from them.

7  Q.    Did he say anything else?

8  A.    He said he had taken them out of his 10b5 plan, or a plan

9  that might have sold them, and that his intent was to let them

10 expire unused when they reached the 10-year mark.  And he said

11 he felt that was the best way to deal with it.

12        He also said that he was sorry for what had happened,

13 and that he knew it was a problem for the company, and that he

14 was -- he was sorry.  So that was, essentially, the end of his

15 comments.

16 Q     Did -- did Mr. Roberts on occasion tell you about any

17 communications he had had up to that point with Mr. Samenuk

18 about this information?

19 A     Yeah, I should say that.  He said also that -- I have to

20 look at this a little bit, but that he had wanted to talk to

21 George about it, that -- at that time we were conducting a

22 investigation about options in the company, an audit regarding

23 options in the company.  And that in addition to our chief

24 auditor, our chief financial officer were working actively on

25 that audit of options, and had called Kent with some questions.

```
 1              Kent said to me that he had not responded to Eric's
 2    calls because he wanted to speak to George first.  And that he
 3    had spoken to George about this already.  The prior night, is
 4    my recollection.
 5              And I believe he also said he had spoken to one of
 6    the attorneys at Wilson, Sonsini the prior night.
 7    Q    And did he mention to you why he wanted to talk to
 8    Mr. Samenuk first?
 9    A    Just to tell him that this had occurred, same way he was
10    telling me.
11    Q    And what happened next in the conversation?  Do you recall
12    Mr. Roberts saying anything else?
13    A    There was some comment I'm not totally crisp on, but
14    essentially that he understood that this would impact his
15    ability to continue in his role, but he might be able to work
16    in some other capacity with us, going forward.
17              And I'm not 100-percent sure of the wording on that,
18    but there was some -- clearly a view that he would continue on
19    with the company.
20    Q    Did he say to you why he was having that thought about not
21    being able to remain in his then-current position of general
22    counsel?
23    A    No, but -- and that's the part I'm not crisp on, because I
24    didn't have it in my notes.  But I recall -- the reason I'm
25    being clear here is I recall him saying something along those
```

1   lines, maybe "strategic planning" or something like that, but I

2   don't have the specific words.

3           But clearly it was that he felt he would still work

4   with the company.

5   **Q**   And, at this point in the meeting with Mr. Roberts, did

6   you have any response -- you have indicated to us earlier that

7   you -- that was essentially a monologue from --

8   **A**   Right.

9   **Q**   -- Mr. Roberts to you?

10  **A**   Right.

11  **Q**   Did you have any response back?

12  **A**   I was -- I mean, to be quite hon- -- I was blown away by

13  what I had heard.  And I didn't want to express how upset I

14  was, but I did say -- at that point he had pretty much said

15  everything he was going to say, and I waited, and there was no

16  more forthcoming.

17          At that point, I said I needed to say a few things.

18  So the first thing I said was "First, Kent, you're in for a

19  tough time.  And I feel for you.  This is not going to be an

20  easy period ahead of you."

21  **Q**   What else did you say?

22  **A**   I said, "Secondly, I think that the first step in this

23  process is you should start being honest, and in particular,

24  being honest with yourself.  And I don't think that you are."

25          I said, "When you said the easiest thing to do was

1  let these expire, that's not the easiest thing.  That is the --
2  I mean the best thing to do is let these things expire.  It was
3  not the best thing, it was the easiest thing.  That the proper
4  thing to do was, you had many chances over the years to come
5  forward and tell us about this, and you never did.  And what
6  you took was the easy route, rather than the proper route."

7          I also said that I -- that there was essentially --
8  that I was -- this was going to have a big impact on the
9  company, and also, quite frankly, had an impact on me, and I
10 was personally very disappointed, because I had gone in and met
11 with him as part of my diligence coming to the company.

12          And I had specific recollections of asking him, "Is
13 there anything I should know, or anything that's inappropriate,
14 or anything you would tell a friend who was thinking about
15 becoming a director?"  I was not anxious to join any company
16 that had problems that weren't business problems at that stage.

17          The prior management problems were supposedly behind
18 it.  There was a new team with a new CEO.  And I was very happy
19 to come in and help fix the company, but I didn't want to get
20 in bed with people that weren't operating the way I would
21 operate in business.

22          So, when we met, he had not been candid with me,
23 personally, and I took that as an affront.

24 Q     And you mentioned it to him that day?

25 A     I said that to him, specifically, how disappointed I was

1   that on a one-on-one basis he hadn't been candid with me when

2   we met.

3          I also felt personally that he has a very strong

4   compass of right and wrong.  I think he has activities outside

5   of work that made me feel that way, as well as my experience

6   with him.

7          And that I said to him, this must have been on his

8   mind every night since it happened, over the six-year period.

9   That it wasn't the kind of thing you forget.  It kind of sticks

10  with you like gum on your shoe, that you -- you don't forget

11  something like this.

12         So -- I'm trying to remember -- so I said, A, I was

13  disappointed on the effects of the company, disappointed -- I

14  didn't think he was being honest with himself, or -- the way he

15  should be.

16         And finally I also said, "Now's the time to put

17  everything on the table.  Don't do Chinese water torture and

18  give us little bits at a time.  If there's a problem here, and

19  there is, let's get everything on the table once, and get it

20  fixed right.  So, if there's anything else that you know of, I

21  need to know it now."

22         And, and finally, I also asked who else was involved,

23  who else was aware of this.  Was there anyone else in Human

24  Resources or anyone else in the company that was in the loop

25  about this thing happening.

1          And he said other than Terry and himself, he wasn't

2  aware of anyone else, which was surprising to me.  And I

3  specifically asked whether HR -- I was suspicious that HR could

4  not have been involved, or how could this happen with just two

5  people.  But, either way, it was at that point he said no one

6  else that he knew of.

7          And I asked if there were any other situations that

8  we should be aware of, and he mentioned a couple.  He said

9  there were a couple of things we should look into.  One was

10 that there was an option grant done a number of years back -- I

11 think around the year 2000, give or take.  And I don't remember

12 if he gave a specific date on the -- this one.

13         But it was with a company called SAS that had done

14 some consulting for McAfee.  And there was an employee in SAS

15 who was a -- I think had some relationship with Terry Davis,

16 and she had been granted options that we ought to take another

17 look at.

18         And finally, there was a focal grant that was done, I

19 believe in 2001.  A focal grant being the main corporate grant

20 where all employees get options.  And Kent said that they did a

21 10 million grant, but originally was a 7 million grant, and

22 that George had gone back and bumped it up to 10 million.

23         I said, "Well, what's wrong?"

24         And he said, "Well, that's just something you should

25 take another look at."

```
 1           So, that was essentially the other stuff.  I think
 2   pretty much at that point, that's around the time where Kent
 3   made some reference to that he was very sorry about this, but
 4   there were other things that he might be able to do in the
 5   company.  And I told him how disappointed I was.  And that's
 6   essentially how the meeting ended.
 7   Q    Other than saying he was sorry, did Mr. Roberts have any
 8   response to those points you were laying out for him?
 9   A    No.  Actually, he wasn't saying a lot to me as I talked to
10   him.  He was looking at me, and his eyes were down a bit.  But
11   the real conversation was Kent speaking until he stopped.
12           Because I didn't want to intervene with any kind
13   of -- it's hard for me not to show my judgmental attitude, so I
14   want to keep -- essentially shut up and let him talk for the
15   first part, so I wouldn't preempt him from saying anything.
16           And then on the second part, I asked him some of
17   these questions.  And I've pretty much given you the answers he
18   gave me.  But it wasn't a long meeting.  The whole meeting was,
19   I would say, less than 15 minutes.
20   Q    And what happened, following that meeting?  You and Mr.
21   Roberts left the room, I assume?
22   A    We left the room.  And I joined -- I understood that
23   Mr. Roberts had also met with Bob Dutkowsky, and I also
24   understood that he had talked to George Samenuk the prior
25   evening.
```

1           So I joined George Samenuk and Bobby Dutkowsky in

2   another room, and sat down with them.

3   Q    And again, without telling us what you talked about,

4   did -- what happened following that meeting?

5   A    We jointly agreed we had to take a number of actions

6   immediately.

7   Q    Let me ask you this.  Following that meeting with

8   Mr. Dutkowsky and Mr. Samenuk, at what point of that did you

9   create your notes for this meeting?

10  A    Directly thereafter.

11  Q    And, you mentioned actions were decided upon.  What

12  actions were decided upon at that point?

13  A    First we decided that we would put Kent on leave of

14  absence.  Our initial discussion was we should fire him now,

15  but we wanted to make sure we did it in an appropriate fashion.

16  And he had an employment contract, so we want to reference the

17  contract and speak to an attorney before we took an action.  So

18  we said we would first put him on leave of absence.

19          Secondly, we decided we would block any access he had

20  to the records of the company, or his files, so that nothing

21  would get altered.  And so we removed his laptop, and also his

22  ID.

23          And in addition, we made a call to the headquarters

24  to make sure that the guards wouldn't just wave him in, because

25  over time, they get to know senior managers, and they don't

1  check their ID, they just say, "Come on in." But we reaffirmed

2  with the guards that no one was to enter the building without

3  actually presenting ID, including the CEO. So, we affirmed

4  that physical access with a blocked.

5           We also decided we would immediately start -- call

6  independent counsel, that we had a real problem on our hands,

7  and that we wanted to get a totally objective, professional

8  party to initiate or -- or to start an investigation.

9           And, we also decided that we would have to check off

10 both talking to our outside counsel and any regulators that

11 were appropriate, whether the SEC or anyone else on the

12 regulatory side, to make sure that all notifications that were

13 appropriate were done.

14 **Q**    And were all those various actions and steps you just laid

15 out, were they in fact taken, to the best of your knowledge?

16 **A**    Yes, they were.

17 **Q**    And how quickly were those actions taken?

18 **A**    They were done immediately. I was present for some of

19 them, while we called out independent counsel. And I knew we

20 had taken the laptop. And I was also there when we called the

21 headquarters to make sure that the physical access was going to

22 be blocked.

23           So, there was a sense of urgency. And quite frankly,

24 I also wanted to make sure that someone who had greater

25 expertise than myself would try to interview Kent, also, before

1   the morning was over.

2   **Q**    And Mr. O'Leary, why did you and other members of the

3   board and senior management act so quickly upon this?

4           **MR. NEAL:**  Object to relevance.  He can't testify to

5   what other members of the board were thinking, and why they did

6   it.

7           **THE COURT:**  And what is the relevance as to why they

8   acted so quickly?

9           **MR. LUCEY:**  Well, Your Honor, obviously Mr. Roberts

10  was, at the time, general counsel of the company.  And, given

11  the testimony offered earlier in this case from other

12  individuals about -- and from Mr. O'Leary including his duty as

13  a member of the Board of Directors, who has duties to the

14  shareholders of the company, why they need to act that quickly

15  in terms of his duties as a member of the Board of Directors.

16          **THE COURT:**  But that's not -- that's really not an

17  issue.

18          **MR. NEAL:**  Right.

19          **THE COURT:**  So, the objection is sustained.

20          And, and how much longer do you have?

21          **MR. LUCEY:**  I'm just about done, Your Honor.  I'll

22  check with my Co-counsel right now.

23          **THE COURT:**  Okay.  Now, I assume you are going to be

24  a while on cross-examination, right?

25          **MR. NEAL:**  Oh, absolutely.  But not --

```
 1              THE COURT:  Not today.  Not today.  And so, I guess,
 2    Mr. O'Leary is going to have to come back on Tuesday then.
 3              MR. LUCEY:  I think it's --
 4              THE WITNESS:  I was looking forward to an airline
 5    meal.
 6              THE COURT:  Not a meal here in San Francisco?
 7              THE WITNESS:  Well, those are better.  A lot better.
 8              THE COURT:  Yeah.  You can't stay the weekend?
 9              THE WITNESS:  No, I have to go back.
10              THE COURT:  Oh, dear.  Then you will have to come
11    back on Tuesday.
12              THE WITNESS:  I will come back, I will be here.
13              THE COURT:  Okay.  Whatever works.  Anything further?
14              MR. LUCEY:  Just one, one brief line of questions.
15              THE COURT:  We will finish up with your direct, and
16    then we can start with cross on Tuesday.
17              MR. LUCEY:  Very quickly, Your Honor, and I'll be
18    done here.
19    BY MR. LUCEY:
20    Q    Now --
21    A    I left one thing out.
22    Q    Please.
23              MR. NEAL:  Your Honor, there's no question pending.
24              THE COURT:  That's correct.  There isn't.  Was it
25    responsive to an earlier question?
```

1          **THE WITNESS:**  Yes, it was, yeah.

2          **THE COURT:**  Okay.

3          **THE WITNESS:**  I'm trying to remember what it was.  It

4   just slipped my mind again.  Same synapse is faulty.  It will

5   come back to me.

6          There was one other thing we did when we spoke.  And

7   it's in my notes, but I can't -- if I look at my notes I'll

8   remember.

9          **THE COURT:**  If you want to look at your notes, you

10  can refresh your recollection.

11  **BY MR. LUCEY**

12  **Q**   Why don't you go ahead and take a moment to look at your

13  notes, Mr. O'Leary.

14         **THE COURT:**  Now he really can look at his notes.

15         **MR. LUCEY:**  Fair enough.

16         (Witness examines documents)

17         **THE WITNESS:**  Oh.

18  BY MR. LUCEY

19  **Q**   Mr. O'Leary, so now you have had a chance to look at your

20  notes from 2006.  Does that refresh your recollection?

21  **A**   Yeah, they're pretty consistent with what I just said.

22  The one -- only one thing I didn't mention was -- oh, man.

23  It's just -- I'm sorry.

24  **Q**   Why don't you try one more time, and then we will try an

25  alternative if that doesn't work.

| | |
|---|---|
| 1 | **THE COURT:**  Past recollection recorded? |
| 2 | **MR. LUCEY:**  That's Plan B, Your Honor. |
| 3 | **THE COURT:**  Always have a plan. |
| 4 | (Witness examines documents) |
| 5 | **THE WITNESS:**  It will come back to me.  I'm sorry. |
| 6 | It wasn't a major thing.  It was just a minor nuance. |
| 7 | **BY MR. LUCEY** |
| 8 | **Q**    Maybe I can help, since you are on the stand today, and |
| 9 | I'm sure that Judge Patel wants me to finish up with your |
| 10 | examination today, before the defense starts up again on |
| 11 | Tuesday.  So -- |
| 12 | **A**    Ah, I got it. |
| 13 | **Q**    Okay. |
| 14 | **A**    The other part was I asked George and Bob about the two |
| 15 | things that Kent had mentioned to me about the SAS grant -- |
| 16 | **MR. NEAL:**  Objection, Your Honor.  This is hearsay. |
| 17 | **THE COURT:**  Well, it's not offered for the truth of |
| 18 | the matter.  Other than what he says he told them, you know. |
| 19 | So, the objection is overruled. |
| 20 | You may answer.  Now, you've forgotten again? |
| 21 | **THE WITNESS:**  No, I've got it this time.  I'm sorry. |
| 22 | But, I did follow up on the information that Kent had |
| 23 | said to me, about two other items.  So, I immediately said to |
| 24 | George and Bob that he mentioned these two things, the focal |
| 25 | grant and the SAS option. |

1    And George and Bob both told me that they had been

2    previously reviewed in the earlier restatement we had gone

3    through as a company, and there was no news there.  And that

4    they were properly approved by -- George said the focal was

5    properly approved by the board, and that the SAS was already

6    disclosed in the prior restatement.

7    **BY MR. LUCEY**

8    **Q**    So, is it fair to say, Mr. O'Leary, you wanted to make

9    sure that you followed up on all the information Mr. Roberts

10   conveyed to you that day?

11   **A**    Yes.

12   **Q**    So, one last topic, Mr. O'Leary.  You mentioned during the

13   course of your conversation with Mr. Roberts in May, 2006 when

14   he told you this information, that you had had a conversation

15   with him or you reminded him of a conversation you had way

16   back, before you even joined the board.

17        What were you talking about there?  You had a

18   conversation with Mr. Roberts in 2003?

19   **A**    Yeah.  Well, joining the Board of Directors is something

20   that's -- can be very interesting and enjoyable, but it can

21   also be a real problem, because you take on legal liability as

22   a director of a company.  You have a duty of care to that

23   company, and a fiduciary responsibility to the shareholders.

24   And the number-one issue is, of all the things you look at, is

25   who are the people you are going to be associated with.  And do

1   you trust them.

2          And I had gone up to a good friend of mine at

3   Harvard, who is a professor there, to just sort of say, "Hey,

4   you serve on a lot of boards.  What's your criteria?"

5          And based on that, when I was being invited to a

6   number of boards at that time, I went around and sort of

7   reinforced the idea that I wanted to sit one-on-one with the

8   people who are running the company, and look them in the eye,

9   and get a feeling whether I could trust them, because my

10  reputation would end up going where theirs did, and where the

11  company's was.

12         So I wanted to get a feeling that I was dealing with

13  people who were very straight shooters.  And very competent.

14  Those were the two things I wanted.

15  **Q**    And that was why you traveled out to visit McAfee before

16  you joined the board?

17  **A**    Strictly to do diligence that I was comfortable with who I

18  was going to be working with, going forward.

19  **Q**    And you met with Mr. Roberts?

20  **A**    Yes, I did.

21  **Q**    And what question did you put to him?

22  **A**    I asked him specifically, in addition to a bunch of

23  questions about the company, and pending litigation, and things

24  like that, I also asked him if there was anything I should know

25  about or that he would tell a friend who was thinking about

1    joining the company, that was an item of concern in any way,

2    shape or form.

3    **Q**    And what -- and what did Mr. Roberts say in response to

4    that question?

5    **A**    He said no, that essentially things are on the table, and

6    that the company is now -- you know, had its problems, but now

7    we were in pretty good form.

8              **MR. LUCEY:**  I have nothing further, Your Honor.

9              **THE COURT:**  Okay.  You may step down, to return on

10   Tuesday morning, at 8:30.  That's when we will be starting.

11   And we will continue with your testimony.

12             Or, is there some witness we have to take out of

13   order for some reason?

14             **MS. BEELER:**  No.

15             **MR. NEAL:**  And Your Honor, the witness is

16   sequestered?

17             **MS. BEELER:**  Oh, he's not going to talk to any other

18   witnesses, right?

19             **THE COURT:**  I'm going to instruct him in just a

20   minute.  I always do, don't I?

21             You are not to discuss your testimony with any other

22   persons who may be witnesses in this proceeding, at all, until

23   you have been excused from testifying in the case.

24             **THE WITNESS:**  All right.

25             **THE COURT:**  Thank you.

```
 1              THE WITNESS:  Thank you.

 2              (Witness excused)

 3              THE COURT:  And, ladies and gentlemen, you are

 4   excused for the weekend.  Now, just put this out of your mind

 5   and think about, dwell on other things.

 6              But, importantly, don't form or express any opinion

 7   based upon what you've heard so far.  Do not discuss anything

 8   about the case, you know, with family members, close personal

 9   friends, or strangers, or anybody else.  The instructions that

10   I gave you earlier apply in all respects.

11              And, don't go Googling "McAfee," don't go looking up

12   anything, or trying to investigate or do your own research or

13   legal research.

14              In other words, have a good weekend.  Okay?  And

15   really, truly have a good one.  And we will see you on Tuesday

16   at 8:30.

17              Remember, please be here promptly at 8:30, so we can

18   all get started.

19              (Jury excused)

20              (Off-the-Record discussion)

21              (At 1:51 p.m. the proceedings were adjourned, to

22              recommence Tuesday, September 23, 2008 at 8:30 a.m.)

23                           -   -   -   -

24

25
```

1                          **I N D E X**

2  **PLAINTIFF'S WITNESSES**                        **PAGE**    **VOL.**

3  **THOMPSON, KANDIS**
   Cross Examination Resumed by Mr. Neal             485        5
4  Redirect Examination by Ms. Beeler               606        5

5  **O'LEARY, DENIS**
   (SWORN)                                           620        5
6  Direct Examination by Mr. Lucey                  621        5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| **I N D E X** | | | | |
| --- | --- | --- | --- | --- |
| **PLAINTIFF'S EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
| 120D | | | 523 | 5 |
| 150-B | | | 580 | 5 |

| **DEFENDANT'S EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
| --- | --- | --- | --- | --- |
| 1005 | | | 555 | 5 |
| 1007 | | | 535 | 5 |
| 1008 | | | 532 | 5 |
| 1009 | | | 536 | 5 |
| 1010 | | | 541 | 5 |
| 1012 | | | 543 | 5 |
| 1136 | | | 527 | 5 |
| 1548 | | | 501 | 5 |
| 1553 | | | 560 | 5 |
| 1557 | | | 549 | 5 |
| 1577 | | | 518 | 5 |
| 1578 | | | 504 | 5 |
| 1581 | | | 496 | 5 |
| 1594 | | | 529 | 5 |
| 1612 | | | 510 | 5 |
| 1621 | | | 571 | 5 |
| 1638 | | | 488 | 5 |
| 1645 | | | 520 | 5 |
| 1655 | | | 515 | 5 |
| 1692 | | | 538 | 5 |
| 1693 | | | 539 | 5 |
| 1694 | | | 558 | 5 |
| 1752 | | | 573 | 5 |
| 1754 | | | 513 | 5 |
| 1801 | | | 588 | 5 |
| 1838 | | | 564 | 5 |
| 2511 | | | 594 | 5 |

1

2                    **CERTIFICATE OF REPORTERS**

3          We, KATHERINE POWELL SULLIVAN and BELLE BALL, Official

4    Reporters for the United States Court, Northern District of

5    California, hereby certify that the foregoing proceedings in CR

6    07-0100 MHP, UNITED STATES OF AMERICA vs. KENT H. ROBERTS were

7    reported by us, certified shorthand reporters, and were

8    thereafter transcribed under our direction into typewriting;

9    that the foregoing is a full, complete and true record of said

10   proceedings at the time of filing.

11

12

13                     s/b Katherine Powell Sullivan
                       ----------------------------------------
14                Katherine Powell Sullivan, CSR #5812, RPR, CRR

15

16                     s/b Belle Ball
                       ----------------------------------------
17                 Belle Ball, CSR #8785, RMR, CRR

18

19                     Friday, September 19, 2008

20

21

22

23

24

25